UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 22cr10141 |
| ) | |
| SEAN O'DONOVAN, ) | Counts One and Two: Honest Services Wire Fraud |
| ) | (18 U.S.C. §§ 1343, 1346) |
| Defendant ) | |
| ) | Count Three: Bribery Concerning Programs |
| ) | Receiving Federal Funds |
| ) | (18 U.S.C. § 666(a)(2)) |
| ) | |
| ) | Forfeiture Allegation: |
| ) | (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)) |

INDICTMENT

At all times relevant to this Indictment:

GENERAL ALLEGATIONS

A. *Background*

1. The defendant, SEAN O'DONOVAN, was an attorney who resided in Somerville, Massachusetts.

2. The Client was a company involved in the cultivation and retail sale of medical and recreational marijuana in Massachusetts.

3. The CEO was employed as the Chief Executive Officer of the Client.

4. The Medford Chief of Police (the Chief) was an employee and agent of the City of Medford. As a municipal employee, the Chief owed a duty of honest services to the City of Medford and could not legally participate in a particular municipal matter in which, to his knowledge, his immediate family member had a financial interest.

5. Individual 1 was a close family relative of the Chief.

6. In calendar year 2021, the City of Medford received more than $10,000 from the United States government under a federal program involving a grant, subsidy, loan, guarantee, insurance, and other form of assistance.

B. *Recreational Marijuana Laws in Massachusetts*

7. In November 2016, the recreational sale and use of marijuana was legalized in the Commonwealth of Massachusetts. Massachusetts state law provided for the licensure and operation of recreational adult-use Marijuana Establishments (MEs) located in the Commonwealth of Massachusetts, which were regulated by the Massachusetts Cannabis Control Commission.

8. Before completing the Commission's application process to become an ME, an applicant was required by Massachusetts law to sign a Host Community Agreement (HCA) with the municipality in which the applicant intended to locate its ME. An HCA set forth the conditions of operation for the ME in the host municipality.

C. *O'DONOVAN's Representation of the Client*

9. In or around November 2018, the CEO approached O'DONOVAN for assistance in obtaining an HCA for the Client and the required local permits and approvals necessary to operate an ME in Medford, Massachusetts. O'DONOVAN prepared a Consulting Agreement, which obligated the Client to pay O'DONOVAN a monthly fee of $7,500 at least until the Client executed an HCA with Medford or it became clear that O'DONOVAN was unable to assist the Client in securing and finalizing an HCA with Medford. The Consulting Agreement also provided that, if the Client received an HCA with Medford and was permitted as a dispensary in Medford, the Client would pay O'DONOVAN one percent (1%) of the annual gross profit of the Client's Medford ME, which annual compensation would inure to the benefit of O'DONOVAN's heirs in

the event of his incapacitation or death. The value of O'DONOVAN's stake in the Client was estimated to be over $100,000 per year.

10. The Client entered into the Consulting Agreement with O'DONOVAN in or around December 2018, and began paying O'DONOVAN a monthly fee of $7,500 in or around January 2019 and continued making these payments until in or around January 2022.

D. *Marijuana Licensure in the City of Medford*

11. In November 2020, the City of Medford, Massachusetts adopted two ordinances, Ordinances 854 and 855, that established additional requirements and processes for operating an ME in Medford. Under the ordinances, only three (3) MEs were allowed within City limits.

12. Among other things, the ordinances provided for the establishment of a local Cannabis Advisory Committee (the Medford CAC) tasked with reviewing applications of interested parties seeking to operate MEs in Medford. The Medford CAC was composed of the Medford Chief of Police, the Medford Director of the Board of Health, the Medford Director of Diversity and Human Resources (or a designee), the Medford Director of Finance (or a designee), and the Medford Building Commissioner.

13. The Medford CAC was tasked with reviewing, interviewing, and ranking applicants for the Mayor of Medford, who would make the final decision on which three (3) applicants would be permitted to enter into HCAs with the City. Each member of the Medford CAC graded applicants based on a 150-point scale developed by the Medford CAC, considering such factors as (1) positive local impact, (2) operational plan, (3) management and ownership, and (4) community and equity. The Medford CAC then aggregated the scores of its members, ranked the applicants by their aggregate scores, and forwarded its rankings to the Mayor for consideration. The Mayor had final authority to enter into an HCA with an applicant on behalf of the City of Medford.

14. Applicants who obtained HCAs with the City of Medford were then required to obtain permission to operate in the City from the Medford Zoning Board of Appeals.

COUNTS ONE – TWO
Honest Services Wire Fraud
(18 U.S.C. §§ 1343 and 1346)

The Grand Jury charges:

15. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 14 of this Indictment.

A.  *The Scheme to Defraud*

16. Beginning in or around February 2021 and continuing until in or about December 2021, in the District of Massachusetts and elsewhere, the defendant,

SEAN O'DONOVAN,

knowingly devised and intended to devise a scheme and artifice to defraud and deprive the citizens of Medford, Massachusetts, and the City of Medford, Massachusetts, of their intangible right to the honest and faithful services of the Medford, Massachusetts Chief of Police, through bribery and kickbacks.

B.  *The Purpose of the Scheme*

17. The purpose of the scheme was for O'DONOVAN to unlawfully benefit and enrich himself through bribery and kickbacks.

C.  *The Manner and Means of the Scheme*

18. The manner and means by which O'DONOVAN carried out the scheme included, but were not limited to, the following:

19. O'DONOVAN, believing that he had reached a corrupt agreement with both Individual 1 and the Chief, corruptly gave, offered, and promised things of value to Individual 1

4

in exchange for official action from the Chief including (a) the Chief's favorable ranking of the Client's application before the Medford CAC for an HCA and (b) the Chief's agreement to advise and pressure the Mayor of Medford to enter into an HCA with the Client.

20. O'DONOVAN and Individual 1 met in parking lots and outside of various homes to discuss O'DONOVAN's requests for official actions favorable to the Client, to be performed by the Chief.

21. In exchange for the Chief's official actions, O'DONOVAN offered approximately $25,000 to Individual 1. During one of his meetings with Individual 1, O'DONOVAN hand delivered $2,000 in cash to Individual 1.

22. O'DONOVAN took steps to hide and cover up his activity, including through the concealment of material information, by proposing various mechanisms to disguise the true purpose of the planned bribe payments. For example:

    a. O'DONOVAN proposed falsely characterizing the payments as a loan to Individual 1.

    b. O'DONOVAN proposed vaguely and falsely referring to the payments as fees for "local municipal consulting" work performed by Individual 1, which O'DONOVAN suggested would protect O'DONOVAN in case "someone ever came knocking."

    c. O'DONOVAN proposed providing the bribe payments to Individual 1 in cash because, O'DONOVAN explained, "If I give you cash, there will be no trace."

D.   *Acts in Furtherance of the Scheme*

23.   The acts caused by O'DONOVAN in furtherance of the scheme included, but were not limited to, the following:

O'DONOVAN Initiates the Scheme

24.   On or about February 10, 2021, O'DONOVAN called Individual 1 and asked to meet Individual 1 in a parking lot in Somerville. During the meeting that day, O'DONOVAN told Individual 1 that he knew the Chief—Individual 1's close family relative—was on the Medford CAC and that O'DONOVAN represented a client (the Client) in the marijuana industry. O'DONOVAN proposed that Individual 1 speak with the Chief about the Client and told Individual 1 that O'DONOVAN would pay Individual 1 $25,000 for doing so.

25.   Shortly after the February 10, 2021 meeting with O'DONOVAN, Individual 1 reported the conversation to the Chief, and the Chief reported the conversation to the Federal Bureau of Investigation (FBI). Both the Chief and Individual 1 agreed to cooperate with the investigation that followed. Thereafter, between in or around February 2021 and December 2021, Individual 1 agreed to allow the FBI to record all telephone calls and in-person meetings between Individual 1 and O'DONOVAN. Individual 1 also agreed to preserve all text messages between Individual 1 and O'DONOVAN, and to provide these text messages to the FBI. The Chief was not aware of these subsequent communications between Individual 1 and O'DONOVAN, and during the process of scoring the applicants for HCAs, the Chief was not aware of the identity of the Client.

26.   Over the course of those communications, O'DONOVAN reached what he believed to be a corrupt agreement with the Chief and with Individual 1. Under this agreement, O'DONOVAN intended to offer the Chief a payment to Individual 1 and did in fact pay Individual

6

1 in exchange for (a) the Chief's agreement to provide a favorable formal ranking of the Client's application before the Medford CAC for an HCA and (b) the Chief's agreement to advise and pressure the Mayor of Medford to enter into an HCA with the Client.

O'DONOVAN's Communications with Individual 1 Between February 2021 and August 2021

27.     On or about February 22, 2021, O'DONOVAN met with Individual 1 in a Somerville, Massachusetts parking lot. O'DONOVAN asked if Individual 1 had been accompanied by anyone else: "You're alone, right?" O'DONOVAN explained his understanding of the Medford CAC's process and scoring criteria. O'DONOVAN provided the name of the Client, stated that he wanted to "try to get the edge 'cause I know everybody's trying to get the edge" in the HCA process, and said that the Chief "has the Mayor's ear." O'DONOVAN then told Individual 1 that he could "guarantee at a minimum 25, probably even 50"; would obtain the "50 grand," then "pay tax on it"; and "give you [Individual 1] the rest." O'DONOVAN also stated: "If we pull this off, for me, $2,500 bucks a month. I gotta work for it, but I'm on the books for years," but "if we don't get it, I don't get—I get nothing." O'DONOVAN then said: "If [the Chief] can square them—if [the Chief] can, we should have no problem."

28.     On or about April 26, 2021, O'DONOVAN met Individual 1 outside of O'DONOVAN's residence in Somerville. At the direction of the FBI, Individual 1 informed O'DONOVAN that Individual 1 had spoken with the Chief briefly about O'DONOVAN's offer. During this meeting, O'DONOVAN asked how he and Individual 1 could "proceed to let him [the Chief] know who it [the Client] is." O'DONOVAN highlighted (i) the Chief's exercise of official action (e.g., ranking the Client's application high before the Medford CAC); and (ii) the Chief's influence with the Mayor and the importance of the Chief's recommendation of the Client to the Mayor: "If [the Chief] goes like this, 'That guy gets five stars, this kid here gets three stars, and

that one gets one star, based on my evaluation,' that's all he has to do." O'DONOVAN told Individual 1, "Whoever [the Chief] gives the nod to, is gonna look great in [the Mayor's] eyes." O'DONOVAN also stated during this meeting: "You paint the picture so you can hide behind the fucking curtain, you do whatever the fuck you want."

29.　On or about April 26, 2021, minutes after meeting with Individual 1, O'DONOVAN sent an Apple iMessage to the CEO: "Working this thing hard just so you know my friend."

30.　On or before April 30, 2021, ten (10) businesses (including the Client) applied for HCAs before the Medford CAC.

31.　On or about August 26, 2021, there was a negative press story regarding the Client.

32.　On or about August 28, 2021, O'DONOVAN texted Individual 1 stating, "It's time," and followed up with another text message: "Tell him to vote [the Client] #1 as they are the best candidate for Medford legitimately."

O'DONOVAN's Communications with Individual 1 in September 2021 and Early October 2021

33.　On or about September 13, 2021, O'DONOVAN sent a text message to Individual 1 stating, "We simply need [the Chief] to score us high."

34.　On or about September 14, 2021, O'DONOVAN met with Individual 1 outside O'DONOVAN's relative's residence in Somerville. During the meeting, Individual 1 told O'DONOVAN that the Chief knew O'DONOVAN would pay Individual 1 if the Chief gave the Client's application for an HCA a high score. O'DONOVAN proposed paying Individual 1 in cash: "If I give you cash, there will be no trace." O'DONOVAN further clarified, "If he [the Chief] gives them a high vote and they get it, you're getting paid." After Individual 1 asked how he would be paid, O'DONOVAN responded: "Cash, I'll give you cash." O'DONOVAN explained

8

that the Client would "write me a check and I'll pay the taxes on it and I'll give you the difference," and added that "no one's going to fucking know about it." Later, during the same meeting, O'DONOVAN clarified that Individual 1 should tell the Chief that O'DONOVAN was not only asking for a high score for the Client, but that O'DONOVAN was also asking for the Chief to tell the Mayor that the Client is a good candidate and to encourage the Mayor to make a decision on the HCA quickly.

35. On or about September 29, 2021, O'DONOVAN met with Individual 1 outside O'DONOVAN's residence in Somerville. At the direction of the FBI, Individual 1 explained to O'DONOVAN that the Chief originally had not ranked the Client in the top three applicants for an HCA because of the negative press article, but that the Chief would change the Client's ranking because Individual 1 was being paid by O'DONOVAN. O'DONOVAN responded, "Beautiful," and when Individual 1 further explained that the Chief would rank the Client the number one applicant, O'DONOVAN replied, "Perfect," and gave Individual 1 a fist bump. Later in the meeting, O'DONOVAN agreed to a down payment in advance of the final Medford CAC rankings.

36. During the September 29, 2021 meeting, O'DONOVAN openly brainstormed ideas for covering up the true purpose of the payment. For example, O'DONOVAN proposed a "check from my office for five thousand dollars that you went and put in your account fuckin', before Wednesday, right? Would that be proof for [the Chief] that you're gonna get the other twenty?" O'DONOVAN later repeated that, in addition to the Chief scoring the Client's application for an HCA high, O'DONOVAN wanted a second official act from the Chief in exchange for the payment to Individual 1: "we need him to advocate to [the Mayor] for us because who knows what [the Mayor's] gonna do." O'DONOVAN then proposed a discussion with the CEO: "Let me do this, let me just say to him, [CEO], I want to give this kid five grand, you know, for, for now . . . for

9

working it, getting it done, um, ah, let me pay him from my account then there'll be a record of it, that I gave it to you, now I don't know if that's bad, that there's a record of it, but, why don't I say this, why don't I, I could, I could send an email that doesn't say Medford, I could say, '[Individual 1], thank you for helping me on the consulting matters'. . . so this way if someone saw the email it looks like you helped me in Somerville." O'DONOVAN then suggested a written contract, but backed off: "but that's not, I don't think that's good paper trail."

37. Approximately one hour after the September 29, 2021 meeting, O'DONOVAN called Individual 1 to propose an additional alternative way to make the bribe payment to Individual 1. O'DONOVAN proposed that O'DONOVAN give a $5,000 loan to Individual 1, which could be forgiven and supplemented with $20,000 if the Client obtained the HCA ("it's all based on success"), but which would be repaid if the Client did not obtain the HCA ("if it didn't work out you would have to pay me back"). O'DONOVAN explained: "If [the Chief] wants some assurance now . . . then I can give you a check from my office and it will be loan and ah, I'll just forgive the loan after success, and then get you another twenty." This was, O'DONOVAN explained, the "cleanest, fastest, and easiest way to do it."

38. In or around late September or early October 2021, O'DONOVAN told the CEO in a telephone call that O'DONOVAN wanted to hire Individual 1 as a consultant to the Client. On or about October 7, 2021, O'DONOVAN sent an Apple iMessage to the CEO: "Hi [CEO] – Do I have permission to higher [sic] a consultant for 25k? Will need to pay it upon success. I would recommend it." In a telephone call on or about October 7, 2021, the CEO rejected the proposal and told O'DONOVAN that the Client is an "above board company." O'DONOVAN never told the CEO that O'DONOVAN had agreed to pay Individual 1 in exchange for the Chief's

10

favorable formal ranking of the Client's HCA application and the Chief's agreement to advise and pressure the Mayor of Medford to enter into an HCA with the Client.

39. On or about October 7, 2021, O'DONOVAN met with Individual 1 outside of O'DONOVAN's relative's residence in Somerville. O'DONOVAN relayed that, instead of paying Individual 1 with a $25,000 check (for which Individual 1 would have to pay taxes and which could potentially be traceable), O'DONOVAN would pay Individual 1 a $5,000 cash advance, and $10,000 in cash "once we know it's all done." O'DONOVAN further stated that Individual 1 must return the $5,000 advance if the Client's HCA application were unsuccessful.

O'DONOVAN Provides Individual 1 With a $2,000 Cash Bribe Payment on October 11, 2021

40. On or about October 11, 2021, O'DONOVAN met with Individual 1 outside of O'DONOVAN's Somerville residence. O'DONOVAN handed Individual 1 $2,000 in cash and stated, "Take that . . . that's two grand." O'DONOVAN explained that the "fifteen grand is locked and loaded. As long as [the CEO] gets what he wants." O'DONOVAN told Individual 1 that the Client did not want to pay "five grand on the street, and then have [the Chief] have a change of heart, now we gotta ask for it back." O'DONOVAN stated to Individual 1 that, "I mean, we know government, right? You know that what could—what could be happening, anything is happening today changes in the morning when you wake up." O'DONOVAN closed by stating, "hopefully my guys score highest and then it goes to the Mayor," and "I'm hoping that [the Chief] can say to the Mayor, 'Give it to them,' you know?" O'DONOVAN never had conversations with the Client about paying Individual 1 cash.

O'DONOVAN'S Communications with Individual 1 From Mid-October 2021 to December 2021

41. On or about October 13, 2021, the Medford CAC held a public meeting to announce the total and average scores given to HCA applicants by the Medford CAC members. Prior to the

11

meeting, the individual members provided their personal scores to a facilitator, who tallied them for the public presentation. The Client was ranked first in the combined scoring, and the rankings were forwarded to the Medford Mayor.

42. On or about October 20, 2021, O'DONOVAN texted Individual 1, "Please call when free thx." On or about October 21, 2021, Individual 1 called O'DONOVAN, who reported to Individual 1 that "everything went really well," and then said, "what [the Mayor's] waiting for I don't know." O'DONOVAN then said, "Especially us because we were so on top, like so over the top with the scores et cetera that you know we need a little push, you know what I mean, and it's the right thing to do, and there's nothing wrong with it."

43. On or about October 26, 2021, O'DONOVAN texted Individual 1: "Any luck? What's [the Mayor] waiting for?"

44. On or about October 28, 2021, O'DONOVAN texted Individual 1, "Pls let me know when you might. [The CEO's] jonesing".

45. On or about December 2, 2021, O'DONOVAN texted Individual 1, "Hi. Nothing still huh?"

E.  *Execution of the Scheme*

46. On or about each of the dates set forth below, in the District of Massachusetts and elsewhere, the defendant,

SEAN O'DONOVAN,

for the purpose of executing the above-described scheme and artifice to defraud and deprive, knowingly transmitted and caused to be transmitted by means of wire communications in interstate commerce the writings, signs, signals, pictures, and sounds described below:

| Count | Approximate Date | Description |
|---|---|---|
| 1 | April 26, 2021 | Apple iMessage to CEO reading: "Working this thing hard just so you know my friend." |
| 2 | October 7, 2021 | Apple iMessage to CEO reading: "Hi [CEO] - Do I have permission to higher [sic] a consultant for 25k? Will need to pay it upon success. I would recommend it." |

All in violation of Title 18, United State Code, Sections 1343 and 1346.

## COUNT THREE
Bribery Concerning Programs Receiving Federal Funds
(18 U.S.C. § 666(a)(2))

The Grand Jury further charges:

47. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 45 of this Indictment.

48. Beginning no later than in or about September 2021 and continuing until in or about December 2021, in the District of Massachusetts and elsewhere, the defendant,

### SEAN O'DONOVAN,

corruptly gave, offered, and agreed to give a thing of value to a person, with intent to influence and reward an agent of a local government, namely, the City of Medford, in connection with any business, transaction and series of transactions of such local government involving anything of value of $5,000 or more, where such local government received benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan guarantee, insurance, and other form of Federal assistance in any one-year period, to wit: O'DONOVAN gave, offered and agreed to give Individual 1 money, intending to influence and reward the Medford, Massachusetts Chief of Police, a public official and employee of the City of Medford, in connection with the Chief's favorable ranking of the Client's application before the Medford CAC for an HCA and the Chief's agreement to advise and pressure the Mayor of Medford to enter into an HCA with the Client.

All in violation of Title 18, United States Code, Section 666(a)(2).

## FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

1.  Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Sections 1343, 1346, and 666, set forth in Counts One through Three, the defendant,

SEAN O'DONOVAN,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

2.  If any of the property described in Paragraph 1, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant –

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 1 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

A TRUE BILL

_Alaeia Picudomio_
FOREPERSON OF THE GRAND JURY

_____
KRISTINA E. BARCLAY
ASSISTANT U.S. ATTORNEY

_____
JONATHAN E. JACOBSON
TRIAL ATTORNEY, PUBLIC INTEGRITY SECTION

District of Massachusetts: __6-23__, 2022
Returned into the District Court by the Grand Jurors and filed.

                                            /s/ Thomas F. Quinn  6/23/22 @ 3:40pm
                                            DEPUTY CLERK