UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                    )
                                                    )
UNITED STATES OF AMERICA          )
                                                    )
v.                                                  )          No. 22-CR-10141
                                                    )
SEAN O'DONOVAN,                        )
                         Defendant           )
                                                    )
_____ )

## **MOTION TO DISMISS**

Now comes the defendant Sean O'Donovan, by and through undersigned counsel, and,

pursuant to Fed. R. Crim. P. 12, hereby respectfully moves this Honorable Court to dismiss

Counts 1, 2, and 3 of the Indictment in the above-captioned matter.  As grounds and reasons

therefor, Mr. O'Donovan states that the facts set forth in the Indictment, accepted as true for

purposes of this Motion to Dismiss, are legally insufficient to support a conviction for honest

services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346, or for federal program bribery in

violation of 18 U.S.C. § 666.

In short, the Indictment purports to allege that Mr. O'Donovan, a practicing attorney

representing a client applying for licensure of a marijuana establishment, engaged in a corrupt

*quid pro quo* agreement to influence an official with whom Mr. O'Donovan is not alleged to

have exchanged a single communication or to have offered or paid even $1 in benefits.  Instead,

the charges are entirely predicated upon Mr. O'Donovan's communications with the official's

relative, who is not alleged to have held any official position himself.  What's more, in his

communications with the relative, Mr. O'Donovan is alleged to have consistently explained his

1

proposal as a payment for legitimate and constitutionally protected lobbying, namely efforts, which at most, were to convince the official to vote in favor of Mr. O'Donovan's client which in fact was determined to have merited the highest score independent of any lobbying efforts, *see* Dkt. 1 ¶¶ 25, 41, and thereafter to request that the official advocate for the client with the Mayor who would have the final decision-making authority.  Construing the federal criminal statutes at issue to apply to such conduct would expose to federal prosecution a wide array of politically active individuals, including former colleagues, former employees, friends, and family members, who exercise some measure of informal influence on public officials.  It would also run the risk of chilling protected First Amendment lobbying activity and infringe upon the rights of states to regulate their own political systems.  Moreover, it would constitute an unprecedented expansion of the federal criminal law into matters traditionally governed by state and local laws and ethics rules, thus broadening the breadth of the criminal statutes at issue well beyond their core purposes.  As further grounds and reasons for his Motion, Mr. O'Donovan incorporates the below Memorandum of Law.

### REQUEST FOR ORAL ARGUMENT

Mr. O'Donovan respectfully requests that oral argument be held on this Motion.

### MEMORANDUM OF LAW

**A.     Background**[1]

Mr. O'Donovan stands charged with two counts of honest services wire fraud, *see* 18 U.S.C. §§ 1343 and 1346, and one count of federal program bribery, *see* 18 U.S.C. § 666.  These

---

[1] The below facts are taken from the Indictment and accepted as true only for purposes of this Motion to Dismiss.  Mr. O'Donovan reserves the right contest any and all of these facts at an eventual trial in this matter.

2

charges stem from Mr. O'Donovan's legal representation of a client (referred to only as the "Client" in the Indictment) seeking to open an adult recreational marijuana establishment in the city of Medford, Massachusetts.  A pair of November 2020 town ordinances prescribed the legal process for opening such an establishment.  *See* Dkt. 1 ¶ 11.  The ordinances created a local Cannabis Advisory Committee ("CAC") responsible for reviewing applications.  *See id.* ¶ 12. The five-member committee included the Medford Chief of Police ("Chief") and four other municipal officials.  *See id.*  Ultimately, after reviewing applications and interviewing applicants, the CAC was responsible for ranking the applications based on factors such as (1) positive local impact, (2) operational plan, (3) management and ownership, and (4) community and equity.  *See id.* ¶ 13.  The rankings would then be transmitted to the Mayor who made the final selection of three applicants that would be permitted to move forward.  *See id.*

Mr. O'Donovan was allegedly retained by the Client's CEO in November 2018 to assist in the foregoing process.  *See id.* ¶ 9.  The Indictment alleges that, in the course of the ensuing representation, Mr. O'Donovan "corruptly gave, offered, and promised things of value to Individual 1," *id.* ¶ 19, "a close family relative of the Chief," *id.* ¶ 5, "in exchange for official action from the Chief," namely "(a) the Chief's favorable ranking of the Client's application before the Medford CAC . . . and (b) the Chief's agreement to advise and pressure the Mayor" to select and enter a contract with the Client, *id.* ¶ 19.

Mr. O'Donovan is not alleged to have offered anything of value to the Chief.  In fact, the Indictment does not reference a single communication between the two.  Instead, the charges are solely predicated upon Mr. O'Donovan's interactions with Individual 1, a relative of the Chief who is not said to have held any official position whatsoever.  Those interactions began around

February 10, 2021, when Mr. O'Donovan allegedly met Individual 1 "in a parking lot in Somerville." *Id.* ¶ 24.[2]  At this initial meeting, the government alleges that Mr. O'Donovan simply asked Individual 1 to "speak with the Chief about the Client and told Individual 1 that O'DONOVAN would pay Individual 1 $25,000 for doing so." *Id.*  Unbeknownst to Mr. O'Donovan, the Chief, upon learning of the conversation from Individual 1, reported it to the FBI.  At that point, "Individual 1 agreed to allow the FBI to record all telephone calls and in-person meetings" with Mr. O'Donovan, as well as to provide all text messages with Mr. O'Donovan to the government. *Id.* ¶ 25.

Mr. O'Donovan and Individual 1 met two more times in early 2021, each time presumably with the government recording.  On February 22, 2021, Mr. O'Donovan said he wanted to "try to get the edge 'cause I know everybody's trying to get the edge" and that the Chief "has the Mayor's ear." *Id.* ¶ 27.  He reiterated his offer to pay Individual 1 $25,000, or possibly $50,000.[3]  *See id.*  About two months later, on April 26, 2021, the FBI directed Individual 1 to tell Mr. O'Donovan "that Individual 1 had spoken with the Chief briefly about O'DONOVAN's offer." *Id.* ¶ 28.  Mr. O'Donovan asked how they could let the Chief know who the Client was and highlighted the Chief's role in ranking applicants and making a recommendation to the Mayor. *See id.*  The articulated objectives of the lobbying as set forth by

---

[2] While the Indictment suggests a nefarious purpose underlying the decision to meet in parking lots or outside homes, the defense notes that such practice was not uncommon (and perhaps advisable) during the height of the COVID-19 pandemic.

[3] Although for purposes of this Motion it is the allegations in the Indictment that are to be evaluated against the imperatives of 18 U.S.C. §§ 1346 and 666, it should be noted that during many of the secretly recorded conversations attorney O'Donovan discussed the offers of payment in connection with Individual 1 being employed to provide future community liaison and/or consultant services only if the Client was selected for licensing.

Mr. O'Donovan were for Individual 1 to advocate for the Chief's evaluation of the Client's application and for him to thereafter recommend the Client to the Mayor – paradigmatic First Amendment protected activities within the heartland of everyday lobbying.

Conspicuously absent from the Indictment's description of this initial round of recorded conversations is any statement by either Mr. O'Donovan or Individual 1 tying the payment to Individual 1 to any official act by the Chief or offering the payment to Individual 1 as a conduit so that the ultimate beneficiary was the Chief.  Instead, on the face of the allegations, the discussion related to payment to Individual 1 for his efforts to convince the Chief to support the Client's application.  In fact, in August, Mr. O'Donovan allegedly instructed Individual 1 to tell the Chief to "vote [the Client] #1 as they are the best candidate for Medford legitimately."  *Id.* ¶ 32.

Almost five months after the prior meeting, Mr. O'Donovan and Individual 1 allegedly met again on September 14, 2021.  During this encounter, "Individual 1 told O'DONOVAN that the Chief knew O'DONOVAN would pay Individual 1 if the Chief gave the Client's application for an HCA a high score."  *Id.* ¶ 34.[4]  Mr. O'Donovan allegedly responded that if the Chief "gives them a high vote *and they get it*, you're getting paid," indicating that the payment would be in cash.[5]  *Id.* (emphasis added).  The two met again about two weeks later on September 29.

_____

[4] Notably, the Indictment does not quote Individual 1's statement on this issue, despite the fact that the government recorded the conversation and that the document quotes other statements allegedly made at the meeting.

[5] Mr. O'Donovan's alleged offer or agreement to pay Individual 1 in cash, absent allegations supporting a corrupt *quid pro quo* agreement to exchange payment for official acts, is not sufficient to establish bribery.  Indeed, in the politically sensitive area of lobbying, with endemic issues of the appearance of conflicts of interest that by themselves are outside the scope of 18 U.S.C. §§ 1346 and 666, there were a number of reasons why Mr. O'Donovan may have wished

"At the direction of the FBI, Individual 1 explained to O'DONOVAN that the Chief originally had not ranked the Client in the top three applicants . . . because of [a] negative press article, but that the Chief would change the Client's ranking because Individual 1 was being paid by O'DONOVAN." *Id.* ¶ 35.[6]  Mr. O'Donovan allegedly responded, "Beautiful." *Id.* On October 11, 2021, Mr. O'Donovan allegedly met Individual 1 and paid him $2,000 cash, with a promise of $15,000 total in the event the Client's application was successful. *See id.* ¶ 40.

## B.     Legal Standard

"An indictment is ripe for dismissal if the facts" alleged by the government "demonstrate that, as a matter of law, the prosecution will not be able to prove each of the elements of the charged offense." *United States v. Sidoo*, 468 F. Supp. 3d 428, 436 (D. Mass. 2020). Accordingly, a defendant may move to dismiss on the grounds that "the specific facts alleged . . . fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *United States v. Willis*, 844 F.3d 155, 162 (3d Cir. 2016) (citation omitted); *see also United States v. Enmons*, 410 U.S. 396, 412 (1973) (affirming dismissal of indictment where statute did not prohibit the conduct charged).

Such a challenge to the indictment is not precluded by mere general allegations setting forth the elements of the offense. While such general allegations are necessary, they are not sufficient to withstand a motion to dismiss, at least where the specific factual allegations set out

---

to avoid widespread knowledge of his arrangement with Individual 1, irrespective of any purported consciousness of guilt. Besides, two weeks later, on September 29, 2021 the discussion had evolved into paying Individual 1 by a "check from my office" and a "written contract," Dkt. 1 ¶ 36, and, later that day, via a loan, *id.* ¶ 37. These discussions of paying Individual 1 were repeatedly tied to the Client being selected. *See e.g.*, *id.* ¶ 37.

[6] Again, the Indictment fails to directly quote Individual 1's statement.

in the charging document do not amount to a violation of the relevant statute.  *See United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002) (rejecting government argument "that an indictment . . . charges an offense . . . as long as it recites in general terms the essential elements of the offense, even if the specific facts alleged in the charging instrument fail to satisfy those elements"), *abrogated on other grounds by Skilling v. United States*, 561 U.S. 358, 410 (2010); *United States v. Pirro*, 212 F.3d 86, 92-95 (2d Cir. 2000) (affirming dismissal of indictment where specific facts alleged did not satisfy all elements of charging statute).  In *Panarella*, the information charged that the defendant "knowingly and willingly assisted" another to avoid apprehension for honest services wire fraud. 277 F.3d at 684.  The defendant failed to "point to any specific statutory language that the charging instrument omitted" and, indeed, the document "track[ed] the language of the relevant statutory provisions nearly word for word."  *Id.*  In assessing the validity of the defendant's guilty plea, however, the Third Circuit did not stop there.  Instead, it proceeded to consider (but ultimately reject) the merits of the defendant's argument because "a charging document fails to state an offense if the specific facts alleged . . . fall beyond the scope of the relevant criminal statute."  *Id.* at 685; *see also United States v. Nosal*, No. 08-CR-0237, 2010 WL 934257, at *2 (N.D. Cal. Jan. 6, 2010) ("General conclusory allegations need not be credited . . . when they are belied by more specific allegations in the [indictment]." (citation omitted) (alteration in original)), *aff'd*, 676 F.3d 854 (9th Cir. 2012).  This analysis is part of the Court's "duty to review the Government's Indictment and confirm that a legally deficient charge does not go to the jury."  *United States v. Pimenta*, No. 14-CR-649, 2015 WL 6502098, at *5 (D.N.J. Oct. 27, 2015) (dismissing charge because factual allegations failed to satisfy element of offense).  "Indeed, it would be a waste of judicial

7

resources to conduct a trial, only to rule on a post-trial motion that the government's theory of criminal liability fails, no matter what facts it was able to establish at trial." *United States v. Heicklen*, 858 F. Supp. 2d 256, 262 n.5 (S.D.N.Y. 2012).

## C.    Argument

The Supreme Court has recently reaffirmed that the scope of the federal statutes at issue here is not unlimited.  They do not criminalize all conduct involving "deception, corruption, [or] abuse of power."  *Kelly v. United States*, 140 S. Ct. 1565, 1568 (2020).  More specifically, they do "not authorize federal prosecutors to set[] standards of disclosure and good government for local and state officials."  *Id.* at 1571 (quoting *McNally v. United States*, 483 U.S. 350, 360 (1987)).  Rather, the several states maintain "the prerogative to regulate the permissible scope of interactions between state officials and their constituents."  *McDonnell v. United States*, 579 U.S. 550, 576 (2016).  Ultimately, the statutory provisions at issue should not be construed to work "a sweeping expansion of federal criminal jurisdiction."  *Kelly*, 140 S. Ct. at 1574 (quoting *Cleveland v. United States*, 531 U.S. 12, 24 (2000)).  Rather, "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance." *United States v. Bass*, 404 U.S. 336, 349 (1971).  Here, the defense contends that the facts set forth in the Indictment do not satisfy either of the charging statutes as a matter of law.

1. *Failure to allege "core" bribery sufficient to constitute honest services fraud under the Supreme Court's narrowing construction of the statute*

Counts 1 and 2 of the Indictment allege honest services wire fraud.  The honest services statute defines the "scheme or artifice to defraud" necessary to support a wire fraud conviction to include schemes "to deprive another of the intangible right of honest services."  18 U.S.C. § 1346.  In *Skilling v. United States*, in order to avoid holding the statute unconstitutionally

vague, the Supreme Court adopted a narrowing construction limiting the scope of §1346 to "*only the bribe-and-kickback core of the pre-McNally case law.*" 561 U.S. 358, 408-09 (2010). For some time prior to the Supreme Court's 1987 *McNally* opinion, lower federal courts had applied the mail and wire fraud statutes to a variety of situations involving alleged deprivation of honest services. But *McNally* "stopped the development of the intangible-rights doctrine in its tracks," holding that the statutes were limited to the protection of property rights. *Id.* at 401. Congress responded by enacting § 1346, which the *Skilling* Court interpreted as intended to "incorporate the honest-services doctrine" recognized prior to *McNally*. *Id.* at 404.

The *Skilling* Court noted that the defendant's "vagueness challenge ha[d] force" because "honest-services decisions preceding *McNally* were not models of clarity or consistency." *Id.* at 405. As the Third Circuit had explained years prior:

> the plain language of § 1346 provides little guidance as to the conduct it prohibits. . . . Deprivation of honest services is perforce an imprecise standard, and rule of lenity concerns are particularly weighty in the context of prosecutions of political officials, since such prosecution may chill constitutionally protected political activity.

*United States v. Murphy*, 323 F.3d 102, 116 (3d Cir. 2003) (citation omitted). Despite this significant ambiguity at the edges of the doctrine, *Skilling* held that the honest services statute was salvageable at its "solid core," namely cases involving "offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes." 561 U.S. at 407. In these cases, "[t]he existence of a fiduciary relationship . . . was usually beyond dispute," including the "public official-public" duty. *Id.* n.41.

Here, there is no allegation of any benefit whatsoever flowing from Mr. O'Donovan to the Chief, the only party alleged to have owed a duty of honest services. This basic fact places

9

the present case decidedly outside the "core" of the pre-*McNally* honest services doctrine.  *See United States v. Urciuoli*, 513 F.3d 290, 294 (1st Cir. 2008) (citing "taking a bribe for a legislative vote" as an example of "core misconduct covered by the statute"); *Skilling*, 561 U.S. at 408 (citing *Urciuoli*'s description of "core misconduct" in support of narrowing construction). Every honest services bribery case cited by the *Skilling* Court as representative of that core doctrine is distinguishable on this basis.  *See, e.g.*, *Shushan v. United States*, 117 F.2d 110, 114 (5th Cir. 1941) (involving alleged payments to members of Levee Board); *United States v. Mandel*, 591 F.2d 1347, 1362 (4th Cir. 1979) (involving allegation that governor, "in return for certain financial and other benefits, took certain positions on racetrack legislation that was before the Maryland legislature"); *United States v. Sorich*, 523 F.3d 702, 707 ("[I]n most honest services cases, the defendant violates a fiduciary duty in return for cash —kickbacks, bribes, or other payments.").  In one analogous pre-*McNally* case where the alleged bribes were rental payments for the official's girlfriend, the court expressly acknowledged that such conduct "did ***not*** resemble the typical scenario in a mail fraud prosecution."  *United States v. Brown*, 540 F.2d 364, 374 (8th Cir. 1976) (emphasis added).  The *Skilling* Court cited *Brown*'s use of the word "typical" as referring to core cases involving bribes or kickbacks, reflecting its belief that promises of third-party benefits like the one alleged here fall outside that category.  *See* 561 U.S. at 408.

In fact, whether or not the alleged scheme must be intended to personally benefit the public official was an unsettled issue under the amorphous state of pre-*Skilling* honest services law.  *See Sorich*, 523 F.3d at 709 ("The defendants' argument that any private gain must go to the defendants themselves is not without basis, for we and other courts have not always been

consistent with our description of the requirement."); *see also Sorich v. United States*, 555 U.S. 1204, 1311 (2009) (Scalia, J., dissenting from denial of petition for writ of certiorari) (noting that the defendants "received no direct personal benefit from the patronage they doled out on behalf of their political masters," but that "the Seventh Circuit found it sufficient that the patronage *appointees*—who were not charged in the scheme—accrued private gain"); *Skilling*, 561 U.S. at 403 n.36 (citing but not deciding circuit split on this and other issues).

The defense is aware of no post-*Skilling* case applying the honest services fraud statute to criminalize a payment made to a third-party to lobby a public official, with no allegation that the official participated in making the arrangements or expected to receive any portion of the payment. By contrast, the few cases applying the statute to third-party benefits have involved direct participation by the party alleged to have owed the honest services (here, the public official). *See United States v. DeMizio*, No. 08-CR-336, 2012 WL 1020045, at *1-2 (Mar. 26, 2012) (private honest services fraud case predicated upon defendant's negotiation of "finder's fees" to be paid to his father and brother in connection with securities transactions in which those relatives had little or no involvement); *id.* at *11 (noting trial evidence that defendant's "motive in setting up the kickback scheme" was to "relieve[] himself of the obligation to assist the [family members] using his own wealth" (citation omitted)). Other courts have rejected indirect theories of bribery altogether. *See United States v. Jimenez*, No. 11-CR-197, 2011 WL 3652773, at *2 (M.D. Fla. Aug. 19, 2011) (granting judgment of acquittal on honest services count where "[t]he Government never contended that [the defendant] received a bribe but instead argue[d] that he indirectly received a kickback through monies paid to his wife"), *rev'd on other grounds*. The government's theory of prosecution in this case is, therefore, an unprecedented one.

11

Another issue on which there was no consensus prior to *Skilling* is whether honest services fraud requires a violation of state law. *See Skilling*, 561 U.S. at 403 n.36 (citing circuit split). The First Circuit held pre-*Skilling* that no state law violation was required. *See United States v. Sawyer*, 239 F.3d 31, 41 (1st Cir. 2001). Years later, but still before *Skilling*, the First Circuit took a less definitive stance on the issue observing that "[t]he relationship between state law and the federal honest services statute is unsettled," with the Fifth Circuit applying § 1346 "only to conduct that independently violates state law" and other circuits "den[ying] that state law plays any necessary role." *Urciuoli*, 513 F.3d at 298. The *Urciuoli* Court attempted to chart a middle course opining that, "in some circumstances, state law might bear on what 'services' are owed by a state [official]. But just how far state law might be a premise for honest services fraud, or, alternatively, might 'immunize' conduct that would otherwise be a federal crime, are tricky questions and may depend *inter alia* on precisely what the government has charged." *Id.* (citation omitted). The defense submits that, given the unsettled nature of the issue when *Skilling* was decided, the Court should construe the "core" of honest services fraud to require a violation of state law. *See Murphy*, 323 F.3d at 116 ("We . . . endorse (and are supported by) the decisions of other Courts of Appeals that have interpreted § 1346 more stringently and required a state law limiting principle for honest services fraud . . . .").

This limiting principle is applicable in the present case, where Mr. O'Donovan's alleged conduct did not, as a matter of law, violate any state statute, including ones addressing the relationship between public officials and people close to them advocating for official acts on behalf of clients. The provisions of the Massachusetts lobbying law are largely limited to "executive [or legislative] lobbying," defined to include "acts to influence or attempt to influence

the decision of any officer or employee of a city or town" *only* where such "acts are intended to

carry out a common purpose with executive lobbying *at the state level*."  Mass. Gen. Laws ch. 3,

§ 39 (emphasis added).  There is no allegation of such coordinated local-state lobbying efforts in

the present case.  To the contrary, the Indictment focuses narrowly and exclusively on the

Medford CAC and Mayor.

The Massachusetts public ethics laws, which do apply to municipal officials, do not

prohibit a family member from lobbying a public official but instead expressly contemplate that

an official may, with disclosure and approval, participate in a decision that affects the financial

interests of a close relative.  *See* Mass. Gen. Laws ch. 268A, § 19 (requiring any "municipal

employee who participates . . . in a particular matter in which to his knowledge . . . his

immediate family or partner . . . has a financial interest" to disclose that interest and obtain

approval prior to participating).  The Indictment is therefore flatly incorrect in its legal assertion

that the Chief "could not legally participate in a particular municipal matter in which, to his

knowledge, his immediate family member had a financial interest."  Dkt. 1 ¶ 4.  What's more,

the applicable state statute places the disclosure obligation squarely on the public official.

Because the state of Massachusetts has largely declined to regulate lobbying at the municipal

level, and because the town of Medford does not appear to have chosen to fill this void with its

own regulation, there was no legal obstacle to Mr. O'Donovan entering into an agreement with

Individual 1 to lobby his relative in exchange for payment contingent upon the success of the

lobbying efforts.  In these circumstances, where state law not only failed to prohibit but in fact

expressly contemplated the conduct alleged, the defense submits that the honest services fraud

statute should not apply.

2. *Failure to allege quid pro quo agreement to exchange payment for official acts, an element required for conviction on any count*

Both the honest services fraud statute and § 666 require *quid pro quo* bribery: "a specific intent to give or receive something of value *in exchange* for an official act." *United States v. Bravo Fernandez*, 722 F.3d 1, 19 (1st Cir. 2013) (quoting *United States v. Sun-Diamond Growers of Calif.*, 526 U.S. 398, 404-05 (1999)) (interpreting 18 U.S.C. § 666 to require *quid pro quo*); *United States v. Urciuoli*, 613 F.3d 11, 13-14 (1st Cir. 2010) (referring to government theory limited "to quid pro quo bribery" as "fit[ting] within the Supreme Court's recent interpretation of the honest services provision in *Skilling*").  And both charges require that the payment be intended to influence a public official in the performance of his official acts.[7]  *See* 18 U.S.C. § 666(a)(2) (proscribing payments "with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government"); *United States v. Martinez*, 994 F.3d 1, 6-7 (1st Cir. 2021) (referring to official act requirement in context of § 666); Dkt. 1 ¶ 4 (alleging that Chief "owed a duty of honest services to the City of Medford").[8]  The entire Indictment in this case is predicated upon the allegation that Mr. O'Donovan corruptly offered payment to Individual 1 in exchange for the Chief's official act of providing a favorable recommendation for the Client and/or advocating with the Mayor on its behalf.

---

[7] *See generally McDonnell v. United States*, 579 U.S. 550, 566-574 (2016), for what constitutes a cognizable official act.

[8] While the honest services statute, may, in certain circumstances, apply to alleged deprivation of honest services owed to a private organization (rather than a governmental body), *see, e.g.*, *United States v. Napout*, 963 F.3d 163, 184 (2d Cir. 2020), the only duty alleged in this Indictment is that of the Chief to the city of Medford.

The Indictment relies exclusively upon Mr. O'Donovan's alleged communications with Individual 1 to support a purported belief on Mr. O'Donovan's part that "he had reached a corrupt agreement with both Individual 1 and the Chief" to pay "Individual 1 in exchange for official action from the Chief." Dkt. 1 ¶ 19. But the specific factual allegations of the Indictment fall short of establishing such a *quid pro quo* exchange in multiple respects.

First, the Indictment fails to allege facts sufficient to prove Mr. O'Donovan's corrupt intent, meaning intent to "influence [an] official action," *Bravo Fernandez*, 722 F.3d at 24 (citation omitted). Instead, the alleged facts reflect Mr. O'Donovan's good-faith belief that he was paying Individual 1 to engage in lawful, legitimate, and constitutionally protected lobbying. More specifically, the Indictment alleges that Mr. O'Donovan sought to pay Individual 1 in exchange for Individual 1's efforts to convince the Chief of the merits of the Client's application. Indeed, in the February 10, 2021 meeting cited as the beginning of the "scheme," Mr. O'Donovan is alleged to have simply "proposed that Individual 1 speak with the Chief about the Client and told Individual 1 that O'DONOVAN would pay Individual 1 $25,000 for doing so." Dkt. 1 ¶ 24. Subsequent allegations are entirely consistent with Mr. O'Donovan seeking to pay for Individual 1's lobbying. In fact, more than six months after the initial contact, Mr. O'Donovan is alleged to have texted Individual 1 to tell the Chief "to vote [the Client] #1 as they are the best candidate for Medford legitimately." *Id.* ¶ 32; *see also id.* ¶ 34 (reflecting Mr. O'Donovan's alleged request for "the Chief to tell the Mayor that the Client is a good candidate").

There is nothing illegal about lobbying efforts like those allegedly proposed by Mr. O'Donovan here. In fact, to the contrary, the right to lobby public officials is protected by the

First Amendment to the U.S. Constitution. *See, e.g.*, *Citizens United v. FEC*, 558 U.S. 310, 369 (2010) ("[T]he Court has upheld registration and disclosure requirements on lobbyists, even though Congress has no power to ban lobbying itself."); *United States v. Sawyer*, 85 F.3d 713, 731 n.15 (1st Cir. 1996) ("[The defendant's] very job description required him to develop contacts in the Legislature, and, as with all lobbyists, his employment goal was to persuade and influence legislators to benefit certain interests.  Such endeavors, however, are protected by the right 'to petition the Government for a redress of grievance' guaranteed by the First Amendment of the United States Constitution; it would be impermissible to rely upon the lobbying position simpliciter to establish a corrupt intent to influence." (quoting *United States v. Harriss*, 347 U.S. 612, 625 (1954)); *cf. FEC v. Cruz*, 142 S. Ct. 1638, 1653 (2022) ("To be sure, the line between *quid pro quo* corruption and general influence may seem vague at times, but the distinction must be respected in order to safeguard basic First Amendment rights.  And in drawing that line, the First Amendment requires us to err on the side of protecting political speech rather than suppressing it." (citations omitted)).  Moreover, as noted above, Mr. O'Donovan's alleged conduct did not contravene any state law.[9]

The allegations also fail to satisfy the independent requirement of an agreement between Mr. O'Donovan and the Chief to exchange payment for official action.  In *Bravo-Fernandez*, the First Circuit held, in the face of a circuit split, that § 666 requires *quid pro quo* bribery, as opposed to mere illegal gratuities.  In doing so, the court observed that "[t]he core difference between a bribe and a gratuity is . . . the *quid pro quo*, or ***the agreement to exchange*** [a thing of

---

[9] The mere allegation that Mr. O'Donovan was told the Chief knew Individual 1 would get paid does not alter this analysis.  Lobbyists get paid as a matter of course, and lobbying is not transformed into bribery due to a public official's awareness of this basic fact.

value] for official action." 722 F.3d at 19 (citation omitted) (emphasis added). In other words, bribery "can be seen as having a two-way nexus." *United States v. Schaffer*, 183 F.3d 833, 841 (D.C. Cir. 1999), *vacated as moot*. It "typically involves an intent to affect the future actions of a public official through giving something of value, and receipt of that thing of value then motivates the official act." *Id.* (emphasis added). Illegal gratuities, "by contrast, require[] only a one-way nexus." *Id.*

Thus, in order for the government to prove a *quid pro quo*, the defendant contends it is not enough to establish the intent of just one party to the transaction. *See, e.g.*, *United States v. Terry*, 707 F.3d 607, 615 (6th Cir. 2013) ("A flow of benefits from one person to a public official, to be sure, does not by itself establish bribery. The benefits instead must be part and parcel of an agreement by the beneficiary to perform public acts for the patron."); *United States v. Jefferson*, 674 F.3d 332, 358 (4th Cir. 2012) ("[T]he public official's intent to perform acts for the payor—required for a bribery offense—is the exchange, or quid pro quo, missing from the illegal gratuity scenario."); *United States v. Siegelman*, 640 F.3d 1159, 1172 (11th Cir. 2011) (affirming instruction that "required the jury to find an agreement to exchange a specific official action for a campaign contribution"). While the official need not actually intend to take an official act in exchange for payment, he must at least convey such an intent to the payor in order for the requisite corrupt exchange to arise. *See, e.g.*, *United States v. Reichberg*, 5 F.4th 233, 247 (2d Cir. 2021) ("[S]o long as the parties to the bribe share an understanding that the payments were made in return for official action, . . . it is not necessary that the public official in fact intend to perform the contemplated official act." (citation omitted)).

17

Here, the allegations regarding the requisite agreement are insufficient.  Again, there is no allegation of even a single communication between Mr. O'Donovan and the Chief.  And Mr. O'Donovan's first several communications with Individual 1 reflect nothing more than legitimate lobbying activity, *i.e.* hiring Individual 1 to attempt to convince the Chief of the merits of the Client's application.  It was not until months later that Individual 1, "[a]t the direction of the FBI," allegedly said to Mr. O'Donovan "that the Chief originally had not ranked the Client in the top three applicants . . . , but that the Chief would change the Client's ranking because Individual 1 was being paid by" Mr. O'Donovan.  Dkt. 1 ¶ 35.  This conversation occurred about seven-and-a-half months after Mr. O'Donovan allegedly offered Individual 1 a payment of $25,000 for him to "speak with the Chief about the Client."  *Id.* ¶ 24.  In these circumstances, the Indictment alleges, at most, an illegal gratuity insufficient to support conviction on any count.  Individual 1 allegedly informed Mr. O'Donovan at this meeting that the Chief had already decided to "rank the Client the number one applicant."  *Id.* ¶ 35.  Mr. O'Donovan was not legally bound to reject this development, which was highly beneficial to his Client.  Indeed, this result was his goal in hiring Individual 1 to lobby the Chief.  The Chief's purported indication, specifically manufactured by the government and communicated indirectly via Individual 1, that his decision was based on the payment from Mr. O'Donovan does nothing to retrospectively alter Mr. O'Donovan's expressly stated intent in offering the payment.  Mr. O'Donovan's decision to go through with the previously proposed arrangement after the Chief was already said to have made a decision was, at worst, "a reward for some future act that" the Chief would "take (and may already have determined to take)."  *Bravo Fernandez*, 722 F.3d at 19 (citation omitted).

18

The defense contends that the foregoing facts easily distinguish this case from others in which courts have applied federal bribery laws to payments or other things of value given to family members of public officials.  For one thing, none of those other cases involved legitimate and constitutionally protected activity like the lobbying at issue here.  For another, in the prior cases the public official and the bribe payor personally arranged and agreed for payment to be made in exchange for official acts.  *See United States v. Krilich*, 159 F.3d 1020, 1024 (7th Cir. 1998) (affirming convictions where defendant and mayor "agreed to use" hole-in-one contest at golf tournament "as [a] vehicle for a payoff" by rigging the contest for the mayor's son to win $40,000); *United States v. Kemp*, 500 F.3d 257, 268-69 (3d Cir. 2007) (affirming convictions where defendants, a public official and a loan officer, discussed and agreed to issue a loan to official's brother-in-law despite "shaky credit" and without the loan officer "so much as seeing an application or speaking to the borrower"); *United States v. Skelos*, No. 15-CR-317, 2015 WL 6159326, at *5 (S.D.N.Y. Oct. 20, 2015) (citing allegation that public official "threatened to block legislation unless the Environmental Technology Company increased its payments to his son").  By contrast, where, as here, the defendant is alleged to have proposed a legitimate lobbying payment only to have, months later, the public official communicate via an intermediary that he decided to change his vote based on the fact of payment, the Court should rule that the alleged conduct does not constitute *quid pro quo* bribery.

3. *Applying the federal criminal statutes at issue to Mr. O'Donovan's alleged conduct would raise substantial Constitutional concerns, as articulated in a recently granted petition for writ of certiorari*

A contrary ruling permitting this prosecution to go forward despite the fact that Mr. O'Donovan is not alleged to have had any direct communication with the official he purportedly

sought to influence and that his alleged conduct violated no state or local regulation would effect

a significant and troubling expansion of federal criminal law.  The Supreme Court recently

granted a Petition for Writ of Certiorari in *Percoco v. United States*, attached hereto as Exhibit

A, raising the issue of whether "a private citizen who holds no elected office or government

employment, but has informal political or other influence over governmental decisionmaking,

owe[s] a fiduciary duty to the general public such that he can be convicted of honest-services

fraud."  In affirming application of the honest services statute in that circumstance, the Second

Circuit relied on a pre-*McNally* opinion by a divided panel.  The dissenting judge in that case

eloquently articulated the potential dangers of such a broad reading of the statute:

> we should recognize that a pluralistic political system assumes
> politically active persons will pursue power and self-interest.
> Participation in the political process is not limited to the pure of
> heart.  Quite frankly, I shudder at the prospect of partisan political
> activists being indicted for failing to act "impartially" in
> influencing governmental acts.  Where a statute, particularly a
> criminal statute, does not regulate specific behavior, enforcement
> of inchoate obligations should be by political rather than criminal
> sanctions.  Where Congress has not passed legislation specifying
> particular acts by the politically active as criminal, our reliance
> rather should be on public debate, a free press and an alert
> electorate.

*United States v. Margiotta*, 688 F.2d 108, 143 (2d Cir. 1982) (Winter, J., dissenting) (internal

footnote omitted).  The Third Circuit has rejected *Margiotta* and endorsed the reasoning of Judge

Winter's dissent.  *See Murphy*, 323 F.3d at 117-18 ("[W]e agree with Judge Winter that

*Margiotta* fails to provide any logical rationale for treating private party officials in the same

manner as public officials since such a loose interpretation of the mail fraud statute creates 'a

catch-all political crime which has no use but misuse.' (quoting *Margiotta*, 688 F.3d at 144

(Winter, J., dissenting))).

The defense acknowledges that *Percoco* is not on all-fours with this case.  There, the defendant alleged to have accepted the bribe was a non-public official found to have nonetheless owed a duty of honest services to the citizenry as a result of his informal influence over government actors.  Here, by contrast, the Indictment (at least nominally) alleges that Mr. O'Donovan sought to influence a public official (the Chief), indirectly by providing payment to a family member (Individual 1).  But the line distinguishing the cases is clearly a thin one.  If charges like those at issue here are permitted to go forward, the government would be able to easily evade any practical effect of an adverse ruling in *Percoco*.  It could simply allege an indirect attempt to influence the public official himself (as in this case) rather than a direct attempt to influence the non-official with informal sway over government actors.  This would do little to ameliorate what the *Percoco* Petition itself identifies as the "[p]erhaps most pernicious" result of the decision below, namely its offering "federal prosecutors a way to pursue the *family members* of public officials," who often "hold unparalleled access and influence within their offices and the government as a whole."  Exhibit A at 33 (emphasis in original).

The Court should reject a reading of the federal statutes at issue that would permit prosecution of such family members of public officials, and those with whom they interact like Mr. O'Donovan, to respect the states' "prerogative to regulate the permissible scope of interactions between state officials and their constituents."  *McDonnell*, 579 U.S. at 576.  Where, as here, "a more limited interpretation" of the statute "is supported by both text and precedent," the Court should "decline to 'construe [it] in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards' of 'good government for local and state officials.'"  *Id.* at 576-77 (quoting *McNally*, 483 U.S. at 360) (rejecting government's

"expansive" interpretation of bribery statute).  Permitting this prosecution to go forward would also "likely chill" protected First Amendment lobbying activity, which provides all the more reason for a more limited interpretation of the statutes.  *Id.* at 575.

**D.     Conclusion**

For the foregoing reasons, the specific facts alleged in the Indictment are insufficient as a matter of law to support a conviction under §§ 1343 and 1346, or § 666.  Accordingly, Mr. O'Donovan respectfully requests that the Court dismiss Counts 1, 2, and 3.

## COMPLIANCE WITH LOCAL RULE 7.1(a)(2)

Undersigned counsel conferred with the Government, and the Government opposes the relief requested in this Motion.

> Respectfully Submitted,
> SEAN O'DONOVAN
> By His Attorney,
>
> **/s/ Martin G. Weinberg**
> Martin G. Weinberg, Esq.
> Mass. Bar No. 519480
> 20 Park Plaza, Suite 1000
> Boston, MA 02116
> (617) 227-3700
> owlmgw@att.net

Dated: August 18, 2022

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, August 18, 2022, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

> **/s/ Martin G. Weinberg**
> Martin G. Weinberg, Esq.

22