No. 21-___

IN THE

# Supreme Court of the United States

JOSEPH PERCOCO,

*Petitioner*,

v.

UNITED STATES,

*Respondent.*

**On Petition For A Writ Of Certiorari
To The United States Court Of Appeals
For The Second Circuit**

**PETITION FOR A WRIT OF CERTIORARI**

| | |
|---|---|
| BARRY A. BOHRER | YAAKOV M. ROTH |
| MINTZ, LEVIN, COHN, | *Counsel of Record* |
| FERRIS, GLOVSKY & | BRETT WIERENGA |
| POPEO, P.C. | JONES DAY |
| 666 Third Ave. | 51 Louisiana Ave., NW |
| New York, NY 10017 | Washington, DC 20001 |
| | (202) 879-3939 |
| MICHAEL L. YAEGER | yroth@jonesday.com |
| CARLTON FIELDS, P.A. | |
| 405 Lexington Ave., | ELIZABETH G. BENTLEY |
| 36th Floor | JONES DAY |
| New York, NY 10174 | 90 South Seventh St., |
| | Suite 4950 |
| | Minneapolis, MN 55402 |

*Counsel for Petitioner*

i

## QUESTION PRESENTED

Does a private citizen who holds no elected office or government employment, but has informal political or other influence over governmental decisionmaking, owe a fiduciary duty to the general public such that he can be convicted of honest-services fraud?

ii

## PARTIES TO THE PROCEEDING

Petitioner, who was a Defendant-Appellant in the Second Circuit, is Joseph Percoco.

Respondent, who was the Appellee in the Second Circuit, is the United States.

Steven Aiello, Joseph Gerardi, Louis Ciminelli, and Alain Kaloyeros were also Defendants-Appellants in the Second Circuit.  Peter Galbraith Kelly, Jr., Michael Laipple, and Kevin Schuler were Defendants in the Second Circuit.

iii

## RELATED PROCEEDINGS

*United States of America v. Percoco, et al.*, No. 16-cr-00776-VEC-1, U.S. District Court for the Southern District of New York.  Judgment as to Mr. Percoco entered on September 25, 2018.

*United States of America v. Percoco, et al.*, No. 18-2990, consolidated with Nos. 18-3710, 19-1272, U.S. Court of Appeals for the Second Circuit.  Consolidated judgment entered on September 8, 2021.

iv

## TABLE OF CONTENTS

**Page**

QUESTION PRESENTED........................................i

PARTIES TO THE PROCEEDING ..........................ii

RELATED PROCEEDINGS ..................................iii

TABLE OF AUTHORITIES...................................vii

INTRODUCTION .................................................. 1

OPINION BELOW .................................................. 4

JURISDICTION ...................................................... 4

PROVISION INVOLVED......................................... 4

STATEMENT .......................................................... 4

    A.   Factual Background .................................. 5

    B.   District Court Proceedings........................ 6

    C.   The Second Circuit's Decision.................... 8

REASONS FOR GRANTING THE WRIT .............. 10

I.   THE THIRD CIRCUIT HAS EXPRESSLY
    REJECTED *MARGIOTTA*...................................... 11

    A.   The *Margiotta* Decision and Dissent ....... 11

    B.   The Circuit Conflict Over *Margiotta* ....... 16

    C.   The Panel's Revival of *Margiotta*............. 19

II.   *MARGIOTTA* WAS WRONG WHEN IT WAS
    DECIDED AND IS INDEFENSIBLE UNDER
    CURRENT LAW....................................................... 21

    A.   *Margiotta* Was Wrong from
        the Outset ................................................. 21

v

## TABLE OF CONTENTS
(continued)

**Page**

B. *Margiotta* Is Irreconcilable
with *Skilling* .............................................. 26

C. *Margiotta* Is Out-of-Step with This
Court's Modern Methodology .................. 28

III. THE DANGERS POSED BY *MARGIOTTA*
WARRANT THIS COURT'S ATTENTION ................ 31

CONCLUSION ........................................................ 34

APPENDIX A: Opinion of the United States
Court of Appeals for the Second Circuit
(Sept. 8, 2021) .................................................. 1a

APPENDIX B: Order of the United States
Court of Appeals for the Second Circuit
Denying Rehearing (Aiello)
(Nov. 1, 2021) ................................................ 47a

APPENDIX C: Order of the United States
Court of Appeals for the Second Circuit
Denying Rehearing (Ciminelli)
(Nov. 1, 2021) ................................................ 49a

APPENDIX D: Order of the United States
Court of Appeals for the Second Circuit
Denying Rehearing (Gerardi)
(Nov. 1, 2021) ................................................ 51a

APPENDIX E: Order of the United States
Court of Appeals for the Second Circuit
Denying Rehearing (Kaloyeros)
(Nov. 1, 2021) ................................................ 53a

vi

## TABLE OF CONTENTS
(continued)

**Page**

APPENDIX F: Order and Opinion of the
United States District Court for the
Southern District of New York
(Dec. 11, 2017) ................................................ 55a

APPENDIX G: Excerpts from Defendants-
Appellants' Appendix Volume II: Trial
Transcript (Jan. 24 & 25, 2018) .................. 118a

APPENDIX H: Excerpts from Defendants-
Appellants' Appendix Volume III: Jury
Instructions Draft (Feb. 23, 2018) ............... 126a

APPENDIX I: Excerpts from Jury Trial
(Feb. 26, 2018) ............................................. 136a

APPENDIX J: Excerpts from Jury Trial
(Mar. 1, 2018) ............................................... 139a

vii

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Cal. Democratic Party v. Jones,*
    530 U.S. 567 (2000) ............................................. 25

*Cheese Shop Int'l, Inc. v. Steele,*
    303 A.2d 689 (Del. Ch. 1973) ............................... 23

*Kelly v. United States,*
    140 S. Ct. 1565 (2020) .................................... 10, 29

*McDonnell v. United States,*
    136 S. Ct. 2355 (2016) .......................... 9, 10, 29, 30

*McNally v. United States,*
    483 U.S. 350 (1987) ......................................*passim*

*Mobil Oil Corp. v. Rubenfeld,*
    339 N.Y.S.2d 623 (Civ. Ct. 1972) ........................ 23

*Skilling v. United States,*
    561 U.S. 358 (2010) ......................................*passim*

*Trs. of Jesse Parker Williams*
    *Hosp. v. Nisbet,*
    191 Ga. 821 (1941) ............................................. 24

*United States v. Adler,*
    274 F. Supp. 2d 583 (S.D.N.Y. 2003) ......... 2, 16, 19

*United States v. Frost,*
    125 F.3d 346 (6th Cir. 1997) ............................... 19

*United States v. Gray,*
    790 F.2d 1290 (6th Cir. 1986) ........................ 17, 19

*United States v. Holzer,*
    840 F.2d 1343 (7th Cir. 1988) ............................. 19

viii

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Margiotta,*
   688 F.2d 108 (2d Cir. 1982).........................*passim*

*United States v. Margiotta,*
   811 F.2d 46 (2d Cir. 1982)................................... 16

*United States v. Murphy,*
   323 F.3d 102 (3d Cir. 2003).........................*passim*

*United States v. Smith,*
   985 F. Supp. 2d 547 (S.D.N.Y. 2014) .................. 19

*United States v. Sun-Diamond*
*Growers of Cal.,*
   526 U.S. 398 (1999) ............................................. 28

*United States v. Turner,*
   465 F.3d 667 (6th Cir. 2006) ............................... 19

*United States v. Warner,*
   292 F. Supp. 2d 1051 (N.D. Ill. 2003) ................. 18

STATUTES

18 U.S.C. § 666 .......................................................... 6

18 U.S.C. § 1343 ........................................................ 6

18 U.S.C. § 1346 ............................................*passim*

18 U.S.C. § 1349 ........................................................ 6

18 U.S.C. § 1951 ........................................................ 6

18 U.S.C. § 1952 ........................................................ 6

28 U.S.C. § 1254 ........................................................ 4

N.Y. Civ. Serv. Law § 107 ........................................ 25

ix

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

N.Y. Pub. Off. Law § 73 ............................................ 30

N.Y. Pub. Off. Law § 74 ............................................ 25

OTHER AUTHORITIES

Robert Batey, *Vagueness and the Construction of Criminal Statutes—Balancing Acts*, 5 VA. J. SOC. POL'Y & L. 1 (1997) .......................... 30

John C. Coffee, Jr., *The Metastasis of Mail Fraud: The Continuing Story of the "Evolution" of A White-Collar Crime*, 21 AM. CRIM. L. REV. 1 (1983) .............................. 31

Kim Eisler, *Hired Guns: The City's 50 Top Lobbyists*, WASHINGTONIAN (June 1, 2007) ......... 32

Ron Elving, *Who is Clinton Confidant Sidney Blumenthal?*, NPR (May 20, 2015) ...................... 33

Thomas Frank & Dan Mangan, *Senate GOP suggests Biden Fed nominee Sarah Bloom Raskin used government ties to help financial tech firm*, CNBC (Feb. 3, 2022) ............ 33

Daniel J. Hurson, *Limiting the Federal Mail Fraud Statute - A Legislative Approach*, 20 AM. CRIM. L. REV. 423 (1983) .................... 22, 30

John Calvin Jeffries, Jr., *Legality, Vagueness, and the Construction of Penal Statutes*, 71 VA. L. REV. 189 (1985) ....................................................... 24, 27, 29

x

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Evan Minsker, *Kanye West and Kim Kardashian Lobbied Trump in Effort to Free A$AP Rocky*, PITCHFORK (July 18, 2019) .................................................... 32

Ashley Parker & Josh Dawsey, *Trump's cable cabinet: New texts reveal the influence of Fox hosts on previous White House*, WASH. POST (Jan. 9, 2022) ...................... 33

*Revolving Door: Former Members of the 115th Congress*, OPENSECRETS ........................... 32

Jordi Blanes i Vidal *et al.*, *Revolving Door Lobbyists*, 102 AM. ECON. REV. 3731 (2012) ........ 32

1

## INTRODUCTION

When a public official accepts money to convince the government to do something, we call him a crook. But when a private citizen accepts money to convince the government to do something, we call him a lobbyist. That is not an arbitrary distinction. It reflects the fact that public officials hold a fiduciary obligation to act in the best interests of the public, while private citizens do not. That basic dichotomy lies at the foundation of our system of representative democracy: Citizens are constitutionally entitled to petition the government in service of their own interests, and public officials and employees are entrusted with making final decisions based on the public good as a whole.

Yet, in just the latest example of federal integrity prosecutors running amok and getting away with it, the Second Circuit held that *private citizens* can owe a fiduciary duty *to the public* and therefore be guilty of honest-services fraud. Under the decision below, if a jury concludes that a private person exercises enough *de facto* influence over government decisionmaking or that state officials sufficiently rely on him, the jury can send him to prison for bribery even if he had no official title, no official power, and no official duties.

Indeed, that was the sole basis to convict Petitioner Joseph Percoco—then the campaign manager for then-Governor Andrew Cuomo's reelection—for being paid $35,000, allegedly to help a developer navigate the state bureaucracy. According to the panel, Percoco owed a duty of honest services to the public because, as a former high-ranking staffer and longtime friend of the Governor, he continued to command "clout" with state agencies and officials. Pet.App.41a-42a.

2

In upholding this conviction, the Second Circuit breathed new life into an old, aberrational precedent, *United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982). Issued over Judge Winter's robust dissent, *Margiotta* expanded the then-nascent theory of "honest services" fraud to an unprecedented degree, based on a fundamentally flawed misapprehension of fiduciary duties. Its overreach was widely condemned, and then abrogated by *McNally v. United States*, 483 U.S. 350 (1987), which rejected the honest-services theory entirely. Congress later revived the concept by enacting 18 U.S.C. § 1346, but *Margiotta*'s reasoning was still firmly rejected by the Third Circuit in a scholarly opinion by Chief Judge Becker. *United States v. Murphy*, 323 F.3d 102 (3d Cir. 2003). Indeed, the decision was so discredited that even district courts in the Second Circuit declared that "*Margiotta* was wrongly decided and is no longer good law in this Circuit or anyplace." *United States v. Adler*, 274 F. Supp. 2d 583, 587 (S.D.N.Y. 2003). And all of that was *before* this Court narrowed § 1346 to "paradigmatic" breaches to avoid due process concerns. *Skilling v. United States*, 561 U.S. 358, 411 (2010).

This Court should grant certiorari and reject the *Margiotta* aberration. The notion that private citizens owe a duty of honest services to the public so long as a jury deems them sufficiently influential finds no basis in law or common sense. It blurs the fundamental line between private and public that defines the relative roles of citizens and officials. And, on a methodological level, reading *Margiotta*'s theory into § 1346 flouts this Court's repeated instruction to construe vague federal corruption statutes with an eye toward lenity, fair notice, federalism, and the First Amendment.

3

This issue warrants the Court's attention not only because of the conflict among the circuits, the tension with this Court's precedents, and the wave of academic criticism, but also—and perhaps most importantly—because of the mischief that *Margiotta*'s resuscitation threatens to unleash. The decision below expands the horizons of public integrity prosecutors to an array of new targets. And its malleable standard offers no way to separate lawful behavior from criminal acts, leaving prosecutors with immense discretion that carries risk of abuse—as Judge Winter foresaw.

As an obvious example, well-connected political insiders and former officials are routinely retained to exert influence over government. Under the decision below, the only thing separating lawful lobbying from illegal bribery is a jury's finding that the lobbyist's *de facto* control or others' "reliance" on him crossed some unspecified line. An entire industry—one engaged in core First Amendment activity, at that—is thus placed in the prosecutorial crosshairs.

Lobbyists are not the only attractive new targets. Officials rely for advice on friends, media figures, party activists, even family members. On the revived *Margiotta* theory, a jury could find that all of these individuals owe a duty of honest services to the public. Think of the temptation to pursue corruption charges against a President's son or a Governor's brother, a Fox News pundit or a *New York Times* columnist, an official's childhood friend or his top campaign donor, a high-profile union backer or corporate confidant.

Once again, the lower courts' expansion of federal bribery law is both wrong and dangerous. This Court should stop this pernicious theory in its tracks.

4

## OPINION BELOW

The decision of the U.S. Court of Appeals for the Second Circuit affirming the petitioner's judgment of conviction (Pet.App.1a) is reported at 13 F.4th 180.

## JURISDICTION

The Second Circuit issued its opinion and entered judgment on September 8, 2021, and denied rehearing on November 1, 2021.  Pet.App.1a, 47a-54a.  On January 7, 2022, Justice Sotomayor extended the time to file this petition until March 1, 2022.  No. 21A298. This Court has jurisdiction under 28 U.S.C. § 1254(1).

## PROVISION INVOLVED

18 U.S.C. § 1346 provides:

For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

## STATEMENT

Petitioner Joseph Percoco resigned from his role in New York's government to manage then-Governor Andrew Cuomo's reelection campaign.  During that time, co-defendant Steven Aiello allegedly hired him to lobby a state agency on an issue affecting Aiello's company.  Percoco received $35,000 for that work. Even though Percoco was only a private citizen during the relevant period, he was charged with depriving the state of his own honest services by accepting a "bribe." The theory was that Percoco's past employment and relationship with the Governor put him in a position of "dominance" over the state.

5

The district court instructed the jury that Percoco could owe a fiduciary duty to the people of New York if he had a requisite level of influence over government decisions. In doing so, the court relied on the Second Circuit's divided panel decision in *United States v. Margiotta*, 688 F.2d 108. On appeal, the Second Circuit affirmed on the same basis, thereby officially resurrecting *Margiotta* notwithstanding this Court's intervening decisions in *McNally v. United States*, 483 U.S. 350 (which rejected the honest-services theory entirely), and *Skilling v. United States*, 561 U.S. 358 (which narrowed the later-enacted honest-services law to "paradigmatic" cases of bribery and kickbacks).

### A. Factual Background.

Percoco was a longtime friend of the Cuomo family who served as Executive Deputy Secretary in the Governor's Office. Pet.App.41a. In April 2014, he officially resigned from that role to manage the Governor's reelection. Pet.App.24a. He had no plans to return to government. Pet.App.120-22a.

Viewing the facts in the light most favorable to the Government, Aiello approached Percoco (via lobbyist Todd Howe) while he was working on the campaign. Pet.App.7a. Aiello wanted state officials to excuse his company, COR Development ("COR"), from entering a potentially costly agreement with a local union, known as a labor peace agreement ("LPA"). *Id.* Aiello emailed Howe to ask whether "there [is] any way Joe P can help us with this issue while he is off the 2nd floor working on the Campaign." Pet.App.23a. By "off the 2nd floor," Aiello was referring to Percoco's time away from the Executive Chamber, on the second floor of the state capitol. D.Ct. Dkt. 538 at 185 (Tr.438).

6

In support of the request, COR wrote two checks totaling $35,000, which Howe forwarded to Percoco's wife. Pet.App.7a. On December 3, 2014, Percoco then reached out to a state official, allegedly to press the relevant agency to reconsider a prior decision and allow COR to receive state funding without an LPA. Pet.App.8a. Although Percoco had, by the time of the call, decided to seek reinstatement to his government employment and continued to have access to the Executive Chamber, he did not resume his state employment until later that month. *Id.* The official nonetheless allegedly "interpreted Percoco's call as 'pressure' coming from one of [the Governor's] 'principals,'" and "relayed this sentiment" to a "senior executive at the agency." *Id.*

### B. District Court Proceedings.

In November 2016, Percoco was charged with a variety of federal offenses. As relevant here, Count Ten of the operative indictment alleged that Percoco had conspired to commit honest-services wire fraud, *see* 18 U.S.C. §§ 1343, 1346, 1349, in connection with his efforts on behalf of COR. Pet.App.9a. For that same conduct, Percoco was also charged with Hobbs Act extortion, in violation of 18 U.S.C. §§ 1951 and 1952 (Count Eight); and solicitation of bribes and gratuities, in violation of 18 U.S.C. § 666(a)(1)(b) and (a)(2) (Count Twelve). *Id.*[1]

---

[1] Percoco was also indicted for offenses relating to a separate scheme not directly at issue here. Those other charges included Hobbs Act extortion, honest-services fraud, and solicitation of bribes and gratuities. Pet.App.9a. One count of conspiracy to commit Hobbs Act extortion (Count Six) was premised on both of the alleged schemes.

7

Percoco moved to dismiss the COR charges on the ground that he could not commit these offenses when he was out of public office.  As to the honest-services count, Percoco contended that he "owed no services to the people of New York" during the period "while he was off the State's payroll."  D.Ct. Dkt. 187 at 20.  The district court denied that motion.  Pet.App.77a.  As to Hobbs Act bribery, however, the court later agreed Percoco could not be guilty of extortion "under color of official right," because he was not a public official at the time he received the funds.  Pet.App.10a.  The court therefore dismissed Count Eight.  *Id.*

After the government rested, Percoco moved for a judgment of acquittal.  *Id.*  He argued that "nothing in the record" showed that he accepted money to take an "official act," as he had accepted funds only "within the period in which he was no longer a state employee."  D.Ct. Dkt. 583 at 167 (Tr.5105).  The court denied that motion after trial.  Pet.App.10a.

Near the end of trial, the district court proposed a jury instruction that Percoco could "owe[] the public a duty of honest services when he was not a state employee, if you find that during that time he owed the public a fiduciary duty."  Pet.App.133a.  Percoco objected, asking that the court instead instruct that he owed "honest services" only "as a public official."  The court disagreed, saying that was "not the law" since "you can owe honest services if you have a fiduciary duty, even if you're not a public official at the time."  Pet.App.138a.  Consistent with *Margiotta*, the final instructions directed the jury to evaluate whether Percoco "dominated and controlled any governmental business" and whether "people working in the government actually relied on him."  Pet.App.142a.

8

The jury convicted Percoco on Count Ten (honest-services fraud conspiracy), but acquitted him on the other COR-related counts (Hobbs Act conspiracy, and solicitation of bribes and gratuities). Pet.App.11a. (The jury also convicted Percoco on counts arising from the distinct scheme not relevant here. *Supra* n.1.)

### C. The Second Circuit's Decision.

In September 2021, a Second Circuit panel affirmed Percoco's conviction. Pet.App.1a-46a.

The panel upheld the jury instructions as falling "comfortably within our decision in *United States v. Margiotta.*" Pet.App.25a. The panel acknowledged that *Margiotta* was no longer binding precedent in light of *McNally*, but concluded that Congress's revival of the honest-services rubric in 18 U.S.C. § 1346 "effectively reinstated" it. Pet.App.29a. In so holding, the panel reasoned that "the statute's capacious language is certainly broad enough to cover the honest services that members of the public are owed by their fiduciaries, even if those fiduciaries happen to lack a government title and salary." Pet.App.27a. And the court believed *Margiotta*'s fiduciary-duties theory was "settled doctrine" before *McNally*, thus justifying an inference that Congress intended to revive the theory through § 1346. Pet.App.25a-29a.

The panel stated the law as follows: "In our view, § 1346 covers those individuals who are government officials as well as private individuals who are relied on by the government and who in fact control some aspect of government business." Pet.App.27a. The test for the latter category is a fact-intensive jury question that asks whether the citizen "exercised sufficient control and reliance." Pet.App.40a-41a.

9

The panel rejected the claim that *Margiotta* had been undercut by *McDonnell v. United States*, 136 S. Ct. 2355 (2016).  In *McDonnell*, the Court held that an "official act" under federal bribery law "must involve a formal exercise of governmental power."  136 S. Ct. at 2371-72.  But the panel noted that *McDonnell* did not address *who* could take an "official act," *i.e.*, whether someone without government office could still take a "bribe" for influencing state action.  Pet.App.29a-30a. The panel also dismissed any constitutional concerns under the First Amendment, Due Process Clause, or federalism principles, framing the issue as whether constitutional avoidance required an *exception* to the law for individuals who are not formal governmental employees.  Pet.App.31a-32a.

Consistent with its articulation of the law, the panel rejected challenges to the sufficiency of the evidence, and, in particular, the evidence that Percoco owed a fiduciary duty to the public under *Margiotta*. Pet.App.36a-37a, 40a-43a.  The panel concluded that Percoco owed such a duty because he "maintained" a "position of power and trust in the state," attributable to his "unique relationship with Governor Cuomo," "being close to him and his family," the likelihood that he would regain the same position after the campaign, and his continued access to the Governor's Office. Pet.App.41a.  And the panel found sufficient evidence that Percoco had agreed to take official action by calling the agency about the LPA.  Pet.App.39a-40a.

Under the panel's logic, Percoco was thus a victim of his own success:  the fact that he was able "to use his position of power" to oppose the LPA itself proved the influence and dominance that supposedly gave rise to Percoco's fiduciary duty to the public.  Pet.App.43a.

10

## REASONS FOR GRANTING THE WRIT

In recent years, this Court has repeatedly rejected creative attempts by federal prosecutors to use the open-ended federal fraud statutes to set standards of ethical government for state and local officials. *Kelly v. United States*, 140 S. Ct. 1565 (2020); *McDonnell*, 136 S. Ct. 2355 (2016); *Skilling*, 561 U.S. 358 (2010). But at least those prosecutors were pursuing *public officials*. The Second Circuit in this case has blessed a theory that expands the sights of public integrity prosecutors beyond those who were elected, appointed, or hired to serve the public. Now it suffices for a jury to infer that a *private citizen*—merely based on his connections, network, or political influence—owes a fiduciary duty to act in the public interest.

This Court should grant certiorari and reverse. The theory that the panel below embraced was expressly rejected by the Third Circuit (among other courts), so the circuit conflict is clear. The *Margiotta* theory is also fundamentally wrong—both as a matter of first principles and as a matter of doctrine. It has been uniformly criticized for nearly forty years, and is even more obviously out-of-step with this Court's decisions now than when it was first decided. And not only does it raise serious constitutional concerns in theory, but it threatens severe disruption and abuse in practice. Indeed, the *Margiotta* test approved below is so murky and amorphous that it would allow prosecutors to charge nearly any half-decent lobbyist in the country with federal bribery. And, as Judge Winter put it so memorably back in his *Margiotta* dissent, it would let a jury convict on nothing more "than the rhetoric of sixth grade civics classes." 688 F.2d at 142. This is an aberration that cannot be allowed to stand.

11

## I. THE THIRD CIRCUIT HAS EXPRESSLY REJECTED *MARGIOTTA*.

The panel below upheld Percoco's honest-services conviction by resurrecting the Second Circuit's 1982 decision in *Margiotta*. But *Margiotta*'s reasoning and holding has been rejected by other courts, including the Third Circuit, and the decision was left for dead even by district courts in the Second Circuit after this Court's *McNally* ruling. By resuscitating this vestige of a bygone era, the court renewed an express circuit split that warrants review.

### A. The *Margiotta* Decision and Dissent.

In *Margiotta*, the Second Circuit broadly construed the federal fraud statutes to embrace the theory that a private citizen "who holds no official government office but who participates substantially" in state or local governance owes a fiduciary duty to the public, so that he could be convicted of depriving the public of the intangible right to honest services. 688 F.2d at 111. In inventing this unique fiduciary relationship, the Second Circuit stretched the reach of the federal fraud statutes well beyond their traditional bounds, drawing a powerful dissent from Judge Winter.

**1.** Joseph M. Margiotta served as Chairman of the Republican Committees of Nassau County and the Town of Hempstead. *Id.* at 112. He was charged with fraud for helping an insurance agency obtain an exclusive broker position with the county and town in exchange for kicking back a portion of its commissions. *Id.* at 120. Although Margiotta held no public office, the government argued that he owed a fiduciary duty to the public because his "power and prestige" gave him "influence" over Republican officials. *Id.* at 113.

12

The panel framed the question as whether the fraud statutes prohibit political misconduct "by individuals who participate in the political process but who do not occupy public office." *Id.* at 112. It recognized this was a "novel application" of the law and purported to "tread most cautiously." *Id.* at 120. Indeed, the panel acknowledged that the "seemingly limitless" language of the fraud statutes created a "danger of sweeping within [their] ambit … conduct, such as lobbying and party association, which has been deemed central to the functioning of our democratic system since at least the days of Andrew Jackson." *Id.* But the panel was equally if not more concerned about "eliminat[ing] a potential safeguard of the public's interest in honest and efficient government." *Id.*

The panel ultimately held that "we do not believe that a formal employment relationship, that is, public office, should be a rigid prerequisite to a finding of fiduciary duty in the public sector." *Id.* at 122. In lieu of a "precise litmus paper test" (because "[t]he drawing of standards in this area is a most difficult enterprise"), the majority invoked two tests to determine whether a private individual owes a fiduciary duty to the public: "(1) a reliance test, under which one may be a fiduciary when others rely upon him because of a special relationship," and "(2) a de facto control test, under which a person who in fact makes governmental decisions may be held to be a governmental fiduciary." *Id.* Almost wishfully, the panel claimed these tests "permit[] a party official to act in accordance with partisan preferences or even whim, up to the point at which he dominates government." *Id.* at 122. Exactly where that point is, the court did not specify.

13

Committed to its private-public fiduciary duty rule, the court rejected any constitutional challenges to its approach.   Quoting the adage that "[m]en must turn square corners when they deal with the Government," the panel reasoned that it "requires little imaginative leap to conclude that individuals who in reality *or effect* are the government owe a fiduciary duty to the citizenry." *Id.* at 124 (emphasis added).  It concluded that this novel application of the statute thus raised no "fair notice" concerns.  *Id.* at 129.

The majority also acknowledged that the rights of "lobbyists and others who seek to exercise influence in the political process are basic in our democratic system."   *Id.* at 128-29.   Yet First Amendment concerns were merely "a chimera," because "there is no indication that the application of the mail fraud statute in this specific case would deter protected political activities in other contexts," even if the same "theory" could be "misused … and misapplied to constitutionally protected conduct." *Id.* at 129.

The majority likewise recognized, "[t]heoretically," that there may be "federalism concerns" in finding a fiduciary duty absent "reference to state law." *Id.* at 124.  Nonetheless, the court held that "a violation of local law is not an essential element" of the offense, and so "we need not examine state law to determine whether Margiotta's relationship of dominance in municipal government gives rise to certain minimum duties to the general citizenry." *Id.*  It sufficed that "federal public policy" stood against his conduct.  *Id.* In any event, the court proceeded to hold that, as a party official, Margiotta did owe a certain "fiduciary duty to the citizenry of Hempstead and Nassau County under New York law." *Id.*

14

**2.**   In a scathing dissent, the late Judge Winter admonished the majority's sprawling decision.  *Id.* at 139.  Judge Winter described "[t]he majority's use of mail fraud as a catch-all prohibition of political disingenuousness" that "expands [the fraud statute] beyond any colorable claim of Congressional intent and creates a real danger of prosecutorial abuse for partisan political purposes."  *Id.*

While Judge Winter recognized the then-existing theory of honest-services fraud, he explained that the majority had added "one seemingly small element to these precedents"—namely, that "a jury may find that a politically active person has sufficient influence and power over the acts of elective officials to be subjected to the same duty as those officials."  *Id.* at 142.  That innovation, he explained, is incredibly consequential: It "leads to a result which is not only greater than, but is roughly the square of, the sum of the parts."  *Id.*  As a practical matter, that new theory "subjects virtually every active participant in the political process to potential criminal investigation and prosecution."  *Id.* at 143.

Turning to first principles, Judge Winter faulted the majority for improperly analogizing fiduciary duties among private parties to those among politically active citizens and the general public "in a pluralistic, partisan, political system."  *Id.* at 142.  The former cannot be imported to the latter context "simply by mouthing the word fiduciary."  *Id.*  Instead, "we should recognize that a pluralistic political system assumes politically active persons will pursue power and self-interest."  *Id.* at 143.

15

Judge Winter then proceeded to explain the effects of the majority's standard: "Juries are simply left free to apply a legal standard which amounts to little more than the rhetoric of sixth grade civics classes." *Id.* at 142. "[N]o amount of rhetoric seeking to limit the holding to the facts of this case can conceal that there is no end to the common political practices which may now be swept within the ambit of mail fraud." *Id.* at 140. That open-ended and malleable standard, in turn, creates "the potential for abuse through selective prosecution and the degree of raw political power the freeswinging club of mail fraud affords federal prosecutors." *Id.* at 143; *see also id.* at 144 ("When the first corrupt prosecutor prosecutes a political enemy for mail fraud, the rhetoric of the majority about good government will ring hollow indeed."). And it also threatens the First Amendment, since the majority's theory "subjects politically active persons to criminal sanctions based solely upon what they say or do not say in their discussions of public affairs." *Id.* at 140.

Of course, Judge Winter "hope[d] that public affairs are conducted honestly and on behalf of the entire citizenry," but "shudder[ed] at the prospect of partisan political activists being indicted for failing to act 'impartially' in influencing governmental acts." *Id.* at 143. "Where a statute, particularly a criminal statute, does not regulate specific behavior, enforcement of inchoate obligations should be by political rather than criminal sanctions." *Id.* And "[w]here Congress has not passed legislation specifying particular acts by the politically active as criminal, our reliance rather should be on public debate, a free press and an alert electorate." *Id.* He decried this new "catch-all political crime which has no use but misuse." *Id.* at 144.

16

**3.** *Margiotta* barely escaped en banc review, leaving the convictions undisturbed over the dissent of four judges after some judges recused themselves from the vote. *See* 811 F.2d 46 (2d Cir. 1982); *Adler*, 274 F. Supp. 2d at 586 (describing *Margiotta*'s en banc vote).

### B.  The Circuit Conflict Over *Margiotta*.

Judge Winter's dire predictions did not immediately come to fruition, because this Court soon overturned the entire honest-services rubric.  And after Congress reversed that decision legislatively, courts even within the Second Circuit considered *Margiotta* dead.  Most relevant, the Third Circuit expressly adopted Judge Winter's dissenting views.

**1.**  Just a few years after *Margiotta*, this Court first considered the honest-services theory.  Although every circuit court had adopted that judge-made doctrine, this Court rejected it.

The Court held that "[t]he mail fraud statute clearly protects property rights, but does not refer to the intangible right of the citizenry to good government." *McNally*, 483 U.S. at 356.  The Court invoked the rule of lenity, explaining "that when there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language." *Id.* at 359-60.  Declining to "construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials," this Court read it "as limited in scope to the protection of property rights."  *Id.* at 360. "If Congress desires to go further, it must speak more clearly than it has."  *Id.*

17

Ironically, the Sixth Circuit decision that *McNally* reversed, *United States v. Gray*, 790 F.2d 1290 (6th Cir. 1986), had adopted the *Margiotta* rule. The Sixth Circuit reasoned that "public office should not be a rigid prerequisite to impressing a fiduciary duty." *Id.* at 1295. The court cited *Margiotta* in concluding that someone "who has no formal employment relationship with government may nonetheless substantially participate in government operations so as to assume a fiduciary duty to the general citizenry." *Id.* But the Sixth Circuit is the only other Court of Appeals that has ever adopted the *Margiotta* approach.

**2.** Congress soon reversed *McNally* by enacting 18 U.S.C. § 1346, which defines the rights protected by the mail- and wire-fraud statutes as encompassing the "intangible right of honest services." Courts therefore again had to evaluate the scope of those services—and who owed them. *Margiotta* was back on the table.

But it did not attract many takers. Most important, the Third Circuit took direct aim at *Margiotta* in *United States v. Murphy*. That case involved charges against a former chairman of the Republican Party in Passaic County for conduct relating to "a contracts-for-payments scheme that Murphy allegedly organized by using his considerable influence over Passaic County officials" to procure contracts for a company seeking to provide services to the county. 323 F.3d at 104. In a unanimous decision by Chief Judge Becker and joined by Judges Scirica and McKee, the court declined to follow *Margiotta*'s "oft-criticized holding" and instead agreed with Judge Winter's dissent that "*Margiotta* extends the mail fraud statute beyond any reasonable bounds." *Id.* at 104, 109.

18

The Third Circuit focused on three points. *First*, it noted that the text of § 1346 "provides little guidance as to the conduct it prohibits," raising fair-notice concerns that are "particularly weighty in the context of prosecutions of political officials, since such prosecution may chill constitutionally protected political activity." *Id.* at 116. *Second*, the court held that honest-services fraud is dependent on a fiduciary *relationship*, and that even a state law criminalizing certain conduct cannot serve as a basis for a fiduciary relationship between a private citizen and the public. *Id.* at 117. Otherwise, "all criminal activity would breach a duty to the public not to break the law that could then form the basis of a mail fraud conviction," and that would "run counter to ... federalism concerns" while giving § 1346 "potentially limitless application." *Id. Finally*, the court faulted *Margiotta* for "fail[ing] to provide any logical rationale for treating private party officials in the same manner as public officials," and shared Judge Winter's worry that it would open too many doors for an "over-zealous prosecutor." *Id.* at 117-18.

District courts likewise declined to follow *Margiotta*. In *United States v. Warner*, for example, the court was "unwilling to adopt a construction of the mail fraud statute so expansive as to require a jury to decide whether a private individual acted enough like a government official to make him criminally liable under § 1346." 292 F. Supp. 2d 1051, 1061 (N.D. Ill. 2003). The court observed that "the Second Circuit's 1982 *Margiotta* decision … has been roundly criticized and arguably is no longer good law" in light of the intervening *McNally* precedent. *Id.* at 1062.

19

Indeed, even district courts *in the Second Circuit* treated *Margiotta* as bad law following *McNally*, notwithstanding that Congress enacted § 1346.  *See Adler*, 274 F. Supp. 2d at 587 ("This Court agrees that *Margiotta* was wrongly decided and is no longer good law in this Circuit or anyplace, as found by the Third Circuit in *Murphy*."); *United States v. Smith*, 985 F. Supp. 2d 547, 603 (S.D.N.Y. 2014) ("*Margiotta* has been 'widely criticized by practically everybody'").

And, while not reaching the precise issue directly, the Seventh Circuit called *Margiotta* one of the "worst abuses of the mail fraud statute," because it could result in a conviction "for conduct not even wrongful under state law."  *United States v. Holzer*, 840 F.2d 1343, 1348 (7th Cir. 1988) (Posner, J.).

**3.**   Against all of this, only the Sixth Circuit has stuck to its pre-*McNally* embrace of *Margiotta*.  In *United States v. Turner*, the court explained that, "to determine whether a defendant who did not hold a public office nevertheless owed the public a fiduciary duty, the district court should have applied the 'two time-tested measures of fiduciary status' as adopted in *Gray*," the case *McNally* reversed on other grounds. 465 F.3d 667, 675 (6th Cir. 2006); *see also United States v. Frost*, 125 F.3d 346, 366 (6th Cir. 1997) (citing *Margiotta* and describing *Gray* as establishing "test for determining whether an individual owes a fiduciary duty to the public").

**C.  The Panel's Revival of *Margiotta*.**

By embracing and doubling down on *Margiotta*'s novel fiduciary duty theory in a post-*McNally* case based on § 1346, the panel below created a clear conflict with the Third Circuit in *Murphy*.

20

The decision below rests on—and thus squarely tees up—the *Margiotta* theory. The issue is well preserved, having been raised from the very outset of the case. *See supra* at 7. And the Second Circuit reviewed and approved it *de novo*. Pet.App.24a-32a. Moreover, Percoco's conviction on Count Ten hinges directly on that issue, *i.e.*, whether he owed a fiduciary duty to the public while working on the Governor's campaign, because he agreed to work for COR and made the critical phone call during that period. Although there was evidence that Percoco also acted to benefit COR nearly a year after his return to state office, there was no evidence at trial to link those actions to the earlier payments. Pet.App.8a-9a. Rather, the LPA was the "front and center issue" for which Percoco was hired (Pet.App.24a n.3), and the panel relied on that action alone to support the conviction (Pet.App.39a-40a).

The panel decision conflicts squarely with *Murphy*. Where the Third Circuit narrowly construed § 1346 to account for the rule of lenity and the risk of chilling First Amendment conduct, 323 F.3d at 116, the Second Circuit here did the opposite. It relied on the statute's "capacious language" and found it "broad enough to cover the honest services that members of the public are owed by their fiduciaries, even if those fiduciaries happen to lack a government title and salary." Pet.App.27a. The panel further imported *Margiotta*'s faulty analogy to private employment, brushing aside any First Amendment concerns on the basis that petitioning the government is no more important than private speech. Pet.App.31a-32a. Ultimately, the decision below allows juries to infer fiduciary duties owed by private citizens to the general public, whereas the Third Circuit categorically foreclosed it.

21

\*　　\*　　\*

In short, of the three circuit courts to have decided whether a private citizen can have sufficient political sway to owe a fiduciary duty to the public under the honest services statute, the Second and Sixth Circuits say yes, and the Third Circuit says no.  That is a clear, meaningful conflict that this Court should resolve.

## II. *MARGIOTTA* WAS WRONG WHEN IT WAS DECIDED AND IS INDEFENSIBLE UNDER CURRENT LAW.

The disagreement among the circuits is enough to warrant certiorari.  But the gravity of the Second Circuit's error in *Margiotta*—which was compounded in the decision below—also cries out for review.  The *Margiotta* theory was wrong *ab initio* as a matter of first principles.  It cannot be squared with this Court's narrowing of the honest services statute in *Skilling* to cover only the pre-*McNally* "core."  And it is woefully out-of-step with the Court's modern methodological approach to statutory interpretation in general and the federal corruption statutes in particular.

### A.  *Margiotta* Was Wrong from the Outset.

1.  *Margiotta*'s core innovation was importing the law of fiduciary duty from the private sector to the public context.  688 F.2d at 141 (Winter, J., dissenting in part).  There is no dispute that, under § 1346, a person who holds public office or public employment owes a fiduciary duty to act in the best interests of the public.  A private employee may also have a fiduciary duty to an employer, born out of that employment relationship.  But *Margiotta* went astray in "drawing an erroneous analogy between fiduciary relationships involving private parties based on express or implied contract and relationships between politically active

22

persons and the general citizenry in a pluralistic, partisan, political system." *Id.* at 142. "It is one thing to show that an employer or client has placed explicit trust in a given individual, thus rendering him a fiduciary. But it is quite another matter to infer a fiduciary relationship from reliance of the citizenry at large or even others in government on a political party leader as a result of his 'special relationship' to government." Daniel J. Hurson, *Limiting the Federal Mail Fraud Statute - A Legislative Approach*, 20 AM. CRIM. L. REV. 423, 439-40 (1983). A politically active individual bears no relationship to the public that generates a duty to act in its interest. *See Murphy*, 323 F.3d at 117; Hurson, *supra*, at 440 ("Unlike elected officials, few political leaders, lobbyists, influence peddlers, or activists hold themselves out as acting for the general welfare of all citizens.").

To the contrary, our democratic system is based on the premise that private citizens will seek to advance their self-interest, while public officials will weigh the aggregate good of the citizenry. "One must question whether it is fair to impose ... a [fiduciary] duty on someone simply because he becomes so involved in governmental affairs that 'others in government,' perhaps in abdication of their own responsibilities, tend to 'rely' on him." Hurson, *supra*, at 440. As Judge Winter thus noted, "we should recognize that a pluralistic political system assumes politically active persons will pursue power and self-interest," and not necessarily act in the best interest of the public. *Margiotta*, 688 F.2d at 143 (Winter, J., dissenting in part). It is public officials—alone—who represent the public and owe duties to act in its best interest.

23

**2.**  *Margiotta*'s analysis also fails on its own terms. The court reasoned that reliance or control gives rise to a fiduciary relationship. But that is wrong, and the cases that *Margiotta* cited do not support it. Rather, those cases *presuppose* the existence of a relationship between the parties at issue and then analyze whether it rose to the fiduciary level. The concepts of reliance and control did not create the relationship in the first place. *Margiotta*, on the other hand, presumes a relationship where none exists—between a private citizen who has influence over government and other private citizens who do not. It then cloaks the reliance and dominance tests over that fiction.

For example, *Margiotta* cited *Cheese Shop International, Inc. v. Steele*, 303 A.2d 689, 691 (Del. Ch. 1973), for the notion that a fiduciary relationship exists "when others rely upon" someone because of a "special relationship." 688 F.2d at 122. But in *Cheese Shop*, the court considered whether two parties *who had entered into a contract* were engaged in a fiduciary relationship. 303 A.2d at 691. Finding no "dependency on or superiority of the one alleged to be a fiduciary," it held that no fiduciary relationship existed. *Id.* Relatedly, in *Mobil Oil Corp. v. Rubenfeld*, the court assessed whether two parties who entered into a franchise agreement had created a fiduciary relationship. When interpreting the effect of the parties' contract, the court noted that "[a] fiduciary relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other." 339 N.Y.S.2d 623, 632 (Civ. Ct. 1972), *aff'd*, 357 N.Y.S.2d 589 (App. Term 1974). But it was not the confidence or influence that *created* the parties' legal relationship.

24

These decisions in no way support a rule that reliance can establish the fiduciary relationship in the first place—let alone that the public has a fiduciary relationship with a private individual based solely on the fact that government officials rely on him. Unlike parties to a contract or franchise, two private citizens have no legal relationship to begin with.

*Margiotta* similarly misapplied cases in setting forth its "control" test. For example, it describes *Trustees of Jesse Parker Williams Hospital v. Nisbet*, 191 Ga. 821 (1941), as establishing a "fiduciary status based on position of dominance and control," 688 F.2d at 122, but, again, *Nisbet* involved the assessment of an established relationship between two parties, *see* 191 Ga. at 840-45. It did not hold that an individual's dominance or control over one party (*i.e.*, a public official) somehow assumes that party's fiduciary relationship with a *third party* (*i.e.*, the public).

Even where an individual may exercise control or influence over government affairs, the nature of the relationship (or lack thereof) between that private citizen and the public does not change. After all, public officials listen to and rely on private citizens all the time, whether constituents, media, lobbyists, donors, or friends. Conversely, "[p]rivate individuals who control government action must necessarily rely on public officials to do their bidding." John Calvin Jeffries, Jr., *Legality, Vagueness, and the Construction of Penal Statutes*, 71 VA. L. REV. 189, 241-42 (1985). The status of those individuals as influencers does not turn them into the equivalent of public officials or obligate them to act exclusively in the best interests of the public as a whole.

25

**3.** If anything, the decision below expanded upon *Margiotta*'s errors. *Margiotta* involved a party official. While it is wrong to treat a party official as owing any fiduciary duties to the general public, it is true that political parties occupy a unique role in the American political system. *See Cal. Democratic Party v. Jones*, 530 U.S. 567, 573 (2000) (recognizing that many states "give[] a special role to political parties" such that "the parties' discriminatory action becomes state action"). And *Margiotta* relied in part on how New York treated party officials and their duties to the public. *See* 688 F.2d at 124-25.

The decision below, however, erased any hope that *Margiotta* would be limited to party officials. Percoco held only a private *campaign* role at the relevant time. Far from imposing duties on campaign partisans, New York law recognizes the difference between a public servant and a private political figure. Indeed, Percoco was required under New York law to resign from his position in the Executive Chamber to work full-time on the Governor's reelection campaign. *See* N.Y. Civ. Serv. Law § 107(1)-(2); N.Y. Pub. Off. Law § 74(3)(d). Percoco's removal from the state payroll materially changed his relationship with the public under state law, transitioning his role from a public servant to a private individual seeking political gain.

Yet the panel nevertheless held him accountable as a public official. More generally, the panel's reasoning and holding would extend to *any* private citizen who holds "sufficient control and reliance," whether based on past service, personal history, political influence, or anything else. *See* Pet.App.40a-41a.

26

*Margiotta* was a monster but arguably a caged one. The decision below unleashed that fearsome creature on the body politic.

## B. *Margiotta* Is Irreconcilable with *Skilling*.

Even if *Margiotta* had a theoretical leg to stand on, it cannot be reconciled with this Court's decision in *Skilling*, which sharply narrowed the scope of honest-services fraud under 18 U.S.C. § 1346 to "heartland" cases to avoid constitutional concerns. 561 U.S. at 409 n.43. *Margiotta* is anything but.

As described above, honest services fraud originated as a judicial creation; courts "interpreted the term 'scheme or artifice to defraud'" in the mail and wire fraud statutes "to include deprivations not only of money or property, but also of intangible rights," including the intangible right of honest services. *Id.* at 400. The doctrine was most often applied to bribery of a public official, but "[o]ver time, '[a]n increasing number of courts' recognized that 'a recreant employee'—public or private—'c[ould] be prosecuted under [the statute] if he breache[d] his allegiance to his employer by accepting bribes or kickbacks in the course of his employment.'" *Id.* at 401. "In 1987," however, this Court "stopped the development of the intangible-rights doctrine in its tracks." *Id.* The Court refused to construe the fraud statute "in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials," and instead limited the statute to the "protection of property rights." *McNally*, 483 U.S. at 360. In response, Congress "swiftly" passed § 1346 to revive the doctrine. *Skilling*, 561 U.S. at 402.

27

That brings us to *Skilling*. The petitioners brought a vagueness challenge to § 1346, which referred to an intangible right but gave no details on what it meant, who owed it, or how it could be breached. To avoid constitutional difficulty, the majority in *Skilling* held that Congress *did not* adopt the pre-*McNally* honest services doctrine wholesale. Rather, the Court limited § 1346 to "paramount," "heartland," or "paradigmatic" cases. *Id.* at 404, 409 n.43, 411. Namely, schemes designed to deprive the public of honest services through "bribes or kickbacks," but not those involving merely a conflict of interest or other ethical breaches. *Id.* at 409-10.

*Margiotta*'s admittedly "novel" application of the honest-services theory to "an individual who occupies no official public office but nonetheless participates substantially in the operation of government" is the opposite of a paradigmatic case. *Margiotta*, 688 F.2d at 121. It was an unprecedented aberration. "[U]ntil *Margiotta*, that [honest-services] theory apparently applied only to public officials." Jeffries, *supra*, at 239-40. The Second Circuit's recognition of the right to honest government as a basis for a fraud conviction of a *private citizen* extended the statute to new bounds— without question outside the realm of the "paramount" or "heartland" cases that survive *Skilling*.

Moreover, in narrowing § 1346, this Court sought to avoid uncertainty as to "the source and scope of fiduciary duties" that could establish the foundation of an honest-services conviction. 561 U.S. at 407 n.41. The Court noted that in bribery and kickback cases, "[t]he existence of a fiduciary relationship" is "usually beyond dispute." *Id.* As examples, it pointed to cases of "public official-public," "employee-employer," and

28

"union official-union members" relationships. *Id.*
Notably absent: "private citizen-public." And, in direct
contrast with *Margiotta*'s reliance-and-control test,
the Court affirmed the "established doctrine that [a
fiduciary] duty arises from a specific relationship
between two parties," not out of thin air. *Id.*

*Skilling* thus plainly understood the "paramount" or
"heartland" honest services cases revived by § 1346 to
include only those cases where a fiduciary duty was
clearly established through a specific relationship long
recognized by the law. That surely does not include
the relationship in *Margiotta*, much less here.

### C. *Margiotta* Is Out-of-Step with this Court's Modern Methodology.

*Margiotta* is also inconsistent more broadly with
this Court's methodology in cases involving expansive
deployment of federal corruption statutes. Time and
again, the Court has emphasized clarity, lenity,
federalism, and other constitutional concerns as a
basis to read these statutes narrowly. *Margiotta* gave
those considerations the back of the hand, and the
court below likewise shunted them aside.

**Lenity.** This Court has taught that, "when there
are two rational readings of a criminal statute, one
harsher than the other, we are to choose the harsher
only when Congress has spoken in clear and definite
language." *McNally*, 483 U.S. at 359-60. And in the
fraught context of political corruption especially, "a
statute ... that can linguistically be interpreted to be
either a meat axe or a scalpel should reasonably be
taken to be the latter." *United States v. Sun-Diamond
Growers of Cal.*, 526 U.S. 398, 412 (1999).

29

Yet both *Margiotta* and the decision below only "pa[id] lip service to construing the criminal law against the government." 688 F.2d at 139 (Winter, J., dissenting in part). Despite acknowledging that "[t]he drawing of standards in this area is a most difficult enterprise," *id.* at 122 (majority op.), and that § 1346's language cannot be "precisely defined" (Pet.App.27a), the Second Circuit concluded that the law was "broad enough to cover the honest services that members of the public are owed by their fiduciaries, even if those fiduciaries happen to lack a government title and salary." *Id.* The result was to create "an exceedingly ill-defined prospect of criminal liability for influential private citizens whose participation in the political process falls short of civics-book standards." Jeffries, *supra*, at 239.

**Federalism.** States maintain "the prerogative to regulate the permissible scope of interactions between state officials and their constituents." *McDonnell*, 136 S. Ct. at 2373. Especially where "a more limited interpretation ... is supported by both text and precedent," courts must thus "decline to 'construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards' of 'good government for local and state officials.'" *Id.* (quoting *McNally*, 483 at 360). "Federal prosecutors may not use ... fraud statutes to 'set[] standards of disclosure and good government for local and state officials.'" *Kelly*, 140 S. Ct. at 1574.

Instead of heeding these principles, *Margiotta* and the decision below construed federal law to override state and local ethics standards. Indeed, *Margiotta* dismissed state law as irrelevant, declaring "federal public policy" to be paramount. 688 F.2d at 124. Its

30

rule directly assigns to the Federal Government the role of defining the parameters of ethical governance. Worse yet, the decision overrides state or local ethics rules that already govern when former public officials and staff can engage in lobbying or other advocacy. For example, the New York Public Services Law forbids officers or employees of the executive chamber from "appear[ing] or practice[ing] before any state agency" for two years after termination. N.Y. Pub. Off. Law § 73(8)(a)(iv). The panel below swapped that restriction for a federal felony.

**First Amendment.** Finally, this Court has been cautious about interpreting corruption laws in a way that "would likely chill federal officials' interactions with the people they serve and thus damage their ability effectively to perform their duties." *McDonnell*, 136 S. Ct. at 2372.

Yet *Margiotta* and the decision below "run[] the risk … of deterring commonplace political behavior in which most Americans would assume they and others had a right to engage." Robert Batey, *Vagueness and the Construction of Criminal Statutes—Balancing Acts*, 5 VA. J. SOC. POL'Y & L. 1, 57-61 (1997); *see also* Hurson*, supra*, at 439-40. It threatens to chill protected speech of politically active individuals, harming their ability to petition the government and impeding public officials' ability to hear from and make decisions based on the voices of their constituents.

*     *     *

It is not an overstatement to say that *Margiotta* was wrong on every conceivable level. The panel erred by reviving it. This Court should correct the error.

31

### III. THE DANGERS POSED BY *MARGIOTTA* WARRANT THIS COURT'S ATTENTION.

This issue also deserves review because *Margiotta*'s revival offers federal prosecutors a novel means of imposing their own conceptions of government ethics (at best) and a pernicious way to pursue political opponents (at worst).  The Court needs to head this off before it generates a host of politicized investigations and prosecutions.

Judge Winter predicted how *Margiotta*'s reasoning "lodge[d] unbridled power in federal prosecutors to prosecute political activists" and created "the potential for abuse through selective prosecution."  688 F.2d at 143-44 (Winter, J., dissenting in part).  *McNally* temporarily shut that down, and the rejection of *Margiotta* by the Third Circuit and district courts within the Second Circuit meant the risk did not materialize even after § 1346's enactment.  But the decision below now renews the dangers Judge Winter warned about, which are only more serious given the modern political climate and "lawfare" trend.

Indeed, there is no end to the mischief that a prosecutor could wreak when constrained only by a jury's application of a fact-intensive "control and reliance" standard.  "[S]elective enforcement becomes possible, and even a politicized war of indictments and counter-indictments between prosecutors of different political persuasions is conceivable."  John C. Coffee, Jr., *The Metastasis of Mail Fraud: The Continuing Story of the "Evolution" of A White-Collar Crime*, 21 AM. CRIM. L. REV. 1, 15-16 (1983).  Once the line between public officials and private citizens is blurred, the list of viable targets increases exponentially.

32

Start with lobbyists. They are often former officials or employees who intimately know the office and the people in it. Indeed, when the *Washingtonian* came out with a "50 Top Lobbyists" list in 2007, almost every person had a government or staffer past—*e.g.*, former Senator Bob Dole, former Senator Kennedy aide Tony Podesta, former White House counsel Jack Quinn, former Rep. Vin Weber, and the list goes on. Kim Eisler, *Hired Guns: The City's 50 Top Lobbyists*, WASHINGTONIAN (June 1, 2007). About one-third of the Members of Congress who left office in January 2019 have taken lobbying jobs. *Revolving Door: Former Members of the 115th Congress*, OPENSECRETS, https://www.opensecrets.org/revolving/departing.php?cong=115 (last visited Feb. 11, 2022). At least part of what makes these former officials and staff effective is their relationships. One study found that lobbyists who had worked for a senator suffer a 24% drop in income when the senator leaves office. *See* Jordi Blanes i Vidal *et al.*, *Revolving Door Lobbyists*, 102 AM. ECON. REV. 3731 (2012).

In light of this, it would be easy for a prosecutor with distaste for "swamp" culture to criminalize it—allege that the lobbyist maintained influence and reliance, and all of his retainer fees become bribes.

Beyond lobbyists who advocate for a living, there are countless of examples of friends, campaign donors, media personalities, former officials, or others who exercise political or social influence over government without any formal office or title. Rapper Kanye West, friend of President Trump, allegedly persuaded him to attempt to intervene in a Swedish criminal case. Evan Minsker, *Kanye West and Kim Kardashian Lobbied Trump in Effort to Free A$AP Rocky*, PITCHFORK (July

33

18, 2019).  Trump routinely consulted with Fox News anchors, who reportedly could "completely change his mind."  Ashley Parker & Josh Dawsey, *Trump's cable cabinet: New texts reveal the influence of Fox hosts on previous White House*, WASH. POST (Jan. 9, 2022).  And this is a bipartisan reality.  Longtime Clinton adviser Sidney Blumenthal sent foreign-policy emails to then-Secretary of State Hillary Clinton, which she "passed on" to others in the government.  Ron Elving, *Who is Clinton Confidant Sidney Blumenthal?*, NPR (May 20, 2015).  And just this month, Republican senators suggested that a Federal Reserve nominee "used her clout from her prior stints in government as an advantage in the corporate sector."  Thomas Frank & Dan Mangan, *Senate GOP suggests Biden Fed nominee Sarah Bloom Raskin used government ties to help financial tech firm*, CNBC (Feb. 3, 2022).

Again, it is easy to imagine an ambitious prosecutor charging a donor who talks an official into giving his company a state contract (a kickback!) or a media figure who is paid by a network (a bribe!) to secure a high-profile interview with a president or governor.

Perhaps most pernicious, the panel's new *Margiotta* revival gives federal prosecutors a way to pursue the *family members* of public officials.  Family members of high-ranking officials—a President's father or son, or a Governor's brother—often hold unparalleled access and influence within their offices and the government as a whole.  And their independent business interests (or those of their clients) may be in a position to benefit from state action.  No specific examples are necessary to appreciate that this too is a bipartisan reality that provides an extraordinarily attractive and high-profile set of targets.  Under the decision below, prosecutors

34

could characterize these benefits as criminal breaches of the family members' honest services to the public, effectively prosecuting public officials by proxy.

None of this is to say that these hypotheticals—and real-life examples—do not raise ethical concerns. But "enforcement of inchoate obligations should be by political rather than criminal sanctions." *Margiotta*, 688 F.2d at 143 (Winter, J., dissenting in part). After-the-fact, case-by-case adjudication by juries asked to evaluate whether a private citizen exercised sufficient "control" or commanded sufficient "reliance" is both unfair and unconstitutional. This Court should grant review to stop this dangerous, wrongheaded theory.

## CONCLUSION

This Court should grant the petition.

February 2022                    Respectfully submitted,

BARRY A. BOHRER              YAAKOV M. ROTH
MINTZ, LEVIN, COHN,            *Counsel of Record*
FERRIS, GLOVSKY &            BRETT WIERENGA
POPEO, P.C.                   JONES DAY
666 Third Ave.               51 Louisiana Ave., NW
New York, NY 10017           Washington, DC 20001
                             (202) 879-3939
MICHAEL L. YAEGER            yroth@jonesday.com
CARLTON FIELDS, P.A.
405 Lexington Ave.,          ELIZABETH G. BENTLEY
36th Floor                   JONES DAY
New York, NY 10174           90 South Seventh St.,
                             Suite 4950
                             Minneapolis, MN 55402

*Counsel for Petitioner*