UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                      )
                                                      )
UNITED STATES OF AMERICA            )
                                                      )
v.                                                    )                    No. 22-CR-10141
                                                      )
SEAN O'DONOVAN,                        )
                          Defendant            )
                                                      )
_____ )

### MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT

Now comes the defendant Sean O'Donovan, by and through undersigned counsel, and, pursuant to the Fifth Amendment Due Process Clause, hereby respectfully moves this Honorable Court to dismiss the Indictment in the above-captioned matter due to a violation of his Due Process rights resulting from government investigators' attempts to unilaterally manufacture a bribery case from his lawful and constitutionally protected efforts to represent a client and to lobby municipal officials in a manner not prohibited by state or federal law.

The charges in this case stem from an effort by Mr. O'Donovan, a practicing attorney, to lobby the Medford Chief of Police ("Chief"), who was also one of five members of the Cannabis Advisory Committee ("CAC"), on behalf of a Client applying for marijuana licensure. The First Amendment to the U.S. Constitution protects the rights of Mr. O'Donovan and his Client to lobby government officials in this manner. *See* Dkt. 19 at 15-16; *Citizens United v. FEC*, 558 U.S. 310, 369 (2010). At no time did Mr. O'Donovan offer or give anything of value or attempt or conspire to give anything of value to the Chief, the only individual alleged to have owed a duty of honest services to the City as required by 18 U.S.C. § 1346 and the only individual who

1

had the power as a public official to agree to exchange an "official act" for a benefit as required by 18 U.S.C. § 666.  To the contrary, there is no indication that Mr. O'Donovan had any communications whatsoever with the Chief.  Investigators' attempt to manufacture a bribery scheme, therefore, relied almost exclusively upon their cooperator, Individual 1.  While Mr. O'Donovan requested that Individual 1 lobby the Chief, Individual 1's close relative, and while Mr. O'Donovan proposed compensating Individual 1 through a consulting position to assist Mr. O'Donovan and/or Mr. O'Donovan's Client if the Client's application for cannabis licensing was accepted by the City of Medford, no portion of that payment was intended to benefit the Chief, much less to bribe him.  And, most crucially, Mr. O'Donovan was both adamant and consistent that he merely wanted Individual 1 to ask the Chief to look at the Client's application and evaluate it on the merits, and, if he believed in the bona fides of the application, to advocate for it with the Mayor.  Multiple times Mr. O'Donovan told Individual 1 that if the Chief did not believe his Client merited support, Mr. O'Donovan would cease any attempt to petition him for his support for his Client.  Months after Mr. O'Donovan's initial request, investigators directed Individual 1 to initiate meetings with Mr. O'Donovan at which Individual 1 was to inject facts invented by the FBI into the discussion: that the Chief had decided to change his vote and rank the Client first based on Mr. O'Donovan's payment of a fee to his close relative.

Investigators' attempt to create a crime, for the sole purpose of prosecuting Mr. O'Donovan, constitutes outrageous government conduct warranting dismissal under the Due Process Clause.  This is especially so in light of the constitutionally protected nature of the proposed lobbying activity, the particular context of an attorney-client relationship requiring Mr. O'Donovan to zealously pursue all lawful means of advancing the Client's interests, and the

2

recorded conversations between Mr. O'Donovan and Individual 1 which demonstrate that Mr. O'Donovan's intent was never to attempt to corrupt the public official and only to have Individual 1 advocate in good faith based on the merits of the Client's application for a city cannabis license.

**REQUEST FOR ORAL ARGUMENT**

Mr. O'Donovan respectfully requests that oral argument be held on this Motion.

**MEMORANDUM OF LAW**

**A.     Background**

On February 10, 2021, Mr. O'Donovan asked Individual 1 if he would talk to his close relative the Chief about the Client.  *See* Dkt. 1 ¶ 24.  Mr. O'Donovan made clear during this initial meeting that he did not want to ask the Chief for any favors.  Rather, he simply wanted the Chief to look at the Client's application.  Mr. O'Donovan proposed paying Individual 1 $25,000 for his efforts.  After speaking with the Chief, Individual 1 decided to report the situation to the FBI.  "Individual 1 agreed to allow the FBI to record all [subsequent] telephone calls and in-person meetings" he had with Mr. O'Donovan, as well as to provide all his text messages with Mr. O'Donovan to the FBI.  Dkt. 1 ¶ 25.

At a February 22, 2021 meeting, Mr. O'Donovan explained to Individual 1, "I wanna try to get the edge '*cause I know everybody's trying to get it*.  However they're trying to get in, to get the edge."[1] (Emphasis added).   Mr. O'Donovan noted that the Chief "has the mayor's ear"

---

[1] Quotations from recorded meetings are based on draft transcripts produced by the government in discovery subject to the caveat that if there were revisions before they were finalized, there would be no reliance on the drafts.  The current drafts appear to be those that were relied upon by the government in drafting its Indictment.

and Mr. O'Donovan wanted the Chief to give his Client "a really good shake."    Mr. O'Donovan
emphasized the strength of the Client's application saying to Individual 1, "I would never
embarrass you. . . .   And I wouldn't waste my time."  In fact, Mr. O'Donovan's belief in the
merits of his Client's application was proven to be entirely accurate: the CAC would ultimately
rank the Client first in combined scoring, a ranking it achieved without any intervention by the
Chief who never even learned the Client's identity.  *See* Dkt. 1 ¶¶ 25, 41.  Mr. O'Donovan
reiterated the offer to pay Individual 1 $25,000, or possibly $50,000, not solely to compensate
Individual 1 for his lobbying efforts but for his future work via a future consulting contract to
assist Mr. O'Donovan or his Client in their ongoing business if the application was approved.

When more than two months passed without any follow-up meeting, investigators asked
Individual 1 to schedule one.  At the outset of that meeting, held April 26, 2021, Individual one
told Mr. O'Donovan, "just haven't heard from you so I wanted to check in."  Individual 1
claimed that he had started to broach the issue with the Chief.  The Chief "didn't say no," but the
conversation was interrupted shortly thereafter.  Mr. O'Donovan suggested that "maybe the best
thing to do is just wait it out and see, make sure my [Client] files first of all . . . .  But thank you
for talking to him.  I mean, we'll see what happens."  Mr. O'Donovan stated that he had always
known the Chief to be "as straight and honest as they get."  He expressed concern that others
would use political influence to undermine the strength of his Client's application saying, "if
you're the type of person that thinks that [the Mayor] isn't gonna pick some people that she likes,
you're . . . crazy."  Mr. O'Donovan told Individual 1, "you know what goes into it.  You paint
the picture so you can hide behind the . . . curtain, you do whatever . . . you want.  And I don't
blame her, if I was the mayor and you were my . . . Chief of Staff, I'd say . . . this is who's

getting it and I'll leave you to make sure (UI), you know.  They deserve it, I want them to have it. . . .  For whatever the reason, then you do it."  Mr. O'Donovan reiterated that the Mayor "likes" and "trusts" the Chief, "[s]o, if she's gonna decide who she's gonna give it to if [the Chief] votes for our guy it'll help. . . .  [H]e doesn't have to say a word to her."  Again, Mr. O'Donovan emphasized the merits of the Client's application and indicated that he was not looking for any special consideration: "I guarantee you if [the Chief] gives [the Client] a good look, he's gonna like 'em.  And that's all I'm asking for."  Mr. O'Donovan expressed concern that, absent Individual 1's efforts, "no one's gonna look at" the applications.  Mr. O'Donovan went on to suggest that Individual 1 tell the Chief if the Client's application "sucks, don't vote for 'em."

Text messages in the ensuing months reinforce the fact that Mr. O'Donovan was not requesting any special consideration, much less attempting to bribe the Chief.  On August 28, 2021, he texted Individual 1 to tell the Chief to "vote [the Client] #1 as they are the best candidate for Medford legitimately."  As they were proven to be.  On September 13, 2021, he texted again, "We simply need [the Chief] to score us high.  It's the best application in the group so it should [not] be difficult frankly."

The next recorded meeting was almost five months after the previous one, on September 14, 2021.  Individual 1 (not Mr. O'Donovan) requested the meeting on the fictional premise that he had seen the Chief at a family wedding, and the Chief mentioned having been approached by someone on behalf of another applicant.  Mr. O'Donovan asked whether the Chief knew his Client was a "good applicant" adding, "[t]hey're the best."  He later suggested Individual 1 tell the Chief, "if he was gonna vote for them anyway and you're giving them a high vote that's what

I'm looking for."  Mr. O'Donovan reassured Individual 1, "you can tell [the Chief] I said this, they will not be embarrassed.  Will not happen. . . .  I'm telling you this, this is a top notch organization."  Again, Mr. O'Donovan expressed the concern that other less qualified applicants would use politics in an attempt to overcome his Client: "there's going to be some inside angles here, coming in from people over there. . . .  That's why I'm talking to you."  Individual 1, unprompted by Mr. O'Donovan, volunteered that he told the Chief about the proposed payment.  Individual 1 then requested payment in cash rather than check asking, "[n]othing's that's [sic] going to trace right?"  On information and belief, this request for cash payment and ensuing demands to expedite payment rather than defer it so it was subject to a subsequent consulting agreement were all scripted by the FBI.

At a subsequent September 29, 2021 meeting, about seven and a half months after the beginning of his conversations with Mr. O'Donovan and at the express "direction of the FBI," Dkt. 1 ¶ 35, Individual 1 told Mr. O'Donovan that the Chief had originally not ranked the Client among his top three applicants, but "[b]ecause I'm getting paid . . . [h]e's gonna change the ranking . . . [h]e's going to move them top, number one."  Mr. O'Donovan responded, "[p]erfect."  Individual 1 requested a partial payment up-front as "proof that something's happening."  Mr. O'Donovan made clear that the full payment would only be due "upon successful completion."  He explained to Individual 1, "you were in politics, you were here in the city, . . . you campaigned, that's what this is, this is like a mini campaign."  Mr. O'Donovan later told Individual 1, "you'd have to be hired as a consultant" to receive the full payment.  On October 11, 2021, Mr. O'Donovan succumbing to Individual 1's FBI-directed demands paid

Individual 1 $2,000 cash, stating that he would pay a total of $15,000 in the event the Client's application was successful.

**B.     Argument**

"Law enforcement conduct encroaches on a defendant's due process rights if it violates 'fundamental fairness' and 'shock[s] . . . the universal sense of justice.'" *United States v. Anzalone*, 923 F.3d 1, 5 (1st Cir. 2019) (quoting *United States v. Russell*, 411 U.S. 423, 432 (1973)).  Claims alleging such "outrageous government conduct" must be considered "holistically, evaluating the totality of the relevant circumstances while recognizing that outrageousness, by its nature, requires an *ad hoc* determination that cannot usefully be broken down into a series of discrete components." *Id.* at 5-6 (citation omitted).  Dismissal of criminal charges may, for example, be warranted where "law enforcement personnel become so overinvolved in a felonious venture that they can fairly be said either to have creat[ed] the crime or to have coerc[ed] the defendant's participation in it." *Id.* at 6 (citation omitted).

That is precisely what happened here.  From his initial proposal on February 10, 2021 until the September 29, 2021 meeting, Mr. O'Donovan was clear and consistent in his requests to Individual 1: that he ask the Chief to give the Client's application fair consideration and nothing more.  Mr. O'Donovan was equally consistent expressing his own belief in the merits of the application.  This is lawful activity, protected by the First Amendment.  *See* Dkt. 19 at 15-16; *Citizens United v. FEC*, 558 U.S. 310, 369 (2010).

Mr. O'Donovan's proposal to pay Individual 1 for his efforts does nothing to change this fact.  It is a self-evident truth to anyone remotely involved in politics that lobbyists are paid.  A public official's mere awareness of that fact cannot, therefore, transform lobbying into bribery.

7

Another obvious truth is that lobbyists often have some relationship to the officials they are hired to lobby. These relationships are what make lobbyists effective. A list of "50 Top Lobbyists" compiled by the *Washingtonian* indicates that most previously worked in government positions. *See* Kim Eisler, *Hired Guns: The City's 50 Top Lobbyists* (June 1, 2007), *available at* https://www.washingtonian.com/2007/06/01/hired-guns-the-citys-50-top-lobbyists/. More recently, nearly half of the members of Congress who left office in January 2019 have taken lobbying positions. *See Revolving Door: Former Members of the 115th Congress*, OpenSecrets, *available at* https://bit.ly/3RKAhL6. After elections, stakeholders change lobbyists to target new officials. *See* Jordi Blanes i Vidal *et al.*, *Revolving Door Lobbyists*, 102 Am. Econ. Rev. 3731, 3732 (2012) (noting that lobbyists who had worked for senators suffered an average 24% drop in income when the senator left office). This is, in a sense, the very definition of lobbying: individuals being "sought out and paid to use their influence in the government to achieve their clients' ends." *United States v. McClain*, 934 F.2d 822, 831 (7th Cir. 1991).

In essence, the present Indictment seeks to criminalize this particular lobbying arrangement because, and only because, of Individual 1's familial relationship with the Chief. But the arrangement proposed by Mr. O'Donovan falls comfortably within the category of constitutionally protected lobbying. There is no meaningful difference between hiring a family member, as opposed to a friend or former aide or ally, to lobby a public official. Paying any such individuals does not violate the criminal statutes at issue here unless it is intended as part of a *quid pro quo* exchange with the public official. As private citizens, neither Mr. O'Donovan nor Individual 1 owed any fiduciary duty to the City of Medford. *See United States v. Murphy*, 323 F.3d 102, 117 (3d Cir. 2003) ("Without any legal basis for determining whether [the] County

or its citizens had a right to [the defendant's] honest services, we conclude that it was improper for the District Court to allow the jury to conjure such a duty out of a fog of assumptions."). By definition, neither was capable of performing or promising the type of "official act" required for a bribery conviction. *See generally McDonnell v. United States*, 579 U.S. 550, 566-574 (2016). Rather, they were constitutionally entitled to petition the government in service of their own self-interests. "Of course, we should all hope that public affairs are conducted honestly and on behalf of the entire citizenry." *United States v. Margiotta*, 688 F.2d 108, 143 (2d Cir. 1982) (Winter, J., dissenting). But, at the same time, "we should recognize that a pluralistic political system assumes politically active persons will pursue power and self-interest" and "shudder at the prospect of partisan political activists being indicted for failing to act 'impartially' in influencing governmental acts." *Id.*; *see also* Daniel J. Hurson, *Limiting the Federal Mail Fraud Statute – A Legislative Approach*, 20 Am. Crim. L. Rev. 423, 440 (1983) ("Unlike elected officials, few political leaders, lobbyists, influence peddlers, or activists hold themselves out as acting for the general welfare of all citizens.").

It is also important to note that neither Massachusetts nor the City of Medford has seen fit to prohibit lobbying by family members when petitioning city or town municipal officials in circumstances such as those at issue. To the contrary, the legal burden is placed exclusively on the public official to make disclosures when a family member is known to have a financial interest in any matter involving the official's decision-making. Accordingly, manufacturing a federal crime in these circumstances not only risks chilling protected First Amendment activity, but also infringes upon the states' "prerogative to regulate the permissible scope of interactions between state officials and their constituents." *McDonnell*, 579 U.S. at 576. In other words, this

case represents an impermissible attempt by federal authorities "to set[] standards of disclosure and good government for local and state officials." *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) (citation omitted).

Until Individual 1's fictitious statement at the September 29, 2021 meeting, there was no suggestion by Mr. O'Donovan or anyone else that the proposed payment to Individual 1 was for the Chief's vote, as opposed to payment for lobbying and/or consulting work, *i.e.* to advocate for a Client and to make requests that the Client's application be carefully reviewed and, if and only if it was merited, supported. Accordingly, it is clear that investigators, not Mr. O'Donovan or any alleged co-conspirator, "creat[ed]" the alleged bribery scheme underpinning all of the charges in this case. *Anzalone*, 923 F.3d at 6 (citation omitted). In other words, "government agents [attempted to] generate[] new crimes by the defendant merely for the sake of pressing criminal charges against him." *United States v. Twigg*, 588 F.2d 373, 381 (3d Cir. 1978). "Fundamental fairness does not permit [the Court] to countenance such actions by law enforcement officials and prosecution for a crime so fomented by them will be barred." *Id.* (holding that dismissal for outrageous government conduct was required where cooperator "suggested [to the defendant] the establishment of a speed laboratory," government and cooperator provided most supplies, government found location for lab, and cooperator was in charge of operating lab at no cost to defendants);[2] *see also United States v. Mosley*, 965 F.2d

---

[2] While the First Circuit has noted a subsequent Third Circuit opinion questioning the vitality of *Twigg*, *see United States v. Luisi*, 482 F.3d 43, 59 n.19 (1st Cir. 2007), the broad proposition for which it is cited above, that Due Process prevents the government from creating crime for the sole purpose of prosecuting a defendant, is entirely consistent with the other authorities cited below as well as the First Circuit's own description of the outrageous government conduct doctrine.

906, 911 (10th Cir. 1992) ("Where the government essentially generates new crime for the purpose of prosecuting it or induces a defendant to become involved for the first time in certain criminal activity, as opposed to merely interposing itself in an ongoing criminal enterprise, such conduct has occasionally been held to be outrageous."); *Greene v. United States*, 454 F.2d 783, 787 (9th Cir. 1971) ("[W]hen the Government permits itself to become enmeshed in criminal activity, from beginning to end, . . . the same underlying objections which render entrapment repugnant to American criminal justice are operative.");[3] *United States v. Lofstead*, 574 F. Supp. 3d 831, 849 (D. Nev. 2021) (dismissing attempted sex trafficking charge where "law enforcement manufactured the entire crime from start to finish: first by creating the fictitious profile, then altering the poster's age, and finally encouraging [the defendant] to continue with an in-person meeting after he showed hesitation"); *United States v. Batres-Santolino*, 521 F. Supp. 744, 751 (N.D. Cal. 1981) ("[G]overnment agents 'manufactured' a crime that this court concludes could not and would not have been committed if [the agent] had not inveigled defendants into it and offered to provide them with an otherwise unavailable source of supply of the illegal drug they were to import.").  Here, as in the above-cited cases, the government sought to "deceptively implant[] the criminal design" in Mr. O'Donovan's "mind" by presenting him with a fictitious scenario that it believed constituted bribery.  *Twigg*, 588 F.2d at 381.  "Such

---

[3] As another judge of this Court has observed, "outrageous misconduct based on government inducement of crime functions as a 'supplement' to an entrapment defense."  *United States v. George*, 839 F. Supp. 2d 430, 438 (D. Mass. 2012) (citation omitted).  Rather than "look[ing] to the defendant's state of mind and criminal propensities" as in the entrapment context, "the defense of outrageous conduct looks to the government's conduct with respect to the charged offense . . . .  While entrapment presents an issue of fact, outrageous misconduct based on government inducement presents a defense at law appropriately decided on a motion to dismiss."  *Id.* at 438-39.  Mr. O'Donovan reserves the right to raise an entrapment defense at trial.

conduct serves no deterrent purpose, . . . as there is no indication a crime would have been committed without the government's involvement." *Lofstead*, 574 F. Supp.3d at 850.

This is, notably, not a case in which the government penetrated an existing criminal enterprise, or where the defendant unknowingly sought out a government cooperator for participation in criminal conduct. *Cf. United States v. Therrien*, 847 F.3d 9, 14 (1st Cir. 2017) (noting that defense is not applicable "each time the government acts deceptively or participates in a crime that it is investigating" (citation omitted)). Far from actively participating in the government-created alleged crimes, Mr. O'Donovan merely failed to reject the scripted fiction of the Chief's feigned decision to act based on the fact of payment to Individual 1 when such action, supporting Mr. O'Donovan's Client, was clearly consistent with a fair and impartial review of the Client's application. *Cf. id.* at 15 (citing defendant's "active involvement" in offense as undermining claim). In fact, the Chief never informed Individual 1 he was changing his vote or supporting Mr. O'Donovan's Client because Individual 1 was receiving a lobbying-related fee; instead, despite the FBI's scripted fictions, the Chief supported Mr. O'Donovan's Client solely on the merits of the application. *See* Dkt. 1 ¶¶ 25, 41.

Investigators' conduct is rendered particularly "coerc[ive]" in light of Mr. O'Donovan's role as an attorney representing the Client. *Anzalone*, 923 F.3d at 6 (citation omitted). In this capacity, Mr. O'Donovan was duty-bound to represent the Client "zealously within the bounds of the law." Mass. R. Pof'l Conduct 1.3; *see also* Comment 1 (requiring attorney to "take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor" and to "act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf"). More than seven months after Mr. O'Donovan proposed hiring

Individual 1 to lobby the Chief, Individual 1 unilaterally indicated that the Chief had agreed to change his vote because Individual 1 was to receive a fee. Mr. O'Donovan's failure to reject this unsolicited development, which was highly favorable to his Client, and consistent with Mr. O'Donovan's frequently expressed belief that his Client deserved to be the top ranked candidate on the merits of his application, does not constitute *quid pro quo* bribery. *See* Dkt. 19 at 18. To do otherwise would have been to jeopardize the Client's application and risk breaching his duty of loyalty.

As context for this Motion, the Court should also consider the following clarifications regarding the Indictment:

- ¶ 4: Asserts that the Chief "could not legally participate in a particular municipal matter in which, to his knowledge, his immediate family member had a financial interest." In fact, as explained in the pending Motion to Dismiss, state law expressly allowed the Chief to participate provided he disclosed the interest and obtained approval. *See* Dkt. 19 at 13.

- ¶ 20: Alleges that, as part of unlawful "scheme," Mr. O'Donovan and Individual 1 "met in parking lots and outside of various homes." Contrary to the suggestion that the meeting locations were selected for a nefarious purpose, the transcripts of recorded conversations make clear that this was an understandable effort to avoid spreading COVID-19 during the height of the pandemic. At the outset of the April 26, 2021 meeting, for example, Mr. O'Donovan explained that he did not want Individual 1, who was unvaccinated, to enter the home he shared with his elderly mother-in-law.

- ¶¶ 22c, 34: Repeatedly relies on Mr. O'Donovan's alleged proposal that "[i]f I give you cash, there will be no trace." This allegation omits that, immediately prior to this statement by Mr. O'Donovan, Individual 1 stated his preference for payment in cash and asked, "[n]othing's that's [sic] going to trace right?" In context, Mr. O'Donovan's statement cannot be fairly construed as a proposal on his part that payment be made in cash.

- ¶ 28: Suggests Mr. O'Donovan's statement about "hid[ing] behind the . . . curtain" referred to Individual 1. In fact, in context, it is clear that the statement referred to the Mayor's selection of applicants. The statement was immediately followed by, "And I don't blame her, if I was the mayor and you were my . . .

13

Chief of Staff, I'd say . . . this is who's getting it and I'll leave you to make sure (UI), you know."

- ¶ 33: Quotes Mr. O'Donovan's text saying, "[w]e simply need [the Chief] to score us high," omitting the remainder of the text adding, "[i]t's the best application in the group so it should [not] be difficult frankly."

For the foregoing reasons, Mr. O'Donovan respectfully requests that this Honorable Court dismiss the Indictment in this case for outrageous government conduct.

## COMPLIANCE WITH LOCAL RULE 7.1(a)(2)

Undersigned counsel conferred with the Government, and the Government opposes the relief requested in this Motion.

Respectfully Submitted,
SEAN O'DONOVAN
By His Attorney,

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

Dated: September 8, 2022

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, September 8, 2022, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.

14