UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                                                    ) | Crim. No. 22-10141-WGY |
| ) | |
| SEAN O'DONOVAN,                         ) | |
| ) | |
| Defendant                ) | |

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

The government hereby responds to Defendant Sean O'Donovan's motion to dismiss the Indictment. ECF No. 19 (the "Motion"). In this bribery case, Defendant (an attorney) sought to corrupt the city of Medford's process for selecting recreational marijuana companies to operate in that municipality. Defendant offered to pay and did in fact pay thousands of dollars in cash to a public official's close relative in exchange for the public official's favorable vote and other official assistance on Defendant's client's application to sell recreational marijuana in Medford. Defendant now claims his offer of a tax-free cash payment to the public official's relative—and his associated effort to cover up the purpose of the payment by, among other things, suggesting the payment was merely a loan—was actually a lobbying fee. He should be free to test that potential factual defense with a jury, but the Indictment here adequately alleges a bribery scheme that constitutes honest services wire fraud and federal program bribery. The Motion should accordingly be denied.

## BACKGROUND

The following allegations, which derive from the Indictment, ECF No. 1 (the "Indictment"), must be taken as true at the pre-trial motion to dismiss stage. *See United States v. Guerrier*, 669 F.3d 1, 3-4 (1st Cir. 2011).

In 2016, Massachusetts legalized recreational marijuana. Indictment at ¶ 7. As relevant here, obtaining a license to sell recreational marijuana involves two steps. *Id.* at ¶¶ 7-8. First, an

applicant must sign a "host community agreement" (an "HCA") with the municipality where the applicant intends to operate; the agreement sets forth the conditions under which the applicant would operate. *Id.* at ¶ 8. Second, after obtaining an HCA, an applicant must secure a license from the Massachusetts Cannabis Control Commission. *Id.* at ¶ 7.

The process for obtaining an HCA varies from city to city in Massachusetts. The city of Medford opted to form a Cannabis Advisory Committee (the "Medford CAC"), which would review and rank applications for HCAs after interviewing applicants. *Id.* at ¶¶ 11-13. Members of the Medford CAC—including the Medford Chief of Police (the "Chief") and other city officials—would grade applicants on a 150-point scale. *Id.* at ¶ 12-13. The Medford CAC would then forward its nonbinding, advisory assessments to the Medford Mayor, who would select up to three applicants to which she would award HCAs. *Id.* at ¶¶ 11, 13.

In or around December 2018, Defendant—a Somerville attorney—entered into a consulting agreement with a company involved in the cultivation and retail sale of medical and recreational marijuana in Massachusetts (the "Client"). *Id.* at ¶¶ 1-2, 9-10. In the consulting agreement, Defendant agreed to assist the Client in obtaining an HCA with Medford to sell recreational marijuana in the city. *Id.* at ¶ 9. For Defendant's efforts, the Client would pay Defendant a $7,500 monthly fee (until the Client either obtained or failed to obtain an HCA) and provide Defendant with an equity stake in the Client's profits if the Client successfully obtained a license to operate a recreational marijuana business in Medford. *Id.*

Knowing that the Chief would be on the Medford CAC, Defendant embarked on the bribery scheme charged here, which involved his effort to secure the Chief's official acts benefitting the Client by making cash payments to the Chief's close family relative ("Individual 1"). *Id.* at ¶¶ 16-22. He did all of this while concealing his actions from the Client. *Id.* at ¶ 38. First, in February

2021, Defendant contacted Individual 1 to set up a meeting in a parking lot during which Defendant proposed paying $25,000 to Individual 1 to speak to the Chief about the Client.[1] *Id.* at ¶ 24. Over the course of the next approximately 10 months, Defendant

> reached what he believed to be a corrupt agreement with the Chief and with Individual 1. Under this agreement, [Defendant] intended to offer the Chief a payment to Individual 1 and did in fact pay Individual 1 in exchange for (a) the Chief's agreement to provide a favorable formal ranking of the Client's application before the Medford CAC for an HCA and (b) the Chief's agreement to advise and pressure the Mayor of Medford to enter into an HCA with the Client.

*Id.* at ¶ 26; *see also id.* at ¶ 19 (similar). In meetings later in February 2021 and in April 2021, Defendant highlighted the Chief's proximity to the Mayor and his power on the Medford CAC, *see, e.g., id.* at ¶¶ 27-28 ("Whoever [the Chief] gives the nod to, is gonna look great in [the Mayor's] eyes."), and emphasized that he was trying "to get the edge." *Id.* at ¶ 27. Defendant offered Individual 1 "50 grand" and explained, "If [the Chief] can square [the Client]—if [the Chief] can, we should have no problem." *Id.*

Four months later, after an August 2021 negative press story surfaced regarding the Client, Defendant again contacted Individual 1 and renewed his interest in paying Individual 1 to secure the Chief's official favor. *Id.* at ¶¶ 31-34. Defendant explained: "If he [the Chief] gives them a high vote and they get it, you're getting paid." *Id.* at ¶ 34. He highlighted repeatedly that the payment to Individual 1 would be in cash, so no one would "fucking know about it" and so "there will be no trace." *Id.* And he emphasized that his payment was in exchange for (a) the Chief's high score for the Client and (b) the Chief's promise to encourage the Mayor to award an HCA to the

---

[1] The Chief and Individual 1 subsequently reported this contact to the Federal Bureau of Investigation. Both agreed to cooperate with the investigation, and Individual 1 agreed to record and preserve his subsequent communications with Defendant. *See* Indictment at ¶ 25.

3

Client quickly. *E.g.*, *id*. When Individual 1 informed Defendant that the Chief was willing to rank the Client higher in exchange for the payment, Defendant responded: "Beautiful." *Id.* at ¶ 35.

Between September and October 2021, Defendant formulated various versions of a more concrete payment plan (generally a down payment and a second payment after the Chief's vote), and sought to confirm via Individual 1 that the Chief was satisfied with the arrangement. For example, Defendant offered to pay $5,000 up front and then $20,000 after the Client obtained an HCA (later this became $2,000 up front and $15,000 after the vote). *Id.* at ¶¶ 37, 40. Defendant wanted to ensure, however, that the Chief was on board. For example, he asked whether a $5,000 up-front payment "[w]ould [] be proof for [the Chief] that you're gonna get the other twenty" and whether the Chief "wants some assurance now" concerning payment to Individual 1. *Id.* at ¶¶ 36-37. Defendant also plotted various alternative cover stories in case "someone ever came knocking," including falsely characterizing the payments to Individual 1 as a loan and falsely referring to the payments as fees for "consulting matters" in Somerville. *Id.* at ¶¶ 22(a)-(b), 36-37.

In October 2021, Defendant in fact paid Individual 1 the promised $2,000 cash bribe. *Id.* at ¶ 40. Defendant explained: "Take that . . . that's two grand," and added that the next "fifteen grand is locked and loaded [] [a]s long as [the CEO of the Client] gets what he wants." *Id*.

The Indictment subsequently charged Defendant with (a) two counts of honest services wire fraud in violation of 18 U.S.C. §§ 1343, 1346 and (b) one count of federal program bribery in violation of 18 U.S.C. § 666(a)(2). *See id.* at ¶¶ 15-46, 47-48.

## LEGAL STANDARD

"When a defendant seeks dismissal of an indictment, courts take the facts alleged in the indictment as true," *United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015), recognizing that the "question is not whether the government has presented enough evidence to support the charge, but

solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense." *United States v. Savarese*, 686 F.3d 1, 7 (1st Cir. 2012). "[A]n indictment that tracks a statute's terms is legally sufficient if the indictment itself gives the defendant adequate notice of the charges she must meet." *United States v. Stepanets*, 879 F.3d 367, 372 (1st Cir. 2018) (recognizing that "in seeing whether an indictment is up to snuff, a court must reject arguments that embrace technical niceties at the expense of common sense"). Indeed, "courts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations." *Guerrier*, 669 F.3d at 4. "When a federal court uses its supervisory power to dismiss an indictment it directly encroaches upon the fundamental role of the grand jury. That power is appropriately reserved, therefore, for extremely limited circumstances." *Whitehouse v. U.S. Dist. Ct. for Dist. of Rhode Island*, 53 F.3d 1349, 1360 (1st Cir. 1995).

## ARGUMENT

The charged conduct here falls comfortably within the bounds of the honest services wire fraud statute, 18 U.S.C. § 1346, and the federal program bribery statute, 18 U.S.C. § 666(a)(2). First, the Indictment properly alleges honest services wire fraud. Defendant's contention that the Indictment violates principles announced in *Skilling v. United States*, 561 U.S. 358 (2010), *see* Mot. at 8-13, misunderstands the gravamen of the charge: Defendant engaged in a perfectly conventional bribery scheme, paying cash for official actions. That he paid a public official's relative rather than the public official himself in no way alters this basic equation, because such third-party payments are directly contemplated by decades of bribery caselaw both before and after *Skilling* and by federal bribery statutes that inform the scope of the honest services fraud statute. His related request to import a state law violation element into the honest services fraud statute, *see* Mot. at 12-13, founders on binding First Circuit precedent. Second, the Indictment adequately

5

alleges *quid pro quo* bribery for purposes of both the honest services fraud statute and the federal program bribery statute. Finally, Defendant's argument that the Indictment raises constitutional issues, *see* Mot. at 19-22, rests on the incorrect assumption that the Indictment would contravene a *hypothetical* defense-favorable decision in an upcoming Supreme Court case.

**I.      The Indictment Properly Alleges Honest Services Wire Fraud**

Defendant's principal argument in the Motion—that *Skilling* requires dismissal of the honest services wire fraud counts here—misunderstands the scope of the decision.

      **A.      All Bribery and Kickback Schemes Survive *Skilling***

Since the mid-20th century, the honest services fraud theory has been used to reach federal mail and wire fraud schemes targeting those who would deprive, *inter alia*, the public of its intangible right to a public official's honest services. *See Skilling*, 561 U.S. at 400-01. In 1987, the Supreme Court limited the reach of these fraud statutes to the deprivation of property rights, invalidating the intangible rights-based honest services fraud theory. *See McNally v. United States*, 483 U.S. 350, 360 (1987). The following year, Congress enacted 18 U.S.C. § 1346,[2] which revived the pre-*McNally* honest services fraud theory. Subsequently, in *Skilling*, the Supreme Court addressed the proper scope of 18 U.S.C. § 1346. For decades, the statute had primarily been used to reach two forms of honest services fraud schemes: (1) bribes and kickbacks and (2) undisclosed self-dealing. *See* 561 U.S. at 407-10. To avoid due process concerns about vagueness, the *Skilling* Court eliminated the second category and restricted Section 1346 to the "solid core" of honest services fraud: bribes and kickbacks. *Id.* at 407-09.

---

[2] The statute reads in full: "For the purposes of th[e] chapter [of the United States Code that prohibits, *inter alia*, mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343], the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

Defendant seizes on the *Skilling* Court's use of the word "core" to fashion his argument, Mot. at 8-10, 12, but the term was used only to distinguish the bribery-and-kickback heartland of honest services cases from the more amorphous undisclosed self-dealing category of conduct:

> [T]o preserve what Congress certainly intended the statute to cover, we pare that body of precedent down to its core: in the main, the pre-*McNally* cases involved fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived. Confined to these paramount applications, § 1346 presents no vagueness problem.

*Id.* at 404. The Court reasoned that "[w]hatever the school of thought concerning the scope and meaning of § 1346, it has always been as plain as a pikestaff that bribes and kickbacks constitute honest-services fraud, and the statute's *mens rea* requirement further blunts any notice concern." *Id.* at 412 (internal quotation marks and citation omitted); *see also United States v. Sidoo*, 468 F. Supp. 3d 428, 444 (D. Mass. 2020) (noting that "'*Skilling* did not eliminate from the definition of honest services fraud any particular type of bribery [or kickbacks], but simply eliminated honest services fraud theories that go beyond bribery and kickbacks'" (quoting *United States v. Bryant*, 655 F.3d 232, 245 (3d Cir. 2011))). Thus, after *Skilling*, all bribery and kickback schemes fall within the scope of Section 1346—without limitation.

    B.    <u>Honest Services Prosecutions Predicated on Bribe Payments to Third Parties Remain Viable Post-*Skilling*</u>

Defendant incorrectly argues, however, that *Skilling* bars prosecutions where the public official was not contemplated as the direct beneficiary of the bribe. Mot. at 9-11. In fact, corrupt bribe payments made to third parties in exchange for official action by public officials have consistently been, and remain even post-*Skilling*, illegal under the honest services fraud statute.

There is a long history, in this Circuit and others, of honest services fraud prosecutions involving payments from bribe payors not to a public official, but to third parties. For example, in

7

*United States v. Silvano*, 812 F.2d 754, 755-58 (1st Cir. 1987), a powerful city of Boston official surreptitiously channeled contracts to entities affiliated with his friend and was convicted of multiple counts of honest services wire fraud. Over the official's objection that he had not directly benefitted from the scheme, the First Circuit explained: "[i]t is immaterial whether [the official] personally profited from the scheme or whether the City suffered a financial loss from it." *Id.* at 759-60; *see also United States v. Welch*, 327 F.3d 1081, 1107 (10th Cir. 2003) (rejecting private-gain requirement as "adding an element to honest services fraud which the text and structure of the fraud statutes do not justify"); *United States. v. Panarella*, 277 F.3d 678, 692 (3d Cir. 2002) (rejecting private-gain requirement as lending "little clarity" to Section 1346).

Even in circuits that ostensibly require the government to establish private gain of some variety in a Section 1346 prosecution, illegitimate funds flowing to third parties qualify. For example, in *United States v. Sorich*, 523 F.3d 702, 706-07, 711 (7th Cir. 2008), the defendants were Chicago city officials who created an "illegitimate, shadow hiring scheme based on patronage and cronyism" in which city jobs were doled out based on political favoritism. The city officials, charged with, *inter alia*, honest services fraud, did not benefit—only the patronage hires did. *Id.* The defendants appealed in part on the grounds that a scheme that only "enriche[es] a third party" could not violate Section 1346. *Id.* at 708-11. The Seventh Circuit, which in fact employs a private gain requirement for honest services fraud cases, provided a detailed explanation of why payments to third parties nevertheless qualified as "private gain." *Id.* at 709 ("By 'private gain' we simply mean illegitimate gain, which usually will go to the defendant, but need not."). The court considered a hypothetical in which an attorney referred clients to a chiropractor friend in exchange for secret kickback fees that he directed to "his estranged brother, about whom the attorney had always felt guilty," explaining that such a scheme would still violate the honest services fraud

statute because "Robin Hood may be a noble criminal, but he is still a criminal." *Id.* at 709-10; *see also United States v. Hausmann*, 345 F.3d 952, 954 (7th Cir. 2003) (kickback arrangement required payments to, *inter alia*, "individuals who had provided miscellaneous personal services to [the defendant] *or his relatives* . . . and . . . charities that [the defendant] supported") (emphasis added); *United States v. McDonough*, 56 F.3d 381, 391 (2d Cir. 1995) (kickback scheme involved payments to corporation owned by defendant's wife).

Rather than disrupting that extensive history, *Skilling* and subsequent cases have in fact reinforced the legitimacy of honest services fraud cases involving payments to third parties. Multiple cases cited favorably in *Skilling* involved schemes where benefits accrued to non-conspirators. *See Skilling*, 561 U.S. at 408 (citing *Sorich*, 523 F.3d at 707 (patronage jobs); *United States v. Brown*, 540 F.2d 364, 374 (8th Cir. 1976) (payments to public official's girlfriend); *United States v. Mandel*, 591 F.2d 1347, 1356 (4th Cir. 1979) (jewelry for official's wife in addition to direct payments)). The *Skilling* Court also explained that the honest services fraud statute's "prohibition on bribes and kickbacks draws content . . . from federal statutes proscribing—and defining—similar crimes," and specifically cited 18 U.S.C. § 201(b) and 18 U.S.C. § 666(a)(2). *See* 561 U.S. at 412. Both of these federal bribery statutes contemplate and criminalize corrupt payments to third parties made in exchange for official actions or with intent to influence officials. *E.g.*, 18 U.S.C. § 201(b) (barring anyone from corruptly offering or promising any public official "to give anything of value *to any other person* or entity, with intent . . . to influence any official act") (emphasis added); 18 U.S.C. § 666(a)(2) (barring anyone from corruptly giving, offering, or agreeing to give "anything of value *to any person*, with intent to influence or reward" an official) (emphasis added). Coupling these citations with the *Skilling* Court's specific acknowledgement of division in the lower courts concerning a private gain

9

requirement for purposes of Section 1346, *see Skilling*, 561 U.S. at 403 n.36, it cannot be said that *Skilling* bars prosecutions based on bribe payments to third parties.

In addition, multiple post-*Skilling* honest services fraud cases have involved payments to third parties. *E.g.*, *United States v. DeMizio*, 741 F.3d 373, 382 (2d Cir. 2014) (rejecting defendant's "contention that a payment in a private-sector scheme does not qualify as a kickback unless the defendant employee himself or herself receives the payoff," and emphasizing that corrupt payments to father or brother could qualify as kickbacks); *Temple v. United States*, No. 04-CR-0568, 2012 WL 7763027, at *3 (N.D. Ga. Dec. 27, 2012) ("*Skilling* did not require that all of the participants in an honest services fraud benefit personally"), *report and recommendation adopted*, 2013 WL 1129408 (N.D. Ga. Mar. 19, 2013). *Cf. United States v. McGregor*, No. 10-CR-186, 2011 WL 1576950, at *4 (M.D. Ala. Apr. 4, 2011) (honest services fraud requires proof of personal benefit to offender, but "the benefit would not have to be in the form of a direct payment of cash to the individual in question" and could instead be payment to third party), *report and recommendation adopted as modified by* 2011 WL 1988363 (M.D. Ala. May 23, 2011).

Defendant seeks to distinguish these cases by arguing that he is not aware of post-*Skilling* cases involving (a) payments "made to a third-party to lobby a public official" where (b) there is "no allegation that the official participated in making the arrangements or expected to receive" a payment. Mot. at 11. These arguments, however, mischaracterize the allegations in the Indictment and the appropriate legal standard here. First, whether Defendant was "lobbying" the Chief's close family relative when he offered the relative an under-the-table, secret cash payment of thousands of dollars (with "fifteen grand [] locked and loaded [] [a]s long as [the Client's CEO] gets what he wants"), Indictment at ¶ 40, presents a factual question for the jury. The Indictment, in other words, alleges bribery (not lobbying), whereas Defendant alleges he was engaged in lobbying (not

10

bribery). Defendant essentially asks the Court, in evaluating the Motion, to *assume* he was engaged in lobbying in assessing whether the Indictment is sufficient. That would be inappropriate. *See Ngige*, 780 F.3d at 502 (indictment allegations must be taken as true on motion to dismiss).

Contrary to Defendant's second argument, moreover, the Indictment contains a direct allegation that he believed he had an agreement with the Chief, and therefore that the Chief "participated in making the arrangements." Mot. at 11. The Indictment alleges that Defendant,

> believing that he had reached a corrupt agreement with both Individual 1 and the Chief, corruptly gave, offered, and promised things of value to Individual 1 in exchange for official action from the Chief including (a) the Chief's favorable ranking of the Client's application before the Medford CAC for an HCA and (b) the Chief's agreement to advise and pressure the Mayor of Medford to enter into an HCA with the Client.

Indictment at ¶ 19; *see id.* at ¶ 26 (similar). Relatedly, the Indictment alleges that in September 2021, Defendant proposed a payment to Individual 1 of $5,000, but wanted to confirm whether that would "be proof for [the Chief] that you're gonna get the other twenty." *Id.* at ¶ 36. Subsequently Defendant proposed an alternative: "If [the Chief] wants some assurance now . . . then I can give you a check from my office and it will be loan and ah, I'll just forgive the loan after success, and then get you another twenty." *Id.* at ¶ 37. Though his own words indicate that he believed he was negotiating with the Chief about "the arrangements" through Individual 1, Defendant inappropriately asks the Court to disregard these allegations in assessing the Motion.

C.   The Government Need Not Establish a State Law Violation

Defendant also mistakenly asserts that the government must establish a state law violation to prove honest services fraud. Mot. at 12-13 and 16 & n.9. There is no such requirement, but even if there were, the Indictment's allegations establish such violations.

The First Circuit has held, as have the majority of other circuits, that honest services fraud prosecutions do "not require proof of a violation of any state law." *United States v. Sawyer*, 239 F.3d 31, 41 (1st Cir. 2001).[3] In a subsequent case, the First Circuit clarified that state law "might bear on what 'services' are owed by a state legislator," but only if the government "had chosen to proceed on the theory that a conflict of interest alone (as opposed to a bribe or concealment of a conflict) was a basis for conviction." *United States v. Urciuoli*, 513 F.3d 290, 298-99 (1st Cir. 2008).[4] In *Skilling*, the Supreme Court merely recognized in a footnote that at least one different circuit required Section 1346 prosecutions to be based on a violation of state law, *see* 561 U.S. at 403 n.36, but in no way sought to resolve that conflict.

Defendant argues that this Court should essentially overrule *Sawyer* and *Urciuoli* and resolve this conflict—one even the Supreme Court declined to resolve—in favor of a state-law-violation requirement for honest services fraud prosecutions. This Court is bound by *Sawyer* and *Urciuoli*, however, and even post-*Skilling* decisions have refused to import such a requirement into this area of the law. *See, e.g.*, *Bahel*, 662 F.3d at 633 (after *Skilling*, adhering to earlier circuit precedent declining to require state law violation in honest services fraud prosecutions); *see also*

---

[3] *See also United States v. Bahel*, 662 F.3d 610, 633 (2d Cir. 2011) ("[T]he Ninth Circuit has rejected the notion that a deprivation of honest services requires a underlying violation of state law in a domestic case."); *United States v. Walker*, 490 F.3d 1282, 1299 (11th Cir. 2007) (holding that an honest services fraud conviction "does not require proof of a state law violation"); *United States v. Bryan*, 58 F.3d 933, 942 (4th Cir. 1995) (holding that the duty of honesty is defined irrespective of the existence of state law), *abrogated on other grounds by United States v. O'Hagan*, 521 U.S. 642 (1997). *But see United States v. Brumley*, 116 F.3d 728, 734 (5th Cir. 1997) (adopting a state-law limiting principle to the federal honest services fraud statute under which "a federal prosecutor must prove that conduct of a state official breached a duty respecting the provision of services owed . . . under state law").

[4] Of course, here, the government is proceeding on a bribery theory, not a conflict of interest theory, *see, e.g.*, Indictment at ¶¶ 16, 48, as it must after *Skilling*. *See* 561 U.S. at 407-10.

12

*United States v. Keleher*, 505 F. Supp. 3d 41, 59 (D.P.R. 2020) (recognizing *Sawyer*'s continued vitality in the First Circuit after *Skilling*).

Additionally, even where courts require a state law violation as a prerequisite to an honest services fraud conviction, they primarily resort to state law to ascertain the scope of the *government official's* fiduciary duty (not to determine whether a private individual-bribe payor's actions independently violate any state law). *See, e.g.*, *Brumley*, 116 F.3d at 734 (noting that government "must prove that *conduct of a state official* breached a duty respecting the provision of services owed to the official's employer under state law") (emphasis added); *see also United States v. Ruiz*, 589 F.3d 1310, 1313 (10th Cir. 2009) ("[E]ven if a predicate state law violation is required for a federal honest services fraud conviction, [the public official-defendant's] conduct clearly violated New Mexico law."). For example, in *United States v. Sawyer*, 85 F.3d 713, 725-32 (1st Cir. 1996), the First Circuit explained the interplay between state statutes and Section 1346 where the government relied exclusively on state law violations to establish a lobbyist-bribe payor's honest services wire fraud. Although the court reversed honest services fraud convictions because the jury could have improperly relied on the state law violations in finding honest services fraud, the First Circuit found no fault with the concept of jury instructions allowing the government to prove either that the lobbyist had "intentionally violated *or caused members of the Massachusetts Legislature to violate*" a state law. *Id.* at 725-27, 731 (emphasis added).

Even if a state law violation were required here, there can be little doubt that were the Chief involved in Defendant's bribery scheme (as Defendant believed he was), Defendant would have caused the Chief to violate a multitude of Massachusetts state laws including those barring bribery, see Mass. Gen. Laws Ann. ch. 268A, § 2(b), undisclosed conflicts, *see id.*, § 19(a),[5] and actions

---

[5] The Indictment echoes this provision: "As a municipal employee, the Chief owed a duty of honest services to the City of Medford and could not legally participate in a particular municipal matter

13

that would induce a reasonable person to question the official's impartiality, *see id.*, § 23(b)(3). Even if the government were obligated to show that *Defendant* violated a state law, the Indictment's allegations track the Massachusetts bribery statute. *Compare, e.g.*, Indictment at ¶ 48 (alleging that Defendant "corruptly . . . gave, offered and agreed to give Individual 1 money, intending to influence and reward the Medford, Massachusetts Chief of Police, a public official and employee of the City of Medford, in connection with the Chief's favorable ranking of the Client's application before the Medford CAC for an HCA and the Chief's agreement to advise and pressure the Mayor of Medford to enter into an HCA with the Client"), *with* Mass. Gen. Laws Ann. ch. 268A, § 2(a)(1) ("Whoever, directly or indirectly, corruptly . . . offers or promises any [municipal] employee . . . to give anything of value to any other person . . . with intent . . . to influence any official act . . . shall be punished . . . .").

## II.     The Indictment Adequately Alleges a *Quid Pro Quo*

Defendant next asserts, inaccurately, that the Indictment fails to adequately allege (a) Defendant's intent to engage in *quid pro quo* bribery or (b) an agreement with the Chief, Mot. at 14-19, but his characterizations of the federal bribery statutes misstate the law and—again—ask the Court to accept in advance his factual lobbying defense.

As an initial matter, the Indictment adequately alleges that Defendant possessed the requisite corrupt intent to engage in a bribery scheme. To plead honest services fraud, the government must allege that the Defendant had a specific "intent to deprive" the public of the

---

in which, to his knowledge, his immediate family member had a financial interest." Indictment at ¶ 4 (referencing Mass. Gen. Laws Ann. ch. 268A, § 19(a)). Defendant argues that a related provision in the same statute authorizing such participation where the public official makes a full disclosure of the conflict, Mass. Gen. Laws Ann. ch. 268A, § 19(b), indicates that state law "expressly contemplated the conduct alleged." Mot. at 13. But Defendant's efforts, as outlined in the Indictment, to keep the entire bribery scheme hidden (*e.g.*, "no one's going to fucking know about it," Indictment at ¶ 34) suggest Defendant did not intend for anyone to take advantage of the disclosure exception.

14

"official's honest services" through bribery or kickbacks. *See Sawyer*, 85 F.3d at 725; *United States v. Potter*, 463 F.3d 9, 19 (1st Cir. 2006) (same); *see also Skilling*, 561 U.S. at 409. As relevant here, to adequately plead federal program bribery, the government must allege that Defendant "corruptly g[ave], offer[ed], or agree[d] to give anything of value to any person, with intent to influence or reward an agent" of Medford "in connection with any business, transaction, or series of transactions" of the city. 18 U.S.C. § 666(a)(2).

Here, the Indictment—aside from tracking the statutory language and complying with *Skilling*'s requirement of alleging a bribery or kickbacks scheme for purposes of Section 1346, *see* Indictment at ¶¶ 16-22, 46-48, which alone would be sufficient for both statutes—charges the requisite corrupt intent. For example, as described above, the Indictment alleges with particularity the nature of Defendant's corrupt agreement with the Chief and Individual 1. *Id.* at ¶¶ 19, 26.

Beyond these allegations, the Indictment repeatedly alleges Defendant's understanding of the Chief's involvement in the scheme. For example, as early as February 2021, Defendant explained: "If [the Chief] can square them—if [the Chief] can, we should have no problem." *Id.* at ¶ 27. In September 2021, Individual 1 conveyed to Defendant that "the Chief knew [Defendant] would pay Individual 1 if the Chief gave the Client's application for an HCA a high score." *Id.* at ¶ 34. Later in September 2021, as discussed above, Defendant proposed mechanisms to obfuscate the purpose of the payment to Individual 1 and simultaneously highlighted his concerns about ensuring the Chief's satisfaction with the arrangement. *Id.* at ¶¶ 22, 36-37 (proposing writing a $5,000 check to Individual 1, but asking whether that would be "proof for [the Chief] that you're gonna get the other twenty" and asking whether the Chief "wants some assurance now" concerning the payment to Individual 1). And in October 2021, Defendant falsely stated that he was only paying a small cash advance to Individual 1 because the Client's CEO—who in fact had no

15

knowledge of Defendant's bribery scheme, *id.* at ¶ 38; *see also infra* note 6—wanted to ensure the Chief did not "have a change of heart" and back out of the agreement. *Id.* at ¶ 40. These statements, along with others in the Indictment, are sufficient at this stage for purposes of alleging Defendant's corrupt intent to engage in a bribery scheme with the Chief. They are also inconsistent with Defendant's purported "good-faith belief that he was paying Individual 1 to engage in lawful, legitimate, and constitutionally protected lobbying." Mot. at 15-16.[6]

Moreover, Defendant incorrectly suggests that the government must allege that the bribe offeree (here, the Chief) convey "an intent [to take official action] to the payor in order for the requisite corrupt exchange to arise." Mot. at 17. This is a misstatement of the law, since the mere corrupt offer of a bribe is sufficient to trigger federal criminal bribery liability (even where the public official, in fact, entirely lacks awareness of the briber offer). *See, e.g., United States v. Davis*, 965 F.2d 804, 810-11 (10th Cir. 1992) ("In fact, so long as the money is offered with corrupt intent, the official does not necessarily even need to be aware of the bribe. The statute makes *attempted* bribery a crime, and so long as a bribe is offered or promised with the requisite intent to influence any official act the crime is committed.") (citation omitted); *United States v. Gallo*, 863 F.2d 185, 189 (2d Cir. 1988) ("Whether or not there was a federal official to whom bribes were actually paid is not determinative of the issue of intent. . . . To find such intent, the public official

---

[6] Many other allegations in the Indictment are categorically inconsistent with "good faith" lobbying. For example, Defendant (a) proposed paying cash to Individual 1 so that "there will be no trace," Indictment at ¶ 34, and so Individual 1 could avoid paying taxes on the bribe, *see id.* at ¶¶ 27, 34 ("I'll pay the taxes on it and I'll give you the difference"); (b) recommended covering up the payment through various mechanisms—including creating a fake "loan" and accompanying promissory note and, alternatively, a false document that would suggest Defendant was paying Individual 1 to provide "consulting matters . . . in Somerville," *id.* at ¶¶ 36-37—all in case "someone ever came knocking," *id.* at ¶ 22(b); and (c) kept his arrangement with the Chief and Individual 1 secret from the Client's CEO, who—in any "good faith" lobbying effort—would surely at least be aware that the Client was to be engaged in a "lobbying" arrangement involving an under-the-table cash payoff to a public official-decisionmaker's close relative, *id.* at ¶ 38.

16

who is the target of the bribe need not be aware of the bribe."); *United States v. Johnson*, 621 F.2d 1073, 1076-77 (10th Cir. 1980) ("In fact, so long as the money is offered with corrupt intent, the official does not necessarily even need to be aware of the bribe."); *see also United States v. Frega*, 179 F.3d 793, 807 (9th Cir. 1999) ("As we have previously made clear, what is critical to a finding that [the bribe payor-defendant] committed the predicate acts for the substantive RICO charge is [his] intent in making the payment, whether to a judge or to a member of the judge's family, not whether the judge was in fact aware of or influenced by the payment.").

The First Circuit has applied this principle directly. For example, in *Potter*, 463 F.3d at 9, corrupt bribe offerors schemed to influence a public official who had no knowledge of their effort. Principals connected to a gambling facility and dog track put in place a scheme to pay the law partner of a public official in order to influence the public official to shape legislation benefitting their business. *Id.* at 13. Not only was the public official unaware of the scheme, but the scheme never came to fruition (no money was in fact ever paid or offered). *Id.* at 14-17. Still, the defendants were convicted of conspiracy to commit honest services wire fraud and multiple substantive counts of honest services wire fraud. *Id.* at 13. The defendants argued there was "no evidence that [the public official] was a party to any agreement or even knew of the scheme." *Id.* at 16. In affirming the conviction, the First Circuit rejected that argument (holding that such evidence was not "essential") and that "anyone could concoct a scheme to deprive [] citizens of [the official's] honest services and could send a fax for the purpose of executing such a scheme." *Id.* at 16-17. There is accordingly no "independent requirement," as Defendant suggests, Mot. at 16, that the government allege or show an *actual* agreement between Defendant and the Chief.

Even if the government were under some obligation to show the Chief's intent, the Indictment alleges—as described in detail above—that Defendant believed he had reached a

17

corrupt agreement with the Chief via Individual 1 (and therefore that Defendant *believed* the Chief shared his corrupt intent). *See* Indictment at ¶¶ 16-22, 26-27, 34, 36-38, 40, 48. Defendant's related contention that the allegations in the Indictment at most establish a gratuity, Mot. at 16-18, glosses over all of the allegations that Defendant's offer and payment of thousands of dollars to Individual 1 were *in exchange for*, and contingent on, the Chief's favorable vote and recommendation (not merely to thank the Chief for some future act). *See, e.g.*, Indictment at ¶¶ 19 ("in exchange for official action"), 21 ("In exchange for the Chief's official actions"), 38 ("agreed to pay Individual 1 in exchange for"). For example, when Defendant paid Individual 1 the $2,000 down payment, he made clear that it was a *down payment*, with "fifteen grand [] locked and loaded [] [a]s long as [the Client's CEO] gets what he wants." *Id.* at ¶ 40. These allegations reflect "a specific intent to give . . . something of value *in exchange* for an official act" (a bribe) rather than "a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken" (a gratuity). *See United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404-05 (1999). Put simply, if Defendant were merely *rewarding* the Chief in advance by paying Individual 1, Defendant would not be holding back a $15,000 payment until after the Chief's vote. Defendant's threat to "ask for [the money] back" if the Chief were to have a "change of heart" about the agreement, Indictment at ¶ 40, is also inconsistent with the notion that the $2,000 he paid Individual 1 was merely a "reward." Rewards are not intended to influence official actions. The Indictment adequately alleges *quid pro quo* bribery.

### III. The Indictment Raises No Constitutional Concerns

Defendant's final flawed argument is that this prosecution would chill "protected First Amendment lobbying activity." Mot. at 22. Defendant relies on a recent petition for a writ of certiorari that the Supreme Court granted in *Percoco v. United States*, No. 21-1158 (S. Ct.).

18

Percoco was a high-level aide of a governor; he was convicted of honest services fraud based in part on conduct that occurred while he was out of government running the governor's re-election campaign. *See United States v. Percoco*, 13 F.4th 180, 193 (2d Cir. 2021). In upholding his conviction, the Second Circuit sustained a jury instruction providing that certain degrees of dominance and control of government business, even without a government position, could trigger a duty of honest services. *Id.* at 193-97 (citing *United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982)). The Supreme Court has granted certiorari on the question of whether private citizens can under such circumstances owe a duty of honest services. Whatever the outcome in *Percoco*, there can be little question here that the Chief owed a duty of honest services to the municipality for which he served as police chief. Indictment at ¶ 4. Accordingly, even a defense-favorable decision in *Percoco* would not likely have any impact on this case.

Defendant suggests that permitting this prosecution to move forward would allow an end-run around a future, *potential* defense-favorable decision in the *Percoco* case. The government, Defendant claims, would "simply allege an indirect attempt to influence the public official himself (as in this case) rather than a direct attempt to influence the non-official with informal sway over government actors." Mot. at 21. First, this Court cannot reasonably predict how the Supreme Court will rule in *Percoco* or what the scope of its decision will be. More fundamentally, though, it is difficult to see how permitting the Indictment here to move forward would be inconsistent with a possible defense-favorable decision in *Percoco*. Defendant claims that family members or close associates of public officials would be subject to prosecution not because they exercise quasi-public authority (as Percoco did), but solely because of their proximity to those who *do* in fact hold public authority. Mot. at 21. But any such potential prosecution would still require the family member's corrupt intent and direct involvement in a bribery or kickback scheme, and

this case presents a perfect example of an appropriate prosecution in such circumstances: where the intermediary close relative merely serves as a conduit to the public official, facilitating a bribery transaction between the official, the relative, and the bribe payor. *E.g.*, Indictment at ¶¶ 19, 21, 26. Defendant does not detail how or why such a prosecution would transgress a hypothetical defense-favorable decision in *Percoco*, particularly where dismissing the Indictment on such grounds would appear to inappropriately *insulate* intermediary relatives and associates from criminal liability even where they participate in and facilitate bribery.

## CONCLUSION

For the reasons described herein, the Motion should be denied.

Dated: September 8, 2022

Respectfully submitted,

RACHAEL S. ROLLINS  
United States Attorney

COREY R. AMUNDSON  
Chief, Public Integrity Section  
U.S. Department of Justice

By: *Kristina E. Barclay*  
Kristina E. Barclay  
Assistant United States Attorney

By: *Jonathan E. Jacobson*  
Jonathan E. Jacobson  
Trial Attorney, Public Integrity Section  
U.S. Department of Justice

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of September 2022 I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF System, which will then send a notification of such filing to all attorneys of record.

*/s/ Jonathan E. Jacobson*  
Jonathan E. Jacobson  
Trial Attorney, Public Integrity Section