```
1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF MASSACHUSETTS (Boston)

3                                   No. 1:22-cr-10141-WGY

4

5    UNITED STATES OF AMERICA

6

7    vs.

8

9    SEAN O'DONOVAN

10

11                          *********

12

13                       For Hearing Before:
                         Judge William G. Young
14

15                       Motion to Suppress

16

17                    United States District Court
                      District of Massachusetts (Boston.)
18                    One Courthouse Way
                      Boston, Massachusetts 02210
19                    Monday, December 19, 2022

20                          ********

21

22            REPORTER: RICHARD H. ROMANOW, RPR
                      Official Court Reporter
23                 United States District Court
          One Courthouse Way, Room 5510, Boston, MA 02210
24                    bulldog@richromanow.com

25
```

```
1                    A P P E A R A N C E S

2

3    KRISTINA E. BARCLAY, ESQ.
        United States Attorney's Office
4       One Courthouse Way, Suite 9200
        Boston, Massachusetts 02210
5       (617) 748-3371
        E-mail: Kristina.barclay@usdoj.gov
6       For the United States of America

7
     MARTIN G. WEINBERG, ESQ.
8       Martin G. Weinberg, P.C.
        20 Park Plaza, Suite 1000
9       Boston, Massachusetts 02116
        (617) 227-3700
10      Email: Owlmgw@att.net
        for the Defendant

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          P R O C E E D I N G S

2          (Begins, 2:00 p.m.)

3          THE CLERK:  Now hearing Criminal Matter 22-10141,

4    the United States of America versus Sean O'Donovan.

5          THE COURT:  Good afternoon.  Would counsel

6    identify themselves.

7          MS. BARCLAY:  Good afternoon, your Honor,

8    Christina Barclay for the United States.

9          MR. WEINBERG:  Good afternoon, your Honor, Martin

10   Weinberg on behalf of Sean O'Donovan, who sits to my

11   right, your Honor.

12         THE COURT:  Yes.  Mr. Weinberg, I will hear you.

13   I will -- I think I should say that having looked at

14   Judge Saris's careful analysis, you would seem to have

15   an uphill climb.

16         MR. WEINBERG:  Yes, and I realize that on December

17   2 the phone cap speaker, and I was going to advise the

18   Court and Ms. Barclay that --

19         THE COURT:  I'm sure you would, that's not the

20   point, but just that that analysis commends itself to

21   the Court.

22         MR. WEINBERG:  Yes, and I'm going to spend a few

23   minutes on that issue, which is one of three issues.

24         THE COURT:  Go ahead.

25         MR. WEINBERG:  There's the general warrant issue

1    that Judge Saris addressed -- and I can't make an

2    argument that the type of warrant that she addressed in

3    *Klyushin* is meaningfully different than the warrants,

4    the four warrants here.  I'm not making factual

5    distinctions, I'm appealing to you as a co-equal judge

6    to consider that, with all due respect to the former

7    Chief Judge, I don't think she got it right here.  And

8    I'll spend about 2 minutes doing that.

9         THE COURT:  Go right ahead.

10        MR. WEINBERG:  And then I'll go to probable cause,

11   and then I'll go to the lack of particularity in the

12   second part of the warrants, which is what can the

13   government search the documents that the ISP's -- Apple

14   have provided.

15        In terms of the general warrant issue, you know I

16   raise it because -- you know not to be dramatic, but you

17   know we work about a mile from the gravestone of James

18   Otis, who's buried right across from the Parker House,

19   and he's the Founder of the Fourth Amendment, and when I

20   had an opportunity at one time to argue to the Supreme

21   Court on a Fourth Amendment issue back in 1977 and '8,

22   and it came from Judge Tauro's granting the suppression

23   and the First Circuit adopting it and Department of

24   Justice appealing it and it turned out to be a 7 to 2

25   opinion in *Chadwick* that Justice Berger wrote.  And it

1    dealt with the idea is the search warrant issue, the

2    warrant clause limited to the home or does it extend to

3    papers, and in that case it was a Footlocker at South

4    Station?

5         The whole history of the Fourth Amendment is a

6    railing by the Founding Fathers against writs of

7    assistance where they went into warehouses and took

8    everything, and later the customs people and the

9    sovereigns, men would go through and decide, "Well

10   that's criminal" and "That's not criminal.

11        In *Chadwick* the government said the warrant clause

12   should be limited to the home.  And when you read

13   Justice Berger's decision, and I reread it last night,

14   it quoted back to the seminal cases that said mail and

15   papers and messages are as protected as the home.  And

16   here the government wouldn't come before the Court, I

17   don't think, and say, "Give me a search warrant that I

18   can serve on the U.S. Postal Inspectors, or the FedEx,

19   or UPS, that allows them to open every package and give

20   us every package, because of course texts and e-mails

21   don't have the same closure that letters and packages

22   do.

23        And the real issue is why isn't the government

24   required and ordered not to seize this limited -- this

25   limitless archive of messages, e-mails, location data,

1    Google searches?  Why would they not be required to tell

2    Apple or tell AT & T or tell Google, "We want only the

3    messages that conform to probable cause," "Give us

4    everything to do with that, give us every communication

5    where the CHS, whose name is --

6         THE COURT:  But isn't the answer to that the

7    practical answer in today's world where, um -- to work

8    backwards, the government will only be able to use --

9    now this is not the most persuasive argument, because

10   the problem with the search is the search.  But they

11   have these and they have in this case, via Judge

12   Cabell's order, they have their filter teams doing the

13   job and excluding, um, from the search, as I understand

14   it, Mr. O'Donovan is a member of the profession, he is

15   bound to keep confidential various communications with

16   his clients that have nothing to do with the alleged

17   criminal activity.  They're not allowed to use that.

18   But as a practical matter it's something like a wiretap,

19   they have to see what they've got to then minimize, to

20   exclude those things that don't have anything -- don't

21   bear on the alleged criminality here.

22        MR. WEINBERG:  And my contention would be, Judge,

23   that in this world where an -- where an iCloud contains

24   everything, and here the only limit on what they

25   instructed Apple to do, "Give us everything" -- and a

1    date link, Apple ignored the date link, it so happened

2    they gave the government more than they asked for.  But

3    there was no subject matter limitation.  It was not

4    saying to Apple, "We want all of the messages, all of

5    the e-mails between Mr. O'Donovan and the following 10

6    people."  Instead they took everything.  And that's a

7    seizure, that's a government seizure, all e-mails, all

8    texts, all iCloud, limited only by a name.

9         And I respectfully contend, and I know this

10   Circuit's decided you can do that with a phone in **Upham,**

11   you know 19 years ago, and Judge Gorton decided you

12   could do it with an e-mail account.  And in another case

13   I had, **Kanodia**, Judge Saris the other day in **Klyushin.**

14   But I think it's an important issue for the Circuit to

15   deal with straight on.  They came close to it in

16   **Aboshady** where the lawyer wasn't pressing the issue I'm

17   pressing, a general warrant on the first level, he was

18   talking about retention.  But I would respectfully

19   request that your Honor grant it, but I understand if

20   you're going to adopt Judge Saris's analysis, I'm saving

21   it for an appeal.

22        THE COURT:  You are and very skillfully too.  I

23   had a general warrant case back when I was a Superior

24   Court judge and when, um, District Attorney Droney was

25   the District Attorney in Middlesex and he had an

1   obscenity prosecution against a bookstore in Lowell.

2   And he had a rather -- it had to do with the execution

3   of the warrant, he had a more specific warrant.  And as

4   you've talked about warehouses, because I looked at the

5   history too, they went in and took everything.  I

6   specifically have in mind they took "Cosmopolitan."

7   But, um, that case, early in my judicial tenure, caused

8   me to reflect on general warrants.

9        Well you've explicated the law.  What else have

10  you got here?

11       MR. WEINBERG:  Okay.

12       Second, is the second search, your Honor, which

13  the government, you know, first gets everything from the

14  ISP and then they tell the law enforcement officers,

15  "You are to look for evidence of bribery as to the

16  following 8 or 9 categories."  And there are two

17  categories that I think are particularly significant in

18  exceeding any alleged probable cause.

19       One is "Contacts with or about public officials

20  who are influencing their authority under the licensing

21  for approval of a marijuana establishment."  That's

22  Paragraph 2.  The first one is for Medford, I get it,

23  "If they satisfy you, there's probable cause."  That's

24  squarely within the probable cause.

25       To then say because there's these communications

1   with Medford, therefore we can go rummaging through his

2   phone for every contact with every public official," I

3   don't believe is supported by probable cause and

4   therefore I think it's overbroad and should not be

5   authorized by the Court.  I think it should be narrowed

6   to "So the objects conform to the probable cause."

7          Another one, which some judges, including your

8   Honor in *Levasseur*, has been critical of is the request

9   -- any evidence regarding the target accounts only,

10  meaning Mr. O'Donovan's state of mind as it relates to

11  the crimes under investigation.

12         Well, your Honor, you know warrant enforcement

13  officers are not psychologists, they go and look at

14  every state of mind, that's fairly delinked from hard

15  probable cause, which is communications with a public

16  official about a client in question.  And there was one

17  client, there's one public official that the government

18  alleged where conversations went from, they claim, from

19  legal to, they claim, illegal.

20         So I ask your Honor to look at Attachment B and

21  determine whether or not it's overbroad and beyond the

22  probable cause set forth in the affidavit.

23         THE COURT:  Um, I had not thought of *Levasseur*,

24  but you bring it back to mind.  My problem in *Levasseur*,

25  which is a domestic terrorism case which resulted in a

1   not-guilty and a hung jury, so we don't know what the

2   basic facts were.  I was concerned about the government

3   trespassing on the free speech concerns because given

4   the valid political expressions of this group, they had

5   various pamphlets and the like, some, which I allowed,

6   "How to make a bomb," um, given the nature of the

7   charges.  But it seemed to me that if they were reading

8   what some would consider rather extreme left-wing data,

9   so be it, that's what the First Amendment is all about.

10          But again as a practical matter, aren't you

11  attacking a little early in the sense that if, um --

12  they're not going to be able to use at trial the results

13  of this search unless they, one, fall within your two

14  challenged criteria, and more than that are relevant

15  evidence.

16          Is that an inappropriate way to analyze it?

17          MR. WEINBERG:  No.  And contrasted to my first

18  argument with the general warrant where there would be

19  total suppression, your Honor is quite right, this is

20  surgical expression of exhibits that might be offered by

21  the government.  I've got a pretrial duty and I don't

22  want to waive this Fourth Amendment issue, so I'm

23  raising it at this time, but not at all disputing that

24  your Honor has the discretion to reserve that analysis.

25          THE COURT:  And the third point?

1     MR. WEINBERG:  The third point is probable cause.

2 I'm anxious to read to your Honor the Supreme Court's

3 oral argument in the *Rococco* case, which was argued to

4 the Supreme Court on November 28, because it's very

5 relevant to what divides the government and

6 Mr. O'Donovan, and it's relevant and applicable to the

7 warrants, because the first three affidavits are based

8 on the first 7 conversations before they really started,

9 you know feeding Mr. O'Donovan scripts they asked him to

10 adopt or dispute certain fictional statements they made.

11 Here is Justice Alito saying to the Solicitor General,

12 and the Solicitor General's answer is the answer of the

13 government.

14     So let's say this person is a childhood friend of

15 the person.  And again we're dealing here with

16 Mr. O'Donovan's request to have a relative of a public

17 official lobby the public official.  Let's say this

18 person is a childhood friend of a person, an elected

19 public official.  They played together in a high school

20 football game.  This person was the elected official's

21 best man, his maid of honor at his wedding.  Spearheaded

22 the person's political career.  Campaign manager for

23 every campaign.  Helped him get elected.  Now he's a

24 lobbyist.  Lobbyists are lots of public officials, lots

25 of clients.  And the Solicitor General says, in answer

1   to the question "Well doesn't the statute -- how far

2   does the sweep of lobbyist goes?" says, "Our position

3   is, as in this case, consistently been that mere

4   influence in not enough to trigger the honest services

5   statute.  Even if an individual is influential, even if

6   they're extremely influential, that person doesn't have

7   the indicia of being a government public official."  And

8   it's a little different because Rococco is the person

9   receiving the money, not the lobbyist hired to give it.

10  This whole transcript shows that the Court is interested

11  in narrowing, not expanding honest services.

12        When your Honor looks at the affidavits --

13        THE COURT:  Well I think that's true.  I'm not

14  insensitive that I was the presiding judge in the

15  Probation case, and we see the First Circuit decision in

16  that case driven appropriately by decisions of the

17  Supreme Court.  So I'm taking these matters very

18  seriously.

19        MR. WEINBERG:  And so here's the government, they

20  start an investigation of a lawyer because the person he

21  chose to lobby was a close relative.  And in the first

22  conversation, and they cite it at Paragraph 13 of the

23  first affidavit, and in every affidavit, and I give them

24  credit, to Agent Elio, for being candid with Judge

25  Cabell, this is not a ***Franks*** argument, this is a facial

1    probable cause argument.  He says, quoting

2    Mr. O'Donovan, "Don't ask Jack," who's the public

3    official, "Don't ask Jack for anything."  Right in the

4    first tape they're talking about, you know, "We want to

5    ask Jack to give these guys," meaning Mr. O'Donovan's

6    client, "a shake."

7          In the second affidavit they're recording a text

8    that they got from the first seizure, he's talking to a

9    public official saying, "Wait till you see my client's

10   application, it's almost done, it's spectacular, it's

11   going to be almost impossible to deny them unless

12   there's local influence, unless DR, who's the Mayor's

13   Chief of Staff, ducks with CAC."  There's another quote

14   saying, "Look, I only want an edge because everybody's

15   trying to get an edge."  And then there's all these

16   bolded statements about Mr. O'Donovan offering to pay

17   the relative of the public official, to lobby the public

18   official, as if money -- as if the offer to pay a

19   lobbyist, which is essentially what the relative was, he

20   was asked to advocate or to lobby for the client that

21   Mr. O'Donovan genuinely felt was the best candidate, and

22   if only people read the applications on their merits and

23   local politics didn't enter into it, would have been

24   chosen as they were, as they were chosen.

25          THE COURT:  This is a variation, and not even a

1  variation of your motion to dismiss.

2       MR. WEINBERG:  It is.

3       THE COURT:  And of course when I confronted your

4  motion now to suppress, um, I realized that I can't just

5  kick that ball down the road and say, "Well we'll get to

6  that, we'll decide that someday," I have to decide now

7  whether I'm going to, um, grant or deny the motion to

8  suppress.  So you're quite right to raise it.

9       Let me tell you how I've reflected on it, and

10  please address this.

11       As I have reflected on it, I see that the

12  government cites to me accurately cases where the money,

13  the -- where the money passed to a third-party, not for

14  the public official, and under the circumstances of

15  those cases it was enough -- that's why we get the

16  appellate cases, that the factfinder was convinced that

17  the intention was to suborn the conduct of a public

18  official by paying the money, that's how I read those

19  cases.  Here that's what they've alleged, it fits the

20  statute.

21       And so I'm thinking, when I come on the bench,

22  Well probably I should deny the motion to dismiss, if

23  I'm going to deny the motion to suppress, but of course

24  we're not clear how this case is going to be defended,

25  and if the government has insufficient evidence for a

1    jury to conclude beyond a reasonable doubt that it was

2    that criminal intention by paying the money, it will

3    be -- and I'll put it on the record right now, it will

4    be my duty under Rule 29 to dismiss -- to grant a

5    directed verdict of acquittal at that point.

6         I'm a pretty transparent person, that's how I came

7    on the bench, that's what I was thinking.  And you're

8    directly addressing it.

9         Isn't that the case here?  There are these cases.

10   I grant you I have no controlling case, nothing in the

11   First Circuit -- well we'll hear what the government has

12   to say.  But as I understand it, nothing that requires

13   that result.  But we have these cases and at least as

14   pled the indictment satisfies the statute.

15        MR. WEINBERG:  So going back for a second to our

16   last argument, of course the manufactured entrapment

17   argument which your Honor reserved, should still be

18   encouraged to be reserved because it's not to be

19   determined on a probable cause basis or a good faith

20   basis --

21        MR. WEINBERG:  Oh, but you see I agree, this is

22   different than entrapment, you see.  It may be, and we

23   don't know yet, and we, that is the government nor the

24   judge, I don't know how you're going to present the

25   defense.  Entrapment is a different defense in my mind.

1   Here it's a failure of proof.

2          MR. WEINBERG:  Yes.

3          THE COURT:  A failure of proof because -- against

4   a beyond-a-reasonable-doubt standard, a properly

5   instructed jury could not conclude that the -- that

6   these payments were to suborn the official -- the honest

7   services of the public official.  That's the statute.

8   And that's -- if we get to the trial, that's how I would

9   be going into the trial.

10          Now if entrapment is the defense, it's that he

11  was -- entrapment, he has the intention to commit the

12  criminal act, but the government manufactured that

13  intention, he would not have but for the conduct of the

14  government, that's how I understand entrapment.  To me

15  the two are different.

16          Am I making myself clear?

17          MR. WEINBERG:  You're totally right.  And we would

18  not be arguing that he attempted to bribe and should be

19  excused because the government, you know, pressured him.

20  We will be arguing that he had an innocent

21  predisposition and a good faith intent and never

22  intended in any respect to breach honest services.  But

23  there will be evidence that the government's scripted

24  conversations that comes late in the trial.

25          THE COURT:  All right.

1        MR. WEINBERG:  But for the purposes of today,

2    the -- there would also be an argument, as we made last

3    time at the conclusion of the government's proof, that

4    not only should the case not go to the jury factually,

5    but your Honor has the right to take it away from them

6    not on an insufficiency of proof, but on an

7    overbroadening by the government.

8        THE COURT:  And we'll deal with that at the

9    appropriate time.  All right, I think I understand your

10   argument.

11       MR. WEINBERG:  But just one point.  Which is the

12   Court said that the cases indicate that a payment to a

13   third-party, if it was intended to cause a breach of

14   honest services, is enough to prove the government

15   cases.  All of them, your Honor, each one of them, and

16   we argued it last time, is distinguished from this case

17   by two factors.  One is zero communications between him

18   and the public official, never met him, never gave him a

19   value, never said a word to him.

20       Number 2, and more important, is that in those

21   cases the public officials engineered the payment to the

22   third-party.  Here the third-party, the middleman, the

23   CHS, is asking for the money and charging as a lobbyist

24   and wanting to know how much money he's getting paid.

25   The public official didn't put the relative out there to

1  get money like the golf -- the example, "I'm going to

2  get my kid to win 40,000 bucks at a hole-in-one golf

3  tournament, or the political cases where the political

4  figure benefited by giving jobs to all of his people.

5  Here there's no involvement of the public official, all

6  of it is between the relative and Mr. O'Brien and then

7  the FBI comes in.  And at one point he says, "Why don't

8  I sit with the public official?"  "No."  The government

9  could have -- we didn't need to have uncertainty, they

10  could have taped him talking to the public official and

11  the relative said, "Oh, no, you're not going to talk to

12  my relative."  So that's my argument on probable cause.

13      THE COURT:  Thank you.

14      I'll hear the government.

15      MS. BARCLAY:  Yes, your Honor.  Just quickly on

16  probable cause, because I think the government

17  essentially rests on its briefing with respect to the

18  motions to dismiss, but as your Honor said, it fits this

19  statute, understanding that there are differences among

20  the various factual scenarios of the cases that we

21  cited.

22      THE COURT:  Well what do you say to what he says

23  are the two crucial factual differences?

24      MS. BARCLAY:  So, your Honor, what I say about

25  those is that this was a -- this was an operation, an

1   undercover operation where there was also a desire to

2   protect the integrity of the marijuana process, right?

3   So, um, there was no direct communication between

4   Mr. O'Donovan and the Police Chief because the police

5   Chief was walled off from the investigation to ensure

6   that the process that they were going through was not

7   impacted by the attempted buy.

8           THE COURT:  I didn't mean that in any, um,

9   pejorative way, but you acknowledge that the cases

10  don't -- that this case is different from those cases

11  where the public official -- I'm borrowing

12  Mr. Weinberg's phraseology and maybe I should not, "put

13  the third-party out there."  This is different.  You're

14  not going to be able to prove, because the public

15  official was walled off --

16          MS. BARCLAY:  Right.

17          THE COURT:  -- that he put the relative out there.

18  That's different?

19          MS. BARCLAY:  Right, but this was Mr. O'Donovan

20  putting the third-party out there.  So perhaps it's a

21  distinction without a difference.  Because it's his

22  intent that governs here, and his intent was to pay the

23  close reactive, the Police Chief, in exchange for the

24  chief's official action.

25          So it's the same intent, it's Mr. O'Donovan making

1  the suggestion or making the approach here, which is

2  slightly different than some of the cases Mr. Weinberg

3  --

4       THE COURT:  Right, you're saying it's different

5  but legally it is not material?

6       MS. BARCLAY:  Right.

7       THE COURT:  Okay, I understand that.

8       MS. BARCLAY:  And with respect to the second, the

9  public -- I think he said that there was, um -- "The

10 public official engineers payments to the third-party

11 and there was no communication."  I guess they're one

12 and the same.  Just the fact of the matter is it's the

13 intent of Mr. O'Donovan that the government will have to

14 prove here and he's the one who approached the close

15 relative of the Police Chief with the intention of

16 paying that relative in exchange for the chief's

17 official action.

18      So that's with respect to probable cause, your

19 Honor.  If you want me to address the general warrant,

20 I'm happy to do that.  I think your Honor with the cases

21 --

22      THE COURT:  I don't think it's necessary.  I do

23 want -- I did want to hear from you.

24      All right, here's the ruling of the Court.  And

25 we'll deal with the issues in the order that

1    Mr. Weinberg raised them.

2         On the issue of whether this is a general warrant.

3    In light of the controlling cases and persuaded really

4    by my colleague Judge Saris's reasoning, this Court

5    concludes that it was not a general warrant.

6         Second, with respect to the challenge to the two

7    specific categories.  In light of the processes set

8    forth by the applicable rules of criminal procedure,

9    again this is not the time to suppress those processes

10   from going forward or enter any blanket suppression

11   order.  I will expect that the government's exhibits

12   will be set forth by the time of the final pretrial

13   conference in this case, at which time the Court can

14   address any issues as to whether they were properly

15   seized under these warrants in this case.

16        With respect to the issue of probable cause.  Upon

17   reflection, the Court denies the motion to dismiss

18   insofar as this Court has kept it under advisement,

19   because the indictment is, um, sufficient under the

20   statute to withstand dismissal.  The Court does not now,

21   nor need it, express a legal opinion on the admitted

22   factual differences between this case and the decided

23   cases which have allowed honest services convictions to

24   stand for two reasons.  One, we may have further

25   guidance from the Supreme Court of the United States.

1  And, two, the government is correct that Mr. O'Donovan's

2  intent is the overriding concern here.

3       So having denied the motion to dismiss, it follows

4  that the Court here, within that framework, also denies

5  these motions to suppress.  The rights of Mr. O'Donovan

6  are saved.

7       That's the order of the Court.  We'll adjourn.

8  We'll recess.

9       (Ends, 2:35 p.m.)

10

11                    C E R T I F I C A T E

12

13       I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

14  hereby certify that the forgoing transcript of the

15  record is a true and accurate transcription of my

16  stenographic notes, before Judge William G. Young, on

17  Monday, December 19, 2022, to the best of my skill and

18  ability.

19

20

21

22  /s/ Richard H. Romanow 01-12-2023
   _____

23  RICHARD H. ROMANOW  Date

24

25