UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Crim. No. 22-10141-WGY |
| ) | |
| SEAN O'DONOVAN, ) | |
| ) | |
| Defendant ) | |

## UNITED STATES' TRIAL BRIEF

The United States respectfully submits this trial brief for the trial scheduled to begin on October 16, 2023. The Indictment charges Defendant Sean O'Donovan with (a) two counts of honest services wire fraud in violation of 18 U.S.C. §§ 1343, 1346 and (b) one count of federal program bribery in violation of 18 U.S.C. § 666(a)(2). This brief provides an overview of the anticipated trial evidence as well as a discussion of certain anticipated evidentiary and legal issues that may arise at trial.

## SUMMARY OF ANTICIPATED EVIDENCE

In this bribery case, Defendant (an attorney and former Somerville Alderman) sought to corrupt the city of Medford's process for selecting recreational marijuana companies to operate in that municipality. Defendant offered to pay and did in fact pay thousands of dollars in cash to Michael Buckley ("Buckley"), the brother of Medford Police Chief John "Jack" Buckley (the "Chief"), in exchange for the Chief's favorable vote and other official assistance on an application by Defendant's client, Theory Wellness, Inc. ("Theory"), for a Host Community Agreement ("HCA") with Medford—a necessary step for Theory to obtain a license to sell recreational marijuana in Medford.

Theory was founded by Brandon Pollock ("Pollock") and Nick Friedman, and operates medical and recreational marijuana dispensary locations in Massachusetts and elsewhere. The

government anticipates that Pollock will provide a brief overview of the marijuana retail licensing process in Massachusetts, and Theory's efforts to set up a retail marijuana store in Medford. Pollock also will testify that he was introduced to Defendant in 2016 when Theory was considering a Somerville location, but that Theory did not hire Defendant until late 2018, when the company was considering a Medford location. In 2018, Theory entered into a Consulting Agreement proposed by Defendant, pursuant to which Defendant agreed to assist Theory in obtaining an HCA with Medford. Theory would pay Defendant a $7,500 monthly fee (until Theory either obtained or failed to obtain an HCA) and provide Defendant with an equity stake in Theory's profits if the company successfully obtained a license for a Medford marijuana retail store.

Medford City Council minutes will establish that, by April 2020, it was public information that the City was considering awarding up to three HCAs to retail marijuana establishments, and that a Cannabis Advisory Committee ("CAC") would be convened to review HCA applications and make recommendations to the Medford Mayor. It was also publicly known that the Chief and the Medford Building Commissioner would be on the CAC. On the morning of February 10, 2021—the day before the first CAC meeting—Defendant called Buckley and insisted that they meet in person later that day. During their subsequent meeting that night in the parking lot of a deserted school, Defendant told Buckley that the Chief was on the CAC and offered Buckley $25,000 to speak with the Chief about Defendant's client Theory.

The following day, February 11, 2021, Buckley reported the conversation to the Chief, who documented Defendant's offer. The Chief, in turn, reported the conversation to the Federal Bureau of Investigation ("FBI") and both Buckley and the Chief agreed to cooperate with the FBI. Thereafter, Buckley recorded all telephone calls and in-person meetings with Defendant and provided all of his text messages with Defendant to the FBI.

Over the course of the following nine months—from February 2021 through October 2021—Buckley recorded six meetings (audio and video) as well as two phone calls with Defendant, and provided the government with 65 pages' worth of screenshots of text messages between himself and Defendant. The government anticipates offering into evidence the videos of the meetings (which contain audio) as well as audio recordings of the phone calls, and also anticipates displaying the recordings captioned with transcripts for the jury.

Over the course of their communications Defendant reached what he believed to be a corrupt agreement with the Chief and Buckley. Specifically, Defendant intended to offer the Chief a $25,000 payment to Buckley, and did in fact make a $2,000 down payment on that bribe offer to Buckley, in exchange for (a) the Chief's agreement to provide a favorable ranking of Theory's application before the CAC for an HCA and (b) the Chief's agreement to advise and pressure the Mayor to enter into an HCA with Theory.

The communications between Defendant and Buckley are described in detail in the Indictment and the government's opposition to Defendant's motion to dismiss the Indictment (ECF 34, at 1-13), and are briefly summarized below.

After their first meeting, Defendant sought a second in-person meeting with Buckley and they met the evening of February 22, 2021 in the same Somerville parking lot. After confirming that Buckley was unaccompanied ("You're alone, right?"), Defendant explained that he was "trying to get the edge" in the HCA process for Theory. He also told Buckley that he could "guarantee at a minimum 25, probably even 50"; that he would obtain the "50 grand," then "pay tax on it"; and that he would "give you [Buckley] the rest." Defendant then said: "If Jack [*i.e.*, the Chief] can square them—if Jack can, we should have no problem."

On April 26, 2021, Defendant met Buckley outside of his Somerville residence, and asked how he and Buckley could "proceed to let him [the Chief] know who it [Theory] is." Defendant also emphasized the Chief's power on the Medford CAC: "If Jack goes like this, 'That guy gets five stars, this kid here gets three stars, and that one gets one star, based on my evaluation,' that's all he has to do." Defendant told Buckley, "Whoever Jack gives the nod to, is gonna look great in [the Mayor's] eyes." Defendant also stated during this meeting: "You paint the picture so you can hide behind the fucking curtain, you do whatever the fuck you want." Later that evening, Defendant texted Theory CEO Pollock, who was unaware of Defendant's secret meetings with Buckley:

> Mon, Apr 26, 6:45 PM
>
> Working this thing hard just so you know my friend.

After the April 26, 2021 meeting, Buckley had no contact with Defendant for over four months. In the meantime, in late April 2021, ten HCA applications (including Theory's) were submitted to the CAC. On August 28, 2021, two days after a press story that had the potential to adversely impact Theory's application for an HCA with Medford, it was *Defendant* who reengaged with Buckley and sought the benefit of his proposed bribe: Defendant texted Buckley, "It's time" and, "Tell him to vote Theory #1 as they are the best candidate."

Defendant next met with Buckley on September 14, 2021, outside of Defendant's aunt's house. Defendant proposed paying Buckley with cash ("But you don't want it . . . You don't want it in a check, right? You don't wanna be . . . you- you want in cash."; "If I give you cash, there will be no trace."). And he explained the arrangement: "If he [the Chief] gives them a high vote and they get it, you're getting paid." Buckley asked, "[H[ow's that work?" Defendant responded:

4

"Cash, I'll give you cash." The conversation continued, with Defendant emphasizing that they could keep the payment hidden ("no one's going to fucking know about it") and describing steps they may need to take to conceal the payment, such as giving Buckley the money in multiple installments so that Buckley would not be "walking around" with "all kinds of" cash, and having Theory write Defendant a check so that Defendant could pay the taxes on it and provide Buckley with the difference.

On September 29, 2021, Defendant met with Buckley outside of Defendant's Somerville home. Buckley, at the FBI's direction, told Defendant that the Chief had not voted Theory "in the top three" but had agreed to "change the ranking" and "move them top, number one" because Buckley was "getting paid." Defendant responded, "Beautiful" and "Perfect," and gave Buckley a fist bump. Buckley told Defendant that the Chief wanted Defendant to pay Buckley a deposit on the bribe money, and Defendant openly brainstormed mechanisms for not paying a deposit and for covering up the bribe payment by dressing it up as a sham consulting agreement or a loan. During this meeting, Defendant also explicitly stated his understanding of the arrangement: the Chief was "*switching the vote for the money*."

Around the same time, with the CAC's scoring determinations imminent, and seeking funds to underwrite his secret bribery scheme—Defendant told Pollock that Defendant wanted to hire the Chief's relative as a "security" consultant for Theory. When Pollock did not give him an answer, Defendant followed up on October 7, 2021 with this text:

> Thu, Oct 7, 8:34 AM
>
> Hi Brandon-
> Do I have permission to higher a consultant for 25k? Will need to pay it upon success.
> I would recommend it.
>
> Thu, Oct 7, 11:56 AM
>
> Call when free please
> Thx

Pollock—concerned about the unusual request but entirely in the dark about Defendant's meetings with (and offers of cash to) the brother of the Chief—called Theory's lobbyist, Jay Youmans, for guidance. Youmans will testify that the call was memorable: Pollock was worried about Defendant's request, and Youmans immediately advised Pollock that he should *not* hire the Chief's brother. Pollock then called Defendant back and rejected the proposal, characterizing Theory as an "above board company."

On the evening of October 7, 2021, a few hours after the text message described above, Defendant met again with Buckley and said that there was a "little glitch," because Pollock "is fuckin' petrified." Defendant falsely stated that Theory now wanted Defendant to pay Buckley $15,000 in cash ($25,000, minus an estimated $10,000 in taxes) because Pollock doesn't "want any record of it." Defendant proposed paying Buckley $5,000 up front, with "the other ten once we know it's all done." Defendant, relaying a conversation with Pollock that he never actually had, falsely told Buckley that Pollock had provided the following directive in the event that the Chief failed to follow through: if "he doesn't do it" (that is, if the Chief did not favorably rank Theory), "then he's gotta pay you back" (that is, Buckley would be required to refund Defendant's $5,000

6

down payment). Defendant informed Buckley that Pollock said, "this way he'll pay no taxes and it'll be cash, no one will know about it."

During an October 11, 2021 meeting outside of Defendant's Somerville residence, Defendant handed $2,000 in cash to Buckley: "Take that," he said, "that's two grand . . . . The fifteen grand is locked and loaded . . . [a]s long as the guy [Pollock] gets what he wants, ri—you know what I mean? If he doesn't get it, he doesn't wanna pay. Um, he goes, 'I just wanna make sure everything goes—I don't want to give five grand on the street, and then have Jack have a change of heart, now we gotta ask him for it back.'"

The government also anticipates the possibility that there may be evidence at trial that Defendant, not confident that a $25,000 bribe to the Chief's brother would sway the CAC and the Mayor to favor Theory, sought further insurance in at least two ways. First, approximately two weeks before the first CAC meeting in February 2021, Defendant entered into a real estate deal with CAC member (and Medford Building Commissioner) Paul Mochi ("Mochi") in which Mochi—without putting up any funds to help purchase a home that the partners intended to buy, renovate, and sell—would obtain 30 percent of any profits. Testimony and text messages will demonstrate that Defendant personally dictated the terms of the transaction: on January 11, 2021, a third partner in the transaction asked Defendant in a text message, "Did you figure out Paul's ownership percentage?" Defendant responded, "30/30/40 (you)." That ownership division is also reflected in bank documents. Moreover, Mochi was omitted from public-facing documents such as the incorporation paperwork for the LLC formed by the partners. Mochi will testify that both before and after this transaction, Defendant almost ceaselessly pressed him about Theory both before the CAC was formed and during the deliberation process. Defendant never informed Mochi

7

that Defendant was serving as a paid consultant for Theory or that Defendant essentially had an equity stake in Theory.

Second, Defendant sought to hire a close ally of the Medford Mayor—an individual named William Carr—as a "community liaison" for Theory. Although Carr rejected the offer, he will testify that Defendant offered Carr's daughter a job at Theory, and Defendant made clear in a text message to Pollock that he extended this offer in exchange for Carr's assistance pressing the Mayor to favor Theory.

The government anticipates that Medford Mayor Breanna Lungo-Koehn will testify that she came into office in 2019 on a "clean government" platform and that Defendant's scheme undermined her vision for the City. She will also testify concerning the CAC process and how Theory was ultimately awarded an HCA in spite of (and not because of) Defendant's bribery scheme.

Additional witnesses will testify regarding electronic evidence. FBI Digital Forensic Examiner Cameron Davis will testify about a forensic extraction of Defendant's phone. FBI Special Agent Kevin Hoyland will testify about Defendant's historical AT&T phone records. A witness from Apple will testify that data associated with the two text messages charged in the § 1346 honest services wire fraud counts traveled outside the state of Massachusetts. Finally, certain records custodians may testify concerning city and other business records.

## ANTICIPATED LEGAL AND EVIDENTIARY ISSUES

### I. Video, Audio, and Text Messages From Defendant

As discussed above, the government intends to admit and publish multiple videos, audio clips, and text messages containing Defendant's conversations with Buckley. Defendant's statements in these communications are admissible against him as statements of an opposing party.

*See* Fed. R. Evid. 801(d)(2). Buckley's statements in these communications will be offered not for their truth but merely to contextualize Defendant's statements. *See United States v. Santiago*, 566 F.3d 65, 69 (1st Cir. 2009). Moreover, Buckley will testify and be subject to cross-examination about any statements he made during these communications.

The government intends to play videos with embedded scrolling transcripts. Allowing scrolling transcripts to accompany videos played at trial is a common practice accepted by courts across the country. *See, e.g.*, *United States v. Bell*, 711 F. App'x 702, 705 (4th Cir. 2017) ("We conclude that the district court did not abuse its discretion in playing the video with the synchronized transcript."); *United States v. Moniruzzaman*, 206 F. App'x 819, 824 (10th Cir. 2006) (rejecting contention that district judge abused discretion in allowing captioned video where "the transcript was played for the jury by means of a scrolling video as the recording was played"). This procedure facilitates the jury's ability to both observe the speakers and understand their speech without the distraction of a paper transcript. The government shared a preliminary version of the transcripts of each recording with Defendant in July 2022 and an updated version with minor changes on September 19, 2023. Defendant has not, as of this date, raised any objection to the transcript.

## II.   Potential Rule 404(b) Evidence

The government intends to introduce evidence concerning the broad scope of Defendant's under-the-table influence campaign on Medford decisionmakers on marijuana issues. As discussed above, while Defendant was pressing CAC member Paul Mochi to favor Theory in his official voting, Defendant was also partnering with Mochi on a real estate transaction on terms highly favorable to Mochi: Mochi put no money into the transaction but was entitled to 30 percent of any

9

profits arising from the "flip" of the home. Moreover, Defendant sought to use William Carr to influence the Mayor and offered to pay Carr's daughter for Carr's assistance.

The Mochi and Carr evidence is "intertwined" with Defendant's bribery scheme and part of a single criminal episode—Defendant's attempt to corrupt the HCA award process in Medford—and is therefore admissible as intrinsic to the crimes charged in the Indictment. *See United States v. Villarman-Oviedo,* 325 F.3d 1, 11 (1st Cir. 2003) (when evidence is "intrinsic" to charged offense, Rule 404(b) is "really not implicated at all"); *United States v. Freeman*, 434 F.3d 369, 374 (5th Cir. 2005) ("Evidence of acts other than conduct related to the offense is intrinsic when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged.") (internal quotations and citations omitted). As demonstrated above, the Mochi and Carr evidence is part of a single criminal episode because Defendant's efforts with Buckley, Mochi, and Carr were simultaneous and all designed to secure the HCA for Theory, and ultimately a stream of income for Defendant. Defendant's conduct with Mochi and Carr is not an independent scheme from which a jury could merely infer Defendant's propensity to commit bribery, but is instead interwoven with the charged scheme to bribe the Chief. Defendant's activities with Mochi and the Chief were simultaneous and directed toward a single criminal object. They both demonstrate his intent to engage in bribery to obtain a Medford HCA. While Carr was not a CAC member, Defendant's attempt to secure the Mayor's support through Carr (by, for example, offering to pay off Carr's daughter) at the same time that Defendant was attempting to bribe the Chief and Mochi similarly demonstrates the breadth of his intentional course of conduct geared toward one criminal objective.

Even if the Court were to determine that the Mochi and Carr evidence is not intrinsic to the bribery scheme, it is admissible under Federal Rule of Evidence 404(b) (recognizing that evidence of other crimes, wrongs or acts is admissible for non-propensity purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident"); *see also United States v. Carrasco*, 79 F.4th 153, 163 (1st Cir. 2023) (referring to such evidence as having "special relevance"). Here, the evidence of this broader surreptitious campaign neatly fits within multiple "special relevance" categories. First, it shows Defendant's desperation to obtain an HCA for Theory in Medford (*i.e.*, his "motive"). Second, it shows that Defendant's bribery scheme was part of a broader "plan" to secretly and corruptly influence the CAC deliberative process. Finally, the Mochi and Carr evidence further corroborates Defendant's corrupt "intent": his willingness to directly and covertly engage in a commercial transaction with a member of the CAC, for example, renders it more likely that Defendant *intended* to bribe the Chief through Buckley. Especially here, where these offenses have such a close nexus to the charged conduct, they should be admitted under Rule 404(b). *See United States v. Donovan*, 984 F.2d 507, 513 (1st Cir. 1993) (recognizing that "'other acts' evidence which is closely bound up with charged crimes is eligible for admissibility under Rule 404(b)"), *judgment vacated on other grounds by Donovan v. United States*, 510 U.S. 1069 (1994).

To the extent that Defendant asserts entrapment-like arguments, whether formally or informally, he opens himself up to "an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue," *Sorrells v. United States*, 287 U.S. 435, 451 (1932), rendering the above-described evidence admissible on an entirely independent ground.

### III. Jay Youmans's Testimony Regarding Call from Pollock

As described above, Pollock will testify that Defendant called Pollock about hiring the Chief's brother as a "security consultant." When Pollock did not respond, Defendant reached out again by text message, obliquely referencing hiring a "consultant for 25k." Pollock will testify that he quickly contacted Theory's lobbyist Jay Youmans, who advised Pollock to reject Defendant's request. Youmans's description of the conversation he had with Pollock is not hearsay. First, Youmans will testify that Pollock asked whether Theory should do as Defendant requested and hire the Chief's brother as a "security consultant." It is black letter law that a question of this type is not hearsay. *See United States v. Vest*, 842 F.2d 1319, 1330 (1st Cir. 1988) (question is not hearsay). In addition, in his conversation with Youmans, Pollock was describing his then-existing state of mind (concern about the propriety of Defendant's request). *See* Fed. R. Evid. 803(3) (excluding from hearsay statements "of the declarant's then-existing state of mind (such as motive, intent, or plan)"). Youmans should accordingly be permitted to recount this significant conversation with Pollock.

### IV. Forensic Cell Phone Extraction

The government intends to admit portions of digital forensic extractions of Defendant's cell phone and Apple iCloud account. Testimony concerning these extractions is not expert testimony, and can instead be admitted by individuals involved with generating the reports using Cellebrite, a basic software that facilitates forensic data extraction from electronic devices and accounts. *See United States v. McLeod*, 755 F. App'x 670, 673-74 (9th Cir. 2019) (district court did not abuse its discretion by admitting testimony without requiring compliance with Rule 702 where witness testified about what Cellebrite does, how he used it to extract information from a cell phone, and how he could select what data to extract); *United States v. Seugasala*, 702 F. App'x

12

572, 575 (9th Cir. 2017) ("The officers who followed the software prompts from Cellebrite and XRY to obtain data from electronic devices did not present testimony that was based on technical or specialized knowledge that would require expert testimony.").

## V.    The Chief's Notes

The government intends to admit at trial certain notes taken by the Chief on four occasions: (1) on February 11, 2021, when Buckley contacted the Chief and informed him of Defendant's bribe offer; (2) approximately seven minutes later, when the Chief called another law enforcement officer in order to obtain a contact at the FBI; (3) the following day (February 12, 2021), when the Chief made contact with the FBI; and (4) on or about August 31, 2021, when the Chief had a conversation with Mochi at the FBI's direction (during which Mochi falsely denied having been privately contacted by any HCA applicants).

First, the Chief's notes taken on February 11, 2021, when Buckley informed him of Defendant's bribe offer, are admissible as non-hearsay present sense impressions. *See* Fed. R. Evid. 803(1) ("statement describing or explaining an event or condition, made while or immediately after the declarant perceived it"). The Chief took notes shortly after being informed of a significant event: Defendant's effort to bribe him through Buckley. These notes are also admissible as non-hearsay excited utterances. *See* Fed. R. Evid. 803(2) ("statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused"). At the time the notes were taken, both Buckley and the Chief remained under the stress of learning about Defendant's scheme. *See United States v. Brito*, 427 F.3d 53, 61 (1st Cir. 2005) ("Rule 803(2) allows the admission of excited utterances based on the theory that a person speaking about a startling event, while still under the stress of experiencing or observing that event, normally does not have either the capacity or the incentive to prevaricate."). Finally, the notes

13

constitute "statements of the [Chief's] then-existing state of mind." *See* Fed. R. Evid. 803(3) ("statement of the declarant's then-existing state of mind (such as motive, intent, or plan)"). For example, the notes reflect that the Chief immediately informed Buckley not to "engage [Defendant] in that subject." The Chief's notes reflecting his call to another law enforcement officer and his notes on calls setting up a meeting with the FBI are admissible for similar reasons. They constitute statements of the Chief's then-existing state of mind. *See* Fed. R. Evid. 803(3). Finally, the Chief's notes from his discussion with Mochi (containing Mochi's statement that he had not been privately contacted by any HCA applicants) are admissible because they are not offered for the truth of the matter asserted. In fact, Defendant had been privately pressing Mochi to favor Theory for months.

## VI. Business Records

The government also intends to admit certain phone, bank, and business email records pursuant to Federal Rule of Evidence 803(6). Records kept in the course of regularly conducted business are admissible unless the opponent can establish that the records have indicia of untrustworthiness. *See, e.g.*, *United States v. Patterson*, 644 F.2d 890, 900 (1st Cir. 1981). These conventional business records fall comfortably within Rule 803(6).

## VII. Summary Exhibits

The government intends to introduce into evidence summaries of certain phone records, pursuant to Federal Rule of Evidence 1006. Defendant has been provided with the records underlying these summaries and has been provided copies of any charts the government intends to introduce. The government reserves the right to generate further similar summary exhibits. Copies of the underlying records also will be available at trial.

**VIII. Special Arrangements**

The government requests that the Court designate FBI Special Agents Matthew Elio (SA Elio) and James Hendry (SA Hendry) as case agents, and that SAs Elio and Hendry be permitted to sit in the courtroom (not at counsel table) during trial, pursuant to Rule 615(b) of the Federal Rules of Evidence.

## CONCLUSION

This memorandum does not exhaust all issues that may be presented at trial. It is intended to assist the Court and present the position of the United States with respect to the above matters. If any legal issues arise that have not been covered in this trial brief, the government respectfully requests permission to file supplemental briefing.

Dated: October 6, 2023

JOSHUA S. LEVY
Acting United States Attorney

By: *Kristina E. Barclay*
Kristina E. Barclay
Assistant United States Attorney

Respectfully submitted,

COREY R. AMUNDSON
Chief, Public Integrity Section
U.S. Department of Justice

By: *Jonathan E. Jacobson*
Jonathan E. Jacobson
Trial Attorney, Public Integrity Section
U.S. Department of Justice

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 6th day of October 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties in this case.

s/ Jonathan E. Jacobson  
Jonathan E. Jacobson  
Trial Attorney