1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|   |   |   |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Criminal Action |
| v. | ) | No. 14-10109-WGY |
| | ) | |
| PAUL R. HINKEL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

JURY TRIAL DAY 3

February 17, 2015
9:22 a.m.

John J. Moakley United States Courthouse
Courtroom No. 18
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1   APPEARANCES:

 2   On Behalf of the Government:
          UNITED STATES ATTORNEY'S OFFICE
 3        By:  AUSA Eve A. Piemonte-Stacey
               AUSA Jordi de Llano
 4        United States Attorney's Office
          One Courthouse Way
 5        Boston, MA 02210
          617-748-3100
 6        eve.stacey@usdoj.gov
          jordi.de.llano.Campos@usdoj.gov
 7
     On Behalf of the Defendant:
 8        Jane Peachy, Esq.
          Tamara Fisher, Esq.
 9        Federal Defender Office
          51 Sleeper Street, 5th Floor
10        Boston, MA 02110
          617-223-8061
11        jane_peachy@fd.org
          tamara_fisher@fd.org

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**INDEX**

**WITNESS:**                                                              **PAGE:**

PETER MANNING (cont.)
        DIRECT EXAMINATION BY MR. DE LLANO     7
        CROSS-EXAMINATION BY MS. PEACHY     11
        REDIRECT EXAMINATION BY MR. DE LLANO    28
CHRISTOPHER DIORIO
        DIRECT EXAMINATION BY MR. DE LLANO   29
        CROSS-EXAMINATION BY MS. PEACHY     40

\* \* \* \* \*

EXHIBITS

NUMBER                    PAGE

 B        (For identification)    18

 5        (In evidence)    37

Jury Verdict.............. Page 105

\* \* \* \* \*

P R O C E E D I N G S

1.    THE CLERK:  United States District Court is now in
session.  You may be seated.

2.    THE COURT:  Good morning, counsel.  I recognize and
the record should show that the defendant is not yet present in
the courtroom, though we have the jurors.  This is in the
nature of the sidebar conference; so I thought I could proceed
and save time.

After considerable reflection, I've decided to charge
on entrapment.  That has the consequence of allowing the
government to put in their propensity evidence.  And my intent
is to allow them to put in all the pictures from the computer,
including what you call anime, the cartoons, the sketches.

And I guess I put it to defense counsel.  I'm
responsible for my own rulings, but the way this case has gone
in, I have excluded them since I was not of the opinion that
propensity evidence was germane, but the defense appears to
want the entrapment to be charged to the jury.  And on this
evidence, I believe it can be argued that the government
induced the conduct by -- I'm not saying this is the only
argument, but this is the one that persuades me -- that the
government induced the conduct by offering the imaginary mother
for dominant/submissive sex play as part of the deal to get the
imaginary daughter involved.

I draw no conclusions, but on the evidence, that could

1    be argued.  That's inducement under the law.

2         So Ms. Peachy, I wanted to come out and say that now,

3    because the computer witness who authenticates all of these

4    things is on the stand; and if you're going to press

5    entrapment, which is your right, we're going to change the

6    ruling on, I believe it's Exhibit 6, to allow all the photos to

7    come in and then let you go from there and you should know

8    before either side rests.

9         MS. FISHER:  Your Honor, I understand your ruling.

09:26 10  Obviously, we still do object.  We filed a motion in limine on

11   this.

12        THE COURT:  You did.

13        MS. FISHER:  On the fact of those photos coming in,

14   because even if we are arguing predisposition, we don't think

15   those photos are evidence of predisposition.

16        THE COURT:  I understand your position, but I

17   disagree.  I do not think they are so inflammatory that under

18   403 they should be excluded.

19        MS. FISHER:  I just want to make that objection for

09:26 20  the record.

21        THE COURT:  You're rights are saved.  So we're clear,

22   entrapment is in the case.  So now the jury is all ready, just

23   as soon as we get Mr. Hinkel here, Exhibit 6 now is the entire

24   Exhibit 6, including the photographs?

25        MR. DE LLANO:  Correct, your Honor; and we had

```
 1    previously wrapped up with this witness.  Would we be able to

 2    resume this morning?

 3            THE COURT:  Doesn't it make more sense to resume this

 4    morning in light of my ruling, then give the defense their

 5    complete cross-examination?

 6            MR. DE LLANO:  That would be our preference.

 7            THE COURT:  All right.  I think you should stand easy,

 8    and we'll press to get Mr. Hinkel up here and get going.

 9            MR. DE LLANO:  Thank you, your Honor.

10            THE COURT:  We're recessed.

11            (Recess taken 9:26 a.m. to 9:27 a.m.)

12    (Jury enters.)

13            THE CLERK:  Court is back in session.  You may be

14    seated.

15            THE COURT:  Well, good morning, ladies and gentlemen.

16    I haven't got the words to thank you.  You people got in here

17    before all the rest of us got in here.  And in fact, we don't

18    have Mr. Romanow.  He's stuck in Newton, so we have a wonderful

19    court reporter, Kelly, and we welcome her to this session of

20    the court.  Thank you so very much.

21            And you may resume the stand.  And if you'll remind

22    the witness.

23            THE CLERK:  I'd like to remind you that you're still

24    under oath.  Do you understand?

25            THE WITNESS:  Yes.
```

09:27 (line 10)
09:38 (line 20)

1    THE COURT:  We wrapped up, but I'm allowing the

2    government a few more questions of this witness, and then we'll

3    get to his cross-examination.  Mr. De Llano, proceed.

4         MR. DE LLANO:  Thank you, your Honor.

5              (PETER MANNING, previously sworn.)

6    DIRECT EXAMINATION BY MR. DE LLANO: (cont.)

7    Q.   Good morning, Special Agent Manning.

8         When we left off last week, you described certain

9    photographs that you discovered on the electronic evidence that

09:39 10   you examined.  In addition to those photographs, did you locate

11   any other images during your examination of the electronic

12   media?

13   A.   I did.

14   Q.   And can you please describe what --

15   A.   Sure.  In the process of looking for the images that we

16   exchanged during the investigation with Mr. Hinkel, we came

17   across some images of interest that needed further review.

18   Q.   Do you have the exhibit binder in front of you?  If I

19   could direct your attention to Exhibit 6, page 84.

09:40 20   A.   Okay.  I'm at page 84.

21   Q.   The third image down, is that one of those images?

22        MS. PEACHY:  I object, your Honor.

23        THE COURT:  Overruled.

24   A.   It is.

25   Q.   Bring it into focus here.  Can you please explain to us

1   the information underneath the image?

2   A.   Sure.  The first series of digits is the actual file name,

3   and then the following, the long string is the file path or the

4   location where you could find that file.

5        THE COURT:  So let me stop you right there.

6   Q.   The first side of characters and numbers it says Seagate

7   number 9IVY, just to remind the Court, what specific drive does

8   that signify?

9   A.   Sure.  That is the hard drive that came out of

09:40 10   Mr. Hinkel's work computer.

11  Q.   So if you could continue, partition 3, what does that

12  mean?

13  A.   Sure.  So as before, hard drives can be broken down to

14  different sections or partitions.  This one is partition 3.  OS

15  stands for the operating system, and the file, TFS, is the type

16  of file system.  The root is the very beginning of that drive.

17  And if you follow that whole path out, you'll see that that

18  file ended up in a cache folder for Mozilla Firefox, which is a

19  browser for the internet.

09:41 20   Q.   And I know we went over it last week, but if you could

21  remind us what it means, what a cache folder is?

22  A.   Sure.  When a user browses the internet, the software

23  developers use the cash directory to speed up the browsing

24  process.  So images and other files that may be reviewed again

25  at the same time or same session are put into a cache folder so

1    they can be recalled quickly instead of back over the internet

2    like they were originally.

3    Q.   If you could turn to the next page, page 8, of Exhibit 6.

4    Two images that appear on this page, where are those located?

5    A.   Again, same hard drive, Mr. Hinkel's work computer.  If

6    you follow the path, you can see the user name there after old

7    drive, it has Paul H. Archambault; and if you keep following

8    the path out, that cache ends up back in the Mozilla Firefox

9    directory.

09:42 10   Q.   And once again, what is Mozilla Firefox?

11   A.   It's a browser that the user can use to access data over

12   the internet.

13   Q.   Finally, page 86 of the report, these two images, can you

14   describe -- were those located in the same location?

15   A.   In general, yes.  They came into the cache directory,

16   Mozilla Firefox, same hard drive for both of them, yes.

17   Q.   In addition to these images, were there any other images

18   discovered in your review or examination of this computer?

19   A.   Yes, we found some images of Mr. Hinkel, what appeared to

09:43 20   look like he was using some of the items that we had recovered

21   on the day of his arrest.

22   Q.   Can I direct your attention to page 67 of that report.

23   I'm not going to go through all of images, but was this one of

24   the images that was discovered?

25          MS. PEACHY:  I object, your Honor.

1       THE COURT:  Overruled.

2    A.   Yes, it was.

3    Q.   Could you please tell us where that image was located?

4    A.   Sure.  It's back on -- it's on Mr. Hinkel's work computer.

5    This one was found in the recycle bin.

6    Q.   And what does it mean to be in the recycle bin?

7    A.   The user has chosen to delete the file, but it's not

8    actually deleted.  It's just placed into a directory that will

9    eventually be deleted.

09:44 10  Q.   Special Agent Manning, there are several pages of

11   pictures.  Will you please flip through pages 67 through 82 of

12   your report and let us know where those images were located.

13   A.   All but one came from Mr. Hinkel's work computer, in the

14   recycle bin.

15   Q.   And the other one that did not?

16   A.   On page 82, the second image came from Mr. Hinkel's work

17   computer, but it came from a temporary internet file directory.

18   Q.   And what is a temporary internet file directory?

19   A.   Works the same way as a cache would for a browser.  The

09:45 20  file would be placed in that directory so it could be recalled

21   easier during Windows Explorer or Internet Explorer viewing

22   situation.

23       MR. DE LLANO:  No further questions, your Honor.

24       THE COURT:  Ms. Peachy.

25

1    CROSS-EXAMINATION BY MS. PEACHY:

2    Q.    Good morning, Agent Manning.

3    A.    Good morning, counsel.

4    Q.    Just because it's been a few days, I want to go through,

5    again, all of the items that you examined in relation to this

6    case; I believe those are listed on the second page of your

7    report, correct?

8    A.    Yes.

9    Q.    So you examined an Acer computer.  That's a regular hard

09:46 10   drive, correct?

11   A.    The Acer is the actual laptop.

12   Q.    That was a laptop computer?

13   A.    I believe so.

14   Q.    A Hitachi.  What was that, a hard drive?

15   A.    That's a hard drive, yes.

16   Q.    A max store, what was that, a flash drive?

17   A.    I believe it was an old hard drive.

18   Q.    That's also a hard drive.  Two Seagate computers?

19   A.    Both hard drives.

09:47 20   Q.    Both hard drives.  3C.  So one, two, three, four, five,

21   six computers you examined in this case, correct?

22   A.    In this report, yes.

23   Q.    Okay.  Did you examine other computers?

24   A.    We did a quick preview of some of the other items, I

25   believe, that were detailed that were returned to Mr. Hinkel.

1   Q.   So in addition to six computers that you looked through,

2   you also looked through some other items, correct?

3   A.   That's right.

4   Q.   And you also, I think you looked through his phone, right?

5   A.   No.  We didn't have a chance to look through his phone.

6   Q.   But there were some other digital or electronic devices

7   that you looked through in addition to these six computers,

8   correct?

9   A.   That's correct.

09:48 10   Q.   And this report that's now marked as -- that's now in

11   evidence as Exhibit 6, this is actually a summary of your

12   findings that you prepared for the prosecution, correct?

13   A.   That's correct.

14   Q.   It's not everything that you found on these six computers,

15   right?

16   A.   That's right.

17   Q.   And you did, in fact, do a more complete -- well, at least

18   a longer report with all of your findings, correct?

19   A.   During -- when we did a preliminary report, there is

09:48 20   provided a section of basically thousands of pages that were

21   not -- no sense of printing all those out -- but it was a long

22   listing of certain types of files, internet history, that

23   didn't make it into this report, that's correct.

24   Q.   And that longer report was over 26,000 pages long, just so

25   we're talking about the same thing, right?  Does that sound

1    about right?

2    A.   I wouldn't really call it a report.  It's more of what the

3    software itself would produce.  It just gives a raw dump of

4    data.  And it's my job to go through and find out what would be

5    relevant for the report itself.

6    Q.   What would be relevant for the prosecution, correct?  What

7    you're going to put in your report, right?

8    A.   Correct.

9    Q.   And that's the report that you put together that's Exhibit

09:49 10   6, right?

11   A.   Sure.

12   Q.   You pulled out pieces that you thought would help the

13   prosecution and put that into the report that's now Exhibit 6,

14   right?

15   A.   Everything that I thought was relevant to the

16   investigation made it into this report.

17   Q.   Okay.  And that longer report -- or I won't call it a

18   report.  That longer data retrieval -- I don't know what else

19   to call it -- that included, you said, internet history, right?

09:50 20   A.   That's correct.

21   Q.   Images, correct?

22   A.   I believe so.

23   Q.   Some that are not in the report, right?

24   A.   Mm-hmm.

25   Q.   Some that aren't in Exhibit 6, right?

1    A.   That's right.

2    Q.   Some chats, right --

3    A.   Sure, yeah.

4    Q.   -- like instant messaging chats, right, you found?

5         So I want to talk about a chat that you found.  One thing

6    you found were some Yahoo Messenger chats, right; is that

7    right?

8    A.   That's correct.

9    Q.   Okay.  And that's an instant messaging program, right?

09:50 10   A.   That is, yes.

11   Q.   Okay.  I think -- well, hopefully people understand what

12   that is.

13        Okay.  And you found one where Mr. Hinkel is using the

14   name "funtoday07," correct?

15   A.   Yes.

16        MS. PEACHY:  May I approach, your Honor?

17        THE COURT:  You may.

18   Q.   I'm showing you a document there.

19   A.   Thank you.

09:51 20   Q.   Can you look at it and just tell me if you recognize what

21   it is.

22   A.   (Witness reviews document)  So one of the software that we

23   use is called Internet Evidence Finder, and this is

24   basically -- again, I wouldn't call it a report because it's

25   not something I prepared, but it's a raw data dump from that

1    software that I included in the preliminary.

2    Q.   And this particular data dump is a data dump of all of the

3    Yahoo chats that you found on Mr. Hinkel's computer, correct?

4    A.   I couldn't say if it was all of them, but it's what we

5    could recover.

6    Q.   Okay.  And these were found on the Acer laptop, correct?

7    A.   Yes.

8         MS. PEACHY:  Okay.  Your Honor, at this point I'd move

9    to introduce that report as Defendant's Exhibit A.

09:52 10         THE COURT:  Well, there isn't a "Defendant's Exhibit."

11    They're just exhibits.  Any objection to that?

12         MR. DE LLANO:  Your Honor, may I we approach the

13    sidebar?

14         THE COURT:  You may.

15    **SIDEBAR:**

16         MR. DE LLANO:  Your Honor, the reason that I've asked

17    for the sidebar is because I believe the defense is attempting

18    to show that or use, I assume, an argument that specific

19    instance where he said, "I would not play with my children" as

09:53 20    evidence that he didn't do it this time.

21         THE COURT:  I guess I don't understand what the --

22         MS. FISHER:  There are two reasons.

23         THE COURT:  Why don't we want this?

24         MS. FISHER:  Well, there are two reasons.  Number one

25    is that an excerpt of this chat is actually in their Exhibit 6,

 1    but it doesn't make clear who is which person; and they, as

 2    your Honor may recall, use this as an example before they

 3    figured out who was who.

 4              MR. DE LLANO:  Just on that point --

 5              THE COURT:  Wait a minute.  Let me just stick with

 6    her.

 7              MS. FISHER:  In their 404(b) initial letter, they used

 8    this as an example before we figured out who was who that he

 9    had asked the other user, "Have you ever played with your

09:54 10    children," when in fact it's the other user saying it to him;

11    and the excerpt of this that is in Exhibit 6 does not make

12    clear who the users are.

13              THE COURT:  Now, wait a minute.  Let me say it back to

14    you.  In evidence already now is Hinkel talking about somebody

15    else all other than the agents, right?

16              MS. FISHER:  Talking with a person other than the

17    agents, an adult, an adult.

18              THE COURT:  That's right, right?  An adult, other than

19    the agents.

09:54 20              MS. FISHER:  Right.  Where the adult, the other

21    person, asks Hinkel, "Have you ever wanted to play with your

22    children," and he said, "No."

23              THE COURT:  You said that's in evidence already.

24              MS. FISHER:  No, but it doesn't make it clear that

25    Hinkel is the one saying no.

1          THE COURT:  All right.  In that excerpt, the other

2    person says, "Have you ever played with your children?"  Hinkel

3    says, "No," right?

4          MS. FISHER:  The excerpt that's in evidence doesn't

5    make it clear who is saying no and who is asking.

6          THE COURT:  Well, the excerpt may not, but there's no

7    dispute about that.  That's how the government presented it.

8          MR. DE LLANO:  During the pretrial motion.

9          THE COURT:  Forget pretrial.  What these people have

09:55 10   heard, these people have heard about a conversation in which

11   somebody else says to Hinkel, "Have you ever played with your

12   children," and Hinkel says, "No."

13         MS. PEACHY:  No, that's not in evidence.

14         MR. DE LLANO:  We took that out, and we have not --

15   it's not in evidence and they have not heard anything about

16   that.

17         THE COURT:  None of that?

18         MR. DE LLANO:  Correct.

19         MS. PIEMONTE-STACEY:  Right.

09:55 20   THE COURT:  So now you --

21         MS. FISHER:  I apologize.

22         THE COURT:  That's all right.  We're sorting it out.

23   So you want to put it in that on another occasion to another

24   person Hinkel said, the point asked, "Do you play with your

25   children," and he says, "I don't."

1          MS. FISHER:  He says, "I would never do that," not

2 only that it's evidence that he solicited --

3          THE COURT:  That's his own children?

4          MS. FISHER:  Yes, but, your Honor, in the chats that

5 are already in evidence, with the mother, he says, "I once

6 solicited this type of scenario, but to be honest, I asked for

7 someone who was of legal age."

8          THE COURT:  Yes, I recall it.

9          MS. FISHER:  It does appear that the person talking to

09:56 10 him is answering that, and he says, "And how old are you?"  She

11 says, "I'm 41," and he says, "You could still be my girl."  So

12 we're saying, this is not evidence, this is evidence of his

13 lack of predisposition.

14          THE COURT:  I don't think it is.  On relevance

15 grounds, it's excluded.

16          MR. DE LLANO:  Thank you, your Honor.

17 (End sidebar.)

18          THE COURT:  Now, just so we're clear, since I didn't

19 admit that in evidence, that we will give a letter, and the

09:57 20 letter will be Exhibit A for identification.

21          MS. PIEMONTE-STACEY:  Thank you, your Honor.

22          THE COURT:  The numbered ones will all be in the jury

23 room.  We already have an A.  It will be Exhibit B for

24 identification.

25             (Exhibit B marked for identification)

BY MS. PEACHY:

Q.   Agent Manning, in those chats that you recovered off the computer, you never found any evidence that Mr. Hinkel was communicating with minors, correct?

A.   Not that we can tell.  I mean, the chats are what they are.  They're just words on a page.

Q.   Right.  Okay.  And you also showed the jury last time we were in court the fragments of the e-mails that you recovered on Mr. Hinkel's work computer.  Do you recall that?

A.   That's correct.

Q.   And you were able to retrieve fragments of the e-mails that he was having with the undercover agent, right?

A.   That's right.

Q.   And you recovered those by searching for those e-mail addresses?

A.   That's right.

Q.   But when you recovered those fragments, you also recovered fragments of other e-mails, correct?

A.   That's correct, if an e-mail is checked in a browser and the fragments come from un allocated part of a drive or a page file that's more of a temporary file, it can be adjacent to other data, other e-mails.

Q.   So you pick up contents of other e-mails with other people, correct?

A.   That's correct.

1 Q. And fair to say that some of the other fragments that you

2 picked up were sexual conversations that Mr. Hinkel was having

3 with other people, correct?

4 A. Appeared to be, yes.

5 Q. Okay. For example -- can I have the Elmo? Thank you.

6 I think this is, if my page numbers are the same as your

7 page numbers, this is page 13. You can see there in the middle

8 of the page an e-mail address that starts "bam," correct?

9 A. Yes, I do.

09:59 10 Q. And then there's a little fragment here. "Yes, sir.

11 Sorry, sir. It will happen again," correct?

12 A. I see that, yes.

13 Q. Okay. And down at the bottom of the page there's

14 another -- appears to be another e-mail fragment with that bam

15 e-mail address, right?

16 A. Yes, I see that.

17 Q. That starts, "Meow," correct?

18 A. That's correct.

19 Q. On the next page, another e-mail fragment picked up with

10:00 20 this bam. It says, "Master," correct?

21 A. Yes, I see that.

22 Q. Okay. And then further along on the page -- again,

23 hopefully my page numbers are correct -- on page 17, there are

24 some e-mail fragments with another e-mail address at the bottom

25 of the page there, "Sweet mistress for you," correct?

1   A.   Yes.

2   Q.   It goes on to the top of the next page. "Tell me, Daddy,"

3   correct? That's part of that e-mail fragment, correct?

4   A.   It appears to be, yes.

5   Q.   And on page 28, another e-mail fragment with the, "Sweet

6   mistress for you," it says, "Daddy dom too busy for attention."

7   Do you see that?

8   A.   I do.

9   Q.   And there are some other e-mail fragments with other

10:01 10   e-mail addresses of a similar nature, correct, that were picked

11   up here --

12   A.   Yes.

13   Q.   -- contained in Exhibit 6, correct?

14   A.   Correct.

15   Q.   And none of those e-mails, none of those other e-mail

16   fragments that you picked up mentioned children, correct?

17   A.   I don't believe so.

18   Q.   Okay. Or wanting to have sex with children, correct?

19   A.   That's correct.

10:02 20   Q.   Okay. And you also talked about how part of your

21   examination of these six computers involved looking at website

22   history, correct?

23   A.   That's correct.

24   Q.   On all six computers, right?

25   A.   Yes.

1  Q.  And it's fair to say you found evidence, you found web

2  history of adult pornography websites being visited.  Do you

3  recall that?

4  A.  I do.

5  Q.  Quite a few, correct, different adult pornography websites

6  being visited, correct, histories?

7  A.  That's correct.

8  Q.  Correct?

9  A.  That's correct.

10:03 10  Q.  Do you recall about how many websites it was?

11  A.  A lot.  I don't recall how many, no.

12  Q.  And you found images of adult pornography, correct?

13  A.  Correct.

14  Q.  A lot, again?

15  A.  A lot.

16  Q.  Okay.  But again, that's not included in your prosecution

17  summary in Exhibit 6, correct?

18  A.  It wasn't -- it's not -- it wasn't part -- it's not a

19  criminal act.  There's nothing criminal about looking at adult

10:03 20  pornography.

21          THE COURT:  Keep your voice up.  It's not a criminal

22  act, and what did you say?

23  A.  It's not a crime to look at adult pornography.

24  Q.  Right.  In all of that web history, you didn't find any

25  evidence on any of the six computers of Mr. Hinkel visiting any

1  child pornography websites, correct?

2  A.   Well, we went through it and saw some of the animae

3  earlier, some of the images.

4  Q.   But you don't know what website those came from, correct?

5  A.   That's correct.

6  Q.   And one thing you were looking for specifically in the

7  website history --

8  A.   Mm-hmm.

9  Q.   -- is whether he's visited any child pornography websites,

10:04 10  right?

11  A.   That's right.

12  Q.   And he hadn't, correct?

13  A.   Not that we could find.

14  Q.   Not in any of the six computers that you looked at, right?

15  A.   That's right.

16  Q.   Not even any websites about pedophilia or where you might

17  go to meet children or talk to children, correct; nothing like

18  that?

19  A.   No.

10:04 20  Q.   And you mentioned these animae pictures and the fact that

21  they were found in a web cache file, right?

22  A.   That's right.

23  Q.   All -- I forget how many -- four of them or whatever, five

24  of them, were found in the Firefox web cache file, right?

25  A.   That's right.

1    Q.   And as I just said, you have no idea what website they

2    came from, right?

3    A.   I don't.

4    Q.   And in fact, when you looked at the web history, there was

5    no evidence of any child pornography-type websites being

6    visited, correct?

7    A.   That's right.

8    Q.   So they could have come from a website that had adult

9    pornography on it?

10:05 10         MR. DE LLANO:  Objection.  Speculative.

11         THE COURT:  Would you ask the question again?  That's

12    my fault.

13    Q.   So those images could have come from a website that had

14    adult pornography on it?

15         THE COURT:  Well, do you know?

16         THE WITNESS:  I don't know what site they came from.

17         THE COURT:  Well, that's his answer.

18    Q.   Okay.  You just don't know what website they came from.

19    You don't know when that website might have been visited,

10:05 20    correct?

21    A.   I don't.

22    Q.   You don't know, even though they were found on

23    Mr. Hinkel's work computer, you don't know who had access to

24    his work computer or who used his work computer, correct?

25    A.   That's true.

1    Q.   Especially because you can't even narrow down when those

2    images were put into the cache file, correct?

3    A.   That's correct.

4    Q.   And when an image shows up in a web cache file, that is

5    without the user ever doing anything, right, except being on a

6    website that has that image on it?

7    A.   Well, the user navigates to that page and views the actual

8    page, and that's how the files end up in the cache.

9    Q.   Okay.  But they don't have to save the image, right?

10:06 10   A.   It's not a conscious decision to save a file into the

11   cache directory, no.

12   Q.   So somehow you are on a website; and you don't know, for

13   example, if whoever is looking at this website that has these

14   images there gets there by accident or on purpose, right?

15   A.   No, you can't tell that.

16   Q.   You can't recreate the path that they took to get to that

17   image, right?

18   A.   I'm sorry.  Path?

19   Q.   You can't like the -- what websites they clicked on to get

10:06 20   to that image, you can't recreate that, right?

21   A.   No.

22   Q.   And once they're on that web page and, again, we don't

23   even know what web page this is, so we don't know what other

24   images there may be on that page, right?  I'm sorry, you have

25   to say --

1    A.    Correct.  Yes, sure.

2    Q.    It just automatically puts a file into the web cache

3    without the viewer doing anything, right?

4    A.    It's part of the process for the browser to download data.

5    Q.    But you don't do anything; you're just visiting this

6    website, and the image automatically goes into the cache file

7    without the user doing anything?

8    A.    I guess I disagree with the user not doing anything

9    because they navigate to that page, and just part of the

10:07 10   process of the browser itself is to actually download those

11   images from the internet.

12         THE COURT:  Now, in this instance, it's perfectly

13   appropriate for her to ask questions that suggest things.  "You

14   were wearing a red hat, weren't you?"  That's how you can

15   question a witness on cross-examination.  But the evidence is

16   what the witness says.  If the witness says something else,

17   then, like any witness, it's up to you whether you believe it,

18   disbelieve it, believe parts of it, but that's the evidence,

19   not what the questions may suggest.

10:07 20         Go ahead, Ms. Peachy.

21   Q.    You keep saying the word "navigate to the page," but

22   again, you don't know if it was -- you don't know who got to

23   that page, who was looking at that page, right?

24   A.    No.

25   Q.    And you don't know, again, what if there was a path, a

1  deliberate path taken to get to that page, correct?

2  A.   I guess I use "navigate" in the general term because the

3  user is actually using that browser to view what that content

4  is on that page.  So maybe navigate is a bad term for it.  But

5  using the browser to view that content, that now appears in the

6  cache folder.

7  Q.   And when you're examining all of these six computers,

8  you're obviously looking for any images of child pornography,

9  correct?

10:08 10  A.   Not directly.  I mean, our job was to look for evidence of

11  the crime.  And as part of that, we're looking for all images

12  related to the investigation that could include child

13  pornography.  We're always keeping our eye open for it.  But

14  for this instance, I was mainly looking for images involved in

15  the investigation exchanged between Mr. Hinkel and the

16  undercover, or other images involved in the investigation.

17  Q.   Okay.  So when you're looking at these six hard drives and

18  you're kind of casually looking to see if any child pornography

19  pops up, on all six computers, there are no images of child

10:09 20  pornography found?

21  A.   Not that I recall.

22  Q.   Correct?

23  A.   Nope.

24  Q.   Not in the web cache file, not anywhere, correct?

25  A.   No.

```
 1              MS. PEACHY:  I have nothing further.

 2              THE COURT:  Any redirect?

 3              MR. DE LLANO:  Briefly, your Honor.

 4      REDIRECT EXAMINATION BY MR. DE LLANO:

 5      Q.   Special Agent Manning, you testified during

 6      cross-examination that you didn't have a chance to look at --

 7              THE COURT:  I didn't hear.  Keep your voice up.

 8              MR. DE LLANO:  I apologize.

 9      Q.   You testified during cross-examination that you didn't

10:10 10     have a chance to look at the defendant's phone.  Why not?

11      A.   That's correct.  As part of the investigation, we would

12      definitely do a forensic analysis on a cellphone.  Mr. Hinkel

13      provided us with a pass code for his phone the day of his

14      arrest.  It was unlocked at the time of his arrest.  However,

15      when we got back for analysis, the pass code was incorrect and

16      wouldn't unlock the phone.  And because of some of the setup

17      for the phone itself and the way it was configured, we were

18      unable to do a forensic, full forensic analysis on the phone

19      itself.

10:10 20     Q.   Now, turning to the discussion about cache, if you could

21      please turn to page 86 of Exhibit 6.

22      A.   86.

23      Q.   What was the hard drive this was found on?

24      A.   Which image?  I'm sorry.

25      Q.   Either one.
```

```
 1              MS. PEACHY:  Objection, your Honor.  This has already
 2       been asked.
 3              THE COURT:  It has been, asked and answered.
 4       Q.   All right.  Is there a user identified in that string of
 5       characters underneath the images?
 6       A.   Yes.  As I was explaining about the path, it starts with
 7       the hard drive; and you can see as you progress through, the
 8       user is Paul.h@archambault.
 9              MR. DE LLANO:  No further questions.
10:11 10        THE COURT:  Anything further for this witness?
11              MS. PEACHY:  No, thank you, your Honor.
12              THE COURT:  You may step down.  Thank you.  Is that
13       the government's case?
14              MR. DE LLANO:  The government calls Christopher
15       Diorio.
16                    (CHRISTOPHER DIORIO, sworn)
17       DIRECT EXAMINATION BY MR. DE LLANO:
18       Q.   Good morning, sir.  Would you please state and spell your
19       last name for the Court.
10:12 20  A.   Yes.  It's Christopher Diorio, D-i-o-r-i-o.
21       Q.   Sir, are you currently employed?
22       A.   I'm a special agent with the Department of Homeland
23       Security, Homeland Security Investigations.
24       Q.   Are you assigned to any particular group or division
25       within Homeland Security Investigations?
```

1   A.   Yes, I am.  I am assigned to the child exploitation/cyber

2   crimes group.

3   Q.   How long have you worked for the Department of Homeland

4   Security?

5   A.   For approximately 13 years.

6   Q.   Prior to working as a special agent with HSI, how were you

7   employed?

8   A.   I was assigned to the United States Coast Guard tactical

9   law enforcement team that specialized in international

10:13  10   narcotics.

11   Q.   Would you please describe generally what your duties and

12   responsibilities are as a special agent with Homeland Security

13   Investigations?

14   A.   Yes.  We're charged with investigating complex criminal

15   organizations and dismantling said organizations.

16   Q.   Sir, were you involved in the investigation that led to

17   the charges against the defendant?

18   A.   Yes, I was.

19   Q.   Would you please describe what your involvement was.

10:13  20   A.   I was aware of the investigation from its start, but I

21   didn't participate in the investigative aspect of the case.  I

22   was brought in more specifically towards the end of the

23   investigation to help with the planning of the actual meet

24   between our undercover officer and the target.

25   Q.   Were you involved on March 19, 2014?

1    A.    Yes, I was.

2    Q.    And what were your duties on that day?

3    A.    As part of that planning and part of the execution of the

4    actual meet with the undercover agent and the target, I was set

5    up in the parking lot outside of an apartment complex in

6    Watertown, Massachusetts.

7         Specifically, my job or my role was to be inside of what

8    we call the cover vehicle.  I was in the back of a minivan with

9    several other agents, and our job was to both maintain and

10:14 10    eyeball a visual of the target as he arrived at the location

11   and be available in case something went wrong to provide cover

12   for the undercover agent if something did, in fact, go wrong.

13   Q.    What time did you arrive at that parking lot,

14   approximately?

15   A.    Earlier that morning.  I'd say 9:00, maybe 8:30.

16   Q.    Could you please describe what, if anything, you observed

17   that morning?

18   A.    Yes.  We arrived at the parking lot and we parked sort of

19   towards the back so that we could see the entrance into the

10:15 20    parking lot.  I was, as I mentioned, in the minivan but not

21   driving.  We were listening to the surveillance of the target

22   from our aircraft and from our other units on the ground,

23   surveillance units.  So we were aware of roughly, if not very

24   specifically, where he was at any given time as he was

25   approaching our location.  As I mentioned, this was our job, so

1    as he pulled closer and pulled up onto a street just outside

2    the apartment complex, he parked his vehicle just outside.  And

3    as I heard on the radio that that was happening, I instructed

4    the person driving the van to go ahead and pull out of our spot

5    and move to a position much closer to the door so that we could

6    get a visual on the truck that the target was driving as well

7    as the door and be closer if we were needed.

8    Q.   And did you get a visual?

9    A.   Yes, I did.

10:16 10    Q.   At what point did you arrive at that vehicle?

11    A.   Sure.  So as soon as I instructed the person who was

12    driving the van to pull up towards the entrance, then we kind

13    of came around a little bit of a corner and I was able to see

14    the back of a truck.  At that point, I saw the defendant near

15    the back of his truck and coming around towards the sidewalk to

16    head towards the apartment door, the outer apartment door that

17    we expected him to go into.

18    Q.   Is the person that you saw that morning in the courtroom

19    today?

10:16 20    A.   Yes, he is.

21    Q.   Would you please point that person out and describe what

22    they're wearing.

23    A.   Yes.  He's the defendant.  He's in a suit wearing a tie at

24    the defendant's table.

25         MR. DE LLANO:  May the record reflect the witness has

1    identified the defendant?

2         THE COURT:  It may.

3    Q.    So Agent Diorio, what, if anything, did you observe after

4    you saw the defendant leaving his vehicle or walking away from

5    his vehicle?

6    A.    As he walked away from his vehicle and up the sidewalk

7    towards the outer apartment door, I just noted what the

8    defendant was wearing, which I was already aware of based on

9    the earlier surveillance and was able to confirm it; and I also

10:17 10   noticed the defendant was carrying some sort of shoulder bag or

11   backpack or something as he walked into, as I mentioned, the

12   outer door of the apartment complex.

13   Q.    At that point, what, if anything, did you do?

14   A.    As he walked into the outer door of the apartment complex,

15   there were other agents on the inside.  Once the defendant was

16   taken into custody, we, as I mentioned, were very close to the

17   door.  And when we realized that we weren't needed, we parked

18   the minivan in a parking spot closest to the door, and I exited

19   the van at that point.

10:17 20        I instructed a few of the surveillance agents and the

21   current team that were with me to secure the defendant's

22   vehicle.  By "secure," I mean pretty much stand around it to

23   make sure that nothing changes or nothing happens to it.  Then

24   I went into the apartment where the defendant was taken into

25   custody.

1    Q.   And when you arrived inside the apartment, what happened?

2    A.   By that point, the defendant was already in a separate

3    room, I believe it was a bedroom, but there was no bed or

4    furniture really in it, and was speaking to the two lead

5    investigators at that point.

6    Q.   And what did you do?

7    A.   When there was a sort of a logical break in their

8    conversation, I told them that we had the car secured and that

9    if we -- if there was going to be consent to search the car,

10:18 10   they could just let me know.  Ultimately, they did do that.

11   They had the defendant sign a consent form, which they provided

12   to me along with the keys for the vehicle.  I took that consent

13   form and the keys and went out to the vehicle and instructed

14   the agents that had been previously securing the vehicle to go

15   ahead and begin searching it.

16   Q.   Had you personally searched the truck?

17   A.   I was there and watched and looked into the truck as it

18   went.  But as far as actually taking things out of the truck,

19   no.  It was the other agents that were standing around that I

10:19 20   instructed who searched it.

21   Q.   Okay.  So how did you obtain access to the inside of the

22   truck?

23   A.   The keys were provided to us by the case agent along with

24   the consent form.

25   Q.   Do any of these keys access all areas of the truck?

1 A. No, they did not.

2 Q. What area was not accessible through those keys?

3 A. As we searched the truck, we became aware of a lockbox in

4 the bed of the pickup truck that was locked, in fact.  And none

5 of the keys on the key ring provided to us opened that lock

6 box.

7 Q. So what did you do at that point?

8 A. At that point I walked back into the apartment, informed

9 the case agents again.  And I heard them go into the room and

10:19 10 they asked the defendant about the lockbox and the keys for the

11 lockbox.  And I heard the defendant's reply direct, which was

12 that the keys were placed in the back seat under a mat in the

13 back portion of the cab.

14  The case agents then came out and told me that, but I had

15 heard it direct as well.  I went outside, went directly to that

16 spot that the defendant had mentioned to us, and there were the

17 keys that opened up the lockbox.

18 Q. And were you able to open that lockbox?

19 A. Yes, we were.

10:20 20 Q. And what, if anything, did you find inside that lockbox?

21 A. We found several items in there, to include sex toys, and

22 we found a wig, a lot of camera equipment.  Some other things

23 you would expect to see in a lockbox, such as like jacks and

24 tools and stuff to that effect.

25 Q. What did you do with the items that you found?

1   A.   Well, we pulled the items out of the box.  We looked

2   through.  Had some plastic bags in there.  We looked through

3   the items; and anything that we deemed relevant towards our

4   child exploitation investigation, we took into custody and we

5   seized.

6           MR. DE LLANO:  Your Honor, may I approach?

7           THE COURT:  You may.

8   Q.   Special Agent Diorio, I'm handing you what has been marked

9   for identification purposes only as Exhibit 5.  Do you

10  recognize Exhibit 5?

11  A.   Yes, I do.

12  Q.   And what do you recognize it to be?

13  A.   These are the three bags that were filled with -- three of

14  the bags that were filled with items that we seized from the

15  defendant's pickup truck that day.

16  Q.   How do you know that those are the same bags?

17  A.   Well, as I look at the bags here, I can see that they have

18  names, dates.  Two of the bags have exactly what's in them, and

19  it has the names of the people, the two officers that I

20  instructed to search the vehicle written right on the bags.

21  Also has a case number that I know reflects this particular

22  investigation.

23  Q.   And do you recognize the contents of those bags?

24  A.   Yes, I do.

25  Q.   And are they in the substantially same condition they were

1   on March 19, 2014?

2   A.   Yes, they are.

3        MR. DE LLANO:  Your Honor, at this point I ask that

4   Government Exhibit 5 be entered into evidence.

5        THE COURT:  Any objection?

6        MS. PEACHY:  Yes, your Honor, pursuant to my motion.

7        THE COURT:  Yes.  Your rights are saved.  Overruled.

8   The items may be admitted.  Exhibit 5 is now in evidence.

9        (Exhibit 5 received in evidence)

10  Q.   Mr. Diorio, would you please identify the items that were

11  recovered from the defendant's toolbox?

12  A.   Yes.  This first bag appears to be or is a bag of sex

13  toys, to include three, possibly four, phallic toys and one

14  sort of baster-type device.

15  Q.   Anything else?

16  A.   Yeah.  The other bag has like a pink tutu sized to fit

17  children three and up, along with several pairs of underwear,

18  to include -- most of them are princess-themed underwear, all

19  with sizes around -- they all appear to be size 8.  And again,

20  there's one, two, three, four, five, six, seven pairs of

21  princess underwear size 8.

22       There's other articles of clothing here that appear to be

23  women's articles of clothing, size large, 10 and 10/12, some

24  bathing suits, underwear in here.  This bag has the wig that I

25  referenced earlier, along with a strap; this actually appears

1   to go with one of the sex toys that I mentioned earlier.  I

2   think they go as a set, from looking at them.  Pantyhose, some

3   wipes and makeup.  There's also some paperclips, two of them,

4   that we seized from the bag.

5          THE COURT:  The way you identify those things is from

6   recognizing them and seeing the nomenclature on the bags.  Have

7   I got it right?

8          THE WITNESS:  That's correct, your Honor.

9          THE COURT:  Why don't you put them back in the bags

10:25  10   that you brought them or that were given to you on the stand

11   rather than putting them all together.  And then as you fill

12   the bag with what was in it, as it was brought to you on the

13   stand, let's let the clerk collect it.  All right?

14          THE WITNESS:  Absolutely, your Honor.  I kind of kept

15   them separate so that would be easier.

16          THE COURT:  I'm telling you that so the jury can have

17   them in the manner that they were handed to you.  That's all.

18   Let me see that first bag for a moment.

19          You're done with the identifications?

10:26  20          MR. DE LLANO:  I'm done.

21          THE COURT:  Come to the sidebar.

22   **SIDEBAR:**

23          THE COURT:  I just have a practical problem.  The

24   defense's rights are saved.  So he's given three bags.  He

25   identifies what's in them.  What's in them is the evidence.

1     This, for example, description is not evidence.  And so I have

2     problems, unless you're not going to object, sending this back

3     to the jury.  Now, we could do it -- well, do you object?

4          MS. PEACHY:  I would prefer if perhaps we could just

5     put Exhibit 5 into a box that doesn't have any labeling.

6          THE COURT:  I'd just as soon keep them in the three

7     bags as the government handed them to him.

8          MS. PEACHY:  Sure.

9          THE COURT:  Because I think that might make the record

10:27 10  better.  Why don't we do this.  Why don't we get three blank

11    bags.  By "blank bags," I mean like shopping bags, not Homeland

12    Security bags.  You take the exhibits from one bag, under the

13    clerk's supervision, and put it in an unmarked bag and saving

14    the defendant's rights against my initial rule, that's how

15    we'll handle it.

16         MS. PEACHY:  Thank you, your Honor.

17    (End sidebar.)

18         MR. DE LLANO:  Your Honor, I have no further questions

19    for the agent.

10:28 20       THE COURT:  Do you wish to have these while you

21    examine him?

22         MS. PEACHY:  I think so, Your Honor.

23         THE COURT:  Fine.  The clerk then will pass it back.

24    I'm just trying to keep things -- you're the judge of

25    everything here, the jury.  But when these items got in his

1 hands here this morning, the lawyer brought up three bags, and

2 I'd just as soon keep things in the same bags as they were in.

3  I'll tell you so you're not surprised over at the

4 sidebar that the bags have writing on it, "Homeland Security"

5 and the like.  We don't need that.  We're going to get some

6 blank bags.  But you will get the three bags with the items

7 because it's the items that are the evidence.  Those will be in

8 the jury room when you get the case, and together they're

9 Exhibit 5.

10:29 10  Ms. Peachy, go ahead.

11 CROSS-EXAMINATION BY MS. PEACHY:

12 Q. Agent Diorio, I have a few questions for you.

13  In those bags, you didn't find any Abercrombie & Fitch

14 clothing, correct, that you recall?

15 A. I'd have to look through everything.  I don't specifically

16 remember Abercrombie & Fitch.

17 Q. Okay.  Do you recall any Victoria's Secret Pink brand

18 clothing?

19 A. May I look through the exhibit?

10:29 20 Q. You may, yes.

21 A. Yes, there does appear to be a pair of underwear labeled

22 Victoria's Secret Pink.

23 Q. Are there any other Victoria's Secret Pink clothing?

24 A. I don't see labels on everything, but there does not

25 appear to be any other Victoria's Secret Pink logo.

1    Q.   Okay.  And you didn't find any shoes, right?  We know

2    that, you didn't find any high-heeled shoes, correct?

3    A.   In the bags, no.

4    Q.   In the truck?

5    A.   Not that I recall.

6    Q.   Okay.  And you mentioned on direct examination that there

7    were some cameras in Mr. Hinkel's truck, right?

8    A.   That's correct.

9    Q.   And these were seized by you, right?

10:31 10   A.   That's correct.

11   Q.   And they were turned over for forensic examination,

12   correct?

13   A.   That is correct.

14   Q.   By Special Agent Manning, right?

15   A.   I believe he did the forensics on this case.

16   Q.   And are you aware that he didn't find anything, any sexual

17   images at all, any images of children on those cameras?

18   A.   No.  Unfortunately, I didn't know the results of the

19   forensics in this case.

10:31 20   Q.   In front of you is a binder.  And I know -- sorry.  Things

21   are getting a little crowded up there.

22   A.   Sure.

23   Q.   But I know up there, somewhere under there is a binder.

24   I'm going to ask you to look at what's already been marked as

25   Exhibit 6 which is right there in front of you, okay?

 1          THE COURT:  Do you still want him to have the --

 2          MS. PEACHY:  I do, your Honor, because I'm going to

 3    ask him some questions about some of the pictures.

 4          THE COURT:  You go right ahead.

 5    Q.   Again, I hope my page numbers are the same as the page

 6    numbers on the exhibit.  But towards the end of that exhibit,

 7    page 67, I believe it is, you'll see a picture of Mr. Hinkel.

 8    A.   Okay.  I do see a picture of the defendant on here.

 9    Q.   Okay.  And you see that he's wearing a white headband in

10:32 10   that photograph?

11    A.   Yes.

12    Q.   And that white headband is contained in the items that you

13    found in his truck; is that correct?  Do you recognize that?  I

14    believe it's right there, right?

15    A.   Yes, it appears to be the same headband.

16    Q.   Okay.  And that pink skirt that Mr. Hinkel is wearing in

17    that photograph, is that that skirt?

18    A.   It would appear to be this skirt.

19    Q.   Okay.  Is that the skirt that says -- this one doesn't

10:33 20   have a label, correct?  It's the other one that has a label,

21    okay.

22          And he's wearing a pair of turquoise underwear, correct,

23    in this photograph?  I'm sorry.  It's the one before this.

24    He's wearing this in this photograph, page 67?

25    A.   Yes.

1    Q.   He's wearing a pair of turquoise underwear; and that's

2    this pair of underwear that Mr. Hinkel is wearing, correct,

3    with the yellow ribbon?

4    A.   You know, it's tough to tell.  It's got the same bow ties

5    on the top, but this one has, you know, has a border on the

6    top, and the one in the picture doesn't appear to have a

7    border.  So I'm not saying it's not the name.  I just can't

8    tell.

9    Q.   It's hard to tell.

10:33 10    A.   Yes.

11   Q.   On the next page there are a couple more photographs on

12   page 68 of this Exhibit 6.  And again, the top image is a man

13   wearing this pink ruffled skirt, correct?

14   A.   Yes.  It appears to be the same one.

15   Q.   And some black thigh-high pantyhose, correct?

16   A.   Yes.

17   Q.   And you found, I think it's in this bag, there's some

18   black thigh-high pantyhose.  Do you recall that --

19   A.   Yes.

10:34 20   Q.   -- without digging through?

21   A.   Yes.

22   Q.   The bottom of that page, 68, another image clearly of

23   Mr. Hinkel, correct?

24   A.   Yes.

25   Q.   And in that one he's wearing a different pink skirt,

1    correct?  With the satin sash, correct?

2    A.    Again, I can't tell from there because, again, the ribbon

3    on this one looks much more substantial than this one, but it

4    could be the same one.

5    Q.    Okay.  And Mr. Hinkel, in that photograph, appears to be

6    wearing lipstick and makeup, correct?

7    A.    I suppose so.

8    Q.    And you found lipstick and makeup, correct?

9    A.    Yes, we did.  We found makeup.

10:35 10   Q.    On the next page, on 69, in the image of Mr. Hinkel at the

11   bottom of that page, he appears to be wearing a wig?

12   A.    That is correct.

13   Q.    Similar to the wig that you found in the back of his

14   truck, correct?

15   A.    Yes.

16   Q.    He's wearing a black sheer skirt in that picture, correct?

17   A.    Yes.

18   Q.    Similar to the black sheer skirt you found in the back of

19   his truck, correct?

10:35 20   A.    Yes.

21   Q.    A black bra, correct; he's wearing a black bra in that

22   picture?

23   A.    Yeah.

24   Q.    Which was also among the items that you found in the back

25   of his truck?

1   A.   Yes.  Looks kind of like a tube top thing.

2   Q.   A strapless bra?

3   A.   I think it's actually -- I'm not really sure what it is.

4   Q.   Okay.  And turning to page 75 of that Exhibit 6, it's

5   again a picture of Mr. Hinkel, correct?

6   A.   Yes.

7   Q.   And again wearing the white headband, right?

8   A.   Yes.

9   Q.   And the black tube top or whatever it is?

10:36 10   A.   I think it's like a skirt pulled up over his chest.

11   Q.   But that was in -- was that amongst the items that you

12   found in his truck, something like that?  This maybe?

13   A.   It could be.  It's so dark.  I can't tell with the

14   pattern, but it could have been this.

15   Q.   On the image on page 75, he appears to be wearing a pair

16   of red underwear, correct?

17   A.   Yes.

18   Q.   And you found a pair of red underwear similar to that in

19   the back of his truck, correct?

10:36 20   A.   Yes, we did.

21   Q.   And again he appears to be wearing makeup in that

22   photograph, correct?

23   A.   Yes.

24   Q.   And the underwear, did you notice that some of these have

25   rips in them around the seams, for example, right there?

1 A. Yes.

2 Q. Around the elastic on the leg, correct?

3 A. Yes.

4 MS. PEACHY: I have nothing further.

5 THE COURT: Anything further, Mr. de Llano?

6 MR. DE LLANO: Not from the government, your Honor.

7 THE COURT: I want to take a moment, for me, and put

8 things back in the bag out of which they came. Does the

9 government have further evidence or does the government rest?

10:37 10 MR. DE LLANO: No, your Honor. That's it.

11 THE COURT: The government rests. Defense?

12 MS. PEACHY: We have a motion, your Honor.

13 THE COURT: I'll hear you.

14 **SIDEBAR:**

15 THE COURT: The defense makes, properly, a motion for

16 judgment of acquittal at the close of the government's case.

17 I'm disposed to deny it, but I'll allow it in part. I don't

18 think it's there to the jury on the theory of indecent assault

19 and battery because the pitch here was willing, and I think the

10:38 20 rest of it is straightforward.

21 All right. Motion is denied. Do you want it put

22 on --

23 MS. PEACHY: No, your Honor.

24 THE COURT: Then fine. We will treat this motion as

25 renewed at the close of all the evidence. I will tell the jury

1    that's all the evidence they're going to have.  I'll give them

2    a break now for 20 minutes.  We'll talk about the charge and

3    come back.

4    (End sidebar.)

5         THE COURT:  All right, ladies and gentlemen.  That's

6    all the evidence that's going to be presented to you in this

7    case.  We're at least, as far as time goes, on track.  What

8    happens now is I need to talk with the lawyers about how I'm

9    going to charge you.  You've heard my general instructions at

10:39 10   the beginning about how I'm going to charge you.

11        And we'll give you a recess until 11:00, and we expect

12   to have this case in your hands probably by 1:00 this afternoon

13   or thereabouts.  And I told you that today we expect you to be

14   with us all day.

15        Now, though you have heard all the evidence, continue

16   to keep your mind suspended and naturally don't start talking

17   about the case among yourselves.  You'll be back there, so I

18   don't know if there's anything else to talk about.  But don't

19   talk about the case with anyone.

10:40 20        Now, this keeping your mind suspended still and not

21   beginning to talk is very important because there are two vital

22   parts of the case that remain to be heard.  The lawyers now --

23   none of it's evidence.  The lawyers now get a chance to stand

24   before you and sum up, to argue to you the conclusions that

25   they want you to draw from the evidence that you've seen and

1   heard.  Now that is a terribly important part of the case.  So

2   don't start talking about the case now, and don't start making

3   up your mind until after you've heard the skilled attorneys

4   marshal this evidence, make arguments about what it shows or

5   fails to show.

6          And then when they're done, I'll be back; and again, I

7   will explain to you the law but now with some more precision

8   because I've presided over the case, as you've been listening

9   to it.  So I can be a little more precise in explaining to you

10:41 10  what it is that the government has to prove here beyond a

11  reasonable doubt; and you'll have that in mind, that the burden

12  of proof rests and stays upon the government.  So keep your

13  mind suspended.  Do not discuss the case either among

14  yourselves, nor with anyone else.  You may stand in recess

15  until 11:00, and I'll remain on the bench.

16  (Jury exits.)

17          THE COURT:  Please be seated.  Let me just say again.

18  I think I said it at the sidebar, but I want to be clear.  The

19  defense has renewed its motion for judgment of acquittal at the

10:42 20  close of all the evidence.  The Court has denied it; allowed it

21  in part, as explained at the sidebar, but otherwise denied it.

22  And the defense's right is saved following the receipt of the

23  verdict.

24          Now, as to the charge, in essence, you've heard it.  I

25  want to say two additional items about it, and then I will ask

1    for questions.  I do propose -- well, maybe I should say more

2    than that.  Let me go through the defense very quickly.  Well,

3    I'm going to touch on the presumption of innocence, as I did

4    before, at the start of the trial, emphasize that proof beyond

5    a reasonable doubt rests on the government.  I'm not going to

6    define reasonable doubt.  I will repeat it often.

7         I will give request number 3 in my language, but I'll

8    make mention of the fact and try in a positive way.  I'm not

9    making mention of the indictment because I'm not sending the

10:43 10   indictment.  When we get to the substance, you have heard my

11   charge, and there's no reason to change that.  I think it was

12   accurate.  However, I am going to give defense instructions

13   number 9, perhaps not in -- I am going to emphasize that the

14   communication must be enticing the minor.  I think that is the

15   law.  The rest of it I think is all the same.

16        I will give not the defense entrapment charge, but I

17   will give the guideline charge on entrapment in the First

18   Circuit, the First Circuit guideline book.

19        Questions on the part of the government?

10:45 20   And of course the order of argument is established by

21   the rules.  Government will argue first and then the defense

22   will argue.  No more than half an hour a side.  I don't invite

23   you to take a half an hour because the case, though a very

24   triable case, is a straightforward single investigation, single

25   incident case.

1        I do want to say a word about government rebuttal.  It

2   best be real rebuttal.  I'll give you about two minutes of

3   stem-winding, arm-waving, but everything else had better be,

4   "They argued this, but remember that."  You can do it better

5   than that, but it has to be true rebuttal.  You don't get two

6   chances to close.  And if I think you are trying to make a

7   second closing, I'll crown you.

8        Now, questions on the part of the government?

9        MS. PIEMONTE-STACEY:  Your Honor, in the preliminary

10:46 10  instruction, I just can't recall whether you gave the

11  pre-charge that the internet was a means of method or

12  interstate commerce.

13       THE COURT:  I don't know if I used those words, but I

14  will.

15       MS. PIEMONTE-STACEY:  Thank you, your Honor.  And I

16  think both parties have both requested a persuade, induce,

17  entice definition.  The government, of course, proposed that

18  the terms aren't defined in the statute, and the jury may use

19  the common sense understanding of the terms to determine

10:46 20  whether the defendant was the --

21       THE COURT:  I propose to do that, but I'm going to use

22  the word -- though I'm picking another word out of the statute,

23  "entice" is to lure.  Again, I will use the words "persuade,"

24  "induce," "lure," as roughly equivalent to "entice," yes, I'm

25  going to say that.  And they can use their plain and ordinary

1   understanding of those words.

2        MS. PIEMONTE-STACEY:  And I believe this is the last

3   question I have, your Honor.  I do remember on the pre-charge

4   you gave an instruction how the government is permitted to

5   subterfuge, a false identification --

6        THE COURT:  That will be part of the entrapment

7   instruction.

8        MS. PIEMONTE-STACEY:  What the government requested,

9   and I'm not sure if that was given in the pre-charge, your

10:47 10   Honor, is the failure to accomplish the intended act to be

11   immaterial.  In other words, the fact that he didn't go there

12   and didn't actually have sex with the --

13        THE COURT:  That will be covered by attempt.  This is

14   an attempt case.  The fact that it was a legal impossibility

15   makes no difference.  I'll talk about attempt in his taking a

16   substantial step toward the accomplishment of the crime.

17        MS. PIEMONTE-STACEY:  That concludes --

18        THE COURT:  Defense?

19        MS. FISHER:  Yes, your Honor.  With regard to the

10:47 20   entrapment instruction, your Honor, we don't think that the

21   pattern instruction accurately lays out sufficiently the

22   inducement because it's more geared to inducement that is more

23   traditional, and I would ask your Honor to give --

24        THE COURT:  "Inducement" is, the language here is that

25   the government did not persuade or talk Mr. Hinkel into

1    committing a crime.  I'm going to give that.  That's what it

2    says.

3           MS. FISHER:  As examples, I think the --

4           THE COURT:  I'm not disposed to give examples.

5           MS. FISHER:  Your Honor, I would ask your Honor to

6    give the portion of the instruction that we referenced from the

7    case of *United States vs. Young* from the Eighth Circuit.

8           THE COURT:  Yes.  Let me find it here, specifically.

9    Where is it?

10:48 10    MS. FISHER:  I'm sorry.  It's on page 17 of our

11   proposed instructions.  "Some of the inducement factors

12   relative to enticement of a minor to engage in sexual activity

13   may include whether the government made the initial contact."

14          THE COURT:  No.  I'm not disposed to -- does the

15   defense want me to give that -- the government want me to give

16   that?

17          MS. PIEMONTE-STACEY:  No, your Honor.

18          THE COURT:  No.  I'm going to stick to the guideline

19   charge.  Your rights are saved.  Anything else?

10:49 20    MS. FISHER:  No, your Honor.

21          THE COURT:  Very well.  So we'll take a recess until

22   11:00.  The government will close.  Then I think maybe another

23   ten-minute recess so we don't have to sit for two hours

24   listening to three of us talk.  And so I can call people by

25   name, who is going to close for the government?

1    MS. PIEMONTE-STACEY:  I am, your Honor.

2    MS. PEACHY:  And I am.

3    THE COURT:  Fine.  We're recessed until 11:00.  We're

4  recessed.

5         (Recess taken 10:50 a.m. to 11:05 a.m.)

6    THE COURT:  As I said, ladies and gentlemen, we now

7  come to one of the most important parts of the trial, the

8  moment when the attorneys stand up before you and quite

9  candidly attempt to persuade you with respect to the evidence

11:05 10  that you've seen and heard.

11       This is the highest calling of the attorney, to stand

12  before an American jury and argue on behalf of the client.

13  It's what we think of when we think of the legal profession

14  here in the United States.  I do have one -- I say to you, I

15  know you're going to give the attorneys the same courteous and

16  careful attention that you've given me and you've given all the

17  witnesses throughout this trial.

18       Now the caution.  These attorneys weren't there.  They

19  don't know what went on.  They have tried through the

11:06 20  presentation of evidence to lay matters before you in an

21  appropriate fashion.  Now they'll argue the strengths and the

22  weaknesses of what you have before you.  Just remember, they

23  weren't there.  They don't personally know.  So if your memory

24  or your beliefs about the evidence is different than something

25  an attorney argues to you here, your memory governs because it

1    is the government here that bears this burden of proof beyond a

2    reasonable doubt, just as it was when evidence was being

3    received; the government gets a chance to make their closing

4    argument first.

5         Ms. Stacey.

6         MS. PIEMONTE-STACEY:  "Lisa, I have to ask, does

7    Samantha know she can never tell anybody about this?"  "Does

8    Samantha know we can get into a lot of trouble, even years

9    later?"  That, ladies and gentlemen, was the e-mail that the

11:07 10   defendant sent to the undercover agents on the morning of March

11   19, 2014.  After he left his home in Connecticut and was

12   traveling more than two hours to Massachusetts to meet what he

13   thought was a 15-year-old minor for sex.

14        Now, ladies and gentlemen, you've heard the evidence

15   in this case.  You've seen exhibits.  You've heard the

16   testimony, and now it's time for you to evaluate that evidence.

17   And the government has proved beyond a reasonable doubt that

18   the defendant attempted to entice a minor into a legal sexual

19   activity.  How do you know?  You're going to use your common

11:07 20   sense in evaluating the evidence, the weight of the evidence

21   and the testimony that you heard.  But what did you hear,

22   ladies and gentlemen?

23        On February 14, 2014, undercover agents for Homeland

24   Security Investigations -- you've heard that referred to as

25   HSI -- posted an ad on craigslist, on the website craigslist.

1    And they posted that ad in the "Casual Encounters" section, and

2    they were acting in an undercover capacity. And what did that

3    ad say? You saw the exhibit. It says -- they posed and

4    pretended to be a mom with a daughter, open-minded, seeking a

5    taboo relationship that needed to be discrete.

6        Ladies and gentlemen, within minutes, within minutes

7    of that advertisement being posted, that man, the defendant,

8    responded. And you saw his response, the very first page of

9    Exhibit 2. He said, "Here are my likes. I like blindfolds" --

11:08 10    "Here of my sexual likes. Blindfolds, handcuffs, sex toys,

11    oral sex," et cetera. He wrote a description of a sexual

12    scenario that he imagined in response to that ad. He sent a

13    description of himself, and he attached a picture of himself.

14        So what did the undercover agents do at that point,

15    ladies and gentlemen? Well, they said, "I'm Lisa Richards.

16    I'm trying to introduce my daughter to sex. Do you mind if

17    she's young?" And you saw those e-mails. And the defendant's

18    response was, "How young?" And, "I hope we can make this

19    work."

11:09 20        All of that, ladies and gentlemen, all of it within

21    the very first hour of the ad being posted. And minutes later,

22    the undercover remembered the testimony you've heard, posing as

23    an abusive mother, said, "My daughter is 15, but she's

24    experienced, and you heard that the undercover agents adopted

25    these personas; the persona of Lisa Richards, offering her

1    15-year-old daughter for sex, and the persona of Samantha,

2    Sammy, who was an experienced 15-year-old child, according to

3    her mom.  And what was the defendant's first response of after

4    hearing she was 15, the very first e-mail, "Sounds very

5    naughty."  That was the defendant's first response after

6    hearing Sammy was 15 years old.

7            Yes, it was followed by, "I'm concerned about her age

8    because legally she should be 16 years or older"; and

9    immediately following in that same e-mail, "I'm concerned about

11:10 10   her age," was all the questions that that man, the defendant,

11   had about that 15-year-old's sexual experience.  And the e-mail

12   ends with the defendant saying, and I quote, "It's a very big

13   turn-on for me."  You'll have those e-mails in the jury room,

14   ladies and gentlemen.

15           From there you heard Agent Squire and you heard the

16   testimony, that over a one-month period of time, undercover

17   agents and the defendant exchanged more than 200 e-mails.  All

18   of them with one sole purpose in mind, sex with a 15-year-old

19   minor named Sammy.

11:11 20         Did the defendant have the opportunity to decline the

21   invitation?  Did he have the opportunity to decline Lisa

22   Richard's invitation to introduce her daughter into sex?  He

23   sure did.  Not once but twice.  But he stayed.  You saw the

24   evidence immediately after the defendant said, "I'm concerned

25   about her age since legally she should be 16 years old."  The

1    undercover agents sent an e-mail back to the defendant and

2    said, "She's not.  I guess this conversation is over."  "She's

3    not 16.  I guess this conversation is over."  Did the defendant

4    say, "Thank you," and move on to the next craigslist ad?  No,

5    he didn't.  He sent two e-mails.  And let me read to you pieces

6    of some of those e-mails.  "Mommy is very naughty," after he

7    finds out she's 15 years old.  "So how and when did you get

8    your daughter involved?  Daddy would like to and needs to spank

9    mommy and daughter.  I'm getting aroused just thinking about

11:12 10    the play we can have together."  And specifically, "Nope.  It's

11    not over.  I want to talk more.  I'm very intrigued by it all,

12    such taboo and naughty play."  That was the defendant's

13    response to, "She's not 16, so I guess this conversation is

14    over."  And that response all is happening within an hour and a

15    half of the ad being posted on craigslist.

16         So what do the undercover agents do next?  They gave

17    the defendant a second opportunity to back away, a second

18    opportunity to get out of Lisa Richards introducing her

19    15-year-old daughter to sex.  What did they say?  They said, "I

11:12 20    don't have time if you're not serious," as they're pretending

21    to be Lisa Richards.  "I don't have time if you're not serious.

22    You can imagine I'm getting a lot of offers."  Did the

23    defendant say, "No, thank you"?  Did the defendant say, "Let me

24    think about it"?  The defendant in the e-mails that you saw

25    said, "I am serious.  I will not waste your time."  He knows

1    Sammy is 15 years old at this point.

2         And when the undercover agent stopped e-mailing with

3    the defendant later that day on February 14, what was the

4    defendant's response?  He didn't go off.  He sent three e-mails

5    to undercover agents, three e-mails that the undercover agents

6    didn't respond to right away.  The first e-mail, "Let's talk

7    more."  Undercover agents don't respond.  A few hours go by.

8    The second e-mail -- this is all on February 14 -- "I wouldn't

9    mind talking to her."  That's Sammy.  The second e-mail,

11:13 10   undercover agents don't respond.  And then the third e-mail,

11   "Hmm.  Did you lose interest, or did you just get busy?"  Those

12   three e-mails from the defendant to undercover agents all not

13   responded to on February 14 by the undercover agents.

14        And then you heard a period of time went by.  Four,

15   five days, and there was no communication at all between the

16   undercover agents and the defendant.  And you heard Agent

17   Squire testify that there were other investigations ongoing

18   during that time and they were triaging the various responses

19   that they got to this craigslist ad.

11:14 20        So on February 19, 2014, five days after the ad was

21   posted, undercover agents responded to, "Did you lose interest,

22   or did you just get busy?"  They responded to the defendant,

23   and you saw that response.  "Hey.  Sorry.  Lost track of the

24   conversation.  Can you believe the snow?"  It was this time of

25   year at that point, ladies and gentlemen, lots of snow.  "Here

I am.  This is a picture of me."  You heard Agent McDonagh

testify that she had posed for this picture that was supposed

to be Lisa Richards.  So Agent Squire attached the picture of

agent McDonagh pretending that she was Lisa Richards, and that

e-mail then got sent to the defendant.  And from that point on,

there was continuous communication between the defendant and

the undercover agents.

During the e-mails did the defendant say he was

concerned about the minor's age?  He said that.  He typed those

words.  What was his concern?  Getting caught, ladies and

gentlemen, getting into a lot of trouble, just like he wrote on

March 19.  That was his concern.  Look at the e-mails.  He knew

how old the minor was.  He says so in the e-mails, and the

e-mails to him say so.

Look at the e-mails.  He knew what he was getting

into.  He says so in the e-mails.  And yet, the defendant still

showed up on March 19 at Sammy's apartment, at that 15-year-old

minor's apartment.  And look at the e-mails where the defendant

talks about his supposed concern for her age.  Each time -- and

there are only a handful of them, ladies and gentlemen, four or

five sprinkled throughout hundreds of e-mails between the

defendant and undercover agents.  And in each of those e-mails

where he says, "I'm concerned about her age.  Are you sure this

is okay," each time immediately following the supposed

statement of concern, he says things like, "As long as she

1    desires this, I'm game."  Same e-mail, same piece of paper.  He

2    says, "Where do we go from here?"  He says, "I want this to be

3    fun, playful and a good experience for her."  He says, "It's

4    hot because it's so naughty."  And he says, "It's a turn-on to

5    have her attracted to me, considering our age difference."

6    That's what you'll find in the e-mails where he supposedly

7    expresses concern about her age.

8          And then the defendant took one step after another to

9    entice that minor into having sex with him.  Look at the body

11:17 10   of e-mails that the defendant has with Lisa Richards, the woman

11   who is going to offer up her daughter for sex.  Look at the

12   things he asks her.  Look at the ways he tries to assure her to

13   get her to allow that child to have sex with him.  "Is Sammy

14   seductive and sensuous," he asks.  15 year old girl.  "Does

15   Sammy like the idea of me being her Daddy and her being my

16   little girl?"  "I want this to be fun, erotic, sensuous and

17   playful."  "What are Sammy's likes and dislikes?"

18         All of these questions and statements coming from the

19   defendant to the mother so that the mother chooses him so he's

11:18 20   the one who can have sex with her 15-year-old daughter.  He

21   says to the mom, "Have Sammy text me or send me an e-mail, and

22   we'll talk directly but save them, save those e-mails so that

23   you can see what she and I are talking about," again assuring

24   the mom this is going to be okay, telling Lisa Richards that it

25   would be better for Sammy to be in her own room where she's

1    familiar, comfortable and secure rather than in a hotel when

2    they have sex.  And then getting Lisa Richard's involved, "How

3    do you see this going?  What type of experience does she have?

4    Can you get her to take this picture for me?"

5         Look at the second body of e-mails, ladies and

6    gentlemen, that the defendant himself had with Sammy.  March

7    12, 2014.  There's a large volume between that man and what he

8    thought was a 15-year-old child.  What does he say to her?

9    What does he say to Sammy?  "Hi, sweetheart.  How was your

11:19 10   day?"  "Have you been thinking of you and me?"  "I'll make it

11   fun and enjoyable for you sweetheart."  "Is there anything you

12   like or hope I do with you?"  "You're a very pretty lady."

13   "Can't wait to see you."  "Would you like me to touch you

14   there?"  "Are you excited to kiss a man for the first time?"

15   "I'll be very good to you."  "I can't wait to hold you in my

16   strong yet gentle arms and feel your body against mine."  To a

17   15-year-old girl.

18        Then, of course, ladies and gentlemen, was the travel.

19   March 19, the day the defendant had arranged to meet with Lisa

11:19 20   Richards to meet her 15-year-old daughter for sex.  The

21   defendant packed up that backpack that you saw, left his home

22   in Connecticut, got into a truck, drove two hours to Boston,

23   more than two hours to Boston, Mass., the e-mail that morning,

24   "Does Sammy know she can't say anything, or we're going to get

25   in a lot of trouble?"

1        The travel, over two hours.  Lots of time to think,

2   plenty of time to turn around, lots of communication with the

3   undercover agents.  And then the defendant, thinking he

4   attained that mental state with that minor, thinking she'd

5   engage in sexual activity with him, all of those steps, all of

6   those steps to entice that minor into sexual activity with him,

7   a sexual activity that is illegal in the Commonwealth of

8   Massachusetts because a minor under 16 cannot consent to sex.

9        Ladies and gentlemen, the undercover agents provided

11:20 10   an opportunity for the defendant to commit a crime.  He took

11   that opportunity.  He ran with that opportunity, and no one

12   forced him into anything.  The undercover agents provided the

13   way out twice.  He stayed.  And his willingness to commit that

14   crime, ladies and gentlemen, more than 200 e-mails.  Several

15   hundred might have been the testimony.  No one forced that guy

16   to sit down at a computer and type that stuff out.  He sat

17   there himself.  He typed those e-mails.  They're on his

18   computer.  You heard the evidence.

19        And look at the travel from Connecticut to

11:21 20   Massachusetts.  Who forced him into the truck that morning?

21   Well, that would be nobody.  He got up, he made a decision.  He

22   packed that backpack full of all the tools he needed to have

23   sex with a child.  He walks out of his house -- you saw the

24   tape, ladies and gentlemen -- methodically.  Comes out of the

25   house, puts something into the car.  Goes back into the house,

1  gets something else.  Comes back to the car, methodically

2  planning.  He got in that car, and no one forced him to take

3  the two-hour drive.  No one forced him to pack the bag.  And

4  when he gets to Watertown, Massachusetts, certainly no one

5  forced him out of the car, and no one made him knock on that

6  apartment door.  The defendant had plenty of opportunity to get

7  out of sex with a minor.  He chose to stay.  "I will not waste

8  your time, he said."  He didn't.

9          Now, as you will be instructed, more instructed, this

11:22  10  is an attempt case because there was no real victim.  But

11  ladies and gentlemen, he didn't know that.  He didn't know that

12  when he sent hundreds of e-mails detailing the sex he would

13  have.  He didn't know that when he packed that bag and brought

14  it with him from Connecticut to Massachusetts.  The defendant

15  didn't know she wasn't real when he traveled.

16          And ladies and gentlemen, let's talk about that

17  backpack for one minute.  You saw all the sex toys that were in

18  that backpack.  I don't need to parade them out here in front

19  of you.  But what was in that backpack, ladies and gentlemen?

11:23  20  The sex toys, sure; sex toys that he said in e-mails he would

21  bring with him; sex toys that he listed he was interested in

22  when he first responded to the ad; sex toys that he mentioned

23  and all of the ways he would have sex with a 15-year-old.  So

24  the sex toys are in the bag.  But ladies and gentlemen,

25  condoms.  There were condoms in the bag.  And do you remember

1    the e-mail where the defendant says, "Is Sammy on birth

2    control?"  Do you remember the e-mail where the defendant says,

3    "Can't have her making babies at her age, can we?"  Condoms

4    were in the bag.  What else was in the bag?  Cologne.  Do you

5    remember the e-mail about the cologne and undercover agents

6    going back and forth and their commenting on how they smell

7    people in a mall, and Sammy and Lisa Richards would say, "That

8    guy smells nice."  And what does the defendant say?  "I'll

9    bring some cologne with me.  She can spray it on her pillow, so

11:24 10   she'll have memories of me taking her there."  He said that

11   about the 15-year-old girl.  And there was the cologne, right

12   in the bag.

13        And then, ladies and gentlemen, further evidence of

14   his intent, whether undercover agents asked him to bring

15   something, whether he decided on his own, a stuffed animal, a

16   stuffed animal that he thinks is appropriate for a little girl

17   who he is trying to have sex with.  Steps to entice that minor

18   into engaging in sexual activity with him, everything the

19   defendant said he would use and he would bring when he was

11:25 20   having sex with a minor.

21        And so ladies and gentlemen, you've heard a lot about

22   these e-mails and you've heard that, you know, sometimes they

23   got graphic.  Well, undercover agents can engage in subterfuge,

24   undercover agents can adopt a false identity to investigate

25   crimes, and that's what these undercover agents did.  But do

1   you know what talking dirty did?  It made it real.  Lisa

2   Richards was an abusive mom offering her daughter up for sex,

3   and the dirty talk going both ways kept that situation real.

4   These agents never forced the defendant to do anything.  They

5   provided him with an opportunity.  The defendant took that

6   opportunity.  The defendant had two opportunities to back out.

7   He didn't.  He stayed.  And he showed up at that door on March

8   19, 2014.

9        Now, the Court will instruct you on the law in this

11:26 10  case, but let me hit and discuss with you some of the elements

11   that I think be you'll be hearing.

12        First, the attempt to entice a minor to engage in

13   sexual activity, there was no real victim, and this is an

14   attempt case, and the Court will instruct you on the law.  But

15   the defendant intended to entice that minor into having sex

16   with him, and you saw the evidence and substantial steps that

17   he took, the e-mailing with Lisa Richards, the e-mailing and

18   texting with Sammy.  The conversations with the undercover

19   agents, packing that bag with stuff that would help him and the

11:26 20  travel to Massachusetts, ladies and gentlemen.

21        And then there's an interstate commerce element.  You

22   heard the testimony of Agent Manning who did the forensic

23   evaluation on the computers and the computer media that were

24   seized from the defendant's home and his office.  And you'll

25   hear that he sent and received e-mails over the internet on his

1   computer and that the computer belonged to the defendant.

2           "Child," under the statute is someone who is less than

3   18 years old.  And you heard the defendant thought that Sammy

4   was 15 years old.

5           And finally, to engage in a legal sexual activity.

6   The e-mails detail that sexual activity.  I've summarized the

7   sexual activity.  I'm not going to do it again, ladies and

8   gentlemen, but all of the sexual activity that the defendant

9   intended to engage in, wrote that he intended to engage in,

11:27 10   described what he intended to engage in, all in those e-mails,

11  the backpack, the fact that Sammy was a minor, and that she

12  can't consent because, under Massachusetts law, a child under

13  16 cannot consent to sex.

14          Ladies and gentlemen, the defendant's e-mails to

15  entice a minor to engage in steps -- I know engage in sex, the

16  steps he took to get her to engage in sex, that shows you his

17  intent.  And keep in mind how this enticement, the defendant's

18  enticement of a minor began and how it ended.  After the first

19  opportunity to walk away, that defendant says, "Nope, it's not

11:28 20   over."  After undercover agents gave him a second opportunity

21  to walk away, he said, "I'm serious.  I will not waste your

22  time."  And then the morning of, "Does Samantha know we can

23  never tell anyone about this, that we can get into trouble,

24  even years later?"  That, ladies and gentlemen, shows you the

25  defendant's intent.

1         We ask that you find the defendant guilty.  Thank you.

2         THE COURT:  Ms. Peachy.

3         MS. PEACHY:  Thank you, your Honor.

4         "I'm pursuing this only because she is consenting.  If

5  I feel or hear her change her mind, I will not engage her."

6  There is no coercion in this case.  There's no child that needs

7  coercing.  If anyone's being persuaded into anything in this

8  case, it's Mr. Hinkel, who is being persuaded to commit the

9  crime the government now charges him with.

11:29 10         We probably all had the experience of buying a car.

11  You go to the lot.  You see a sticker price on the car.  That's

12  the price that's advertised.  In this case there's something

13  being advertised.  It's an ad on craigslist put out by the

14  undercover agent, which says nothing about a minor.

15         And sometimes it's that way when you're buying a car.

16  You see a sticker price advertised, and it says nothing about,

17  "Oh, this is included," and or, "That isn't included."  And

18  when you talk to the dealer about it, that's when you start to

19  find out, "Oh, that price doesn't include that and doesn't

11:30 20  include that," and the dealer tries to talk you into it a

21  little bit.  And you express some concerns.  Maybe you express

22  some hesitations, and the dealer reassures you.  The dealer

23  wants to make a deal.  And eventually maybe you accept the

24  dealer's offer.

25         Now, wouldn't it be strange if after you buy the car

1 from that dealer, he then later says, that you, the buyer,

2 coerced him into making the deal?  Well, that's pretty much

3 what the government is doing here in this case.

4   They advertise on craigslist, personal ads, casual

5 encounters, it's a regular website, personal ad website.  It's

6 not some child predator website or child pornography website; a

7 regular website.  They advertise this mother-daughter scenario,

8 and they don't say anything about the scenario involving

9 someone who is underage.

11:31 10   So when you look at Mr. Hinkel's initial response to

11 that advertisement, keep that in mind.  He doesn't know when he

12 writes that initial response that this involves an underage

13 person.  He talks about how he's a Daddy dom, and, in fact,

14 their advertisement said that they're looking for some dom,

15 some domination-type sex.  So he tells them, "I'm an

16 experienced Daddy/dom."  And he lists all those other things

17 he's interested in, this 50 Shades of Grey-type stuff, bondage,

18 spanking, toys, all this stuff we know that he's interested in.

19   But what doesn't he say in that initial response?  He

11:31 20 doesn't say anything about wanting to have sex with someone who

21 is underage.  That's not on his laundry list of interests.  We

22 know that from his initial response.  And what happens when he

23 is told that the daughter is young?  He's not just told that

24 she's 15.  By the way, we're not talking about an

25 eight-year-old here.  We're talking about a 15-year-old.  The

1    agents designed this as a 15-year-old.  And he's not just told

2    that she's 15.  It's 15 but she's experienced.  Both things

3    designed to try to make this more okay for Mr. Hinkel, for him

4    to feel more comfortable about this.  She's already sexually

5    experienced.  She's 15.  It's all okay.

6         What else does Agent Squire tell Mr. Hinkel about the

7    girl's sexual experience?  Agent Squire tells him this

8    (indicating).  Agent Squire writes this to him (indicating).

9    Agent Squire writes this to Mr. Hinkel (indicating) and writes

10   this to Mr. Hinkel (indicating), referring to the fact that

11   they've looked at pornography together online.

12        You heard that one of the first things that Mr. Hinkel

13   says when he's told that the girl's age is that he's concerned

14   about the age.  And the prosecutor told you that maybe a

15   handful of times he expressed some concerns, but it's only

16   because he was afraid of being caught.  Well, let's look at

17   what Mr. Hinkel said.  "As long as she desires this, I am

18   game."  "That made me feel more comfortable, knowing she's on

19   board with this."  "I was concerned and skeptical at first when

20   you told me her age."  "I am pursuing this only because she is

21   consenting."  "If I feel or hear her change her mind, I will

22   not engage her.  I will hate myself forever leaving an

23   emotional scar on her."  "I won't lie.  I do have some

24   conflicting feelings about this."  "It's hot because it's so

25   naughty, but I do sometimes feel like I shouldn't be doing

this."  "I fear ruining her emotionally, but as long as she is willing and excited about this, I will proceed."  "So she's really okay with my playing with her?"  "I'm still not sure what we will be doing yet.  I'm going to play it by ear and gauge it based on Samantha's feelings and comfort level." That's the day before he's supposed to meet her.  "Lisa, her comfort and her feelings is my priority."

Again, the day before the meeting is supposed to happen, "Lisa, I really am nervous.  This is so out of my element.  I never thought I would be with such a young girl. When I answered your ad, I was thinking mother-daughter, like a mother in her 40s and a daughter in her 20s.  I guess I won't know how I will really feel until I see Samantha's response and excitement."  "Even though I have always been dominant and take charge, this is one situation that I just don't know how things will transpire yet."  "I know I sound like a broken record, but I really don't know how things will go."  Those hesitations are real.  He tells them that he is not sure, that he's not going to do anything that she doesn't want to do.  And he's reassured by the agent, even when he expresses those concerns and hesitations.  You can look at what the agents write back to him after he writes those e-mails to the agent expressing his concerns.

Here he is, charged with attempting to coerce a minor into sexual activity.  It's kind of a strange thing in this

1    case, attempting to coerce a minor that they created,

2    attempting to coerce a minor into a situation that they created

3    before Mr. Hinkel even entered the picture.

4         Keep in mind that there's that one crucial element

5    here.  I keep saying it, coercion, persuasion, enticement.

6    This isn't about whether Mr. Hinkel intended to have sex with a

7    minor.  That's not what he's charged with.  That's not what the

8    government has charged him with here.  Did he intend to have

9    sex with someone underage?  Sounds like it.  You know, the

11:36 10   government spent a lot of time talking about that.  But what

11   he's charged with is luring a child over the internet into

12   agreeing to have sex with him.  And that's not what he did.

13        It's not about whether he drove two hours.  It's not

14   about whether he traveled to go meet the mother and the girl.

15   That's not what he's charged with.  He's charged with coercing

16   a minor with his communications over the internet.  That's what

17   makes this a federal crime, is that internet part of it, that

18   it was those communications, those e-mails that he's writing

19   that were designed to lure the minor into agreeing to have sex

11:37 20   with him.

21        Like I said, the government did spend a lot of time

22   talking about the trip that Mr. Hinkel made from his house in

23   Connecticut to Watertown.  They obviously spent a lot of money,

24   resources, with this helicopter taping him getting from his

25   house to his truck, following him from Connecticut to

Massachusetts, all these agent on the ground, the guy in the helicopter, the agent with the Easter decorations in the window. They put a lot of effort into this case. But you know what? They overplayed their hand. They really overplayed their hand.

The stuff that Mr. Hinkel has in his truck, I showed you this morning -- unfortunately, we have to see these pictures of Mr. Hinkel, right? He's dressed in women's clothing, and he's wearing makeup, and he's wearing the things that are in the truck. I told you that in my opening, that when they introduce the stuff in the truck, we know what it's for because we have pictures of Mr. Hinkel wearing it. It's not for Sammy. It's for him. And the stuff that he has in the backpack, again, I told you in the opening keep in mind who told him to bring that stuff? The gift. Are they saying that that's the proof that he was trying to coerce the minor? Because that was them who told him to bring the gift, not once but twice, once by Lisa and then again as Sammy, who asks about if he's going to bring her something. The cologne, that's their idea. The lube, that's their idea. The sex toys, they want him to bring the toys because they think it would be fun to use the sex toys.

And what else did we find out about some of the things in the truck? When Mr. Hinkel is interviewed by agents when he's arrested, he tells them, "It's for sex with other women."

And we know some of that from some of the stuff that they got
off his computer, some of these other e-mail fragments, that
he's having this BDSM type of sex with other people.  You can
see that in the e-mail chats.

          I would like you to focus on where the actual coercive
statements are.  Where is it that Mr. Hinkel is talking to
Sammy or through the mother and trying to coerce this girl into
having sex, to do something that she's not willing to do?
Where is he trying to bend her will?  He actually only speaks
to Sammy twice.  And you'll see, you can look at those e-mails.
On February 24 and March 12.  He actually calls her sweetheart.
Is that him trying to coerce her into sex?  Asking her her
favorite color, talking nice to somebody, is that what we're
going to call coercion?  Is that luring a child into having
sex?

          And what does he talk about doing when he's actually
talking to Sammy?  When he talks to Sammy, all he talks about
is kissing and touching.  He doesn't talk to Sammy about having
sex with her.  All he talks about asking her to do is kissing
and touching, and that's not illegal.  Sure, it's
uncomfortable, and no one really wants to think about it
probably, but that's not a crime.  Kissing a 15-year-old, as
long as she's willing, is not a crime.  Touching is not a
crime.  The crime is if he's trying to lure her into agreeing
to have sex with him, and that's not what he's talking about

1    when he talks with Sammy.

2            What does the agent tell Mr. Hinkel about how Sammy

3    feels about this whole thing?  Agent Squire tells Mr. Hinkel

4    that she -- they showed Sammy all of the pictures.  This is

5    including the picture of a penis, that she thinks he's someone

6    famous.  And I'm not going to read out loud the rest of it

7    that's there.  That's how Sammy feels about all this, according

8    to what the agent is writing to Mr. Hinkel.

9            Sammy says that he's hot, that she thinks it's going

11:42 10   to be fun when she's asked about how she feels about this

11   meeting coming up.  When Mr. Hinkel says, "Would you like me to

12   touch you there as well," this is after Sammy says that she

13   rubs herself sometimes, she says, "I think so.  Mom said you're

14   really good at it, and if it feels really good when a man does

15   it."  Does that sound like someone he's coercing into

16   something?  When he says, "I hope you like to kiss," she says,

17   "I do.  I haven't kissed a man before, and you are very hot.

18   Mom showed me all the pics, too."  The agent has Sammy refer to

19   Mr. Hinkel as her BF, as her boyfriend.  She signs off a e-mail

11:42 20   with HAK, hugs and kisses.  Is this someone who he's luring

21   into something?

22            After Mr. Hinkel chats with Sammy, the agent, as Lisa

23   says, "The way she was floating around here on cloud nine when

24   she was done talking with you."  And it goes on from there.

25            When Mr. Hinkel is corresponding with the agents,

1    there is certainly some very explicit conversations that get

2    very uncomfortable to read and to listen to.  But keep in mind

3    that the agent is reciprocating.  And not just that.  He's

4    going even further, even when Mr. Hinkel isn't asking or

5    engaging in any back-and-forth conversation.  The agent comes

6    up with these fantasy stories that he throws out there to

7    Mr. Hinkel like that one on March 15 where he talks about how

8    Lisa and Sammy are sitting together talking about Mr. Hinkel

9    and thinking about him.  And she starts masturbating herself

10   and masturbating her daughter, and it's all like a dream.  Is

11   that the agent just -- whatever he said -- like continuing some

12   persona or trying to be convincing in this persona?  No.

13   That's him trying to hook Mr. Hinkel, trying to lure him

14   further into this whole scenario that they've created.

15          What else does the agent write?  What are some of the

16   other things that Agent Squire, a Homeland Security agent, who

17   is sitting at his computer, is writing?  He writes that

18   (indicating).  He writes that about the 15 year old

19   (indicating).  He writes that (indicating).  He writes that

20   (indicating.)  He writes that to Mr. Hinkel (indicating).  He

21   writes this, after Mr. Hinkel sends the picture of a penis

22   (indicating).  He writes that (indicating).  He writes that

23   (indicating).  He writes that (indicating).  He writes that

24   (indicating).

25          This is more than a case where the government is

1    creating, offering on opportunity for Mr. Hinkel to commit a

2    crime.  It's more than that.  They're not just offering him an

3    opportunity.  This is entrapment.  This is the government going

4    too far and persuading and talking Mr. Hinkel into committing a

5    crime.  How do they do that?  How do they induce him into

6    committing this crime?  They do it by complimenting him,

7    telling him he's hot, by telling him his penis is big.  They do

8    it by writing pornography to him, by suggesting repeatedly that

9    he talk to the 15-year-old Samantha, by suggesting that he

11:46 10  bring a gift, which now the government wants to argument is

11   evidence of his enticement of the girl.  They induce him by

12   making it all seem okay because the girl is 15, but she's

13   already had sex.  And the mom's continuing to molest her and

14   have sex with her and kind of make it all seem okay.

15        They induce him by offering the mother as a willing

16   person, as a person who wants to have sex with Mr. Hinkel and

17   wants to have the kind of BDSM sex that Mr. Hinkel is

18   interested in.  They induce him by pursuing him again, even

19   after he stops writing to them for five days.

11:46 20       Whatever their excuse is, I don't -- it doesn't

21   matter.  Mr. Hinkel stops writing to them for five days.  Okay,

22   so the night of the 14th he says, "Did you lose interest, or

23   are you just busy?"  Is that someone who is trying to lure a

24   child who just stops writing?  They pick up the communications

25   again after five days of Mr. Hinkel not saying anything to

1   them.  They induce him by putting the ad out there that doesn't

2   say anything about this involving a minor.

3         And the other part of entrapment, you'll hear the

4   judge tell you, is that Mr. Hinkel was not predisposed to

5   commit this crime; that he wouldn't have otherwise committed

6   this crime if it weren't for what the government did in this

7   case, and we know that there is absolutely no predisposition on

8   Mr. Hinkel's part.  You heard he has no criminal record.  He's

9   married.  He has two children.  They talked to his wife.  They

11:47 10   talked to his children.  They didn't find any evidence of abuse

11   or anything like that.  His wife, when she found out, was

12   shocked, fell to the floor crying.  They looked through five

13   computers, God knows what else, the cameras in the truck, other

14   electronic devices, but five whole computers, 26,000 pages of

15   data retrieval here.

16         And what do they find that shows that Mr. Hinkel was

17   predisposed to commit this crime?  Do they show any evidence of

18   him trying to lure other children, trying to talk to other

19   children, looking at child pornography, going to child

11:48 20   pornography websites?  You know what they find?  They find five

21   animae cartoon pictures in a web cache file that we have no

22   idea where that came from, when it got there.  It could have

23   been just -- we do know that he didn't visit any child

24   pornography websites, so we know it doesn't come from a website

25   where he's going to look for child pornography.  God knows how

1    that ends up there.  That doesn't show that he's predisposed to

2    commit this crime.  But that's all they got, so they got to put

3    it out there.  That's how much they're reaching here.

4    Mr. Hinkel has no child pornography, no evidence that he was

5    trying to have sex with minors at all.  And we even know that

6    from his own words, saying that, you know, he once placed an ad

7    for something like this but the ad said the girl had to be of

8    legal age.

9         He's obviously having a lot of kinky sex.  We talked

11:49 10   about this in the opening.  There's a lot of mention of his

11   interests.  And that might make you uncomfortable, and you

12   might not like hearing about that kind of stuff, and you know

13   he's married and he's not a saint, that's for sure.  But he's

14   not a pedophile, and he's not a predator.

15        Coercion, inducement, persuasion, enticement, that's

16   one of the critical elements here.  Think about what those

17   words mean to you.  And the government must convince you beyond

18   a reasonable doubt.  You must be convinced beyond a reasonable

19   doubt that that's what Mr. Hinkel was doing when he was writing

11:50 20   these e-mails.  They also must prove to you beyond a reasonable

21   doubt that this was not entrapment.  You must be convinced

22   beyond a reasonable doubt that Mr. Hinkel was not persuaded by

23   the government agents to commit this crime.  You must be

24   convinced beyond a reasonable doubt that Mr. Hinkel was

25   predisposed to commit this crime.

1     So if you're going back and forth over these e-mails

2     when you're deliberating trying to say, "Well, does it mean

3     this, or does it mean that," and you can't decide, Mr. Hinkel

4     is entitled to the benefit of that doubt.  That means you must

5     acquit him and find him not guilty.

6          There's a quote when you come up to the courthouse

7     inside in the main lobby there, the grand staircase, by Justice

8     Brandeis.  The quote says, "Justice is but truth in action."

9     The truth here, Mr. Hinkel would have never committed this

11:51 10  crime if the government hadn't taken these steps to persuade

11    him to commit the crime.  The truth is that what Mr. Hinkel did

12    is not the crime that the government has charged him with.  He

13    was not trying to coerce a minor into sexual activity.  That

14    truth in action justice here is a verdict of not guilty.

15          THE COURT:  Any rebuttal, Ms. Stacey, briefly.

16          MS. PIEMONTE-STACEY:  The defendant wasn't

17    predisposed?  He sure has an interest in children.  Okay.

18    There wasn't child pornography on his computer.  He wasn't

19    charged with possession or receipt or anything having to do

11:51 20  with child pornography.  The defendant is being charged with

21    trying to get a minor to agree to have sex with him, not

22    whether he actually had sex, not whether he intended to have

23    sex, to get a minor to agree to have sex with him.  So look at

24    that evidence.

25          The pictures of the defendant in little girl's

1    clothes, interest in children?  The pictures, the animated

2    cartoons where adults are sexualizing children, sexual interest

3    in children?  E-mails that ask if Sammy has any idea that he

4    will be licking and kissing her, e-mails where that man says

5    he's just the right size for a baby girl to feel deep inside

6    her.  He was predisposed.

7           Ladies and gentlemen, the defendant was coerced?  And

8    he couldn't have possibly been interested in sex with Sammy

9    because he didn't talk to Sammy about it.  Well, you saw all

11:52 10   the e-mails where he spoke about all the things he was going to

11   do to that child with her mom.  And you know why he didn't talk

12   to Sammy about it?  Because it's really scary to a 15-year-old,

13   isn't it, to have a man of his age talking about all the

14   bondage and the sex that he's going to have with her.  And you

15   know what would have happened if he spoke about that sex with

16   Sammy?  She would have said no.  In that way, how do you entice

17   someone to have sex with you, because talking can be really

18   scary?

19          Ladies and gentlemen, this is not about whether a

11:53 20   minor's experienced.  It's not about whether a minor consented.

21   It's about the defendant's intent, not whether he intended to

22   have sex but whether intended to get that minor to agree to

23   have sex.  We ask that you find the defendant guilty.

24          THE COURT:  So we don't talk to you for two straight

25   hours, let's take a brief recess, about seven or eight minutes.

1    Then I'll be back to explain the law precisely to you in this

2    specific case.  Because what I'm going to say to you now is the

3    law that governs this case, you must still keep your mind

4    suspended and do not start talking about the case among

5    yourselves.  We'll recess for about seven or eight minutes.

6    The jury may stand in recess.

7    (Jury exits.)

8              (Recess taken 11:53 a.m. to 12:04 p.m.)

9              THE COURT:  We come now to the final step in the case

12:04 10   before the case is handed to you.  And it is a tradition in

11   this court that, at the outset of the judge's charge, the jury

12   and I stand and face one another.  So I'll ask you to stand up

13   for just a minute.  It is a tradition, in this session of the

14   court, that all you members of the jury and the judge stand and

15   face one another.  This is not as we stand up to honor our jury

16   system as you come in and out.  This is for us to stand and

17   acknowledge that we live under a Constitution and government of

18   law, and the fair and impartial application of that law lies at

19   the very heart and core of our civilization.  That is the

12:05 20   responsibility imposed both on you and on me.  Please be

21   seated.

22        Now my responsibility is to teach you the law which

23   you must apply in arriving at a fair and a just verdict in this

24   case.  And we'll start with the two great principles of law

25   coming straight from our Constitution that govern the trial of

1    any case like this first.

2         Mr. Hinkel started this case innocent, an innocent

3    man.  If he is to be convicted, it could only be on the

4    evidence that you have seen it and heard it right here in this

5    courtroom and on nothing else whatsoever.  It doesn't count

6    against him in any way that we had a trial, that he is here;

7    doesn't count.  He starts innocent.  And that basic principle

8    teaches us how trials work.  The government bears the burden of

9    proof here, and the burden of proof that they must bear is

12:07 10    proof beyond a reasonable doubt.  He need do nothing.  You

11    can't start a case, waltz into court and say, "Now explain

12    this, explain that."  If that were the law, you see, it would

13    shift that burden of proof.  He'd have to do something.  He

14    doesn't have to do anything.

15         Now, in this case, he didn't testify, but of course he

16    doesn't have to.  Look at all the things that his attorneys on

17    his behalf did.  They've asked witnesses, introduced exhibits,

18    made arguments to you, all of which they may do.  They have

19    equal right to do that with the government.  And what they have

12:08 20    laid before you, consider that.  Consider it along with the

21    evidence the government has laid before you.  You can draw

22    things against Mr. Hinkel from that evidence.  But the point

23    is, by doing that, he assumes no obligation to say or do

24    anything.  So to the extent that there's been any silence and

25    some gap left here, if gap there is, you can't hold it against

 1   him.  He's under no obligation to do anything.  The government

 2   bears the burden of proof beyond a reasonable doubt.

 3        Now, let's talk a little bit you as jurors.  I said at

 4   the very beginning, and it applies in full force, I emphasize

 5   it, that your verdict must be based on the evidence.  It must

 6   be fair and impartial, a cool reflective sifting of the

 7   evidence is the best way I can say it, so that here, in this

 8   courtroom, justice may be done.

 9        When I'm done, two of your number are going to be

12:09 10   designated alternates, and we'll put the alternates down in

11   these chairs.  And when you go out, the alternates will go to

12   my little office there next to the jury room.  And I say, the

13   alternates won't deliberate.  And I tell you now, the

14   alternates, don't you alternates start talking about the case.

15   And you may say, "Well, we've come in" -- yes, the trial has

16   stretched out unavoidably.  I thank you again for your care and

17   attention here and your promptness.  That's true of all 14 of

18   you now.  Now two, we're going to put in another room.  Really,

19   I'm talking to everybody now.  That emphasizes just how serious

12:10 20   this is.  Because once in a great while during jury

21   deliberations, something will happen, a juror will take sick,

22   there's some real emergency at home, and I'll lose a juror.

23   Rare, but it happens.  And I'll tell you what happens, were

24   that to occur in this case, then I could let that juror go and

25   I could take an alternate and put the alternate in the jury

1    room.  And if that were to happen, I would tell you all, "Start

2    all over again," because it isn't 11 of you who are left having

3    talked it all through or talked it through so far and then one

4    new alternate coming in and the rest of you say to the

5    alternate, "Well, here's what we think."  No, no, no.  That's a

6    new juror.  It's 12 different people, and you have to start

7    right from the beginning.  So if you are picked as an

8    alternate, believe me, you have contributed as much to this

9    case as the deliberating jurors.

12:11  10         The verdict must be unanimous.  That is, all 12 of you

11    deliberating jurors -- there's only one question on the verdict

12    slip.  I'm going to go over the verdict slip.  There's only one

13    question:  Is Mr. Hinkel not guilty or guilty?  And you all

14    must agree.  You all must agree as to not guilty.  You all must

15    agree to guilty.  I'm going to go over in detail those specific

16    things that the government has to prove.  So remember, you have

17    to follow the law.  If I tell you that the government has to

18    prove something, but you don't think that's terribly important

19    in view of other things, you can't just skip over it.

12:12  20    Likewise, I will tell you the specific things they have to

21    prove, and you can't add to their burden.  You can't say,

22    "Well, I want to know about this or that or the other."  The

23    question is, on the specific things I'm going to go over, did

24    they prove those things beyond a reasonable doubt.

25         A word about my function.  I'm the judge of the law.

1      You must follow the law the way I explain it to you.  This

2      judge's charge is like a law school class, a form of teaching.

3      I am trying to explain the law to you as accurately and

4      precisely as I can in this specific case.  You can ask me

5      questions.  What you should do is wait until you get out to

6      deliberate.  And while you're deliberating, if you're not clear

7      on some point of law -- I can't say anything about the

8      evidence, not my business.  Under the Constitution, that's for

9      you.  I have nothing to say about it.  But if you're not clear

12:13 10   what the law requires, what the law says, by all means write it

11     out.  We'll bring you back in here.  I will explain it, and I

12     will keep explaining it until you understand it.  This will

13     prove to you that, in fact, we work in the afternoon because

14     we're going to be here all the time that you are deliberating.

15     And if it goes into tomorrow, I'll be right here to answer any

16     questions about the law.

17         Now, what I try to do is erect for you a mental

18     framework within which you and you alone decide what the

19     evidence either has proved or has failed to prove.  The fact

12:14 20   that I am going to talk about all elements in this case does

21     not mean that I think that anything is proved or not proved.  I

22     simply am trying to explain it all to you.

23         Let's talk about the evidence.  I'm not going to

24     suggest to you how you react to the evidence in any way.  Not

25     my business.  But I do want to explain a few things about the

evidence.  Evidence can be of two types.  Direct evidence and circumstantial evidence.  Direct evidence is evidence from a witness who says directly, "I saw," "I heard," "I touched, tasted, smelled," evidence that comes directly from that witness's senses.

Circumstantial evidence is evidence of a circumstance which, when combined with the other evidence, may lead you to a conclusion.  The law makes no difference between direct evidence and circumstantial evidence.  A case can be proved on direct evidence, on circumstantial evidence or any combination of the two.  But it must be proved to the jury unanimously beyond a reasonable doubt.  This case involves proof of Mr. Hinkel's intent.  What did he intend to do?  Did he have the requisite criminal intent?  There's no way to get inside a person's mind.  The law does not require that.  The law says that a person intends the natural and probable consequences of what he may do.  Example:  And my examples have nothing to do with this case.  I have a cup of water here.  If there was evidence that I took this cup of water and I held it out like this and then I crushed the cup, the water would all run out there on the witness seat.  And if you believed that I did that, you could draw the conclusion that I intended that consequence, that the water run out.  How do you judge these witnesses?  Remember, the case does not turn on how many witnesses are called, the case does not turn on which side

1    called those witnesses.  Those things don't count.  What counts

2    is what you make of each witness's testimony.  And as to that,

3    you have the broadest possible power as jurors.  I charge you

4    that you may believe everything that I allowed a witness to

5    testify to here before you, and equally important, you may

6    disbelieve and disregard everything that a witness testified to

7    just as though that witness had never taken the stand.  You

8    decide that.

9          How do you do it?  You can use everything you know

12:18 10   about these witnesses from watching them both on direct

11   examination and on cross-examination.  How did the witnesses

12   answer the questions?  What were the witnesses' ability to

13   recall matters, to understand matters?  What was the accuracy

14   with which they testified?  What does their testimony -- and

15   treat each witness individually.  Does it have the ring of

16   truth?  Is it believable?  Does it fit in with the testimony of

17   other witnesses?  Or, does the testimony of other witnesses

18   tend to undercut it, take away from it, make it less

19   believable?  Are these witnesses employed by, engaged by,

12:19 20   supportive of any party in this litigation?  Did that color

21   their testimony, put a spin on anything?  All these matters are

22   left to your good judgment as you are reasonable men and women.

23          In addition to the testimony, we have various

24   exhibits.  The exhibits which are in evidence will go back with

25   you to the courtroom -- to the jury room.  One of them is a

video, and we'll have some video player if you want to see that
again so you can play it.  Those are exhibits.  Your power is
the same with exhibits as with any other evidence in the case,
which is, you can read it, or you can look at it.

You can handle certain real evidence, things that are
in evidence.  And you can draw conclusions from them.  I
suggest with respect to the particular -- with respect to all
items of evidence, your analysis should really be in two steps.
Do you believe the thing is what it purports to be?  Is this
something found in a specific place?  Is this something that
was sent by someone actually involved in this case?  Was this
response a response to this other e-mail?  You can decide that,
see if it is what it purports to be.  And if it isn't, pay no
attention to it.  If you think it is what it purports to be,
then how does it fit?  What does it tell you about what's going
on?  More specifically, if you believe that was Mr. Hinkel on
certain of these e-mails, what does it tell you about his
intent?  What was in his mind?  Because that's very important
here.  You can disregard the exhibits; you can believe all the
exhibits; draw conclusions from them.  You can believe some of
them and disbelieve others.  You are the jury in this matter.

Now, that's the evidence in this case.  Now, from that
evidence, you're entitled to draw what are known as reasonable
inferences, logical deductions, common sense.  You don't check
your common sense at the door to the jury room.  Just the

1    reverse.  I charge you to apply your common sense to the

2    evidence that you've heard and seen in this case to the end

3    that justice may be done.  But the standard of proof -- don't

4    conflate the two -- isn't some sort of common sense.  It's

5    proof beyond a reasonable doubt.  So in this case, you're not

6    interested in what may be possibly or even probably was in

7    Mr. Hinkel's mind or even if it was Mr. Hinkel.  Is the matter

8    proved to you beyond a reasonable doubt?

9         Let me give you an example, which has nothing to do

12:22 10   with the case, that I think illustrates what you can do with

11   reasonable inferences and what you may not do.  A witness is

12   testifying.  She's on the stand.  She testifies she's walking

13   along, and she's walking along a field.  To her right is a

14   field of barley.  Barley is what they make whiskey out of,

15   green, red tassels, beautiful field of barley.  And she notices

16   that through that field of barley, the barley stalks are all

17   laying down.  Now, she hasn't seen anything.  That's her

18   testimony.  And you the jury, you believe that testimony.  Now,

19   from that testimony standing alone, you could infer, it's

12:23 20   logical, common sense, you can infer something went through the

21   field, because if it had been a windstorm, it would have

22   knocked all the barley down.  But if that's all the testimony

23   you have, you don't know what went through the field, an

24   animal, a human, someone on a dirt bike, big, small?  You don't

25   know from that evidence alone.  And you may not guess in this

1    case.  You may not speculate.  You may not pile inference upon

2    inference.  The case must be proved as to each essential

3    element beyond a reasonable doubt.

4           Let me pause for just a moment and mention two things

5    that are not evidence, but it's appropriate that I say them to

6    the attorneys.  This case has been well-tried, well-tried for

7    the government, well-tried for Mr. Hinkel.  As you are officers

8    of the court, you have ably discharged your duty in seeking out

9    justice here.  I don't say that in every case.  It's

12:24 10   appropriate.  You have seen a well-tried case.  Pay no

11   attention to what I just said.  And what I mean by that is, if

12   you have liked the attorneys' presentation or you warm to their

13   argument -- now if their argument convinces you or suggests a

14   reasonable doubt, that's what attorneys are supposed to do, go

15   ahead.  But what I'm saying is just because you react

16   positively to these attorneys as professionals, that counts for

17   nothing.  Equally, if you don't like something an attorney did,

18   the way they presented something, don't hold it against either

19   party.  It's unfair.  These attorneys are professionals doing

12:25 20   their job.

21          Now equally important, if you think that I think

22   anything at all about this case, anything at all about this

23   case, I most earnestly instruct you to disregard it.  And I

24   tell you as near as I know my own heart, I have no opinion

25   about this case, no clue to give you.  I do not know how this

1    case will come out, as they say.  For me even to form such a

2    view would be improper.  I don't talk about that with

3    Ms. Gaudet or any of the court staff.  I've got plenty to do

4    here to follow the rules of evidence, so I'm not here to give

5    you any clue.  I have no clue to give you.  The burden of

6    deciding the case rests upon the jury of the people, which jury

7    you are.  I will tell you this, and if this is a bias, I

8    acknowledge it.  I believe passionately in the jury system.  I

9    believe that you 14 men and women, the 12 deliberating jurors

12:26  10    and the two alternates, that you will do justice in this case

11    and that your verdict, whatever that verdict is, will be just

12    in this case.

13          Now, let's get to it specifically.  The verdict slip

14    will read like this:  We, the jury, on the charge before us,

15    and the charge is that Mr. Hinkel used a means of interstate

16    commerce to attempt to entice a child to engage in illegal

17    sexual activity.  I have to go over each one of those things.

18          First of all, the government has to prove beyond a

19    reasonable doubt that the person who answered this

12:27  20    advertisement and these various e-mails back and forth was

21    Mr. Hinkel, this man, this individual sitting here in court.

22    We're not talking theoretically about a government sting and

23    how the government seeks to enforce the laws.  We're talking

24    about this man, his intent, so it's got to be Mr. Hinkel.  So

25    first, did Mr. Hinkel use a facility or means of interstate

commerce?  Now, why do they have to prove that?  Well, they
have to prove it because we're here in the courts of the United
States, not in the courts of our Commonwealth; the United
States.  It doesn't have to be -- the internet, by the way, is
a means of communication in interstate commerce.  E-mails don't
have to go across state lines from someone in Connecticut to
someone in Massachusetts.  Just to use it, since it connects to
so many different places, that is a facility or means in
interstate commerce.  So he's got to use that facility.
Mr. Hinkel has got to use a facility or means of interstate
commerce.  "In an attempt," now because this was a sting
operation, there is no imaginary Lisa, there is no imaginary
Samantha, but there needn't be.  A sting operation, an
undercover operation is perfectly lawful, with limits that I'm
going to get to, a perfectly appropriate way to enforce the
law.

But that means that the whatever was legally
impossible because there weren't anyone, a mother named Lisa, a
minor named Samantha.  So was there an attempt?  An attempt
means that Mr. Hinkel took some substantial step to accomplish
that which the law forbids, that defined, that beyond a
reasonable doubt, that he took some substantial step to
accomplish what the law forbids.  And what does the law forbid?
It forbids using the internet to entice a child to engage in
illegal sexual activity.

1      Now, there's been some talk in the closings here about

2  coercing the imaginary child.  The statute uses the word

3  "coerce," but it also uses the word "entice."  The government

4  doesn't have to prove coercion.  That has the sensitivity, the

5  nuance of some sort of arm-twisting.  No, no.  The law doesn't

6  require them to prove that.  But it does require that

7  Mr. Hinkel entice the minor.  What does "entice" mean?

8  "Entice" means to lure, to persuade, to cause the minor's own

9  independent will to be transformed so that the minor will do

12:32 10  what Mr. Hinkel wanted.

11      Specifically, the government -- and now, in a case

12  like this, where there isn't -- if you believe this all

13  happened, there is not just communication between what the

14  government says is Mr. Hinkel and the imaginary child Samantha.

15  There's communication between what the government says is

16  Mr. Hinkel and the imaginary mother Lisa.  And in such a case,

17  understand, you've heard testimony that Mr. Hinkel communicated

18  with undercover officers who were pretending to be the minor's

19  mother.  The government does not have to prove that Mr. Hinkel

12:32 20  communicated directly with the pretend minor, Samantha.  It is

21  sufficient for the government to prove that Mr. Hinkel

22  attempted to persuade, induce, entice the minor through his

23  communication with an adult intermediary, such as the imaginary

24  parent, Lisa, even though that person was an undercover law

25  enforcement officer.  However, where an adult intermediary is

1    involved, Mr. Hinkel's communication with that intermediary,

2    the pretend mother, Lisa, must be aimed at transforming,

3    overcoming the child's independent will, enticing her.

4         In other words, it's not enough for the government to

5    prove that Mr. Hinkel believed he was communicating with

6    someone who could arrange for the minor to be produced for

7    illegal sexual activity or that what he intended was to

8    persuade, entice, induce the pretend parent to put the child

9    out for illegal sexual activity.  What's charged here is the

12:34 10   communication, perhaps through the pretend parent, must be an

11   attempt to influence the minor, the imaginary Samantha, to

12   engage in illegal sexual activity even if the attempt is made

13   through the intermediary.

14        Use of the internet in an attempt to entice a child.

15   Under federal law -- and remember, it's always what's in

16   Mr. Hinkel's mind.  If you believe this is Mr. Hinkel, it's

17   what's in his mind.  The federal law that we're talking about

18   here defines a child as a person under 18 years of age.  And

19   then the last part of it is to engage in illegal sexual

12:35 20   activity.

21        As I said at the beginning of the case, Congress was

22   very wise here because the states have different statutes.  And

23   so what has got to be in his mind, Mr. Hinkel's mind, is to

24   induce, to entice the minor, the supposed imaginary child,

25   Samantha, to engage in illegal sexual activity, in

1    Massachusetts, which we're talking about, where, if you believe

2    the government's case where things were supposed to happen,

3    it's illegal to engage in sexual intercourse with a child under

4    the age of 16.  So it's not enough that it be a child under the

5    law of the United States to make it illegal in Massachusetts,

6    if what he had in mind was sexual intercourse.  And the

7    government said something -- that they don't have to prove that

8    what he had in mind was sexual intercourse with the imaginary

9    Samantha.  Yes, they do.  That's got to be what you think he

12:36  10    was attempting to do.  So a child under the age of 16 cannot

11    consent.  You're not interested in what was being said about

12    consent.  Legally to protect children, a child cannot consent

13    under the age of 16 to engage in sexual intercourse.  Now I

14    have to define that at the beginning of the trial.  Same

15    definition.  Here is how it applies here.  Not talking about

16    touching.  He's got to have intended to engage in sexual

17    intercourse, that's the sexual activity the government has

18    charged here, with this imaginary minor -- it's an attempt

19    because there never was an imaginary minor -- is under the age

12:37  20    of 16 here's what the law said is sexual intercourse.  The

21    penetration, however slight, of a woman's vagina or anus by the

22    penis, the mouth, the tongue rather, a finger or any object

23    wielded by the man, the penetration of the child's mouth by the

24    penis of a man.  That in the law is sexual intercourse.  That's

25    the illegal sexual activity that is charged, or at least what

1    he was supposed to have had in his mind, under this statute.

2         Using means of interstate commerce to attempt to

3    entice a child into illegal sexual activity.  Well, then the

4    word "entrapment" has been used here.  Entrapment is a

5    perfectly appropriate limit on government activity.  And

6    because the issue of entrapment does present itself, the

7    issue -- I'm not saying anything about it, but the issue

8    presents itself.  The government has to prove either one of two

9    additional things.  Even if they prove all the rest, if they

12:39 10   don't prove any of those things, you can stop, return a verdict

11   of not guilty.  But suppose they prove all of that.  Well,

12   there's the issue of entrapment.

13        So let me explain entrapment and be very clear what

14   the government has to prove.  They have to prove one of two

15   very different things.  A person is entrapped when he is

16   induced or persuaded by law enforcement officers to commit a

17   crime that he was not otherwise ready and willing to commit.

18   The law forbids his conviction in such a case.  However, law

19   enforcement agents are permitted to use a variety of methods to

12:40 20   afford an opportunity to a defendant to commit an offense.

21   They can use undercover agents.  They can furnish funds.  They

22   can use informers.  They can -- at least what the government

23   says happened here, they can use false identities.  They can

24   set up what in the common parlance is known as a sting

25   operation.  That is lawful.  But for you to find Mr. Hinkel

1 guilty of this crime, you must be convinced that the government

2 has proven beyond a reasonable doubt that he wasn't entrapped.

3   To show that Mr. Hinkel was not entrapped, the

4 government must establish beyond a reasonable doubt one of the

5 two following things, and I'll take them in order.  First, the

6 government has got to prove -- just like everything else,

7 Mr. Hinkel doesn't have to prove anything.  The government has

8 to prove it -- that the undercover officers did not persuade or

9 talk Mr. Hinkel into committing the crime.  Simply giving

12:41 10 someone an opportunity to commit a crime is not the same as

11 persuading him.  But excessive pressure by the undercover

12 officers or an undo appeal can be improper.

13   Now, if the government proves that they did not induce

14 him to commit the crime, you can stop your consideration.  But

15 suppose you're not clear whether they've proved beyond a

16 reasonable doubt that they, in fact, induced the commission of

17 the crime.  Well, then they have to prove something else.  But

18 only then.  Even if they induced it, if they prove -- and this

19 they have to prove beyond a reasonable doubt -- that Mr. Hinkel

12:42 20 was ready and willing to commit the crime without any

21 persuasion from the undercover officers, so if he would have

22 done it anyway, without -- he would have attempted to do it, he

23 had the mental intent to commit the crime.  Then that's not the

24 propensity, we say, to commit this crime even if the officers

25 hadn't done whatever you find they did that suggests to you

1  that they were inducing him.  Now the government has to prove,

2  well, he would have done it anyway, had a propensity to do it.

3  In that circumstance, then they have proved -- either one of

4  those, they've proved that there's no entrapment.  But if they

5  can't prove either one of those things, I tell you entrapment

6  at least is an issue in the case, and even if they prove

7  everything else, he cannot be convicted.

8          We've ordered lunch for when?

9          THE CLERK:  12:30.

12:43 10          THE COURT:  I want to talk about the mechanics now

11  because I want you to be comfortable.  Lunch should be there,

12  cafeteria food.  We'll tell the alternates, put the alternates

13  in my lobby.  We'll be sure you have lunch.  You can take

14  magazines and books in there and the like.  What will happen is

15  you'll go out, Ms. Gaudet comes back in here.  She goes over

16  the exhibits.  She'll bring the exhibits all back to you.

17          Once you go out, you can start deliberation.  She'll

18  also bring back to you a verdict slip.  That's my fault.  I

19  should have the verdict slip.  It's very straightforward.  It

12:44 20  simply says "Guilty" or "Not Guilty," but it has to be a

21  written verdict slip, and we'll bring that back to you.  But

22  you can start just as soon as we send you out.

23          As I've said, if you have any questions about the law,

24  just write them out.  We'll bring you back in here.  I will

25  answer your questions about the law.  We will deliberate or

1    allow you to deliberate close on to 5:00 this afternoon, unless

2    I get some weather advisory, that that would subject us to less

3    than safe conditions.  But this is supposed to be a light snow,

4    and I doubt that will happen.  I will stop your deliberations

5    shortly before 5:00 p.m. if you have not reached a verdict, and

6    we'll come back tomorrow 9:00 and go right on with your

7    deliberations.

8            We ask you for your verdict.  We do not demand it.  So

9    when you get in there and you start deliberating among

10   yourselves, now you are going to talk among yourselves about

11   this case, and there's no longer any need to keep your minds

12   suspended.  Now you will be discussing with your fellow jurors,

13   your fellow judges of the facts, that what is the fair and just

14   verdict in this case.  I do suggest to you that you probably

15   ought not do this.

16           Well, let me say for starters.  Madam forelady, you

17   don't do all the talking and equally you don't keep your mouth

18   shut.  You're all equal in there.  You ought to set things

19   up -- and that's why it's such a nice conference table.  You

20   can all see each other sitting around it, where each and every

21   one of you can express your views with the other jurors

22   listening and commenting on the views expressed.

23           Jury deliberations are the deliberations of all 12 of

24   you deliberating together, not eight of you talking about the

25   case and four of you looking out at the snow.  You're all going

1   to deliberate together.  You can use your notes.  Remember,

2   your notes -- you now take your notebooks back to the jury

3   room.  Your notes are just for you.  Don't pass your notes

4   around to your fellow jurors, because they're not evidence of

5   anything.  They're what you thought you wanted to take down.

6   They're not evidence.  They refresh your memory.

7       The one caution or the one advice I have, don't get

8   back there and take a straw vote right at the beginning and see

9   who is for what.  The risk in that is that you may think --

10  since you're all under oath as jurors, if you do that, you are

11  required by your oath to stick with that view.  Now, if you

12  have strong views about any aspect of this case, by all means,

13  stick with that.

14      The verdict must be unanimous.  That's not ten of you

15  thinking something and the other two going along so you can go

16  home.  Now, I'm bold to say you're not that kind of jury.  You

17  slogged through the snow.  Every trial day, you've been

18  carefully attentive.  No one can go along here.  But you can be

19  persuaded.  That's what deliberations are.  So I charge you,

20  listen to the views of your fellow jurors.  If those views

21  persuade you one way or another, genuinely persuade you, that's

22  fine.  That's jury deliberations.  When you are ready to return

23  a verdict, the forelady signs it and dates it, and you've got

24  to check it, either "Not Guilty" or "Guilty."  And you tell the

25  Court security officer you have a verdict.  He'll let

1    Ms. Gaudet know.  We'll set things all up in here.  Whatever

2    I'm doing in here, they'll all have to wait, and we'll bring

3    you into the courtroom.  This is how we take a verdict.

4         So you all get in here and we sit down.  And

5    Ms. Gaudet says, "Ladies and gentlemen of the jury, have you

6    reached a unanimous verdict?"  And I assume if you're back with

7    a verdict rather than a question, you'll say, "Yes"; and she

8    says, "Pass the verdict slip," it's passed.  I'm the first one

9    who looks at it.

12:48 10      Now, I look at it just to see whether it's logical,

11   not what the verdict is.  But in this case, it's the most

12   straightforward verdict slip.  It's either not guilty or

13   guilty.  But if you haven't checked either one, I won't know

14   what to do.  If you check both of them, I won't know what to

15   do.  But so long as one is checked, I will say, "The verdict is

16   in order.  It may be recorded."  She'll ask you all to stand

17   up, alternates, too.  They'll be in these chairs here.

18        If at that time when you stand, each one of you

19   deliberating jurors is satisfied with the consciousness of your

12:49 20   duty faithfully performed, you will have done what's required

21   of you in this case.  The word "verdict" comes from two Latin

22   words.  They mean to speak the truth.  That is what is asked of

23   you in this case, to speak the truth.

24        Now, I may have left something out, I may have

25   misstated something.  And before we let you go out to commence

1    your deliberations, the lawyers get a chance to tell me that

2    now.  Counsel?

3    **SIDEBAR:**

4         MS. PIEMONTE-STACEY:  Your Honor, just one objection

5    to the part where you said the government said that they didn't

6    have to prove that they intended, that the defendant intended

7    to persuade, induce, or entice to have sex.

8         THE COURT:  Right.

9         MS. PIEMONTE-STACEY:  In the case of *United States vs.*

12:50 10 *Berk*, *United States vs. Dwinells*, underlined just a portion of

11   the government's proposed jury instruction on page 14, that it

12   says that it is not necessary for the government to prove that

13   the defendant actually intended to have sex as a followup to

14   this coercion and enticement, and I believe that the

15   instruction as you gave it indicates that the government had a

16   burden of proving that the defendant intended to have sex.

17        THE COURT:  I'm going to stick with my charge.  Your

18   rights are saved.

19        MS. FISHER:  Your Honor, with regard to that charge,

12:50 20 the first thing is I believe you said something to the effect

21   of, when you were talking about sexual activity versus some

22   other kind of activity, what was in his mind.  And the problem

23   is it's not what was in his mind.  It's what he was attempting

24   to persuade her to do.  So we'd ask you to clarify that.

25        THE COURT:  I'll say that.

1        MS. FISHER:  Okay.  My other thing is, I object to

2   your entrapment instruction, and I ask you to give our

3   instruction, 12 specifically, I'd like to say that your

4   instruction didn't really detail the psychological

5   manipulation.

6        THE COURT:  I considered it, and your rights are

7   saved, but I'm not going to.  Okay.

8   (End sidebar.)

9        THE COURT:  Both counsel make what is, in essence, the

12:51 10   same point, and I should make this clear.  When we're talking

11   about enticing, persuading, inducing the child, Mr. Hinkel has

12   to have -- you've got to be satisfied beyond a reasonable doubt

13   that he used a facility of interstate commerce in an attempt to

14   entice, lure, persuade the imaginary child to engage in

15   unlawful sexual activity.  This may be a fine point.  But the

16   charge is not that he attempted to actually carry it out.  The

17   charge focuses, yes, entirely on his intent; but what makes it

18   illegal is to entice, to lure, to persuade a child, to persuade

19   the child to agree to engage in illegal sexual activity the way

12:53 20   I described it.  Is the supplementary charge satisfactory to

21   the government?

22        MS. PIEMONTE-STACEY:  Yes, your Honor.

23        THE COURT:  And saving your rights as to the other

24   point, Ms. Fisher, is that satisfactory?

25        MS. FISHER:  Your Honor, I have one other point.

```
  1          THE COURT:  Fine.
  2   SIDEBAR:
  3          MS. FISHER:  I just wanted your Honor to instruct them
  4   that it was -- that he has to entice, lure, persuade her to
  5   engage in, what sexual activity under the statute, which is
  6   illegal intercourse --
  7          THE COURT:  But those words are redundant.  I've
  8   defined it.  I'm satisfied.  Your rights are saved.
  9   (End sidebar.)
12:54 10        THE COURT:  We'll bring in -- well, first of all, the
 11   alternates are as follows.  Mr. David Wright, Mr. Edward
 12   Henley.  Would you come down and take these two chairs.
 13          When the jury recesses, you folks can leave.  Just
 14   hook a right and then into my little office there.  We'll get
 15   you lunch and whatever else you may need.  Don't discuss the
 16   case.
 17          Very well.  Also understand that you can start your
 18   deliberations right away.  You'll be interrupted only with
 19   Ms. Gaudet bringing in the exhibits and then bringing in the
12:55 20   one-page verdict slip as I've instructed you.  The jury may
 21   retire and commence their deliberations.
 22          THE CLERK:  All rise for the jury.
 23   (Jury exits.)
 24          THE COURT:  Please be seated.  Just two things, three
 25   things really.  One, the compliment is very sincere.
```

1    Well-tried case.  Triable case and well-tried.  It's a
2    privilege to preside over a case with lawyers so well prepared
3    and such good advocates.
4         Second thing, if I'm going to stash the alternates in
5    my lobby there, I have to go back there and take off the robe.
6    No one has an objection if I do that, as long as I don't talk
7    about the case.  I face this in every case, but I stay away
8    from potentially deliberating jurors.  But I'll need to be in
9    their presence anyway.
12:56 10         And third, you know my practice.  You're free now to
11   go.  Tell Ms. Gaudet where you're going to be.  Stay here until
12   you've counted out the exhibits, but tell her where you're
13   going to be.  If there's a question, I will wait five minutes
14   for you to answer the question but not longer than that.  So
15   you've got to be around.
16        Truth to tell, I don't have any hearings this
17   afternoon, so you can use the courtroom as your base.  It is my
18   practice when we get to about ten minutes of 5:00 to bring the
19   jury in and give them the appropriate instructions.  If they
12:56 20   have to separate, I'm not going to call you for that.  Be back
21   here at ten minutes of 5:00.  Naturally, if we get a verdict,
22   we'll let you know that.  Thank you very much.  We're recessed.
23        (Recess taken 12:56 p.m.)
24        (Resumed, 2:37, verdict)
25        THE COURT:  Madam forelady, members of the jury, has

1   the jury reached a unanimous verdict?

2              JURY FORELADY:  Yes.

3              THE CLERK:  Please pass the slip.

4              THE COURT:  The verdict is in order.  It may be

5   recorded.

6              THE CLERK:  Madam forelady, members of the jury,

7   please stand and listen to the verdict as the Court records it.

8              On the charge of using a facility of interstate

9   commerce in an attempt to entice a minor to engage in illegal

02:37 10  sexual activity, we find Paul H. Hinkel guilty.

11             So say you, madam forelady?

12             JURY FORELADY:  Yes.

13             THE COURT:  So say you, members of the jury?

14             THE JURY:  Yes.

15             THE COURT:  Please be seated.

16             Ladies and gentlemen, I want to thank you.  Not for

17  your verdict.  I thank you for your verdict, whatever your

18  verdict is.  I thank you most sincerely in the care, attention,

19  promptness, the obvious scrutiny you've given to the case.  The

02:37 20  case is now over.  I'd like to come and thank you personally,

21  but you'll be free to go, and you have the right to say

22  anything to anyone about anything.  You no longer have to not

23  talk to people about the case.  I'm not inviting you to talk,

24  but you have that free speech right.

25             In one respect, I caution you.  There hasn't been

1     press on this case so far as I can see, but it is not the

2     lawyers or the litigants, they are forbidden by the rules of

3     court from reaching out to you, contacting you in any way, and

4     we'd be right on top of that.  That won't happen.  But it's

5     possible the press could be in touch with you, and I cannot

6     tell you not to talk to them, but I strongly urge you not to

7     say anything about what went on in the jury room.  By your

8     verdict, you have spoken the truth about these matters.  Your

9     internal discussions should be private to the 12 of you.  We'll

02:38 10    recess, and I'll ask you to wait for just --

11              MS. PEACHY:  Your Honor, I'm sorry.  May the jury be

12     polled?

13              THE COURT:  The jury may be polled.  Here's what that

14     means.  We need to know individually whether you affirm the

15     verdict that the Court has just recorded.  And so I'll just

16     start with the forelady, and then I'll go next juror, next

17     juror, next juror.  If you are individually willing to affirm

18     the verdict, you say yes.  If it's no or you have some question

19     about it, you say that.

02:39 20         So does the jury affirm the verdict as the court

21     recorded it?  Forelady?

22              JURY FORELADY:  Yes.

23              THE COURT:  Next.

24              THE JUROR:  Yes.

25              THE COURT:  Next.

|     |     |
| --- | --- |
| 1   | THE JUROR:  Yes. |
| 2   | THE COURT:  Next. |
| 3   | THE JUROR:  Yes. |
| 4   | THE COURT:  Next. |
| 5   | THE JUROR:  Yes. |
| 6   | THE COURT:  Second row. |
| 7   | THE JUROR:  Yes. |
| 8   | THE JUROR:  Yes. |
| 9   | THE JUROR:  Yes. |

02:39 10      THE JUROR:  Yes.

11      THE JUROR:  Yes.

12      THE JUROR:  Yes.

13      THE JUROR:  Yes.

14      THE COURT:  Thank you.  The jury may stand in recess.

15  I'll remain on the bench.

16      THE COURT:  All rise for the jury.

17  (Jury exits.)

18      THE COURT:  Please be seated.  Mr. Hinkel will be

19  remanded to the custody of the marshals, but I'd like to

02:40 20  suggest a date of sentencing with you.  How about the 5th of

21  May at 2:00 p.m.  Government?

22      MS. PIEMONTE-STACEY:  Yes, your Honor.

23      THE COURT:  And Ms. Peachy?

24      MS. PEACHY:  Sorry, your Honor.  Yes.  That's fine.

25      THE COURT:  Thank you.  So while he's here, though

1    he'll be remanded, could you go to probation and see if the

2    process could start today so they can begin the Presentence

3    Report?

4              MS. PEACHY:  Yes, I will try.

5              THE COURT:  Thank you.  We'll recess.

6                   (Whereupon the proceedings

7                    adjourned at 2:40 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL REPORTER

1

2

3          I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that pursuant to Section 753, Title 28, United States

7    Code that the foregoing is a true and correct transcript of the

8    stenographically reported proceedings held in the

9    above-entitled matter and that the transcript page format is in

10   conformance with the regulations of the Judicial Conference of

11   the United States.

12                    Dated this 3rd day of June, 2015.

13

14                    /s/ Kelly Mortellite

15                    _____

16                    Kelly Mortellite, RMR, CRR

17                    Official Court Reporter

18

19

10:33  20

21

22

23

24

25