UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. 22-10141-WGY |
| | ) | |
| SEAN O'DONOVAN, | ) | |
| | ) | |
| Defendant | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Sean O'Donovan is scheduled to be sentenced on February 7, 2024. The United States respectfully submits this memorandum in connection with sentencing.

**PRELIMINARY STATEMENT**

Defendant sought to corrupt the City of Medford's political process for selecting retail marijuana companies. He wanted his client Theory Wellness to skip to the front of the line so that he could share in the company's profits—potentially hundreds of thousands of dollars each year in his own pocket—if it successfully opened a retail marijuana store in Medford. In his own words, Defendant wanted to "try to get the edge." To do so, he secretly offered as much as $50,000 in tax-free cash to Michael Buckley, the brother of Medford Chief of Police Jack Buckley (who would be voting on Theory Wellness's application), in exchange for the Chief's official support. Defendant cynically explained to Michael Buckley that he was not foolish enough to pay Jack Buckley directly: "So I'm being smart," he said, "I went to his brother."

After a five-day trial in October 2023, a jury quickly recognized Defendant's maneuver for what it was and found him guilty of two counts of honest services wire fraud (18 U.S.C. §§ 1343 and 1346) and one count of federal program bribery (18 U.S.C. § 666(a)(2)). The government respectfully submits that a Guidelines sentence of 41 months (at the upper end of the applicable

1

33-41 month range) is sufficient but not greater than necessary to achieve the sentencing purposes described in 18 U.S.C. § 3553(a).

## BACKGROUND

### I.      The Defendant and His Offense

In this bribery case, Defendant (an attorney and former Somerville Alderman) offered to pay and did in fact pay thousands of dollars in cash to Michael Buckley, the brother of Medford Police Chief John "Jack" Buckley (the "Chief"). In exchange, Defendant sought the Chief's favorable vote and other official assistance on an application by Defendant's client, Theory Wellness, Inc. ("Theory" or "Theory Wellness"), for a Host Community Agreement ("HCA") with Medford—a necessary step for Theory to obtain a license to sell recreational marijuana in Medford.

#### A.      The Relationship Between Defendant and the Buckleys

Defendant met Michael and Jack Buckley when they were children growing up in the same neighborhood in Somerville. *See* Trial Tr. 10/24/23, Vol. 1 at 15:24-25 (M. Buckley) ("[W]e lived a street apart"); Trial Tr. 10/26/23, Vol. 1 at 53:7-10 (J. Buckley). Although they knew each other, Defendant was never particularly close to Jack Buckley. *See* Trial Tr. 10/26/23, Vol. 1 at 53:11-22 (J. Buckley). But Defendant and Michael Buckley became close when they reconnected as adults, working for the city of Somerville in the 2000s. *See* Trial Tr. 10/24/23, Vol. 1 at 16:1-17:21 (M. Buckley). While Defendant served as an Alderman for the city from 2000 to 2013, *see* Final Presentence Report ("PSR") at ¶ 8, Michael Buckley was serving the Somerville Mayor and acting as a liaison to the Board of Aldermen. *See* Trial Tr. 10/24/23, Vol. 1 at 16:15-25 (M. Buckley). Michael Buckley, however, ceased working for the city of Somerville in approximately 2007 or

2008 and had limited contact with Defendant over the next decade. *See id.* at 18:17-20; GX 32 at 1-11.

      B.    <u>Defendant Signs Theory as a Consulting Client</u>

      Defendant, in turn, left his position as an Alderman in 2013. *See* PSR at ¶ 8. Soon after that, in 2016, recreational marijuana sales were legalized in the Commonwealth of Massachusetts. *See* Trial Tr. 10/25/23, Vol. 1 at 72:12-14 (Pollock). But in order to open a recreational marijuana store in Massachusetts, both state and local approvals are required. *See id.* at 73:19-25. At the local level, a marijuana retailer must obtain an HCA with the local community. *Id.* The need for companies to navigate the highly localized HCA process created an opening for Defendant, who began serving as a well-paid lobbyist for cannabis companies seeking a connected local insider. *See* PSR at ¶ 8; Trial Tr. 10/26/23, Vol. 1 at 80:3-14 & Vol. 2 at 98:22-25 (Pollock); GX 16 at 2-3.

      It was in his capacity as a lobbyist that Defendant was introduced—in 2016—to Brandon Pollock, the Chief Operating Officer of Theory, a company that operates medical and recreational marijuana dispensary locations in Massachusetts and elsewhere. *See* Trial Tr. 10/26/23, Vol. 1 at 75:17-76:5, 79:20-80:6 (Pollock); GX 2. In 2018, Theory entered into a Consulting Agreement proposed by Defendant, pursuant to which Defendant agreed to assist Theory in obtaining an HCA with Medford. GX 16. For Defendant's efforts, Theory would pay Defendant a $7,500 monthly fee (until Theory either obtained or failed to obtain an HCA) and provide Defendant with a one-percent stake in Theory's profits if the company successfully obtained a license for a Medford marijuana retail store. *See id.* Pollock testified that although he believed the agreement was "too expensive, too rich of an ask with the 1 percent," he ultimately signed the contract because Theory was "inexperienced in the city of Medford"; the company wanted "professional support" navigating

the HCA process; and because Defendant told him that the agreement was "take it or leave it." *See* Trial Tr. 10/25/23, Vol. 2 at 103:19-105:3 (Pollock).

      C.    <u>Medford's HCA Process</u>

Medford took years to set up its HCA process for marijuana retailers. *See* Trial Tr. 10/25/23, Vol. 2 at 106:1-108:22 (Pollock). Ultimately, though, by late 2020, the city passed ordinances establishing a Cannabis Advisory Committee ("CAC") tasked with issuing non-binding recommendations to the Mayor about which companies should obtain HCAs. *See* GX 56, 57. The Chief was one of five members of the CAC. *See* GX 57; Trial Tr. 10/26/23, Vol. 1 at 51:4-15 (J. Buckley).

      D.    <u>February 10, 2021: The Original Corrupt Offer in the St. Clements Parking Lot</u>

By February 2021, Michael Buckley had not worked in city government for nearly 15 years; he had been working in the finance department of Harvard University for the last four years. *See* Trial Tr. 10/24/23, Vol. 1 at 13:22-14:10 (M. Buckley). But on February 10, 2021—a few days before the first Medford CAC meeting, *see* GX 17—Defendant reached out to Michael Buckley by text, writing: "Can we talk when you're free?" GX 32 at 12. Defendant followed up with a call, during which he told Michael Buckley that he would "rather meet in person" than speak over the phone. *See* Trial Tr. 10/24/23, Vol. 1 at 24:23-25 (M. Buckley). The two ultimately agreed to meet that evening in the St. Clements Church parking lot on the border between Medford and Somerville. *See id.* at 26:2-14.

During the parking lot meeting, Defendant informed Michael that he was working with a company seeking to open a "cannabis shop" in Medford" and confirmed that Michael was still close with the Chief. *See id.* at 28:3-6, 28:25-29:3. Defendant thereafter explained what he wanted from Michael: "He [] said, you know, 'Is there, you know a way that you could maybe talk to your

brother Jack, he's on the committee?' And, um, he had said that he would, um, make it worth my while and up to like $25,000 to talk to him." *Id.* at 28:10-13. Buckley testified that he is not a lobbyist, that he knew "[a]bsolutely nothing" about Medford's marijuana laws, that he in fact lived in Somerville, and that he was wholly unaware of his brother the Chief's role on the Medford CAC. *See id.* at 29:4-14. Michael Buckley understood immediately that Defendant's corrupt offer was "definitely wrong"; he explained that he "didn't want to hurt my brother, I didn't want to get my brother in any trouble[] or ruin his reputation." *Id.* at 31:14-17. On his drive home after the conversation, Michael Buckley explained, he was upset. *See id.* at 30. He banged on the steering wheel, "swearing and dropping F-bombs." *Id.* at 30:18-19.

The following day, Michael Buckley called the Chief. *Id.* at 32:2-4. As soon as Michael Buckley described Defendant's offer, he testified, the Chief "told me to shut-the-f up and he hung up on me." *Id.* at 32:5-8. The Chief characterized the conversation identically, explaining that he "hung up" on his brother after Michael told the Chief that Defendant had offered Michael $25,000 to "sit and have a conversation with me about a marijuana business license in the City of Medford." Trial Tr. 10/26/23, Vol. 1 at 55:10-16, 56:4-22 (J. Buckley). But not before the Chief told Michael that he "had to do something about this." *Id.* at 56:16-17. The Chief thereafter contacted the Federal Bureau of Investigation ("FBI") and Michael Buckley agreed to cooperate with the investigation by wearing a wire in a series of in-person meetings with Defendant and preserving his text messages with Defendant. *See* Trial Tr. 10/24/23, Vol. 1 at 33:13-18 (M. Buckley).

E.    February 22, 2021 (GX 33)

On the evening of February 22, 2021, Defendant met Michael Buckley again in the same Somerville parking lot. After confirming that Michael Buckley was unaccompanied ("You're alone, right?"), Defendant explained that he was "trying to get the edge" in the HCA process for

Theory. He also told Michael that he could "guarantee at a minimum 25, probably even 50"; that he would obtain the "50 grand," then "pay tax on it"; and that he would "give you the rest." Defendant then said: "If Jack [*i.e.*, the Chief] can square them—if Jack can, we should have no problem."

      F.    <u>April 26, 2021 (GX 34)</u>

On April 26, 2021, Defendant met Michael Buckley outside of his Somerville residence, and asked how he and Michael could "proceed to let him [the Chief] know who it [Theory] is." Defendant also emphasized the Chief's power on the Medford CAC: "If Jack goes like this, 'That guy gets five stars, this kid here gets three stars, and that one gets one star, based on my evaluation,' that's all he has to do." Defendant told Michael Buckley, "Whoever Jack gives the nod to, is gonna look great in [the Mayor's] eyes." Defendant also stated during this meeting: "You paint the picture so you can hide behind the fucking curtain, you do whatever the fuck you want." Later that evening, Defendant texted Theory CEO Pollock:



Mon, Apr 26, 6:45 PM

Working this thing hard just so you know my friend.

GX1 at 30. Pollock testified that he was entirely unaware of Defendant's contacts with Michael Buckley and that Defendant never informed him about this message. *See* Trial Tr. 10/25/23, Vol. 2 at 128:2-17 (Pollock). After the April 26, 2021, meeting, Michael Buckley had no contact with Defendant for over four months. *See* Trial Tr. 10/24/23, Vol. 1 at 56:20-57:21 (M. Buckley). In the meantime, in late April 2021, ten HCA applications (including Theory's) were submitted to the CAC. On August 28, 2021, two days after a press story that had the potential to adversely impact Theory's application for an HCA with Medford, *see* GX 24; *see also* Trial Tr. 10/25/23, Vol. 2 at

132:14-24 (Pollock), it was *Defendant* who reengaged with Buckley and sought the benefit of his proposed bribe: Defendant texted Buckley, "It's time" and, "Tell him to vote Theory #1 as they are the best candidate." GX 32 at 37.

G.     September 14, 2021 (GX 35)

Defendant next met with Michael Buckley on September 14, 2021, outside of Defendant's aunt's house. Defendant proposed paying Michael Buckley with cash ("But you don't want it . . . You don't want it in a check, right? You don't wanna be . . . you- you want in cash."; "If I give you cash, there will be no trace."). And he explained the arrangement: "If he [the Chief] gives them a high vote and they get it, you're getting paid." Michael asked, "[H[ow's that work?" Defendant responded: "Cash, I'll give you cash." The conversation continued, with Defendant emphasizing that they could keep the payment hidden ("no one's going to fucking know about it") and describing steps they may need to take to conceal the payment, such as giving Michael Buckley the money in multiple installments so that he would not be "walking around" with "all kinds of" cash, and having Theory write Defendant a check so that Defendant could pay the taxes on it and provide Michael Buckley with the balance.

H.     September 29, 2021 (GX 36)

On September 29, 2021, Defendant met with Michael Buckley outside of Defendant's Somerville home. Michael Buckley, at the FBI's direction, told Defendant that the Chief had not voted Theory "in the top three" but had agreed to "change the ranking" and "move them top, number one" because Michael Buckley was "getting paid." Defendant responded, "Beautiful" and "Perfect," and gave him a fist bump. Michael Buckley told Defendant that the Chief wanted Defendant to pay Michael Buckley a deposit on the bribe money, and Defendant openly brainstormed mechanisms for not paying a deposit and for covering up the bribe payment by

dressing it up as a sham consulting agreement or a loan. *E.g.*, GX 36 ("If someone ever came knocking, and said 'What was that [payment to Michael Buckley] for?,' I say, 'Oh, I was trying to get some, I'm representing the guy that's doing Boynton Yards.'"). During this meeting, Defendant also explicitly stated his understanding of the arrangement: the Chief was "*switching the vote for the money.*"

Around the same time, with the CAC's scoring determinations imminent, and seeking funds to underwrite his secret bribery scheme—Defendant told Pollock that Defendant wanted to hire the Chief's relative as a "security" consultant for Theory. *See* Trial Tr. 10/25/23, Vol. 2 at 137:3-19 (Pollock). When Pollock did not give him an answer, Defendant followed up on October 7, 2021 with this text:



GX 1 at 76. Pollock subsequently told Defendant that he was "not interested in hiring the consultant, it made me uncomfortable, and we're an above-board company." *See* Trial Tr. 10/25/23, Vol. 2 at 141:20-22 (Pollock). But Defendant's one-man bribery scheme continued, behind the back of the client he purported to serve.

I.      October 7, 2021 (GX 38)

On the evening of October 7, 2021, a few hours after the text message described above, Defendant met again with Michael Buckley and said that there was a "little glitch," because Pollock "is fuckin' petrified." Defendant falsely stated that Theory now wanted Defendant to pay

Michael Buckley $15,000 in cash ($25,000, minus an estimated $10,000 in taxes) because Pollock doesn't "want any record of it." Defendant proposed paying Buckley $5,000 up front, with "the other ten once we know it's all done." Defendant, relaying a conversation with Pollock that he never actually had, *see* Trial Tr. 10/25/23, Vol. 2 at 143:12:15 (Pollock), falsely told Michael Buckley that Pollock had provided the following directive in the event that the Chief failed to follow through: if "he doesn't do it" (that is, if the Chief did not favorably rank Theory), "then he's gotta pay you back" (that is, Michael Buckley would be required to refund Defendant's $5,000 down payment). Defendant falsely informed Michael Buckley that Pollock said, "this way he'll pay no taxes and it'll be cash, no one will know about it."

J.      October 11, 2021 (GX 39)

During an October 11, 2021 meeting outside of Defendant's Somerville residence, Defendant handed $2,000 in cash to Buckley (GX 40): "Take that," he said, "that's two grand . . . . The fifteen grand is locked and loaded . . . [a]s long as the guy [Pollock] gets what he wants, ri—you know what I mean? If he doesn't get it, he doesn't wanna pay. Um, he goes, 'I just wanna make sure everything goes—I don't want to give five grand on the street, and then have Jack have a change of heart, now we gotta ask him for it back.'" Pollock testified that Defendant never informed him about any payments made to Michael Buckley in connection with Theory Wellness. *See* Trial Tr. 10/25/23, Vol. 2 at 145:17-146:1 (Pollock).

Defendant deleted nearly his entire text message history with Michael Buckley. *Compare* GX 32 (text messages between Michael Buckley and Defendant on Michael Buckley's phone from August 2019 to December 2021), *with* GX 42 (same set of text messages from Defendant's phone, showing only text messages between October 11, 2021—the day of the bribe payment—and

December 2021); *see also* Trial Tr. 10/26/23, Vol. 1 at 22:19-22 (Davis) (forensic examiner

testifying that other text threads on Defendant's phone dated back to 2018 or 2019).

### SENTENCING GUIDELINES

Defendant's Sentencing Guidelines have been calculated by the Probation Officer as

follows:

| SENTENCING GUIDELINES CALCULATIONS 18 U.S.C. §§ 666, 1343, 1346 (Counts One-Three) | | | | | |
|---|---|---|---|---|---|
| Base Offense Level (U.S.S.G. § 2C1.1(a)(2)) | | | | | 12 |
| Benefit to Be Received Between $40,000 and $95,000 (U.S.S.G. §§ 2C1.1(b)(2), 2B1.1(b)(1)(D)) | | | | | +6[1] |
| Offense Involved Public Official in High-Level Decision-Making Position (U.S.S.G. § 2C1.1(b)(3)) | | | | | +4 |
| *Adjusted Offense Level* | | | | | *22* |
| | | | | | |
| Chapter Four Zero-Point Offender Adjustment (U.S.S.G. § 4C1.1(a)) | | | | | -2 |
| | | | | | |
| **TOTAL OFFENSE LEVEL** | | | | | **20** |
| CH Cat. I | CH Cat. II | CH Cat. III | CH Cat. IV | CH Cat. V | CH Cat. VI |
| 33-41 | 37-46 | 41-51 | 51-63 | 63-78 | 70-87 |

### ARGUMENT

"As a matter of administration and to secure nationwide consistency, the Guidelines should

be the starting point and the initial benchmark" in determining the appropriate sentence. *See Gall*

*v. United States*, 552 U.S. 38, 49 (2007); *see also Peugh v. United States*, 569 U.S. 530, 549 (2013)

(recognizing that the "Guidelines will anchor both the district court's discretion and the appellate

---

[1] The government has objected to the PSR's calculation under U.S.S.G. § 2C1.1(b)(2) because the value of the benefit to be received by Defendant in exchange for the bribe—that is, Defendant's anticipated profit from Theory's future Medford retail marijuana store—was expected to exceed $100,000 per year (as Theory CEO Brandon Pollock testified at trial). *See* Trial Tr. 10/25/23, Vol. 2 at 103:2-5 (Pollock). Accordingly, the base offense level should be increased by 8 levels (*see* U.S.S.G. §§ 2C1.1(b)(2), 2B1.1(b)(1)(E)), resulting in an Adjusted Offense Level of 24 and a Total Offense Level of 22. Based upon a Total Offense Level of 22 and a criminal history category of I, the Guideline imprisonment range should therefore be 41 to 51 months.

review process"). The Guidelines "seek to embody the § 3553(a) considerations, both in principle and in practice." *Rita v. United States*, 551 U.S. 338, 350 (2007). "[I]f the district court decides that an outside-Guidelines sentence is warranted, [it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Crespo-Rios*, 787 F.3d 34, 38 (1st Cir. 2015) (internal quotation marks and citation omitted). The § 3553(a) factors, which the government discusses below, include the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence; and protect the public from further criminal conduct by the defendant. *See* 18 U.S.C. § 3553(a).

Taking into account both the Guidelines and the § 3553(a) factors discussed below, the government respectfully requests that the Court sentence Defendant to a within-Guidelines sentence of 41 months' imprisonment.

## I.    <u>The Nature and Circumstances of the Offense, and the Seriousness of the Offense</u>

The seriousness of the offense alone—a surreptitious corrupt offer of tens of thousands of dollars to a public official's brother in exchange for official action—warrants a sentence within the applicable Guidelines range. *Every* individual who came into contact with Defendant's scheme recognized that it was wrong. *See* Trial Tr. 10/24/23, Vol. 1 at 24:23-25 (M. Buckley) (Michael Buckley's testimony that on his drive home to his wife after hearing Defendant's offer, he was banging on the steering wheel, "swearing and dropping F-bombs"); Trial Tr. 10/26/23, Vol. 1 at 55:10-16, 56:4-22 (J. Buckley) (Jack Buckley's testimony explaining that he "hung up" on his brother after being informed about Defendant's offer of $25,000 for a "conversation"); Trial Tr. 10/25/23, Vol. 2 at 141:20-22 (Pollock) (Theory CEO Pollock's testimony that even Defendant's watered-down version of his scheme—in which Theory would pay the Chief's brother as a

11

"security consultant"—"made me uncomfortable" and that he rejected Defendant's proposal because "we're an above-board company").

Defendant was not walking the line between bribery and lobbying: as an experienced professional, an attorney, and a long-time public official himself, *e.g.*, PSR at ¶ 8, he knew where the line was. And he knew he was well over it when he paired a promise to pay Michael Buckley "50 grand"—while guaranteeing that he would "pay tax on it" himself—if "Jack [*i.e.*, the Chief] can square them [Theory]." GX 33.[2] This conduct is not ambiguous. This conduct is not nuanced, multi-faceted, or opaque. This conduct is not lobbying. This conduct is what the jury decided it was in under three hours of deliberation, *see* ECF No. 164, after a week-long trial: bribery, plain and simple.

```
                        JURY VERDICT

    On Count 1, charging honest services wire fraud,
    we find Sean O'Donovan:

              _____ Not Guilty      _____✓____ Guilty


    On Count 2, charging honest services wire fraud,
    we find Sean O'Donovan:

              _____ Not Guilty      _____✓____ Guilty


    On Count 3, charging federal program bribery,
    we find Sean O'Donovan:

              _____ Not Guilty      _____✓____ Guilty
```

ECF No. 165 (Verdict).

---

[2] Notably, these words were spoken by Defendant on February 22, 2021, at the very outset of the investigation during the second meeting in a row that Defendant himself initiated to discuss what he obliquely referred to in a text message to Michael Buckley as "the other matter." GX 32 at 14.

Bribery of this sort has broad and detrimental effects. Quid pro quo corruption threatens "the integrity of our system of representative democracy." *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 388 (2000) (internal quotation marks and citation omitted). As one court explained:

> Bribery cannot properly be seen as a victimless crime, for in a sense it threatens the foundation of democratic government. Putting aside the financial havoc it can cause, bribery tears at the general belief of the citizenry that government officials will carry out their duties honestly, if not always competently. And that harm, though it may at times appear intangible, is real.

*United States v. Hayes*, 762 F.3d 1300, 1309 (11th Cir. 2014); *see also United States v. Conyers*, 737 F. Supp. 2d 696, 702 (E.D. Mich. 2010) (recognizing that "'[b]ribery is a betrayal of trust'" and the "'social injury inflicted by breaches of trust goes beyond any material measurement'") (quoting Judge John T. Noonan, *Bribes* (1987)); *cf. United States v. Sorenson*, 233 F. Supp. 3d 690, 700 (S.D. Iowa 2017) ("Given the risk of future harm to the public if political corruption—such as that committed by Defendant—is not stymied, the Court concludes a term of imprisonment must be imposed to engender respect for our anticorruption laws and to deter others from engaging in similar criminal conduct.").

And it makes no difference that the arrangement was unconsummated (*i.e.*, that the Defendant's corrupt scheme did not in fact succeed). A few years ago, this Court was confronted with the issue of whether a defendant convicted on the basis of a successful sting operation merited a lesser sentence. In *United States v. Paul Hinkel*, an undercover federal agent placed an advertisement online that ultimately led the defendant to reach out and entice a fictional minor to engage in sexual activity in violation of 18 U.S.C. § 2422(b). *See* No. 14-CR-10109 (D. Mass.) (Young, J.), ECF No. 1 (Complaint). After a trial at which the defendant was convicted, the defense argued at sentencing that "this was not a real minor, not a real - - just an undercover agent who set up --." *Id.*, ECF No. 129 at 11 (Sentencing Transcript). The Court interjected: "But what difference

does that make?" *Id.* The Court went on: "I mean I listened to this case. He had every benefit in terms of the careful explication of the law and the jury found beyond a reasonable doubt the necessary elements of the crime here, and in this Court's view their finding was amply supported by the evidence. So that's the background upon which I must impose sentence." *Id.* at 12; *see also United States v. Navedo-Ramirez*, 781 F.3d 563, 570 (1st Cir. 2015) (affirming district court's imposition of Guidelines sentence over objection that defense was entitled to downward departure because his conviction arose from a sting operation); *United States v. Portela*, 167 F.3d 687, 708 (1st Cir. 1999) (same).

Just as this Court concluded in *Hinkel* that a defendant convicted as part of a sting operation was not entitled to any special benefit at sentencing, there is no difference in culpability between a defendant who intended to commit a bribery offense (and *believed* himself successful) and a defendant who intended to commit a bribery offense and *was* in fact successful. The Sentencing Guidelines do not generally treat such defendants differently. *See, e.g.*, *United States v. Hendron*, 43 F.3d 24, 26 (2d Cir. 1994) ("Hendron should not be helped in sentencing by the fortuity that the purchasers [of the illegal firearms he was selling] were government agents so that he could not, in fact, accomplish what he clearly intended."). Nor do the criminal statutes. For example, this Court rightly rejected Defendant's contention—at the motion to dismiss stage—that sting operations fall outside the scope of the honest services wire fraud statute. *See* ECF No. 63 at 4 (finding "no precedent that suggests this Court" must accept the contention that "the existence of an undercover operation and a cooperating witness removes this case from the core of honest services wire fraud"). The same principles should apply now, at sentencing. Defendant should not be able to leverage the fact that his criminal bribery scheme was exposed in a sting operation to obtain a lighter sentence.

14

## II.    __Defendant's History and Characteristics__

Defendant's history and characteristics, too, justify an upper-end Guidelines sentence. He has a loving family, he attended and graduated from college and law school, and he had a successful law and lobbying practice after serving for over a decade as an elected public official. *See* PSR at ¶¶ 8, 59-60. He has had many advantages in his life, advantages that many defendants who come before this Court for sentencing have lacked. In spite of those privileges, he sought to corrupt the political process in his own backyard. His continued assertion that he was seeking to "lawfully lobby," *see* PSR at ¶ 5 n.1, moreover, demonstrates a lack of remorse. This factor, too, counsels in favor of a Guidelines sentence. *See United States v. Harrison*, 899 F.3d 49, 51 (1st Cir. 2018).

To the extent Defendant may argue that his lack of criminal history, history of business success, or the collateral consequences associated with this conviction support a downward variance, his claims are without merit. The Guidelines generally prohibit consideration of socioeconomic status, successful employment history, and reputational collateral consequences in fashioning a sentence. *See* 28 U.S.C. § 994(d) ("The Commission shall assure that the guidelines and policy statements are entirely neutral as to . . . socioeconomic status of offenders."); *see also* U.S. Sentencing Guidelines § 5H1.2 (vocational skills and education not ordinarily relevant); U.S. Sentencing Guidelines § 5H1.5 (employment record not ordinarily relevant); U.S. Sentencing Guidelines § 5H1.6 (family ties and responsibilities not ordinarily relevant); U.S. Sentencing Guidelines § 5H1.10 (socioeconomic status not relevant). Indeed, courts have "repeatedly expressed a distaste for sentencing that reflects different standards of justice being applied to white and blue collar criminals," based on the need to deter large-scale fraud and the possibility that a lenient sentence may "undermine[] public confidence in whether the justice system is doing equal

right to the poor and the rich as our oath requires." *United States v. Hoffman*, 901 F.3d 523, 556-57 (5th Cir. 2018) (internal citation, quotation marks, and alterations omitted); *see also, e.g.*, *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (emphasizing importance of "the deterrence of white-collar crime (of central concern to Congress), the minimization of discrepancies between white-and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail").

## III.   <u>The Need for General Deterrence</u>

Finally, the Court should issue an upper-end Guidelines sentence here to deter other individuals who may—like Defendant—be inclined to "try to get the edge." GX 33. Public corruption in the burgeoning area of medical and recreational marijuana regulation is a growing problem across the nation. The tight controls that governments place in this area over approvals and licensing—particularly coupled with the significant financial windfalls that can be reaped in the industry—have generated new opportunities for graft and bribery. And numerous recent cases show that courts have taken the issue seriously.

Here in Massachusetts, while Defendant's scheme was underway, former Fall River Mayor Jasiel F. Correia II was sentenced to six years in prison in connection with, *inter alia*, extorting and conspiring to extort marijuana vendors for hundreds of thousands of dollars. *See United States v. Jasiel F. Correia II*, No. 18-CR-10364 (D. Mass.) (Woodlock, J.), ECF Nos. 69, 313. The problem, though, is nationwide. In 2022, a former mayor was sentenced to 60 months in prison for, *inter alia*, accepting a $10,000 cash bribe from an undercover FBI agent who told Wright he wanted assistance in securing votes to expand a marijuana business zone and for protection from code enforcement related to a purported marijuana transportation business. *See United States v. Jermaine Wright*, No. 17-CR-229 (C.D. Cal.), ECF Nos. 11, 162. Similarly, in early 2023, four

men were charged with, and pled guilty to, participating in bribery schemes involving Rick Johnson, the former chair of the Michigan Medical Marijuana Licensing Board. *See United States v. Rick Vernon Johnson et al.*, No. 23-CR-40 (W.D. Mich.), ECF Nos. 1-5. Johnson was sentenced to 55 months in prison; John Dalaly, who operated two companies formed for the purpose of obtaining licenses from the board, was sentenced to 28 months in prison; and Brian Pierce and Vincent Brown—who lobbied on behalf of businesses that were seeking operating licenses from the board—were sentenced to 24 months and 20 months of imprisonment, respectively. *See id.*, ECF Nos. 86, 96, 131, 135. More recently—in a case echoing the fact pattern here—a former Los Angeles-area city councilman was charged alongside one of his consulting clients with bribing a city council member in exchange for that official's support for commercial marijuana permits. *See United States v. Isaac Jacob Galvan et al.*, No. 23-CR-456 (C.D. Cal.), ECF No. 1.

In short, Defendant's offense is no one-off event; instead, it is part of a pattern of corruption in this industry. The Court should send a message that bribery of public officials—in the marijuana industry or any other—will not be tolerated in this country.


Dated: February 1, 2024                          Respectfully submitted,


JOSHUA S. LEVY                                   COREY R. AMUNDSON
Acting United States Attorney                    Chief, Public Integrity Section
                                                 U.S. Department of Justice


By: *Kristina E. Barclay*                         By: *Jonathan E. Jacobson*
Kristina E. Barclay                              Jonathan E. Jacobson
Assistant United States Attorney                 Trial Attorney, Public Integrity Section
                                                 U.S. Department of Justice

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 1, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF System, which will then send a notification of such filing to all attorneys of record.

<u>*/s/ Jonathan E. Jacobson*</u>
Jonathan E. Jacobson
Trial Attorney