UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. 22-10141-WGY |
| | ) | |
| SEAN O'DONOVAN, | ) | |
| | ) | |
| Defendant | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**<u>MOTION FOR BAIL PENDING APPEAL</u>**

After a five-day trial, a jury found defendant Sean O'Donovan guilty on two counts of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346; and one count of federal-programs bribery, in violation of 18 U.S.C. § 666(a)(2). The Court sentenced him to concurrent 24-month terms of imprisonment, and denied his motion for release pending appeal. O'Donovan renewed his motion to the First Circuit, and the government opposed. The First Circuit has remanded the matter for the limited purpose of enabling this Court to enter a statement of reasons addressing the bail factors set out at 18 U.S.C. § 3143(b). Because O'Donovan's appeal will not advance substantial questions pertaining to the sufficiency of the evidence supporting his convictions, the Court's evidentiary rulings, or the jury instructions, none of O'Donovan's claims is likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed. Accordingly, the Court properly denied O'Donovan's request to remain free on bail pending his appeal.

1

**Background**

The Court, having presided over the trial in this matter, is familiar with the facts. The government hereby incorporates the factual recitation, with trial record citations, contained in its sentencing memorandum. ECF:173:2-10.

**Bail Standard and Standard of Review**

A defendant requesting bail pending appeal must establish by clear and convincing evidence that: (1) he is "not likely to flee or pose a danger to the safety of any other person or the community if released," and (2) that his "appeal is not for the purpose of delay and raises a substantial question of law or fact." 18 U.S.C. § 3143(b)(1)(A)-(B). As relevant here, O'Donovan must establish that his appeal "raises a *substantial* question of law or fact likely to result in … reversal, … an order for a new trial, … a sentence that does not include a term of imprisonment, or … a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process." 18 U.S.C. § 3143(b)(1)(B) (emphasis added). This provision "breaks down into two distinct requirements," namely: "(1) that the appeal raise a substantial question of law or fact and (2) that if that substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed." *United States v. Bayko*, 774 F.2d 516, 522 (1st Cir. 1985) (citation omitted); *accord United States v. Zimny*, 857 F.3d 97, 99 (1st Cir. 2017). A "substantial question" is one that is "close" in the sense that it "very well could be decided the other way." *Bayko*, 774 F.2d at 523 (citation omitted); *Zimny*, 857 F.3d at 100. Questions are not "substantial" simply because they are "novel," not the subject of "controlling precedent," "undecided," or "fairly debatable." *Bayko*, 774 F.2d at 522-523 (citation omitted). So too, the

mere "possibility of reversal" does not warrant bail pending appeal. *Id.* at 523. And an error that is harmless cannot meet the "likelihood prong." *Ibid.*

## Argument

O'Donovan seeks release on the concern that he could serve "the majority of his term of imprisonment before his appeal is likely to be decided." ECF:174:2. But the First Circuit routinely denies release to defendants sentenced to short prison terms when they fail to identify a substantial question of law or fact. *See, e.g.*, *United States v. Lee*, No. 20-1326 (1st Cir. Jul. 1, 2020) (denying release for defendant sentenced to 12 months and 1 day). And because O'Donovan's motion fails to identify any such question, that course is warranted here.

### A. The trial evidence identified an interstate communication.

The jury found O'Donovan guilty on two counts of honest-services wire fraud. The relevant provision, 18 U.S.C. § 1343, prohibits the transmission of a "wire … communication in interstate or foreign commerce" for the purpose of executing a fraud scheme. At trial, the government identified two Apple iMessages sent by O'Donovan in furtherance of his honest-services fraud scheme. ECF:159:34-35; 44-45.[1] The FBI forensics examiner testified that "iMessages travel over the internet through servers." ECF:162:10. The iMessage is "an Apple-specific protocol that allows [users] to communicate through text" with "data transmission over the internet." ECF:162:9.

This evidence, viewed in the light most favorable to the verdict, proves O'Donovan's transmission of a wire communication in interstate commerce. The First Circuit has held that

---

[1] Transcript page citations reference the PACER-generated pagination (rather than the court reporter's pagination, which is obscured in several transcript volumes).

"[t]ransmission of photographs by means of the Internet is tantamount to moving photographs across state lines and thus constitutes transportation in interstate commerce." *United States v. Carroll*, 105 F.3d 740, 742 (1st Cir. 1997). That conclusion applies to a message transmitted over the internet; it is tantamount to sending the message across state lines.

Although O'Donovan doubts (ECF:174:3) that an internet transmission satisfies the "interstate" wire element, *Carroll*'s on-point holding is "binding" in this circuit. *United States v. Lewis*, 554 F.3d 208, 216 (1st Cir. 2009). On a Rule 29 sufficiency challenge, O'Donovan's "use of the internet … [i]s enough, standing alone, to satisfy the jurisdictional element." *Ibid*.

O'Donovan relatedly argues (ECF:174:3-4) that the FBI forensic examiner's testimony that iMessages "travel over the internet" was inadmissible under Federal Rule of Evidence 702. This Court's contrary ruling (ECF:162:10) was correct and presents no substantial question on appeal.

Rule 702 authorizes "[a] witness who is qualified as an expert" to "testify in the form of an opinion." This rule allows "the expert to testify as to the inferences and conclusions" she drew from relevant facts and a methodological analysis of those facts. *United States v. Mooney*, 315 F.3d 54, 63 (1st Cir. 2002). Rule 701 articulates a related standard for lay-witness opinions.

But in a circumstance where the witness testifies to "facts, not opinions, … [Rules 701 and 702] do not apply." *United States v. Kearn*, 863 F.3d 1299, 1307 n.3 (10th Cir 2017). That principle forecloses O'Donovan's claim. The FBI examiner testified to a fact: Apple iMessages travel over the internet. Because the examiner did not tender any opinions or inferences to the jury, Rule 702 is inapplicable.

No authority supports O'Donovan's contention (ECF:174:3) that only an expert could have testified to this fact. Awareness that iPhones transmit messages over the internet does not require

4

"scientific, technical, or other specialized knowledge." Fed. R. Evid. 702(a); *see, e.g., Riley v. California*, 573 U.S. 373, 397 (2014) (observing that "Internet-connected devices … display data stored on remote servers"). Apple widely discloses this feature, and it falls well within the ken of everyday phone users. *See In re Apple, Inc.*, 149 F. Supp. 3d 341, 356 (E.D.N.Y. 2016) ("iMessage allows Apple customers (connected over the Internet) to communicate by messages sent and received via their iPhone."); Salvador Rodriguez, "Text messaging turns 20 years old," Los Angeles Times (Dec. 4, 2012) ("[F]ree Internet-based text messaging services such as Apple's iMessage, Facebook messages and apps including WhatsApp and TextPlus have grown in popularity.").

O'Donovan's cited decisions—which address expert testimony about the technical means by which cell towers record historical cell-phone location data or by which the Internet routes traffic through specific servers—are inapposite. ECF:174:4. In fact, one of his decisions explains that "a lay witness could presumably testify to commonplace Internet activities." *Keywords, LLC v. Internet Shopping Enterprises, Inc.*, 2005 WL 8156437, at *7 (C.D. Cal. Jun. 29, 2005). Because the FBI examiner's testimony did just that, Rule 702 did not apply.

O'Donovan lastly finds "[n]othing" in the FBI examiner's "testimony indicat[ing] that he was testifying based on his personal knowledge." ECF:174:4. However, O'Donovan never lodged a Rule 602 personal-knowledge objection during trial and the claim now lacks merit. "Testimony is inadmissible under Rule 602 only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed what he testified to." *United States v. Brown*, 669 F.3d 10, 22 (1st Cir. 2012) (internal quotation marks and citation omitted). The FBI examiner completed 400 hours of "classroom training" and "hands-on testing." ECF:159:80. The

examiner had also examined hundreds of phones, understood that phones communicate through cellular networks, and testified about a phone's stored contents—including chat messages. ECF:159:80-82; ECF:160:6. Based on this training and experience, the Court could fairly exercise its discretion and infer the FBI examiner's personal knowledge regarding the manner in which iPhones transmit messages.

### B. The Court correctly omitted an "official act" element in its § 666 instructions.

The jury also found O'Donovan guilty of federal-programs bribery, which entails giving a thing of value "with intent to influence or reward an agent … of a State, local or Indian tribal government, or any agency thereof, in connection with any business … involving anything of value of $5,000 or more." 18 U.S.C. § 666(a)(2)(B). The Court's refusal to instruct the jury that O'Donovan could be found guilty only if he "contemplated" "an official act … by the public official" when paying Michael is not subject to fair debate. ECF:162:43.

O'Donovan's argument is premised on *McDonnell v. United States*, 579 U.S. 550 (2016). *McDonnell* addressed the federal-official-bribery statute, which makes it a crime for a person to pay a public official to accept anything of value in return for being "influenced in the performance of any official act." 18 U.S.C. § 201(b)(2)(A). As to the "official act" requirement, the Supreme Court held that (1) the government must identify a "focused and concrete" question or matter that involves "a formal exercise of governmental power," 579 U.S. at 571; and (2) the government must show that the public official made a decision or took an action "on" that question or matter, *id*. at 567. The different statutory text and First Circuit case law foreclose O'Donovan's attempt to infuse an "official act" element into Section 666.

6

First, Section 666 does not refer to an "official act." And O'Donovan identifies no reason to believe that Section 666's capacious language—which forbids payments "to influence or reward an agent of … a State, local or Indian tribal government … in connection with *any business, transaction, or series of transactions* of such … government," 18 U.S.C. § 666(a)(2)(B) (emphasis added)—carries the same meaning as the term "official act" in Section 201.

The First Circuit's decision in *United States* v. *Abdelaziz*, 68 F.4th 1 (1st Cir. 2023), likewise dooms O'Donovan's contention that Section 666 prohibits only bribes connected to an "official act" by the public official. *Abdelaziz* explained that "Congress crafted § 666 … to target particular classes of misconduct, and thus did not necessarily confine th[e] statute[] to criminalizing the classic crime of 'bribery.'" 68 F.4th at 31. The court further observed that "§ 666 uses 'expansive, unqualified language' in service of Congress's unique interest in protecting federal funds from misuse." *Ibid.* (citation omitted). As a result, O'Donovan's varied "arguments about the meaning of 'bribe' and 'bribery' or the generalized purposes of 'bribery' laws"—all of which animated *McDonnell*'s construction of Section 201—"are beside the point" when ascertaining Section 666's sweep. *Abdelaziz*, 68 F.4th at 24.

Legislative history confirms this lesson from *Abdelaziz*. "Congress enacted 18 U.S.C. § 666 following a circuit split over whether the federal bribery statute, 18 U.S.C. § 201, applied to state and local officials." *United States v. Lindberg*, 39 F.4th 151, 168 (4th Cir. 2022). And "[s]ince the drafting of § 666 was motivated by a circuit split regarding the reach of § 201, Congress must have been aware of § 201's definition of 'official act' when it drafted § 666—and yet it chose not to include the term in the text of the latter statute." *Ibid*. That history "shows that

7

Congress knew how to" craft a bribery offense narrowed to official acts and that Congress "chose not to do so in … § 666." *Abdelaziz*, 68 F.4th at 23.

Every other court of appeals to examine this question after *McDonnell* has refused to read an "official act" requirement into Section 666. *See Lindberg*, 39 F.4th at 166-169; *United States v. Roberson*, 998 F.3d 1237, 1247 (11th Cir. 2021); *United States v. Ng. Lap Seng*, 934 F.3d 110, 134 (2d Cir. 2019); *United States* v. *Porter*, 886 F.3d 562, 565-566 (6th Cir. 2018); *see also United States v. Maggio*, 862 F.3d 642, 646 n.8 (8th Cir. 2017) ("*McDonnell* had nothing to do with § 666."). None favors O'Donovan's position.

In any event, any instructional error on this Section 666 dispute would be harmless. When instructing on the Section 1346 honest-services fraud counts, the Court explained that bribery entails "a quid pro quo, a specific intent to give something of value in exchange for an official act." ECF:162:48. The Court then defined "official act": (1) it must involve a "question or matter" that is "specific and focused and involve[d] a formal exercise of governmental power," and (2) "the public official must make or agree to make a decision or take or agree to take an action on that question or matter." ECF:162:52.

Because the Court included an official-act instruction when charging the jury regarding Section 1346 honest-services fraud, the jury necessarily found O'Donovan guilty of bribery with respect to an official act. And because the evidence supporting those charges would apply equally to the Section 666 count, no sound basis exists to believe that the same jury would have found an official act with respect to the honest-services counts but not with respect to the Section 666 count. *See McDonnell*, 579 U.S. at 574 (bribery of officials responsible for making clemency recommendations to Commissioner of Indian Affairs "fits neatly within" definition of official act)

8

(citing *United States v. Birdsall,* 233 U.S. 223 (1914)).  Any error in the Section 666 instructions would thus be harmless.

  C. **The Court correctly refused an entrapment instruction.**

"Entrapment occurs when the criminal design originates with the government, which implants in the mind of an innocent person the disposition to commit the alleged offense and induces its commission." *United States v. Saemisch*, 18 F.4th 50, 60 (1st Cir. 2021) (internal quotation marks, brackets, and citation omitted).  "The defense … has two elements: (1) government inducement of the accused to engage in criminal conduct, and (2) the accused's lack of predisposition to engage in such conduct." *Ibid*. (citation omitted).  "A defendant is entitled to a jury instruction on entrapment if he meets a modest burden of production on the two prongs." *United States v. Perez-Rodriguez*, 13 F.4th 1, 18 (1st Cir. 2021).  "In analyzing whether the defendant has met his burden, the court must construe the evidence in the light most favorable to the defendant." *Id*. at 19.

O'Donovan requested an entrapment charge, characterizing his payment offers up through September 14, 2021—cash to Michael in exchange for Michael "simply ask[ing] that the chief read the application"—as lawful lobbying.  ECF:161:41.  O'Donovan then argued that Michael's "manufactured lie" at the September 29 meeting induced O'Donovan to offer a bribe payment. *Ibid*.  The Court's declination to instruct on entrapment is unassailable on appeal, given the trial evidence.  ECF:161:42.

Specifically, because the video exhibits show O'Donovan proposed his bribe-for-vote arrangement *before* September 29, he could not have been entrapped by the government on that date.  The February 22 video shows that O'Donovan broached the matter of payment.  GEX:33 at

9

9:10.[2]  He "would hire [Michael] for a consultant," "it'll all be legit," and "50 grand I'll give you cash, I gotta pay tax on it so I'll give you the rest."  *Id*. at 9:39-9:52.  O'Donovan then identified what he wanted: "if Jack can have them score them high, we should have no problem" and "we need Jack to whisper back [to the mayor] that they're good too."  *Id*. at 10:57-11:07.

The September 14 video further confirms that O'Donovan originated the bribe proposal.  When Michael asked about payment, O'Donovan said: "You don't want it in a check, right? … you want in cash … If I give you cash, there'll be no trace."  GEX:35 at 3:47-3:54.  O'Donovan then told Michael that this payment was conditioned on something more than Jack simply giving a hard read or a fair shake to Theory's application: "If [Jack] gives them *a high vote* and they get it, you're getting paid."  *Id*. at 4:53-4:58 (emphasis added).  O'Donovan added that he was "not only asking [Jack] for a good vote, he's asking [Jack] to tell the Mayor that it's a good candidate." *Id*. at 9:32-9:40.  This offer of payment in exchange for Jack's vote and "action to advise another official *on* the pending question" is a quintessential bribe.  *McDonnell*, 579 U.S. at 574.

O'Donovan has never claimed that the FBI, working through Michael, induced him at these meetings.  In fact, "the videos of these [conversations] show that [O'Donovan] didn't look anything like a person who's being entrapped."  *United States v. Gonzalez-Perez*, 778 F.3d 3, 13 (1st Cir. 2015) (internal quotation marks, brackets, and citation omitted).  Michael never made "threats, forceful solicitation and dogged insistence, [or] repeated suggestions" of criminal activity.  *United States v. Gamache*, 156 F.3d 1, 9 (1st Cir. 1998).  Because O'Donovan outlined the bribe-for-vote deal to Michael well before September 29, he cannot claim that the government entrapped him into that deal on that date.

---

[2] "GEX" citations refer to audio and video exhibits admitted at trial.

Moreover, the "predisposition" prong independently scuttled O'Donovan's entrapment theory. As the February 22 and September 14 videos show, O'Donovan sketched the bribe-for-vote deal without any reluctance and without any government inducement. *See Saemisch*, 18 F.4th at 61 (listing predisposition factors). O'Donovan also stood to profit handsomely if Theory successfully opened a Medford marijuana shop: a provision in the Theory-O'Donovan consulting agreement entitling O'Donovan to a percentage of Theory's profits from a Medford store was expected to generate $100,000-$200,000 annually for O'Donovan and his heirs. ECF:159:8,10.

Finally, the videos displayed O'Donovan's other criminal proclivities with respect to Theory's marijuana application. Upon hearing that a former mayor approached Jack about a rival company, O'Donovan said "that's against the law." GEX:35 at 1:25. O'Donovan then remarked: "I'm being smart, I went to his brother"—illustrating his intent to access the same illegal channel to influence Medford's selection process. *Id*. at 2:41. O'Donovan also contemplated an after-tax cash payment to Michael—thereby avoiding a paper trail and inviting Michael to commit tax fraud. *See* GEX:33 at 9:49 ("I'll give you cash, I gotta pay tax on it so I'll give you the rest."); GEX:35 at 3:53 ("If I give you cash, there'll be no trace."); GEX:35 at 11:06 ("I'll pay the taxes, you take the cash."). Finally, O'Donovan tried to defraud his client into unwittingly funding the bribe. In mid-September, O'Donovan advised Theory to hire "the brother of the chief of police as a security consultant." ECF:159:44. The CEO had not heard of the brother before, ECF:159:46, much less know that the brother was a Harvard finance administrator who lacked experience in security matters. All these statements occurred before September 29, when O'Donovan claimed the government entrapped him. Given the weight of this predisposition evidence, the district court correctly refused an entrapment charge.

In any event, any error in refusing an entrapment instruction would be harmless in light of the jury's verdict. In Count One, the jury found that O'Donovan devised a scheme to defraud the City of Medford of the police chief's honest services and that O'Donovan transmitted a wire communication on April 26, 2021, that tended to further the scheme. ECF:162:36-38 (jury instructions). Because the Count One offense conduct occurred *five months before* O'Donovan's alleged entrapment on September 29, the district court's failure to issue the charge was necessarily harmless with respect to Count One.

The Count One verdict also forecloses any entrapment defense for the other counts because it conclusively demonstrates O'Donovan's predisposition to commit bribery. The jury found that O'Donovan "intentionally, knowingly, [and] willfully" participated in the charged scheme as of April 26. ECF:162:36 (instructions). Because the jury "focus[ed] on [O'Donovan's] state of mind prior to the inducement" and found the requisite scienter, its verdict "establish[ed] his predisposition to commit crimes" before September 29—the date "for which the entrapment defense [was] asserted." *United States v. Palow*, 777 F.2d 52, 54-55 (1st Cir. 1985); *see also United States v. Gendron*, 18 F.3d 955, 962 (1st Cir. 1994) (predisposition "asks how the defendant likely would have reacted to an *ordinary* opportunity to commit the crime"—*i.e.*, "an opportunity that lacked those special features of the government's conduct that made of it an 'inducement,' or an 'overreaching.'").

### D. The Court acted within its discretion in excluding proffered defense witnesses.

O'Donovan contends that the Court erred in its exclusion of three defense witnesses. ECF:174:11. Because settled evidentiary rules and case law confirm the wisdom of the Court's rulings with respect to each, these claims do not advance a substantial question.

1. **Robert Scarcia**

Scarcia would have testified that another individual, Robert Carr, had a conversation with the mayor in July 2021 and the "Mayor had told [Carr] that the company represented by Mr. O'Donovan was in the top three applicants for cannabis licensure, if not the top candidate." ECF:162:113. Carr then repeated the mayor's statement to Scarcia and O'Donovan on multiple occasions. *Ibid*. O'Donovan sought to admit Carr's out-of-court statement not for its truth, but as evidence of O'Donovan's state of mind. ECF:161:20. The Court correctly excluded the testimony as irrelevant. ECF:161:21.

O'Donovan accepts that Carr's out-of-court statement "was not offered for its truth" and instead asserts "relevance [based] solely in the fact that Carr made those statements in O'Donovan's presence." ECF:174:14. He reasons that Carr's out-of-court statement shed light on O'Donovan's mental state and assertions of good faith. A defendant seeking to admit hearsay on this ground must "establish a meaningful relationship between" the out-of-court statement and "his proffered good-faith defense." *United States v. Simon*, 12 F.4th 1, 55 (1st Cir. 2021). O'Donovan has failed to articulate any viable connection.

*First*, O'Donovan contends that Carr's out-of-court statement corroborated O'Donovan's belief that Theory had submitted a top application. ECF:174:12. But as the Court observed, O'Donovan's subjective belief in the merits of Theory's application "add[ed] nothing" to this proceeding. ECF:161:20. An individual who offers a bribe to a public official is culpable irrespective of whether the individual subjectively believed that he was advancing a laudable or meritorious cause. *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 379 (1991).

13

*Second*, O'Donovan contends (ECF:174:12) that Carr's out-of-court statement showed O'Donovan's "lack of motive to pay a bribe" to Jack because Theory was "highly likely" to obtain a Medford license. That contention disregards Medford's two-stage review process: the CAC first ranked the applications and the mayor then selected the finalists. At the first stage, each CAC member "[i]ndependently" ranked the candidates. ECF:160:61. That O'Donovan believed the mayor had positively evaluated Theory's application sheds no light on O'Donovan's motive to influence the CAC's independent role at the first stage.

O'Donovan's own words confirm this: he said the mayor would "pick some people that she likes," GEX:34 at 3:30, and he targeted Jack's vote for this reason: "[The mayor] likes Jack, she trusts Jack," and "[w]hoever he gives the nod to, is gonna look great in her eyes." *Id*. at 4:03, 4:54; *see* GEX:35 at 8:25 ("I know the Mayor likes him, and I know the Mayor listens to him."). Simply put, O'Donovan's belief that the mayor viewed Theory as a top candidate does not bear on his motive to influence Jack's separate and independent review of Theory's application.

*Third*, O'Donovan contends (ECF:174, 12) that Carr's out-of-court statement prompted O'Donovan to disbelieve Michael's assertion on September 29 that Jack "did not rank [O'Donovan's] guys in the top three." GEX:36 at 4:39, 4:46. But the defense offered no foundation connecting Carr's statement in July 2021 to O'Donovan's state of mind on September 29, 2021.[3] The record instead shows the opposite: O'Donovan was concerned that the negative publicity would cause the CAC to lower Theory's ranking. *See* ECF:159:40 (Sept. 1, 2021) (O'Donovan: "Someone trying to sink us in Medford. They're circulating articles about not paying employees overtime at Theory."); GEX:35 at 8:50 (Sept. 14, 2021) (O'Donovan: "all's it does is

---

[3] O'Donovan cites only his counsel's closing summation to assert a link. ECF:174:12.

hurts us."). "Because no foundational facts were presented to establish the relevancy of [Carr's out-of-court statement in July] to [O'Donovan's] state of mind during the [September 29 meeting]," the Court's exclusion of the evidence could not have amounted to an abuse of discretion. *United States v. Wilson*, 798 F.2d 509, 515-516 (1st Cir. 1986).

In any event, the Court's exclusion of this testimony would be harmless. As noted above, the jury in Count One found O'Donovan guilty of honest-services fraud in connection with a text message he transmitted on April 26, 2021. Carr's out-of-court statements occurred three months after this offense conduct. Given this sequence, Carr's statements do not bear on O'Donovan's *mens rea* or good faith on the Count One conviction.

The Count One verdict also demonstrates harmlessness with respect to the other two counts. The jury found that O'Donovan intentionally, knowingly, and willfully participated in a scheme to bribe Jack as of April 2021. That finding forecloses any realistic possibility that the jury would have agreed that O'Donovan lacked criminal intent in the subsequent months.

### 2. Edward Mastrocola

Mastrocola would have testified that Carr learned from "the Medford Mayor or her office" that "the company represented by Mr. O'Donovan was … one of the top three applicants for cannabis licensure, if not the top." ECF:162:113. Carr reported this statement to Mastrocola at an August 2021 dinner; O'Donovan was not present. *Ibid*.

The Court excluded Mastrocola's testimony on the same grounds as Scarcia's. ECF:161:135. For the reasons just cataloged, this claim presents no substantial question for appeal. *See* pp.13-15, *supra*. Moreover, O'Donovan was not even present for Carr's out-of-court statement to Mastrocola in August 2021. Because O'Donovan did not hear Carr's statement, it

could not have influenced O'Donovan's mental state in subsequent months. *See Simon*, 12 F.4th at 55 ("Because [the defendant] has never been privy to the findings of the investigation, those findings could not have informed his subjective beliefs."); *United States v. Dynalectric Co.*, 859 F.2d 1559, 1574 n.19 (11th Cir. 1988) ("[T]he proffered evidence is irrelevant absent evidence that defendants actually relied on this information.").

### 3. Frank Perullo

O'Donovan sought to call Frank Perullo—owner of a marijuana retail chain—to offer lay opinion under Federal Rule of Evidence 701 that cannabis companies retain lobbyists and consultants with local influence to help them "meet with the right authorities and present the best case." ECF:77:4. The Court excluded Perullo's testimony, ruling that "[w]e're not going to have people … giving evaluative testimony" about the marijuana industry's practices. ECF:155:3.

Rule 701 authorizes opinion testimony from a lay witness if the opinion would be "helpful … to determining a fact in issue."[4] The district court is afforded "'considerable discretion' in deciding whether lay opinion testimony is admissible." *United States v. Irizarry-Sisco*, 87 F.4th 38, 49 (1st Cir. 2023) (citation omitted). Because O'Donovan's motion, ECF:174:15, does not even attempt to explain how the court abused its discretion, he has not demonstrated a substantial question for appeal.

Nor is such an explanation apparent on the record. The jury was well aware that marijuana companies hire lobbyists and consultants to assist them in obtaining licenses from local and state

---

[4] O'Donovan alternatively offered Perullo as an expert witness. Rule 702(a) includes the same helpfulness standard.

jurisdictions. *See* ECF:159:5-6 (testimony that O'Donovan assisted two other companies with Boston permits); ECF:159:17-18 (testimony that Theory hired a government relations firm).

O'Donovan, by contrast, offered $25,000 cash to Michael—a university finance administrator with no experience lobbying or consulting on behalf of marijuana companies or in Medford. In doing so, O'Donovan told Michael that he wanted Jack to "score [Theory] high," GEX:33 at 10:57; he would pay cash so "no one's going to f***ing know about it," GEX:35 at 5:18; and he would draft a fake consulting agreement, GEX:36 at 9:20-9:47. Perullo's proffered testimony did not address this type of conduct, much less characterize it as standard industry practice. Because it would not have meaningfully aided the jury's evaluation of O'Donovan's conduct, the Court acted well within its discretion in excluding it.

### E. The remaining instructional claims do not present a substantial question.

Each additional instructional claim (ECF:174:15-18) lacks merit.

#### 1. Honest-Services Wire Fraud Charge

The Court instructed the jury that it could find O'Donovan guilty only if he "knowingly and willfully participated with the scheme with the intent to commit bribery, as [the court] described it, and to defraud." ECF:162:104-105. The Court further instructed that this element "requires that Mr. O'Donovan make statements or make a misrepresentation of a material fact … knowing that what he was saying was untrue, with the object, with the goal of making the scheme come about." ECF:162:105. O'Donovan objected on the ground that this language employed "classic fraud misstatement language." ECF:162:107. The Court correctly overruled the objection, *ibid*.

17

The instruction was erroneous in one respect: it required the government to prove that O'Donovan "ma[de] statements or … a misrepresentation of a material fact … with the goal of making the scheme come about." "[I]n cases involving honest services fraud" like this, "a misrepresentation of fact is not required." *United States v. Sawyer*, 85 F.3d 713, 732 (1st Cir. 1996). Rather, "in honest services cases, the scheme to defraud the public of honest services can be proven when a public official accepts a bribe and fails to disclose it to the public." *United States v. Langford*, 647 F.3d 1309, 1321 n.7 (11th Cir. 2011).

Although the Court's "instruction added an element not required by" Section 1346, "this addition certainly did not prejudice [O'Donovan]." *United States v. McVeigh*, 153 F.3d 1166, 1196 (10th Cir. 1998). To the contrary, it helped him by inserting an element into the honest-services fraud counts that the government was not legally required to prove. In any event, a "conviction will be proper" "[s]o long as all of the elements necessary to find [the defendant] guilty of the crime … were put before the jury." *United States v. Rashwan*, 328 F.3d 160, 165 (4th Cir. 2003). That conclusion applies here because the instructions put all necessary elements of honest-services fraud before the jury.

O'Donovan asserts that the instruction improperly invited the jury to consider his misrepresentations to his client and about his client, but those misrepresentations were fair game in this honest-services prosecution. The government had to establish O'Donovan "intended that the public be deceived," *Sawyer*, 85 F.3d at 733, and O'Donovan's "own acts of deception" plainly bear on that question, *ibid*. As the government's closing noted, O'Donovan advised Theory to hire Michael as a security consultant and bragged about hiding the bribe scheme from Theory. ECF:162:66; *see also* GEX:36 at 12:40-12:46. O'Donovan's misrepresentations amply

demonstrated his intent to keep his scheme hidden from public view, thereby "defraud[ing] the people of Medford of the honest services of Chief Jack Buckley." ECF:162:36 (jury instructions).

### 2. Instruction on Specific Intent

The Court instructed that each count required the jury to decide whether O'Donovan "had a specific intent … to engage in a scheme that involved fraud and bribery." ECF:162:33. On that element, the government had to prove "the specific intent of Mr. O'Donovan to offer th[e] money believing that he could get a deal with the Chief, Chief Buckley, that would cause the Chief to act in a different way because [O'Donovan] was paying money, a thing of value, to Michael Buckley." ECF:162:35-36. The Court correctly rejected O'Donovan's argument that the government had to show his belief "that he in fact had an agreement" with the police chief. ECF:162:43.

In bribery prosecutions, the First Circuit requires only that "the jury … find [the defendant's] 'intent to otherwise influence or improperly affect the official's performance of duties.'" *United States v. McDonough*, 727 F.3d 143, 160 (1st Cir. 2013) (citation omitted). Because the instructions here tracked that requirement, no error possibly occurred.

### 3. Omission of Gratuity Instruction

O'Donovan sought an instruction that "[a] gratuity is not enough to support a guilty verdict for the offenses charged." ECF:91:13. His proposed instruction defined a gratuity as "a reward for some hoped for or even some expected future act that the public official may take and may have already determined to take." *Ibid*. O'Donovan's instruction went on to say that, "[i]n those situations, the payment is not in exchange for the public official taking an official act." *Ibid*. The Court's refusal to give the instruction is unassailable. ECF:162:45. At bottom, the gratuity concept was "substantially covered in the charge actually given." *United States v. De La Cruz,* 514 F.3d

121, 139 (1st Cir. 2008) (citation omitted). The jury was directed to ascertain O'Donovan's "specific intent … if he makes these payments, or promises to pay, [or] he offers to pay." ECF:162:35. The Court further explained: O'Donovan had to intend that "th[is] fact is going to get to the Chief" and that this fact "is corruptly going to affect the Chief's vote *with respect to these marijuana licenses*." *Ibid*. (emphasis added). In finding O'Donovan guilty, the jury necessarily determined that O'Donovan offered payment with the specific intent to affect Jack's ranking of Theory's marijuana application. The jury thus necessarily rejected the possibility that O'Donovan intended his payment as "merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken." *United States v. Fernandez*, 722 F.3d 1, 19 (1st Cir. 2013) (emphasis and citation omitted).

## Conclusion

The Court should deny O'Donovan's motion for release pending appeal.

| | |
|---|---|
| Dated: March 29, 2024 | Respectfully submitted, |
| JOSHUA S. LEVY<br>Acting United States Attorney | COREY R. AMUNDSON<br>Chief, Public Integrity Section<br>U.S. Department of Justice |
| By: *Kristina E. Barclay*<br>Kristina E. Barclay<br>Assistant United States Attorney | By: *Jonathan E. Jacobson*<br>Jonathan E. Jacobson<br>Trial Attorney, Public Integrity Section<br>U.S. Department of Justice |

## Certificate of Service

I certify that on March 29, 2024, I electronically served a copy of the foregoing document on counsel for appellant via the Court's ECF system.

/s/Kristina E. Barclay