UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>SEAN O'DONOVAN, )<br>    Defendant )<br>) | No. 22-CR-10141<br>Leave to File Granted<br>April 4, 2024 |

### DEFENDANT'S REPLY TO THE GOVERNMENT'S OPPOSITION TO HIS MOTION FOR BAIL PENDING APPEAL

Now comes the defendant Sean O'Donovan, by and through undersigned counsel, and hereby respectfully submits this Reply to the government's Opposition to his Motion for Bail Pending Appeal.

**I.    THE BAIL PENDING APPEAL STANDARD**

The government Opposition begins by arguing that the standard of proof for determinations about the substantiality of the issues to be raised on appeal is clear and convincing. This Court need not find the existence of a substantial question likely to result in reversal or a new trial by clear and convincing evidence. Rather, that heightened standard applies only to the (here, undisputed) questions of whether the defendant poses a risk of flight or danger. *See* 18 U.S.C. § 3143(b)(A)-(B). The substantiality of the questions to be raised on appeal is, by contrast, a pure question of law. *See United States v. Pollard*, 778 F.2d 1177, 1182 (6th Cir. 1985). And, contrary to the government's suggestion, the novelty of the questions is

1

clearly relevant to this inquiry.[1]  The government does not contend that O'Donovan does not meet the other conditions of release *i.e.* that he is either a risk of flight or danger to the community.

## II. INSUFFICIENT EVIDENCE TO PROVE TRANSMISSION OF CHARGED WIRES IN INTERSTATE COMMERCE (COUNTS 1 AND 2)

The government argues that conclusory testimony that iMessages "travel over the internet through servers," Tr. 10/27:10-12, suffices to prove beyond a reasonable doubt that the two charged messages here were transmitted "in interstate . . . commerce."  That argument is based on a single precedent, *United States v. Carroll*, 105 F.3d 740 (1st Cir. 1997), which is clearly distinguishable, both legally and factually.  Legally, the interstate commerce element of the statute at issue in *Carroll* could be satisfied by proof other than a true interstate transmission.  *Id.* at 741.  Factually, there was direct evidence in *Carroll* of the defendant's intent to transport the images across state lines.  *Id.* at 742 ("[S]ince the photographs were taken in New Hampshire but the computer that [the defendant] allegedly planned to use was located in Massachusetts, interstate transportation perforce would have occurred . . . .").  Therefore, any suggestion that transmission via the internet, without more, would have sufficed was mere *dicta*.

Accordingly, this Court should follow the persuasive authority that use of the internet alone does not satisfy the wire fraud statute's jurisdictional element.  *See United States v.*

---

[1] The government's quotation of *United States v. Bayko*, 774 F.2d 516, 523 (1st Cir. 1985) (citation omitted) (emphasis added), on this issue omits important context: "an issue may be without controlling precedent largely because the issue is **so patently without merit that it has not been found necessary for it to have been resolved**."  The government does not suggest that any of the issues raised in O'Donovan's appeal fit that description.

*Biyiklioglu*, 652 F. App'x 274, 281 (5th Cir. 2016) (unpublished); *United States v. Kieffer*, 681 F.3d 1143, 1155 (10th Cir. 2012).

The government is wrong in suggesting that O'Donovan's independent evidentiary challenge to FBI Forensic Examiner Cameron Davis's testimony for lack of personal knowledge was not preserved. Indeed, the record made clear that Davis had no personal knowledge whatsoever regarding how iMessages are transmitted. *See, e.g.*, Tr. 10/27:13 (Davis agreeing with statement that "some teacher taught you or told you that an imessage goes over the internet and that's the basis of your testimony"); *id.* at 14 (Davis agreeing that he "learned somewhere from somebody that [iMessages] went over the internet"). Counsel immediately thereafter moved to strike at sidebar. The Court denied the motion expressly adding, "your rights are saved." Tr. 10/27:15. The prior day, the Court struck the testimony of Apple "Lead Genius" Mustafa Naief for the same reason: the witness's testimony was "based on hearsay" and he was not disclosed as an expert. Tr. 10/26:39. In these circumstances, the grounds for the defense motion to strike Davis's testimony were "obvious from context" – they were the core of the cross-examination as to the lack of personal knowledge and the reliance on an unidentified source *i.e.* hearsay. *United States v. Gomes*, 177 F.3d 76, 80 (1st Cir. 1999).

It is blackletter law that lay witnesses must "testify from personal knowledge," not based on hearsay. *United States v. Rosado-Perez*, 605 F.3d 48, 55 (1st Cir. 2010). Rule 702 is an exception to that general rule. The government's argument that Davis's testimony falls outside this exception to the requirement of personal knowledge self-evidently does not help its case for the admissibility of the testimony. In arguing that Davis satisfied the personal knowledge requirement, the government relies exclusively on his "training and experience." Opposition 6.

But only experts, which Davis indisputably was not, are permitted to testify on this basis. *See, e.g.*, *Freedom Wireless, Inc. v. Bos. Commc'ns Grp., Inc.*, 369 F. Supp. 2d 155, 158 (D. Mass. 2005) (explaining that 2000 amendment to Rule 701 "put an end to the blurring of the line between the two categories [of expert witnesses and lay witnesses], which had led to decisions allowing 'lay' witnesses to testify more and more like experts, relying on training and experience and drawing conclusions that lay witnesses are not normally allowed to draw." (citation omitted)).

The government is also incorrect in its assertion that Rule 702 applies only to opinion testimony. The rule, on its face, permits qualified experts to "testify in the form of an opinion ***or otherwise***" if the subsequent requirements are met. Fed. R. Evid. 702 (emphasis added). In many of the cases cited in the defense Motion, the testimony held subject to Rule 702 could just as easily have been characterized as factual in nature as Davis's testimony here. *See* Motion 4 (citing cases); *United States v. Montijo-Maysonet*, 974 F.3d 34, 50 n.13 (1st Cir. 2020) ("To the extent [the defendant] argues that [the witness] gave expert testimony when she said that KIK used the Internet, that . . . was harmless.").

To hold otherwise, and adopt the government's reasoning, would be to invite absurd results. Surely a court is not bound to permit a witness to testify open-endedly to matters far beyond his or her personal knowledge whenever that testimony is labeled factual, rather than opinion-based. The defense is aware of no authority supporting that view.[2]

---

[2] *United States v. Kearn*, 863 F.3d 1299 (10th Cir. 2017), the sole case cited by the government on this point, is clearly distinguishable. There, witnesses testified that the defendant "distributed" images to a detective and that "he owned the iPhone on which the images were recovered." *Id.* at 1307 n.3. This was simply a recitation of facts within the witnesses' own knowledge and requiring no specialized training or experience.

### III.   OMISSION OF OFFICIAL ACT REQUIREMENT (COUNT 3)

Whether or not 18 U.S.C. § 666 requires proof of an official act, as defined by *McDonnell v. United States*, 579 U.S. 550 (2016), is an important legal issue which the First Circuit has yet to decide. *United States v. Abdelaziz*, 68 F.4th 1 (1st Cir. 2023), did not address any such requirement.[3]  The government, in relying on out-of-circuit authority declining to require proof of an official act, does not even attempt to address the defense argument that those decisions are unpersuasive.  *See* Motion 6-8.  The government's argument regarding harmless error overlooks O'Donovan's other objections to the Court's instructions on the honest services counts.[4]

### IV.   OMISSION OF ENTRAPMENT INSTRUCTION (ALL COUNTS)

The government is wrong in contending that the jury's conviction of O'Donovan on Count 1, alleging honest services wire fraud on April 26, 2021, moots any error in omission of an entrapment instruction.[5]  First, there was insufficient evidence to support that conviction for

---

[3] *Abdelaziz* did include a footnote on the Fourth Circuit's opinion in *United States v. Lindberg*, 39 F.4th 151 (4th Cir. 2022), but only in addressing the defense argument that a different instructional error undermined the jury verdict on a separate tax count.  *See* 68 F.4th at 66 n.42.  The opinion did not address any alleged instructional error for failure to include an official act element.  Indeed, *Abdelaziz* did not even involve a public official, but instead an alleged attempt to bribe employees of private universities.

[4] The defense additionally contends, though it did not object specifically to this issue, that the Court's instruction that a "decision or action on" "did you qualify for a host community agreement[]" would be an official act" improperly had the effect of telling the jury that the alleged acts taken by the Chief constituted official acts as a matter of law.  *See Lindberg*, 39 F.4th at 159 (vacating convictions because court instructed "that the removal or replacement of a [S]enior [D]eputy [C]ommissioner by the [C]ommissioner would constitute an official act," and thereby "impermissibly took an element of the crime out of the hands of the jury and violated the defendant's Fifth and Sixth Amendment rights" (citation omitted)).

[5] The same analysis applies to the government's harmless error argument regarding the exclusion

5

reasons set forth *supra* II.  Second, in light of the instructional error set forth *infra* VI, the jury may have rendered a guilty verdict on Count 1 without finding O'Donovan's corrupt intent to commit *quid pro quo* bribery as contrasted to another uncharged offense – wire fraud through false statements to an informant or to O'Donovan's client.

Third, importantly, the conviction on Count 1 is independently invalid because of an insufficiency of proof – an issue that is raised on appeal.[6]  The alleged message from O'Donovan to Pollock, who by his own testimony had no knowledge at the time of O'Donovan's conversations with Buckley, "working this thing hard, just so you know my friend," did not "facilitate" and was not "in furtherance" of any bribery scheme in existence at that time.  *See United States v. Tavares*, 844 F.3d 46, 59 (1st Cir. 2016) (requiring that jurisdictional communication "must at least have some tendency to facilitate execution of the fraud").  Rather, it more logically applies to O'Donovan's overall work as a lawyer/consultant to Pollock as to matters Pollock does know about *e.g.* helping with his upcoming application to the CAC.

Fourth and finally, Buckley's deception of O'Donovan began well-before September 29, 2021.  The April 26, 2021 meeting was arranged by Buckley on the fictional premise that he had spoken with the Chief.  *See* Tr. 10/24:50, 10/25:24.  At that meeting, Buckley told O'Donovan that the Chief was not a fan of marijuana and hated being on the CAC, which led O'Donovan to fear he might not read the applications carefully.  *See* Tr. 10/25:26-27.  On September 14, 2021, Buckley relayed an FBI-scripted lie that the former Mayor of Medford

---

of defense witnesses.

[6] O'Donovan's appeal brief was tendered on March 29, 2024.

had approached the Chief on behalf of a competitor, thus reinforcing O'Donovan's fear of local influence adversely affecting a merit-based decisions.  *See* Tr. 10/24:67, 10/25:36.  Buckley went on to falsely tell O'Donovan that he had informed the Chief that he was going to be paid and that the Chief wanted to be sure Buckley would be paid, which then led to a discussion of how payment might be made.  *See* Tr. 10/25:39-42, 9/14:24-26.  In short, the entrapment here did not arise from a single lie, but an escalation of falsehoods culminating in the September 29, 2021 big lie.

The government's Opposition belies its overbroad theory of prosecution.  It is not a crime to pay a lobbyist.  Contrary to the government's suggestion, that is true even if the lobbyist is related to the public official, *see Percoco v. United States*, 598 U.S. 319, 331 (2023); even if, as in all lobbying, the goal is to "influence" a public official, *see, e.g.*, *United States v. McClain*, 934 F.2d 822, 831 (7th Cir. 1991); even if payment of the fee is contingent on success; and even if the payment is offered in cash.[7]

The government's factual recitation also skips over the crucial April 26, 2021 meeting during which O'Donovan repeatedly stated to Buckley[8] his "ask" of the Chief: "Sean O'Donovan represents Theory Wellness, . . . I don't know, but he tells me they're a great company ***alls I'm asking to do is give them a fair shake. . . . [A]ll I'm . . . asking you is to read that application for me.  Jack if it sucks, don't vote for 'em*** . . . .  Give him a nice fair shake, . . .

---

[7] The record reflects O'Donovan's understanding that Buckley wanted to be paid in cash.  *See* Tr. 9/14:25.  In any event, this case includes no allegation of tax fraud and no allegation that the payment of a third party in cash without far more constitutes bribery of the public official.

[8] While the government repeatedly calls Buckley a "Harvard finance administrator," Opposition 11, he was also the longtime Chief of Staff to the Somerville Mayor and a savvy participant in municipal politics.

if you don't like the application think it sucks . . . then O'Donovan would agree but I'm just asking that you give it a look cuz what we're afraid of Michael no one's gonna look at them. . . . So . . . if you can say to him, can you give it an honest look. . . . I think you'll like it Jack but if you don't, O'Donovan would understand anyway. . . . ***If Jack's score coming back and it sucks, then they didn't deserve it. . . . [A]lls you do is you're saying O'Donovan just asked me for a fair shake***. That'll get him to read it." Tr. 4/26:17-19. (emphasis added).

On September 14, 2021, O'Donovan repeated, "you . . . gotta say to Jack, . . . if O'Donovan's group doesn't get it because . . . they suck then he wouldn't want to put you in that spot. . . . But, . . . ***if he was gonna vote for them anyway and you're giving them a high vote that's what I'm looking for***." Tr. 9/14:25 (emphasis added). He later added, "[I]t's not only that we want Jack to advocate for us and give us a good vote because we think we deserve it, by the way. This is no tom foolery." Tr. 9/14:30. The government's attempt to disassociate this discussion from the April 26 meeting that immediately preceded it distorts its meaning.

In arguing predisposition, the government overlooks the fact that such predisposition must relate to the charged crime, here *quid pro quo* bribery. The government's argument regarding purported predisposition to, *e.g.*, commit tax fraud, is therefore beside the point. *See, e.g.*, *United States v. Joost*, 92 F.3d 7, 14 (1st Cir. 1996) ("[D]efendant was certainly predisposed to commit the crime of counterfeiting, but the question is whether he was predisposed to commit the crime of procuring and possessing a firearm . . . ."); *United States v. McGill*, 754 F.3d 452, 458 (7th Cir. 2014) (rejecting argument that defendant's "possession of child pornography [wa]s evidence of a predisposition to distribute").

V.  **EXCLUSION OF PROFFERED DEFENSE WITNESSES (ALL COUNTS)**

The government's contentions on this issue relate exclusively to the weight, not the admissibility, of the proffered testimony. In any event, the government's characterization of the evidence is unconvincing, and far from inevitable.

First, the government suggests that O'Donovan's "subjective belief in the merits of Theory's application" is not relevant, Opposition 13, but the leading authority cited by the government on this issue states that a "good-faith defense . . . asks the jury to determine what the defendant's actual, subjective beliefs may have been." *United States v. Simon*, 12 F.4th 1, 55 (1st Cir. 2021) (citation omitted). If O'Donovan subjectively believed that the offered payment to Buckley was only to ensure that the Chief voted on the merits of Theory's application, pro or con, that, by definition, would not be a corrupt and prohibited exchange of payment for official action.

Second, the government argues that the tendency of the evidence to show O'Donovan's lack of motive to commit bribery was undermined by the two-step process by which the Chief (and others) would submit an advisory vote and the Mayor would subsequently choose which companies to award licenses to. But the first stage was purely advisory. The Mayor held ultimate authority to disregard the other officials' votes. *See* Tr. 10/26:51-52. And part of the government's theory was that O'Donovan sought to bribe the Chief to "tell the Mayor that [Theory was] a good candidate." Opposition 10 (citation omitted). In these circumstances, evidence that O'Donovan believed the Mayor was highly likely to select Theory for one of the three licenses was indisputably relevant to his lack of motive.

Third and finally, the government's argument about the timing of O'Donovan's conversations with Sarcia does not affect their admissibility. While the government was free to argue that the Attorney General's investigation of Theory was an intervening event that may have caused O'Donovan to fear for his client's prospects, it cites no authority for the proposition that that rendered the evidence irrelevant or otherwise inadmissible. It is hardly an inferential leap for a jury to conclude that a series of three conversations including O'Donovan, the first occurring in July 2021, would impact his state of mind in September of that year. The cases cited by the government are inapposite. *See Simon*, 12 F.4th at 55 (holding that "the findings of [an] investigation" that the defendant had "never been privy to . . . could not have informed his subjective beliefs"); *United States v. Wilson*, 798 F.2d 509, 515 (1st Cir. 1986) (observing that "no foundational facts were presented to establish the relevancy of the 1982 buyout to [the defendant's] state of mind during the indictment years," 1979-80).[9] As to Count 1, the only count preceding the conversations, *see supra* 5-7.

## VI. MISREPRESENTATIONS AS BASIS FOR CONVICTION FOR HONEST SERVICES FRAUD (COUNTS 1 AND 2)

The government now concedes that the Court's instructions on this issue were erroneous. But, notably, the instructional error was expressly invited by the government. *See* Doc. 92 at 15 (government proposing instruction requiring "the misrepresentation or concealment of a material fact or matter"); Doc. 128 at 4-5 (defense objection). The government argues that the error was harmless because it merely added an element that the government was required to prove. But

---

[9] Mastrocola's testimony regarding an August 2021 conversation that did not include O'Donovan was offered to corroborate Sarcia's account that Carr repeatedly stated O'Donovan's client was one of the top three applicants during this timeframe.

10

that is not so.  Instead, the instructional error, which was at the heart of the Court's supplemental instructions, fundamentally altered the nature of the charge, introducing a separate basis for conviction that was both uncharged and legally invalid.  The government's focus on O'Donovan's misrepresentations to his client, both at trial and in its Opposition, supports a finding of prejudice.

Respectfully Submitted,
SEAN O'DONOVAN
By His Attorney,

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

Dated: March 29, 2024

### CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, March 29, 2024, a copy of the foregoing document has been served via email on AUSAs Kristina Barclay and Jonathan Jacobson.

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.
