# United States Court of Appeals
## For the First Circuit

No. 24-1200

UNITED STATES OF AMERICA,

Appellee,

v.

SEAN O'DONOVAN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Barron, Chief Judge,
Kayatta and Aframe, Circuit Judges.

Martin G. Weinberg, with whom Kimberly Homan was on brief,
for appellant.

David M. Lieberman, Public Integrity & Appellate Sections,
Criminal Division, United States Department of Justice, with whom
Joshua S. Levy, Acting United States Attorney, District of
Massachusetts, Donald C. Lockhart, Appellate Chief, Kristina E.
Barclay, Assistant United States Attorney, Nicole M. Argentieri,
Principal Deputy Assistant Attorney General, Lisa H. Miller,
Deputy Assistant Attorney General, and Jonathan E. Jacobson,
Public Integrity & Appellate Sections, Criminal Division, United
States Department of Justice, were on brief, for appellee.

January 15, 2025

**AFRAME**, **Circuit Judge**.   In the Commonwealth of Massachusetts, the recreational sale of marijuana is an over-a-billion-dollar-a-year industry.[1]  But a company seeking to participate in this lucrative market must clear certain hurdles. It must first obtain an operating license from the Commonwealth. See Mass. Gen. Laws ch. 94G, § 5 (2024).  And to do that, it must enter a "host community agreement" with the municipality in which it hopes to operate.  Id. § 3(d).  Municipalities may limit the number of available host community agreements, see id. § 3(a)(1)-(2), and this scarcity -- along with the profit potential these agreements unlock -- makes them quite valuable.

The City of Medford limits the number of host community agreements available for recreational dispensaries.  In 2019, Theory Wellness, an operator of marijuana dispensaries, contracted with defendant-appellant Sean O'Donovan, a local attorney, to provide government-relations assistance in support of its efforts to obtain one of these agreements.  The defendant instead sought to procure the agreement by attempting to bribe Medford's chief of police.  That choice led to the defendant's convictions on two counts of honest-services wire fraud, 18 U.S.C. §§ 1343, 1346, and one count of federal programs bribery, 18 U.S.C. § 666.

---

[1]   See Massachusetts Sees Record Marijuana Sales in 2023, CBS News (Feb. 6, 2024, 8:17 PM), https://www.cbsnews.com/boston/news/massachusetts-record-marijuana-sales-2023/ [https://perma.cc/UCF8-QVHZ].

The defendant appeals, challenging his convictions on multiple grounds.  We vacate the honest-services fraud convictions because the district court erroneously admitted the only evidence establishing each count's jurisdictional element.  We affirm, however, the federal programs bribery conviction.

## I.

We first address the sufficiency of the evidence for the honest-services fraud convictions.  The defendant argues, for reasons detailed below, that there was insufficient evidence to support several elements necessary for those convictions.  Because the defendant preserved his sufficiency challenges through a timely motion under Federal Rule of Criminal Procedure 29, we review them de novo, United States v. Falcón-Nieves, 79 F.4th 116, 123-24 (1st Cir. 2023) (citing United States v. Millán-Machuca, 991 F.3d 7, 17 (1st Cir. 2021)), taking the evidence "in the light most favorable to the verdict," United States v. Abbas, 100 F.4th 267, 274 (1st Cir. 2024) (quoting United States v. Facteau, 89 F.4th 1, 16 (1st Cir. 2023)).  Importantly, in doing so, we consider "all the evidence submitted to the jury, regardless of whether it was properly admitted." United States v. Acevedo, 882 F.3d 251, 258 (1st Cir. 2018) (quoting United States v. Diaz, 300 F.3d 66, 77 (1st Cir. 2002)).  We will sustain the convictions unless "no reasonable jury could have rendered" them.  United

States v. Paret-Ruiz, 567 F.3d 1, 5 (1st Cir. 2009) (quoting United States v. Nelson-Rodriguez, 319 F.3d 12, 27 (1st Cir. 2003)).

**A.**

In 2016, Massachusetts, by popular referendum, legalized the recreational use and sale of marijuana. Legislation subsequently enacted to regulate the marijuana-sales industry established a new state agency, known as the Cannabis Control Commission (the "Commission"), and authorized it to grant licenses for the private operation of recreational marijuana businesses. See Mass. Gen. Laws ch. 94G, §§ 4, 5 (2024).

Notwithstanding the Commission's ultimate licensing authority, municipalities, such as Medford, may also regulate the marijuana-sales industry in certain respects, including, as relevant here, by negotiating host community agreements with applicants seeking to operate within municipal limits. These agreements set "forth the conditions to have a marijuana establishment . . . located within the host community." Id. § 3(d)(1). Host community agreements are then subject to the Commission's review and approval. Id. §§ 3(d)(3), 4(a)(xxix).

In 2020, Medford revised a local zoning ordinance to permit the operation of up to three recreational marijuana-sales businesses within the City. It also established, by separate ordinance, a Cannabis Advisory Committee (the "Committee") to evaluate applicants seeking to obtain host community agreements.

The five-member Committee, which included Medford's police chief, John Buckley,[2] was tasked with reviewing applications for host community agreements, ranking those applications based on factors described in the ordinance, and submitting its rankings to Medford's mayor, Breanna Lungo-Koehn (the "Mayor"), for a final decision.

The Committee first convened on February 11, 2021. By that time, Theory Wellness had operated marijuana dispensaries in Massachusetts for more than four years and had long considered expanding to Medford. In January 2019, Theory Wellness engaged the defendant, an attorney experienced working in Medford, for government-affairs assistance in obtaining a host community agreement. Under their contract, Theory Wellness agreed to pay the defendant a monthly retainer of $7,500 until it entered a host community agreement with Medford and, thereafter, to pay the defendant in perpetuity one percent of its future Medford profits. Theory Wellness's chief executive officer, Brandon Pollock, estimated that one percent of profits from the Medford dispensary would approximate $100,000 to $200,000 annually.

When Theory Wellness engaged the defendant, Pollock anticipated that it would obtain a host community agreement by the

---

[2] We refer to John Buckley as "the Chief" to distinguish him from his brother, Michael Buckley, to whom we refer by their common surname.

middle of 2019. But Medford moved more slowly than expected. For over a year after Theory Wellness retained the defendant -- but before Medford finalized the ordinances authorizing the issuance of host community agreements -- the defendant assisted Theory Wellness primarily by monitoring city council hearings and advocating Theory Wellness's interests. The defendant and Pollock communicated often during this period. After Medford adopted the ordinances in 2020, the defendant began assisting Theory Wellness to prepare its application for a host community agreement.

On February 10, 2021 -- the day before the Committee's first meeting -- the defendant texted the Chief's brother, Michael Buckley, asking to talk. The defendant knew Buckley because the two men had grown up together in Somerville, Massachusetts, and later crossed paths professionally while both were working in Somerville politics. After a brief phone conversation, the defendant proposed to meet in a local church parking lot. At that meeting, the defendant told Buckley that he was involved with a company looking to open a marijuana dispensary in Medford and offered Buckley $25,000 to ask the Chief to give the company's forthcoming application for a host community agreement "a second look." Buckley was not a lobbyist, knew nothing about Medford's marijuana laws, and was unaware of his brother's role on the Committee. Buckley provided an essentially noncommittal response

to the defendant's proposal.  He later testified that he never considered agreeing to the defendant's offer.

Buckley also testified that he was upset by the defendant's offer, which he considered "definitely wrong," and decided to report it to the Chief.  The following evening, Buckley called the Chief and told him about the defendant's offer.  The Chief instructed Buckley to stop speaking, hung up on him, and contacted the Federal Bureau of Investigation ("FBI").  An FBI agent subsequently called Buckley, who agreed to assist in investigating the defendant.[3]  There followed a series of video-and-audio-recorded meetings between the defendant and Buckley.  These recordings were played at the defendant's trial.

The first recorded meeting occurred on February 22, 2021, in the same church parking lot as the prior meeting.  After a brief discussion about local politics, the defendant explained the Committee's formula for scoring host-community-agreement applications, including his view that the criteria permitted Committee members to tailor their score "to help a particular candidate."  The defendant believed that inclusion of this feature was a deliberate choice, stating that, "if you were [the Mayor],

_____

[3]    The Chief was isolated from the FBI's investigation to permit him to continue to discharge his duties on the Committee. He remained unaware of the identity of the defendant's client throughout the selection process.

you'd set it up that way too," presumably to ensure influence over which companies were selected.

The defendant assured Buckley that Theory Wellness was a strong applicant but stated that he wanted to "try to get the edge" because he knew "everybody's trying to get it."  The defendant explained that the Chief "ha[d] the Mayor's ear" and that "she like[d] him," such that his recommendation favoring Theory Wellness would carry great weight.  The defendant equivocated, however, about whether and how to approach the Chief, stating that he did not want to do so if the Chief disliked him or if it would "put [the Chief] in a bad spot."  He also expressed concern that communicating with the Chief could negatively affect Theory Wellness's chances at securing a host community agreement.

Thereafter, the defendant and Buckley briefly discussed the amount and manner of payment.  The defendant explained that, if Theory Wellness obtained a host community agreement, he could guarantee Buckley at least $25,000, and probably $50,000, payable pursuant to a sham consulting agreement or as cash under the table.  He then returned to specific requests for the Chief, including "scor[ing Theory Wellness] high" and "whisper[ing]" in the Mayor's ear that it was a good company.  Again, the defendant expressed trepidation about approaching the Chief, admonishing Buckley to "[j]ust be careful" because "I don't want [the Chief] to hit me."

Buckley and the defendant's next meeting took place approximately two months later, on April 26, 2021. Prior to the meeting, Buckley texted the defendant, telling him, falsely, that he had spoken to the Chief. When the two men met, Buckley reported, again falsely, that the Chief had said that he hated being on the Committee, but the Mayor needed him to serve. The defendant responded that this was because the Chief was "the only one the Mayor can fucking trust."

Buckley then told the defendant that he had talked to the Chief about how "there could be something good for us and uh he didn't say no. He didn't hit me[.]" Upon hearing this report, the defendant thanked Buckley. He then asked Buckley for his thoughts on how to approach the Chief and sought assurance that the Chief was "at least . . . not adverse to it," which Buckley provided. The defendant responded that he knew that the Chief "was as straight and honest as they came" but also knew that all three men -- O'Donovan, Buckley, and the Chief -- understood politics. And, the defendant explained, for the selection process, "politics [wa]s everything." It was "fucking crazy," he opined, to think that the Mayor "[wa]sn't going to pick some people that she like[d]." He gestured in the direction of Somerville's City Hall and stated, "you know what goes into it" -- a reference to Buckley's prior tenure working for a Somerville mayor -- "[y]ou paint the picture so you can hide behind the fuckin' curtain [and]

. . . do whatever the fuck you want," likening the process to "put[ting] on the facade."  Continuing in this vein, the defendant stated that the Mayor trusted the Chief and that "[w]hoever he gives the nod to" would "look great in her eyes."

Buckley asked the defendant how he should respond if the Chief "reache[d] out to [him] again" about the proposal.  The defendant talked through several formulations of a script that, while varying in details, consistently included his desire that the Chief give Theory Wellness's application "a good look" or "a nice fair shake"; his concern that "no one[ would] look at" the applications; his confidence that, if the Chief were to look at Theory Wellness's application, he would "love it"; his continued apprehension about a negative response from the Chief; and his assurances that he would understand if the Chief's score "c[ame] back and it suck[ed], [because] then" Theory Wellness would not have "deserve[d] it."

That evening, the defendant sent an iMessage to Pollock, stating that he was "[w]orking this thing hard just so you know my friend."  Pollock was at his home in Boxford, Massachusetts, when he received the iMessage from the defendant, who was also in Massachusetts.  Pollock did not ask the defendant what he meant by the iMessage, and the defendant did not elaborate.  Theory Wellness submitted its application for a host community agreement the next day and, throughout the spring and summer of 2021, Theory Wellness

made presentations to the Committee and conducted public outreach to support its application.  The defendant and Buckley were not in contact during this period.

On August 26, 2021, while Theory Wellness's application was pending before the Committee, the Massachusetts Attorney General announced that Theory Wellness had paid a $300,000 settlement to resolve an investigation into its failure to pay certain overtime wages.  Theory Wellness received negative news coverage after the settlement.  Pollock and the defendant were concerned about the potential impact of the negative coverage on Theory Wellness's application.

Two days after the Attorney General's settlement announcement, the defendant texted Buckley, "[i]t's time." Buckley, at the FBI's instruction, asked the defendant for direction.  The defendant wrote that he wanted Buckley to tell the Chief "to vote Theory #1 as they are the best candidate for Medford legitimately."  Buckley agreed to do so, and the two men arranged to meet the following week.

That meeting occurred on September 14, 2021.  Buckley told the defendant, falsely and at the FBI's direction, that the Chief had said that a former Medford mayor had recently lobbied him for a different candidate.  The defendant stated that the former mayor "should not be doing that" and contrasted the activity with his own behavior, which he described as "being smart" by going

"to [the Chief's] brother."  Buckley also mentioned Theory Wellness's settlement with the Massachusetts Attorney General over the failure to pay overtime.  The defendant responded that Theory Wellness had sent the Committee a letter explaining the resolution of the wage investigation.

Buckley then asked "about the money."  He told the defendant that the Chief knew Buckley was "going to get paid," and that the Chief wanted to "help" Buckley with his fictitious "financial issues."  The two men agreed that Buckley would be paid in cash -- because, as the defendant stated, "there'll be no trace" of a cash payment -- but the defendant explained that first he would have to get the money from Theory Wellness.  When discussing this payment, the defendant again advised Buckley to be careful, stating that he did not want the Chief "coming after [him] saying, you're fucking calling my brother to get to me."  He also asked Buckley to tell the Chief that, if Theory Wellness's application "suck[ed]," the defendant "wouldn't want to put [the Chief] in that spot."

After a brief discussion of other topics, the defendant reiterated that he wanted the Chief, not only to give Theory Wellness "a good vote," but also "to tell the Mayor that it's a good candidate."  He emphasized the Chief's importance in the selection process and the weight that his opinion would carry with the Mayor.  And, noting the possibility that the Mayor could lose

her reelection bid, the defendant stated that "[w]e need him to get her to make a fucking decision. She's taking forever." He then summarized the status of the selection process, including his belief that the Committee's vote was in the offing. He concluded by telling Buckley, "there's going to be some inside angles here, coming in from people over there," which, the defendant stated, was the reason "why I'm talking to you."

Theory Wellness was scheduled to appear before the Committee on September 20, 2021, and the defendant and Buckley continued to correspond by text message during the next week regarding the status of its application. Among other things, the defendant requested that Buckley ask the Chief to inquire at the Committee meeting about Theory Wellness's security plan; he also sent Buckley positive media coverage of Theory Wellness. Around this time, the defendant called Pollock and recommended that Theory Wellness "hire the brother of the chief of police as a security consultant." Pollock's response was "[s]omewhat dismissive," and Theory Wellness did not hire Buckley.

On September 27, 2021, Buckley texted the defendant, asking to meet. Buckley and the defendant met two days later. At the meeting, Buckley told the defendant, falsely, that the Chief had not ranked Theory Wellness in the top three because of the Attorney General's wage investigation but, because Buckley was "getting paid," the Chief would change his vote to rank Theory

Wellness first. The defendant responded "[b]eautiful" and "[p]erfect" and gave Buckley a fist bump. But, Buckley explained, the Chief would not change his vote without proof that Buckley would be paid. Buckley asked the defendant if he could provide a portion of the agreed-upon payment in advance to reassure the Chief. After some discussion, the defendant and Buckley agreed that the defendant would send Buckley an email confirming their arrangement and would see whether he could arrange for a partial advance payment.

The defendant called Buckley later that day and told him that Theory Wellness was not willing to make an advance payment. In fact, the defendant had not spoken to Pollock about the proposed arrangement. The defendant then stated that he could personally advance Buckley $5,000 through a loan to be forgiven after Theory Wellness obtained a host community agreement. Buckley said that he would consider the offer. The next day, the two men exchanged text messages in which Buckley agreed to the arrangement, and the defendant said he would give Buckley a $5,000 check that Tuesday. The defendant did not pay Buckley as planned; rather, on October 5, 2021, he texted Buckley that he had run out of checks and was waiting for a check order to arrive.

On October 7, 2021, the defendant sent an iMessage to Pollock seeking "permission to hire a consultant for 25K," payable "upon success." Both the defendant and Pollock were in

Massachusetts at the time. From their prior discussion, Pollock understood that the defendant was proposing to hire Buckley. Pollock called the defendant and told him that Theory Wellness was "not interested in hiring the consultant, [that] it made [him] uncomfortable," and that Theory Wellness was "an above-board company."

The defendant met with Buckley later that day. At the meeting, the defendant changed the offer. He explained that because of Theory Wellness's purported concern that Buckley paying taxes on the $25,000 would create a paper trail, it would instead funnel a $15,000 under-the-table cash payment to Buckley through the defendant. This statement was false; Pollock had expressed no such concern and had not agreed to pay Buckley. Buckley agreed to the new arrangement with the defendant. As Buckley understood it, the expectation was that he would not pay taxes on the $15,000 payment.

At the two men's final meeting, on October 11, 2021, the defendant paid Buckley a $2,000 advance in cash, explaining, falsely, that Theory Wellness did not want to front $5,000 because it was concerned that the Chief might have "a change of heart." The defendant assured Buckley, however, that the $15,000 was "locked and loaded" to be paid to Buckley after Theory Wellness's successful negotiation of a host community agreement. The defendant remarked that he thought the Chief probably liked Theory

Wellness's application because he had heard that the Mayor did, but cautioned Buckley, stating, "we know government, right? . . . . [A]nything . . . happening today changes in the morning when you wake up."

Two days later, the Committee released its rankings. Theory Wellness received the top ranking and, thereafter, began to negotiate a host community agreement with the Mayor. The defendant and Buckley spoke one more time after the release of the rankings, on October 21, 2021, when the defendant asked Buckley to arrange for the Chief to give Theory Wellness "a little push" in its negotiations with the Mayor. The defendant sent several text messages to Buckley following up on this request. Buckley deflected the first message, stating that he had been unable to reach the Chief, and thereafter did not respond. Theory Wellness ultimately executed a host community agreement with Medford in January 2022.

A grand jury indicted the defendant on two counts of honest-services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and one count of federal programs bribery, in violation of 18 U.S.C. § 666. A petit jury convicted the defendant on all three counts, and the district court subsequently sentenced him to concurrent twenty-four-month terms of imprisonment. The defendant timely appealed.

**B.**

The wire fraud statute, 18 U.S.C. § 1343, criminalizes the use of interstate wires to further a scheme or artifice to defraud a victim of money, property or, as provided by § 1346, the intangible right to honest services. 18 U.S.C. §§ 1343, 1346; see Ciminelli v. United States, 598 U.S. 306, 312-13 (2023). The defendant asserts three challenges to the sufficiency of the evidence supporting his § 1346 convictions.

The first and second challenges impugn only count one, which is predicated on the defendant's April 26 iMessage to Pollock, stating that he was "[w]orking this thing hard just so you know my friend." The defendant contends that there was no evidence of a quid pro quo bribery scheme as of that date, and that, even if there were, his iMessage to Pollock did not further the scheme. The third challenge, which concerns both § 1346 counts, alleges an absence of record evidence that the April 26 iMessage and another iMessage the defendant sent to Pollock on October 7, 2021, upon which count two is predicated, crossed state lines.

**1.**

We begin with necessary background on the scope of § 1346 fraud. Because of the "disjunctive phrasing" of the mail and wire fraud statutes, Skilling v. United States, 561 U.S. 358, 400 (2010), which extend to "any scheme or artifice to defraud, or for

obtaining money or property by means of false or fraudulent pretenses, representations, or promises," 18 U.S.C. § 1343 (emphasis added); see 18 U.S.C. § 1341 (same in the mail fraud context), the federal courts of appeals had long considered §§ 1341 and 1343 to encompass not only fraudulent schemes to obtain money or property, but also schemes to defraud victims of certain intangible rights, see McNally v. United States, 483 U.S. 350, 365 & n.5 (1987) (Stevens, J., dissenting) (explaining that "[e]very court to consider the matter" prior to McNally "had so held"); Skilling, 561 U.S. at 401 ("[B]y 1982, all Courts of Appeals had embraced the honest-services theory of fraud . . . ."). In McNally, however, the Supreme Court held that the phrase "any scheme or artifice to defraud" was "limited in scope to the protection of property rights," 483 U.S. at 360 (construing 18 U.S.C. § 1341), thereby "stopp[ing] the development of the intangible-rights doctrine in its tracks," Skilling, 561 U.S. at 401.

The next year, Congress enacted 18 U.S.C. § 1346 "specifically to cover one of the intangible rights that lower courts had protected prior to McNally: the intangible right of honest services." Skilling, 561 U.S. at 402 (quoting Cleveland v. United States, 531 U.S. 12, 19–20 (2000)) (quotation marks and ellipsis omitted). Section 1346 provided then, as now, that "the term 'scheme or artifice to defraud'" under the mail and wire fraud

statutes "includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. But uncertainty regarding the scope of the mail and wire fraud statutes remained. Section 1346 did not define "the intangible right of honest services." See id. And, although § 1346's enactment "on the heels of McNally" and its "us[e of] that decision's terminology" made clear "that Congress intended § 1346 to refer to and incorporate the honest-services doctrine recognized . . . before McNally," Skilling, 561 U.S. at 404 (citing McNally, 483 U.S. at 355, 362), this provided little clarity, as "honest-services decisions preceding McNally" were in "considerable disarray" insofar as they extended beyond the "core category" of "bribery and kickback schemes," id. at 405.

The Court resolved the uncertainty in Skilling. See 561 U.S. at 403-09. In rejecting a vagueness challenge to § 1346, the Court "look[ed] to the doctrine developed in pre-McNally cases . . . to ascertain the meaning of the phrase 'the intangible right of honest services.'" Id. at 404 (quoting 18 U.S.C. § 1346). "[T]o preserve what Congress certainly intended the statute to cover," while avoiding unconstitutional vagueness, it "pare[d] that body of precedent down to its core." Id. "In the main," the Court explained, "the pre-McNally cases involved fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived."

Id.; see also id. at 407-08 (collecting cases).  And, the Court concluded, when "[i]nterpreted to encompass only bribery and kickback schemes" that formed the core of pre-McNally case law, § 1346 was "not unconstitutionally vague."  Id. at 412.

The defendant appropriately does not dispute that paying a relative of a public official in exchange for that official performing an official act may amount to a § 1346 bribery scheme.[4] Instead, the defendant contends that count one fails because there was no evidence that he intended to offer a bribe to the Chief when he sent Pollock the April 26 iMessage.  Because bribery requires "a specific intent to give or receive something of value in exchange for an official act," United States v. Fernandez, 722 F.3d 1, 19 (1st Cir. 2013) (quoting United States v. Sun-Diamond Growers of Cal., 526 U.S. 398, 404-05 (1999) (construing 18 U.S.C. § 201)), he submits that an absence of such evidence precludes his conviction on count one.[5]

---

[4]    The federal courts of appeals consistently have held that such payments may form the basis of a § 1346 scheme.  See, e.g., Ryan v. United States, 688 F.3d 845, 850 (7th Cir. 2012) (financial benefits to various family members of official); see also United States v. DeMizio, 741 F.3d 373, 381-82 (2d Cir. 2014) (collecting cases in which kickbacks were directed to "family, friends, or others loyal to the defendant").

[5]    The defendant does not dispute the sufficiency of the evidence to support the jury's finding of a bribery scheme as of October 7, 2021, when he sent the iMessage to Pollock upon which count two is predicated.  He argues, however, that by then he had been entrapped, a contention that, due to our vacating his § 1346 convictions on other grounds, we consider below in the context of

But the evidence that the defendant had devised a scheme to bribe the Chief when he sent the April 26 iMessage to Pollock is stronger than he acknowledges.  When Buckley told the defendant at the April 26 meeting that he had informed the Chief that "there could be something good for us," the defendant did not respond -- as he argues now -- that the Chief was not supposed to know about the defendant's offer to pay Buckley.  Rather, the defendant sought confirmation that the Chief was "not adverse to it" and, once Buckley so assured him, he expressed appreciation to Buckley for "broach[ing] it with [the Chief]."  The defendant's reaction suggests that he was pleased that Buckley told the Chief that he had offered something of value in exchange for the Chief's help with Theory Wellness's application -- in other words, his reaction suggests that he wanted the Chief to know that he had offered a bribe.

The defendant views the conversation differently, asserting that he was merely praising Buckley for lobbying on Theory Wellness's behalf.  But the jury was free to reject the defendant's cramped interpretation of the conversation in favor of the government's view that he had intended to offer a bribe.  <u>See</u> <u>United States</u> v. <u>Allinson</u>, 27 F.4th 913, 925 (3d Cir. 2022) ("[B]ribery can occur through 'knowing winks and nods.'" (quoting

---

his conviction for § 666 bribery.

Evans v. United States, 504 U.S. 255, 274 (1992) (Kennedy, J., concurring in part and concurring in the judgment))).  As of April 26, 2021, the defendant had: (1) offered Buckley $25,000, ostensibly to talk to the Chief, and suggested that he could probably provide twice that amount, even though Buckley knew nothing about the marijuana industry and was not a lobbyist; (2) requested that, rather than talk by phone, Buckley meet him in a church parking lot when it likely would be empty; (3) repeatedly expressed trepidation about Buckley approaching the Chief; (4) indicated that he had not told his client about the scheme, explaining to Buckley that "they don't even wanna know about that," "you know what I mean"; and (5) expressed his thanks after Buckley told him the Chief knew "there could be something good for us and . . . didn't say no."  While the defendant casts those facts as consonant with a lawful lobbying effort, a reasonable jury could have inferred that the defendant had proposed a bribery scheme.

The defendant separately argues that the evidence on count one was insufficient to sustain his conviction because it did not permit the jury to conclude that he believed the Chief had agreed to participate in the charged scheme.  We need not resolve that question because the defendant's liability under § 1346 does not depend on whether he believed that the Chief had accepted his bribe offer.  See United States v. Potter, 463 F.3d 9, 16-17 (1st Cir. 2006).  Rather, as we explained in Potter, § 1346 allows

conviction of a defendant who has devised the scheme and sent an interstate wire "for purposes of executing" it, so long as the scheme contemplates a quid pro quo exchange between the defendant and the public official.[6] Id. at 17.

The defendant discounts Potter as "a pre-Skilling § 1346 case." But Skilling did not undermine this aspect of Potter: nothing in "the bribe-and-kickback core of the pre-McNally case law" to which Skilling limited § 1346 suggests that a defendant who has offered a bribe is exempt from criminal liability unless and until he believes that the official has agreed to the illicit exchange. Skilling, 561 U.S. at 409. Rather, federal bribery statutes, from which § 1346 "draws content," have long permitted conviction of the offeror for merely offering the bribe. Id. at 412-13 (citing, inter alia, 18 U.S.C. §§ 201(b), 666(a)(2)); see, e.g., United States v. Jennings, 160 F.3d 1006, 1016-17 (4th Cir. 1998) ("Under § 666(a)(2) the intent of the payor, not the intent

---

[6]     Other courts of appeals have reached the same conclusion. See United States v. Shen Zhen New World I, LLC, 115 F.4th 1167, 1177 (9th Cir. 2024) ("When the defendant is the bribe-giver, . . . '[t]he crime of offering a bribe is completed when a defendant expresses an ability and a desire to pay the bribe.'" (quoting United States v. Rasco, 853 F.2d 501, 505 (7th Cir. 1988))); United States v. Suhl, 885 F.3d 1106, 1113 (8th Cir. 2018) ("A payor defendant completes the crime[] of honest-services . . . bribery as soon as he gives or offers payment in exchange for an official act . . . ."); United States v. Ring, 706 F.3d 460, 467 (D.C. Cir. 2013) ("[A] defendant may be [found] guilty of honest-services bribery where he offers an official something of value with a specific intent to effect a quid pro quo . . . .").

of the payee, is determinative of whether a crime occurred."); United States v. Johnson, 621 F.2d 1073, 1076 (10th Cir. 1980) ("It is not necessary to show that the official accepted the bribe [to be liable under § 201(b)(1)] . . . . [S]o long as the money is offered with corrupt intent, the official does not necessarily even need to be aware of the bribe." (citation omitted)); United States v. Jacobs, 431 F.2d 754, 760 (2d Cir. 1970) ("It is . . . perfectly plain that the crime [of § 201(b)(1) bribery] is consummated irrespective of whether an offer of an amount of money to influence an official's behavior is accepted by the official.").

The cases cited by the defendant are inapposite, as they concern either § 1346 convictions for taking (rather than offering) bribes, see United States v. Terry, 707 F.3d 607, 611 (6th Cir. 2013); United States v. McDonough, 727 F.3d 143, 152 (1st Cir. 2013), or the difference between bribes and gratuities, see Sun-Diamond, 526 U.S. at 404-05; United States v. Correia, 55 F.4th 12, 31 (1st Cir. 2022); Fernandez, 722 F.3d at 19.[7] The federal bribery statute criminalizes the offering and taking of

_____

[7] One decision cannot be classified so neatly. In United States v. Reichberg, 5 F.4th 233, 247 (2d Cir. 2023), the court of appeals stated the standard applicable for the receipt of bribes when reviewing jury instructions charging a defendant who had offered a bribe. In doing so, it cited United States v. Silver, 948 F.3d 538 (2d Cir. 2020), which, unlike Reichberg, involved the prosecution of a public official for accepting bribes. See Reichberg, 5 F.4th at 246-47. But whatever that court of appeals may have intended by that statement, it does not direct our disposition of this appeal.

bribes, but only the latter requires the parties to reach a quid pro quo agreement. Compare 18 U.S.C. § 201(b)(1) (criminalizing, inter alia, "corruptly giv[ing] . . . anything of value . . . with intent . . . to influence any official act"), with id. § 201(b)(2) (criminalizing, inter alia, "corruptly . . . agree[ing] to receive or accept anything of value . . . in return for . . . being influenced in the performance of any official act"). See also Ring, 706 F.3d at 467 ("The bribery statute expressly criminalizes a mere 'offer' of something of value with the intent to influence an official act . . . . That the official need not accept that offer for the act of bribery to be complete is evident from the structure of the statute . . . ."). Terry and McDonough, which concerned the taking of bribes, have no bearing on the defendant's liability for offering one. See Terry, 707 F.3d at 613 ("So long as a public official agrees that payments will influence an official act, that suffices."); McDonough, 727 F.3d at 152 ("[B]ecause '[t]he illegal conduct [for a public official] is taking or agreeing to take money for a promise to act in a certain way,' . . . the government must prove that an agreement for a quid pro quo existed; that is, the receipt of something of value 'in exchange for' an official act." (first quoting United States v. Brewster, 408 U.S. 501, 526 (1972); and then quoting Sun-Diamond, 526 U.S. at 404-05)).

The defendant's reliance on gratuity cases is likewise misplaced. The three that he cites articulate the principle that a gratuity is paid as a gift or reward for past action, while a bribe is intended to form part of a quid pro quo exchange for future action. See Sun-Diamond, 526 U.S. at 404-05; Correia, 55 F.4th at 31; Fernandez, 722 F.3d at 19. None suggest -- as the defendant argues -- that completion of the quid pro quo (or a perceived agreement to complete it) is necessary to impose liability on the offeror. Rather, "in the context of a bribe payor[,] . . . the offer of the bribe is the violation of the statute . . . [, and] the quid pro quo need not be 'fully executed for the act to be considered a bribe.'" Ring, 706 F.3d at 467 (quoting United States v. Orenuga, 430 F.3d 1158, 1166 (D.C. Cir. 2005)).

At bottom, the defendant's arguments run contrary to the wire fraud statute, which "punishes the scheme, not its success." Pasquantino v. United States, 544 U.S. 349, 371 (2005) (quoting United States v. Pierce, 224 F.3d 158, 166 (2d Cir. 2000)); see also Ring, 706 F.3d at 467. The defendant devised a scheme to bribe the Chief through his brother in exchange for the Chief's help in securing a host community agreement for Theory Wellness, thereby defrauding Medford of its police chief's honest services. And he had offered that bribe by the time he sent the April 26 iMessage to Pollock, on which count one is based. Whether the

defendant believed the Chief had accepted that offer does not alter his liability.

## 2.

The defendant next contends that his conviction on count one cannot stand because his April 26 iMessage to Pollock, stating that he was "[w]orking this thing hard just so you know my friend" did not further the charged fraud. We disagree.

The wire fraud statute "does not purport to reach all frauds." United States v. Tavares, 844 F.3d 46, 58 (1st Cir. 2016) (quoting Schmuck v. United States, 489 U.S. 705, 710 (1989)) (addressing 18 U.S.C. § 1341). Rather, it extends only to those in which an interstate wire was sent "in furtherance of the alleged scheme." United States v. Simon, 12 F.4th 1, 33 (1st Cir. 2021) (citing United States v. Arif, 897 F.3d 1, 9 (1st Cir. 2018)). The in-furtherance requirement has been generously construed by the Supreme Court, see Schmuck, 489 U.S. at 710-15, and thus "is to be broadly read and applied," United States v. Hebshie, 549 F.3d 30, 36 (1st Cir. 2008) (citing United States v. Koen, 982 F.2d 1101, 1107 (7th Cir. 1992)). We have found it satisfied where "the perpetuation [of a relationship] was essential to the scheme and the [charged communication] was incidental to that perpetuation." United States v. Cacho-Bonilla, 404 F.3d 84, 91 (1st Cir. 2005); see also Hebshie, 549 F.3d at 37-38 (similar).

Although the connection between the April 26 iMessage and the defendant's bribery scheme is "thin," it is nevertheless sufficient under the in-furtherance requirement's broad standard. Cacho-Bonilla, 404 F.3d at 90. The defendant's goal in bribing the Chief was to secure a large and perpetual annual payment from Theory Wellness by seeing to it that Theory Wellness obtained a host community agreement. To achieve this benefit, the defendant needed for Theory Wellness to persist in its efforts, provide additional resources that he thought necessary, and ultimately perform its duties pursuant to the agreement, which was hardly ironclad. Thus, even accepting the defendant's characterization of the iMessage as a routine reassurance that he was pursuing Theory Wellness's interests, a jury could permissibly conclude that it furthered the scheme. Just as performance matters to the maintenance of a business relationship, so too does client management. Even though the April 26 iMessage may only have been a minor or incidental part of the defendant's efforts to cultivate his relationship with Pollock and Theory Wellness, that is enough to meet the in-furtherance requirement. See id. at 90-91.

### 3.

The defendant's final sufficiency challenge alleges a lack of evidence that the iMessages underpinning counts one and two were "transmitted . . . in interstate or foreign commerce." 18 U.S.C. § 1343. Satisfaction of the interstate-commerce element

requires proof that the charged communications "actual[ly] cross[ed] . . . a state or national border." <u>United States</u> v. <u>Lewis</u>, 554 F.3d 208, 213-14 (1st Cir. 2009). The defendant and Pollock were both in Massachusetts when the defendant sent the two charged iMessages, and, at trial, there was no direct evidence that the iMessages had in fact crossed state lines.[8] An FBI digital forensics examiner testified, however, that the two iMessages were transmitted over the Internet, and the government submits that, under our decisions in <u>Lewis</u> and <u>United States</u> v. <u>Carroll</u>, 105 F.3d 740 (1st Cir. 1997), such testimony is sufficient to prove that the communications were transmitted in interstate commerce.

There is a circuit split on the issue. <u>See</u> <u>United States</u> v. <u>Haas</u>, 37 F.4th 1256, 1264-65 (7th Cir. 2022). One position, prevailing in the Ninth and Tenth Circuits, declines to assume that "use of the [I]nternet, 'standing alone,'" is sufficient "to establish that a web transmission 'traveled across state lines in interstate commerce.'" <u>United States</u> v. <u>Kieffer</u>, 681 F.3d 1143, 1153 (10th Cir. 2012) (quoting <u>United States</u> v. <u>Schaefer</u>, 501 F.3d 1197, 1200-01 (10th Cir. 2007)) (construing 18 U.S.C. § 1343); <u>see</u>

---

[8] The government called an employee from a local Apple store who testified that Apple's servers, with which all iMessages interact, are located outside of Massachusetts. The district court, however, struck that testimony for lack of personal knowledge. Purported business records from Apple offered by the government, but not in the materials before us, also appear to have contained information regarding the location of Apple's servers. The district court excluded these too.

also <u>United States</u> v. <u>Wright</u>, 625 F.3d 583, 590-95 (9th Cir. 2010)
(construing 18 U.S.C. § 2252A(a)(1), which required transportation
"in interstate or foreign commerce").

The other view -- that evidence of transmission over the
Internet is per se sufficient to prove transmission in interstate
commerce -- was inaugurated by this Court in <u>Carroll</u> and has since
been adopted by the Third and Fifth Circuits. <u>See</u> <u>Carroll</u>, 105
F.3d at 742 (construing 18 U.S.C. § 2251(a), which required
transportation "in interstate or foreign commerce"); <u>United States</u>
v. <u>MacEwan</u>, 445 F.3d 237, 244 (3d Cir. 2006) (construing 18 U.S.C.
§ 2252A(a)(2)(B), which required the same); <u>United States</u> v.
<u>Runyan</u>, 290 F.3d 223, 239 (5th Cir. 2002) (construing 18 U.S.C.
§ 2251, which also required the same).[9] We reaffirmed <u>Carroll</u>'s
holding in <u>Lewis</u>, concluding, after surveying our case law, that
the government had satisfied the jurisdictional element of 18
U.S.C. § 2252(a)(2) "when it introduced evidence that [the
defendant] received images that were transported over the
Internet."[10]  <u>Lewis</u>, 554 F.3d at 215; <u>see also</u> <u>United States</u> v.

_____

[9]    The Second and Fourth Circuits have held similarly in
unpublished opinions. <u>See</u> <u>United States</u> v. <u>Harris</u>, 548 F. App'x
679, 682 (2d Cir. 2013) (construing 18 U.S.C. § 2252(a)(2), which
required transportation "in interstate or foreign commerce");
<u>United States</u> v. <u>White</u>, 2 F. App'x 295, 298 (4th Cir. 2001)
(construing 18 U.S.C. § 2252A(a)(5)(B), which required possession
of child-pornography images shipped or transported "in interstate
or foreign commerce").

[10]    At the time, § 2252(a)(2) encompassed the knowing

<u>Pires</u>, 642 F.3d 1, 9–10 (1st Cir. 2011) (applying <u>Lewis</u>'s holding to a § 2252(a)(2) charge where a video file was transmitted over the Internet).

The defendant contends that <u>Lewis</u> and <u>Carroll</u> do not control here, noting that no federal court of appeals has held that use of the Internet alone suffices to satisfy the jurisdictional element of the wire fraud statute.[11] But we see no reason to distinguish the wire fraud statute from the statutes at issue in <u>Lewis</u> and <u>Carroll</u>. We recognized the close resemblance

---

receipt or distribution of prohibited material "shipped or transported in interstate or foreign commerce." <u>Lewis</u>, 554 F.3d at 212 n.4 (quoting the statute). The statute has since been broadened to cover receipt or distribution of such material "shipped or transported in or affecting interstate or foreign commerce," 18 U.S.C. § 2252(a)(1), obviating the need for proof of interstate transit, <u>see</u> <u>Circuit City Stores, Inc.</u> v. <u>Adams</u>, 532 U.S. 105, 115 (2001) ("[T]he word involving, like affecting, signals an intent to exercise Congress' commerce power to the full. Unlike those phrases, however, the general words in commerce and the specific phrase engaged in commerce are understood to have a more limited reach." (quotation marks and citations omitted)).

[11] We are aware of two courts of appeals' decisions addressing the question. The Tenth Circuit considered proof of use of the Internet alone insufficient to establish the interstate-commerce element of a § 1343 conviction. <u>See</u> <u>Kieffer</u>, 681 F.3d at 1154–55. The Fifth Circuit seems to have arrived at the same conclusion in an unpublished opinion, <u>United States</u> v. <u>Biyiklioglu</u>, 652 F. App'x 274, 280–82 (5th Cir. 2016), notwithstanding and without mentioning its prior holding in <u>Runyan</u> that use of the Internet constitutes transportation in interstate commerce, <u>see</u> <u>Runyan</u>, 290 F.3d at 239. Whether that conclusion was essential to <u>Biyiklioglu</u> is not clear. The case appears to have turned on the government's failure to identify wires for certain counts rather than its failure to prove that those wires, if identified, were transmitted in interstate commerce. <u>See</u> <u>Biyiklioglu</u>, 652 F. App'x at 281–82.

among the three statutes in Lewis, where we noted that 18 U.S.C. § 2251 "contains the same language" as 18 U.S.C. § 2252(a)'s jurisdictional element, which was, in turn, "like that of many other criminal statutes," including, among others, the wire fraud statute. Lewis, 554 F.3d at 213. There is no material difference between the statutes at issue in Lewis and Carroll and the wire fraud statute, which all require that the subject shipment, transportation, or transmission occur "in interstate or foreign commerce." Compare 18 U.S.C. 1343, with Lewis, 554 F.3d at 212 n.4 (quoting 18 U.S.C. § 2252(a)), and Carroll, 105 F.3d at 741 (quoting 18 U.S.C. § 2251(a)).

The defendant would have us read other, extratextual restrictions into our holding in Lewis, suggesting that it applies only where it is impossible to determine whether the charged communication crossed state lines; where expert testimony about the workings of the Internet is presented to the jury so that it can judge for itself the efficacy of Internet use as a proxy for interstate transit; or where the crime charged concerns child sexual abuse, which Congress has a heightened interest in eliminating. But Lewis did not limit its holding in any of these respects. See 554 F.3d at 215–16. Lewis did not mandate expert testimony about the workings of the Internet or the impossibility of proving that a particular transmission crossed state lines. See id. And while Carroll and Lewis concerned child sexual abuse,

we did not purport to criminalize conduct beyond the textual limits of those statutes to account for a belief that Congress possessed a unique interest in preventing such crimes.  Cf. United States v. Davis, 588 U.S. 445, 451 (2019) ("Only the . . . legislature [is] authorized to 'make an act a crime.'" (quoting United States v. Hudson, 11 U.S. 32, 34 (1812))).

Although the law-of-the-circuit doctrine compels us to reject the defendant's challenge here, see, e.g., United States v. Perez, 89 F.4th 247, 250 (1st Cir. 2023), we recognize the contrary position taken by the Ninth and Tenth Circuits.  The en banc process, however, is the means through which this Court reconsiders decisions by prior panels, absent limited circumstances that are not present here.  See id.

We therefore conclude, based on Lewis and Carroll, that proof that the defendant transmitted the iMessages over the Internet was sufficient to satisfy the interstate-commerce element for honest-services wire fraud.

## II.

Having rejected the defendant's challenges to the sufficiency of the evidence supporting his § 1346 convictions, we turn to his contention that the FBI examiner's testimony, on which the government rested its proof that the two iMessages traveled over the Internet and thus were transmitted in interstate commerce,

should have been excluded. We review for abuse of discretion. See United States v. Rathbun, 98 F.4th 40, 47 (1st Cir. 2024).

The FBI examiner testified that he knew from FBI training classes he attended and his general experience with mobile devices that the iMessages from the defendant (in Massachusetts) to Pollock (also in Massachusetts) were sent over the Internet. But he admitted on cross-examination that his knowledge on this point was based solely on what an FBI instructor had told him and, even when pressed, he could not provide any more detail about how iMessages are transmitted.

The parties dispute the correct characterization of the FBI examiner's testimony. The defendant asserts it amounted to impermissible expert testimony or, in the alternative, a lay opinion, while the government maintains that it was simple fact testimony. We need not resolve the matter because, however characterized, the testimony was inadmissible. The FBI examiner could not have properly given expert testimony because he was not disclosed or qualified as an expert. See Fed. R. Crim. P. 16(a)(1)(G); Fed. R. Evid. 702. And he lacked an adequate basis in personal knowledge to give lay testimony, whether fact or opinion, concerning how iMessages are transmitted.[12] See Fed. R. Evid. 602; 701(a).

_____

[12] The government asserts that the defendant has forfeited

The government resists this conclusion, arguing that the FBI examiner's training enabled him to offer lay testimony that iMessages are transmitted over the Internet. But testimony concerning information learned on the job, like any lay testimony, must be based on personal knowledge, see Fed. R. Evid. 602, or "deduced 'from a process of reasoning familiar in everyday life,'" United States v. Sepúlveda-Hernández, 752 F.3d 22, 34 (1st Cir. 2014) (quoting Fed. R. Evid. 701 advisory committee's note to 2000 amendment).

For this reason, we have permitted a witness to testify that her employer, a bank, was federally insured and involved in interstate commerce where "her job [had] brought her into contact with records, including certificates provided by the FDIC" and customer information, that indicated as much. United States v. Neal, 36 F.3d 1190, 1206 (1st Cir. 1994). And we have allowed police officers to testify that a defendant's behavior fit within "patterns of behavior" the officers had observed "across criminal

_____

a personal-knowledge objection to the admission of the FBI examiner's testimony. We disagree. The defendant objected to the FBI examiner's apparent lack of personal knowledge prior to his testimony. Subsequently, defense counsel devoted almost all of cross-examination to revealing that the FBI examiner had testified based solely on what someone else had told him and immediately thereafter moved to strike the testimony. That is sufficient to preserve the objection. See United States v. Pereira, 848 F.3d 17, 26–27 (1st Cir. 2017) (finding objection preserved where the defense "demonstrate[d] . . . that the ground for the objection was obvious from the context in which it was made" (quoting United States v. Boyd, 54 F.3d 868, 872 (D.C. Cir. 1995))).

operations." United States v. Vega, 813 F.3d 386, 394 (citing United States v. Santiago, 560 F.3d 62, 66 (1st Cir. 2009); United States v. Ayala-Pizarro, 407 F.3d 25, 28-29 (1st Cir. 2005)); see also United States v. Montijo-Maysonet, 974 F.3d 34, 48 (1st Cir. 2020). But we have excluded testimony concerning information that, while learned on the job, was not gleaned from the application of reasoning "processes that are 'well founded on personal knowledge and susceptible to cross-examination.'" Vega, 813 F.3d at 394 (quoting Ayala-Pizarro, 407 F.3d at 28); see, e.g., id. at 395 (prohibiting lay testimony regarding Medicare laws and regulations).

The FBI examiner's testimony fits within the latter category. The testimony had no grounding in the examiner's own perception or experience, and, as cross-examination showed, it could not meaningfully be probed or tested. See Vega, 813 F.3d at 394. Nor was it deduced from a process of reasoning familiar in everyday life. See Sepúlveda-Hernández, 752 F.3d at 34. The testimony therefore should have been excluded. And the erroneous admission of the testimony was not harmless. See Rathbun, 98 F.4th at 60. Rather, it plainly contributed to the verdict -- as the examiner's testimony was the only proof presented to satisfy § 1343's interstate-commerce element.

The parties disagree about the consequences of the error. The defendant contends that because the properly admitted

evidence was insufficient to convict him on counts one and two, we must enter a judgment of acquittal.  The government asserts that the remedy is to vacate the convictions on those counts and remand for a new trial.  We agree with the government.  The admission of the FBI examiner's testimony is the sort of "ordinary 'trial error' [concerning] the 'incorrect receipt . . . of evidence'" that is cured by vacatur.  <u>Lockhart</u> v. <u>Nelson</u>, 488 U.S. 33, 40 (1988) (quoting <u>Burks</u> v. <u>United States</u>, 437 U.S. 1, 15 (1978)).  That the remaining evidence would have been insufficient to convict the defendant is immaterial.  <u>See</u> <u>id.</u> at 40-41.  Sufficiency is determined by reference to "all the evidence offered by the government that was admitted by the court, 'even if the court erroneously admitted some of that evidence.'"[13]  <u>United States</u> v. <u>Santiago-González</u>, 825 F.3d 41, 46-47 (1st Cir. 2016) (quoting <u>United States</u> v. <u>Ramírez-Rivera</u>, 800 F.3d 1, 16 (1st Cir. 2015)); <u>see also</u> <u>United States</u> v. <u>Martínez-Hernández</u>, 118 F.4th 72, 80 (1st Cir. 2024) ("[H]earsay-based challenge[s] . . . [are] irrelevant to [a] sufficiency inquiry.").  And, as we have explained, here the admitted evidence was sufficient to convict

---

[13]    The defendant cites <u>United States</u> v. <u>Meises</u>, 645 F.3d 5 (1st Cir. 2011), but that case does not pertain to the circumstances present here.  In <u>Meises</u>, we addressed the effect of the erroneous admission of certain testimony on an evidentiary record that would have been sufficient to convict without it.  <u>See</u> <u>id.</u> at 13.  In doing so, we did not purport to disturb the rule that sufficiency is measured by reference to all the admitted evidence.  <u>See</u> <u>Lockhart</u>, 488 U.S. at 40.

the defendant on counts one and two.  We therefore vacate the convictions on counts one and two and remand for further proceedings.

## III.

The defendant next challenges his conviction for federal programs bribery, 18 U.S.C. § 666.  He alleges three errors in the jury instructions.  First, he contends that the district court failed to instruct that the bribe must have been offered in exchange for an "official act," as that term is used in the federal bribery statute, 18 U.S.C. § 201(a).  Second, he says that the court should have given an instruction on his proposed entrapment defense.  Third, he argues that the court failed to apprise the jury that a belief in a completed agreement for a quid pro quo exchange was necessary for conviction.  We reject these challenges.

## A.

The defendant contends that the district court should have instructed that § 666 requires proof that the defendant sought to bribe the Chief in exchange for an "official act."  The term "official act" is defined by the federal bribery statute, § 201, to mean

> any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit.

18 U.S.C. § 201(a)(3).  In <u>McDonnell</u> v. <u>United States</u>, the Supreme

Court elaborated on § 201's official-act definition:

> The "question, matter, cause, suit, proceeding
> or controversy" must involve a formal exercise
> of governmental power that is similar in
> nature to a lawsuit before a court, a
> determination before an agency, or a hearing
> before a committee.  It must also be something
> specific and focused that is "pending" or "may
> by law be brought" before a public official.
> To qualify as an "official act," the public
> official must make a decision or take an
> action on that "question, matter, cause, suit,
> proceeding or controversy," or agree to do so.
> That decision or action may include using his
> official position to exert pressure on another
> official to perform an "official act," or to
> advise another official, knowing or intending
> that such advice will form the basis for an
> "official act" by another official.

579 U.S. 550, 574 (2016) (quoting 18 U.S.C. § 201(a)(3)).

We quote § 201 and case law construing it because the

term "official act" does not appear in § 666.  Rather, § 666

criminalizes offering a bribe with the intent to influence a public

official "in connection with any business, transaction, or series

of transactions of [the official's] organization, government, or

agency involving anything of value of $5,000 or more."  18 U.S.C.

§ 666(a)(2).  The defendant nevertheless urges that § 666 should

be construed to include an official-act requirement.  In support,

he relies upon <u>McDonnell</u>, in which the parties agreed to define

honest-services fraud and Hobbs Act extortion -- two offenses

whose statutory text does not use the term "official act," <u>see id.</u>

§§ 1343, 1346, 1951 -- by reference to § 201's official-act definition, see 579 U.S. at 562-63, as well as post-McDonnell decisions applying an official-act requirement to prosecutions under those statutes.

The Supreme Court has not squarely addressed whether § 666 bribery requires an official act, but every court of appeals to have considered the issue has determined that it does not.[14] See, e.g., United States v. Lindberg, 39 F.4th 151, 165-69 (4th Cir. 2022); United States v. Roberson, 998 F.3d 1237, 1245-47 (11th Cir. 2021); United States v. Ng Lap Seng, 934 F.3d 110, 131-38 (2d Cir. 2019); United States v. Porter, 886 F.3d 562, 565-66 (6th Cir. 2018). We have not resolved the question, see United States v. Carrasco, 79 F.4th 153, 161 (1st Cir. 2023), and need not do so here. Even assuming that § 666 bribery requires proof of an official act, the lack of a jury instruction to that effect was harmless because the existence of an official act was not contested by the defendant and was supported by overwhelming evidence.[15] See Neder, 527 U.S. at 17.

---

[14] In a recent decision concerning whether § 666 prohibits the giving of gratuities to public officials, the Supreme Court used the term "official act" to refer to the action solicited by the defendant from a public official. See Snyder v. United States, 603 U.S. 1 (2024). Whether § 666 includes an official-act requirement was not, however, a question presented or expressly addressed in Snyder.

[15] We have previously assumed, without deciding, that, under Neder v. United States, 527 U.S. 1 (1999), "the omission of

At trial, the defendant did not dispute that he wanted the Chief to rank Theory Wellness favorably and then advocate to the Mayor on its behalf. Nor could he have, considering his numerous recorded conversations with Buckley in which he requested that the Chief take precisely those actions. Both plainly constitute official acts. The Chief's ranking of applicants to obtain a host community agreement is a quintessential exercise of official authority on a "focused and concrete" question or matter. McDonnell, 579 U.S. at 571. And advocating on behalf of one of those applicants to the municipal official empowered to issue the agreement (here, the Mayor) also "fits neatly within" § 201's official-act definition, as elaborated in McDonnell. See id. at

_____

an element is harmless only when the reviewing court draws two conclusions beyond a reasonable doubt: the element is uncontested, and the element is supported by overwhelming evidence." United States v. Pizarro, 772 F.3d 284, 298 (1st Cir. 2014). When the element has been mentioned, but misdescribed, we have applied a less rigorous standard. See United States v. McLellan, 959 F.3d 442, 446 (1st Cir. 2020) ("Where a potentially erroneous instruction deals with an essential element of the crime, it is harmless if it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (quotation marks and citations omitted)). Because the outcome of this appeal does not depend on the mode of harmless-error analysis employed, we need not decide whether the failure to give an official-act instruction (assuming one is required) would constitute a misdescription of § 666's quo element or an omission of a separate element. Similarly, (assuming the failure to give an official-act instruction constitutes an omission of a separate element) we need not decide whether Neder requires that the omitted element be uncontested, in addition to being supported by overwhelming evidence, for an omitted element to be harmless. We instead assume that the more defendant-favorable standard -- as described in Pizarro -- applies here.

574; id. at 572 ("[U]s[ing an] official position to provide advice to another official, knowing or intending that such advice will form the basis for an 'official act' by another official . . . can qualify as a decision or action for purposes of § 201(a)(3)."); see also Carrasco, 79 F.4th at 162 (concluding that advice given to mayors in connection with awarding of contracts could constitute an official act).

On appeal, the defendant does not dispute these conclusions. Rather, the defendant contends that the omission of an official-act instruction was not harmless because of other errors in the district court's § 666 instructions. He focuses particularly on the court's purported failure to correctly describe the statute's corrupt-intent element, asserting that the instructions impermissibly permitted his conviction if the jury found that he sought "an edge" from the Chief. The defendant's argument is both unavailing and misplaced. He did not raise it below, so it is forfeited. See Rosa-Rivera v. Dorado Health, Inc., 787 F.3d 614, 618 (1st Cir. 2015). And regardless, any defect in the district court's instruction on the corrupt-intent element has no bearing on whether the defendant offered money to Buckley in exchange for the Chief performing official acts in the desired manner, which plainly the defendant did.

We therefore conclude that the omission of an official-act instruction on the § 666 count, if error, was

harmless.  The evidence that the defendant requested that the Chief perform official acts was overwhelming and uncontested.

## B.

The defendant next argues that the district court should have instructed on entrapment.  "Entrapment is an affirmative defense."  United States v. Shinderman, 515 F.3d 5, 14 (1st Cir. 2008).  To obtain an entrapment instruction, the defendant must show, with "some hard evidence," that (1) the government induced the commission of the charged crime and (2) he was not otherwise predisposed to commit it.  United States v. Sandoval, 6 F.4th 63, 100 (1st Cir. 2021) (quoting United States v. González-Pérez, 778 F.3d 3, 11 (1st Cir. 2015)); see also United States v. Gendron, 18 F.3d 955, 960-63 (1st Cir. 1994) (describing these prongs in more detail).  We review de novo a preserved challenge to the refusal to instruct on entrapment, United States v. Salinas-Acevedo, 863 F.3d 13, 15 (1st Cir. 2017), taking the evidence in the light most favorable to the defendant and affording him the benefit of all reasonable inferences, United States v. Pérez-Rodríguez, 13 F.4th 1, 19 (1st Cir. 2021).[16]

---

[16]    The government asserts that the defendant is judicially estopped from seeking an entrapment instruction.  We need not reach the issue, however, because even if we were to disagree with the government's estoppel argument, the defendant still would not have been entitled to an entrapment instruction.

We begin by considering whether the government improperly induced the defendant to bribe the Chief. See Gendron, 18 F.3d at 961. "Merely providing an opportunity to commit a crime is not improper inducement, although proof of opportunity plus something else may be adequate to meet a defendant's burden to prove inducement." United States v. Saemisch, 18 F.4th 50, 61 (1st Cir. 2021) (quotation marks and brackets omitted) (quoting United States v. Gamache, 156 F.3d 1, 9 (1st Cir. 1998)). "[P]lus" factors may include "excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, noncriminal type of motive." Id. (quoting United States v. Hinkel, 837 F.3d 111, 117 (1st Cir. 2016)); see also United States v. Dávila-Nieves, 670 F.3d 1, 10 (1st Cir. 2012) (explaining that "[t]ypical plus factors" also include "intimidation, threats, or 'dogged insistence'" (quoting United States v. Vasco, 564 F.3d 12, 18 (1st Cir. 2009))).

The alleged plus factor here comprises several statements by Buckley, most fabricated and all made at the FBI's direction, that the defendant claims preyed upon his fear that Theory Wellness's application for a host community agreement would not be fairly considered. The pertinent statements include: (1) that the Chief disliked marijuana and hated serving on the Committee; (2) that the Chief had been lobbied by a former mayor of Medford on behalf of another applicant; (3) a mention of the

Massachusetts Attorney General's wage investigation of Theory Wellness; and (4) that the Chief had not ranked Theory Wellness among the top three candidates because he was bothered by the Attorney General's investigation, but would change his vote if the defendant were to pay Buckley.[17] The defendant argues that these statements placed him in an "impossible situation," requiring him to choose between bribing the Chief and jeopardizing Theory Wellness's chances of securing a host community agreement. He submits that putting him to that choice constituted improper inducement.

Inducement is often a question "of degree," and that is the case here. United States v. Acosta, 67 F.3d 334, 338 (1st Cir. 1995). We think that, even if Buckley's statements proceeded slightly beyond offering the "[m]ere[] . . . opportunity to commit a crime," Saemisch, 18 F.4th at 61 (quoting Gamache, 156 F.3d at

---

[17]    The government asserts that the defendant waived reliance on all but the fourth statement -- that the Chief would change his vote in exchange for payment -- by failing to raise the others below, either in pretrial briefing or at the charge conference. See United States v. Muñoz-Franco, 487 F.3d 25, 54 (1st Cir. 2007) (explaining that an affirmative defense is "not cognizable on appeal unless properly raised below" (quoting United States v. Spero, 331 F.3d 57, 60 n.2 (2d Cir. 2003))). The defendant disputes that contention, characterizing the fourth statement as a culmination of a process of entrapment that included the others. But the dispute is immaterial because Buckley's statements to the defendant do not establish improper inducement even when considered in full.

9), they did not approach the sort of overreach necessary to amount to improper government inducement.

Buckley's statements fit no recognizable pattern of improper inducement. The defendant was not "intimidat[ed or] threat[ened]" by Buckley. Dávila-Nieves, 670 F.3d at 10. Nor did Buckley's suggestions that Theory Wellness's prospects might be at risk, after the defendant had recommenced contact with Buckley apparently because of similar concerns, amount to "dogged insistence" that the defendant bribe the Chief. See id. (quoting Vasco, 564 F.3d at 18). Notably, the defendant knew, even before he spoke with Buckley, that Theory Wellness was not a shoo-in -- that is precisely why the defendant reached out to Buckley and offered him payment in the first place.

Buckley also did not prey upon the defendant's sympathies. See Shinderman, 515 F.3d at 15. While Buckley presented his fabricated financial problems to explain the Chief's purported willingness to participate in the scheme, by that time the defendant had already offered to pay Buckley. Cf. Gendron, 18 F.3d at 961-62 (collecting cases in which the government improperly appealed to sympathy). And Buckley did not appeal to any noncriminal motive. See Jacobson v. United States, 503 U.S. 540, 543-45 (1992). He did not suggest that the payment would be anything other than a bribe, urge the defendant that paying bribes in these circumstances should be legal, cf. id. at 545, downplay

the resulting harm, see Pérez-Rodríguez, 13 F.4th at 25, or bundle licit and illicit conduct into a single proposition, see id.

Rather, the most that can be said of Buckley's statements is that they cultivated the defendant's fears that Theory Wellness might lose out on a host community agreement. But the possibility that an important venture will fail is a typical motive for offering a bribe. Statements made to remind the defendant of that possibility -- which had preoccupied him from the start -- or to suggest that failure was looming do not, without more, amount to government overreach. Cf. Shinderman, 515 F.3d at 15 ("[I]n the classic entrapment context, false statements constitute improper inducement only when they have the purpose or effect of preying on the sympathy, weakness, or goodwill of a defendant."). And here, there was nothing more. Buckley's false statements did not pressure the defendant in any other respect and, as we have detailed, there was no other evidence of improper inducement. Buckley and the FBI presented the defendant nothing meaningfully more than the opportunity to commit a crime that typifies a government sting. That does not amount to improper inducement, and the district court thus properly denied an entrapment instruction.

We briefly address the defendant's predisposition to bribe the Chief, which provides another ground for denying an entrapment instruction. The predisposition inquiry requires us

"to abstract from -- to assume away -- the present circumstances insofar as they reveal government overreaching" and "ask how the defendant likely would have reacted to an ordinary opportunity to commit the crime." Gendron, 18 F.3d at 962 (emphases omitted) (citing Jacobson, 503 U.S. at 549 n.2). In doing so, we consider

> (1) the character or reputation of the defendant; (2) whether the initial suggestion of criminal activity was made by the Government; (3) whether the defendant was engaged in the criminal activity for profit; (4) whether the defendant showed reluctance to commit the offense, which was overcome by the governmental persuasion; and (5) the nature of the inducement or persuasion offered by the Government.

Gamache, 156 F.3d at 9-10.

Here, of course, there is nothing "to assume away," Gendron, 18 F.3d at 962, because we have already concluded that "there was no improper inducement," Saemisch, 18 F.4th at 61. That said, if we assume that the government improperly induced the defendant, we would limit our focus to the evidence concerning the defendant's predisposition prior to the alleged inducement.[18] See id. And the predisposition question would hinge principally upon when the suggestion of bribery made its first appearance, who made

---

[18]    The precise date that Buckley's statements allegedly amounted to improper inducement is not entirely clear. The defendant argued below that he was entrapped on September 29, 2021. At oral argument, defense counsel stated that Buckley's statements first amounted to a "plus" factor on September 14, 2021. But, in any event, the defendant was predisposed to offer a bribe months before September 2021, for the reasons we explain.

it, and how the defendant responded when he learned about the Chief's apparent willingness to participate in a bribery scheme.[19]

It is undisputed that the defendant began by offering to pay the Chief's brother, a person with no knowledge about the marijuana industry and no experience as a lobbyist, $25,000 to talk to the Chief about Theory Wellness. Taking the evidence in the defendant's favor, Pérez-Rodríguez, 13 F.4th at 19, the initial offer perhaps could be construed as a request for Buckley to engage in lobbying. Considerably more pertinent, however, is how the defendant reacted when, on April 26, Buckley told the defendant that he had mentioned the proposal to the Chief and that the Chief was not opposed.[20] The defendant did not express concern that Buckley had informed the Chief of the offer; did not balk at Buckley relating that he had told the Chief "there could be something good for us"; and did not remark on Buckley's failure to tell the Chief anything about Theory Wellness's merits (or even its identity), which, if Buckley were truly engaged in lobbying,

---

[19]  It is undisputed that, prior to the events at issue, the defendant was a law-abiding and productive member of the community; the first factor thus modestly favors him. With respect to the third factor, it is undisputed that the defendant engaged in the scheme for profit; this factor thus modestly favors the government.

[20]  The defendant argues that Buckley did not introduce a quid pro quo until September 29. While the bribery scheme did become more explicit then, Buckley's statement on April 26 was cast in terms of a quid pro quo exchange, if perhaps one effected through "knowing winks and nods" rather than explicit affirmation. Allinson, 27 F.4th at 925 (quoting Evans, 504 U.S. at 274).

presumably would have been his primary focus.  Rather, the defendant only sought to clarify that the Chief was not opposed to the offer.  All of this is consistent with a bribery scheme -- indeed, we see no other way to view it.

The defendant seizes upon certain statements that he made to Buckley -- including that he did not want to put the Chief in a "bad spot," and that he wanted favorable action on Theory Wellness's application only if the Chief thought the application merited such action -- to argue that a reasonable jury could have found that he was not predisposed to offer a bribe.  We disagree. The defendant's occasional and perhaps superficially benign statements on and before April 26 do not undermine his unhesitating agreement to bribe the Chief when he learned that Buckley had communicated the offer.  Taken in the light most favorable to the defendant, the statements depict, at most, someone probing for different ways that his goal might be achieved, some of them potentially legal and others not.  But to be predisposed to bribery, the defendant must be "ready and willing" to offer a bribe; he need not be dead-set on doing so.  United States v. Garcia, 37 F.4th 1294, 1301 (7th Cir. 2022) (quoting United States v. Mayfield, 771 F.3d 417, 436 (7th Cir. 2014) (en banc)).[21]

_____

[21]    See also United States v. Cabrera, 13 F.4th 140, 147 (2d Cir. 2021) ("'[T]he ultimate question basic to all claims of entrapment' is whether the defendant was 'ready and willing to

Because the defendant, as demonstrated by his own words and actions, was willing to bribe the Chief prior to any alleged government inducement, he was predisposed to commit the charged crime and therefore not entitled to an entrapment instruction.

## c.

The defendant argues that the jury instructions were inadequate for two additional reasons: first, for failing to require that the jury find that the defendant believed he had reached an agreement with the Chief, and second, for erroneously describing what action the defendant was required to solicit from the Chief, i.e., the "quo" in the proposed quid pro quo exchange. These claims are variations on arguments that we rejected earlier, see supra I.B.1., III.A., and we reject them here as well.

With respect to the first, the defendant argues that the district court should have instructed the jury that it had to find that the defendant believed the Chief had accepted the quid pro quo offer to convict him of § 666 bribery. We explained why there was no such requirement under § 1346, and much of that reasoning

---

commit the offense if given an opportunity to do so.'" (quoting United States v. Martinez-Carcano, 557 F.2d 966, 970 (2d Cir. 1977))); United States v. Stein, 985 F.3d 1254, 1266 (10th Cir. 2021) ("[P]redisposition is judged by examining whether defendants were 'ready and willing to commit the crime' for which they were charged . . . ." (quoting United States v. Ortiz, 804 F.2d 1161, 1165 (10th Cir. 1986))).

applies here.[22]  But the conclusion is even easier to reach under § 666 because of the statute's text.  Section 666(a)(2) prohibits, inter alia, the corrupt "giv[ing], offer[ing], or agree[ing] to give anything of value" with the "intent to influence or reward" a government agent in connection with certain actions.  18 U.S.C. § 666(a)(2).  It does not require a belief that there was a completed agreement; rather, as the Eighth Circuit has explained, the offeror, provided he acts with corrupt intent, "completes the crime" of federal programs bribery upon the offering of a bribe "even if the payee does nothing or immediately turns him in to law enforcement."[23]  Suhl, 885 F.3d at 1113.

The second claimed error essentially reprises the defendant's contention that, to convict him for § 666 bribery, the jury had to find that he sought an "official act" from the Chief, and the district court erred by instructing the jury that it was sufficient to find that the defendant sought an "edge."  We have

---

[22]    The defendant also argues that the language of the indictment charged that he believed he in fact had reached an agreement with the Chief.  To the extent he is contending that the indictment bound the government to prove such a belief, his argument is waived for lack of development.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

[23]    The defendant argues that the omission nevertheless deprived him of his primary defense to the § 666 charge: that he wanted the Chief to give Theory Wellness's application favorable treatment only if it were deserving.  But, as we have explained, whether he believed there was a completed agreement has no bearing on that defense, which goes to the nature of the proposed agreement, not a belief that the Chief accepted it.

already explained why that argument, even if correct, does not cast doubt on the defendant's conviction: overwhelming evidence, uncontested even on appeal, supports the conclusion that the defendant sought the Chief to perform official acts.

**IV.**

We end by addressing a few final matters. The defendant asserts that the district court erred by excluding the testimony of two witnesses, Robert Sarcia and Edward Mastrocola. Sarcia would have testified that, in July and August of 2021, a third man, William Carr, told him at least a dozen times (and at least twice in the presence of the defendant) that the Mayor had told Carr that Theory Wellness was a top candidate for a host community agreement. Mastrocola would have testified that Carr made similar statements to him and Sarcia. The defendant argues that because this testimony showed that he knew the Mayor favored Theory Wellness's application, it would have supported his defense that he did not intend to bribe the Chief.

Mastrocola's testimony was properly excluded. The defendant did not hear Carr's statements to Mastrocola, and consequently those statements "could not have informed [the defendant's] subjective beliefs." Simon, 12 F.4th at 55 (citing United States v. Zayyad, 741 F.3d 452, 461 (4th Cir. 2014); United States v. Dynalectric Co., 859 F.2d 1559, 1574 n.19 (11th Cir. 1988)). The defendant contends that Mastrocola's testimony was

relevant because it would have corroborated Sarcia's. Sarcia's testimony, however, was offered not for its truth, but rather for the defendant's state of mind and motive, subjects into which Mastrocola had no insight.[24] See United States v. Brewington, 944 F.3d 1248, 1257-58 (10th Cir. 2019).

Portions of Sarcia's testimony were, in contrast, potentially relevant to the defendant's state of mind and motive in his dealings with Buckley. Thus, if the district court excluded Sarcia's testimony as irrelevant, see Fed. R. Evid. 401, the exclusion might have been an abuse of discretion, see Rathbun, 98 F.4th at 51. The record does not, however, clearly show whether the district court excluded the testimony under Rule 401 or instead under Rule 403, which may have offered a potentially better basis for exclusion. See United States v. Guzmán-Montañez, 756 F.3d 1, 7 (1st Cir. 2014) ("We usually defer to the district court's balancing under Rule 403 of probative value against unfair prejudice." (quoting United States v. Smith, 292 F.3d 90, 99 (1st Cir. 2002))).

---

[24] At most, testimony that Carr made statements to Mastrocola similar to those he made to Sarcia might tend to show that Carr did, in fact, make those statements to Sarcia. But there was no indication that this was disputed; consequently, and under the circumstances of this case, any purported corroboration that Mastrocola might have offered would have been of such minimal significance that we cannot conclude that its exclusion was an abuse of discretion. See Rathbun, 98 F.4th at 51.

We need not resolve the ground on which the district court excluded Sarcia's testimony or whether its exclusion was erroneous because the error, if any, was harmless. See United States v. Abdelaziz, 68 F.4th 1, 70 (1st Cir. 2023) ("An error will be treated as harmless only if it is highly probable that the error did not contribute to the verdict." (quoting United States v. Kilmartin, 944 F.3d 315, 338 (1st Cir. 2019))). The probative value of the excluded testimony was low. It is unlikely that the jury -- which had heard the defendant's own comments about how government decision-making could change overnight -- would have believed that the defendant decided not to bribe the Chief because Carr had said, more than a month earlier, that the Mayor viewed Theory Wellness's application favorably. Those statements predated other negative developments -- including coverage of Theory Wellness's settlement with the Massachusetts Attorney General and Buckley's report that the Chief had been lobbied by another applicant -- that related directly to the defendant's beliefs about the influence of politics on the selection process. It was this concern about political influence that motivated the defendant from the start to want the Chief on his side.

Moreover, the government's evidence on count three was strong. See Kilmartin, 944 F.3d at 338-39 ("[T]he strength or weakness of the government's evidence of guilt is normally the most important integer in the harmlessness equation."). The

defendant agreed with Buckley that the Chief would rank Theory Wellness first in exchange for payment to Buckley and then provided Buckley a portion of the money to prove to the Chief that he would follow through with the agreement. The defendant contends that he knew that the Chief would never take a bribe and had paid Buckley "only to keep the peace," but that defense is implausible. Sarcia's testimony almost certainly would not have changed the jury's conclusion, and any error in its exclusion was thus harmless.

Finally, the defendant argues that the various alleged evidentiary errors, in aggregate, require reversal.[25] Cumulative error may require reversal "because individual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect and thus add up to prejudice." United States v. Baptiste, 8 F.4th 30, 39 (1st Cir. 2021) (quotation marks, brackets, and emphases omitted) (quoting

_____

[25] We have addressed the defendant's many allegations of error previously, save one, which we discuss briefly here. In connection with the § 1346 counts, the district court instructed the jury that "the fraud part of the scheme" concerned misstatements of material facts made by the defendant. The defendant and the government properly agree that this language, which addressed standard wire fraud, was inappropriate in an honest-services wire fraud instruction. See United States v. Sawyer, 85 F.3d 713, 732 (1st Cir. 1996) (explaining that a misrepresentation of fact is not required to establish a violation of § 1346). Because we have vacated the § 1346 convictions on other grounds, there is no reason to determine whether there was prejudice from this instructional error.

United States v. Sepulveda, 15 F.3d 1161, 1195-96 (1st Cir. 1993)).

Here, however, the defendant's claim of cumulative error fails

because the only alleged errors that could have affected his § 666

conviction concerned the official-act instruction and the

exclusion of Sarcia's testimony.  Whether considered individually

or together, the "total impact" of these claimed errors was

minimal.  United States v. Pérez-Greaux, 83 F.4th 1, 34 n.16 (1st

Cir. 2023) (quoting United States v. Padilla-Galarza, 990 F.3d 60,

85 (1st Cir. 2021)).

## V.

For the foregoing reasons, we **vacate** the defendant's

convictions for honest-services wire fraud, 18 U.S.C. §§ 1343,

1346 (counts one and two), **affirm** the defendant's conviction for

federal programs bribery, 18 U.S.C. § 666 (count three), and **remand**

for further proceedings consistent with this opinion.  On remand,

the district court should consider whether a modification of the

defendant's sentence on count three is warranted, see United States

v. Tkhilaishvili, 926 F.3d 1, 20-21 (1st Cir. 2019), a matter on

which we express no opinion.

**So ordered**.